FILED

DEC 1 - 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Eric Lighter
P.O. Box 2556
Honolulu, Hawaii 96804
Telefax (808) 533-8801

November 27, 2011

Honorable Edward J. Davila
U.S. District Court, NDCA, San Jose
280 South First Street, # 4050
San Jose, CA 95113

Re:   USA v. Lighter, CR 05-0215 EJD, amended CONFIDENTIAL Request to submit
      Request for Internal DOJ Investigation Re: Corruption, Retaliation and
      Entrapment, replacing letter request dated November 26, 2011

Your Honor,

          In response to the United States request to prevent me from filing tax returns or
administrative complaints to the IRS, on November 18, 2011 (see herein docket items 204-
205) your Honor consented to my attorney Jerry Fong being the conduit for any
communication I have with the United States.

          Therefore I CONFIDENTIALLY ask permission to request an internal affairs
investigation by the U.S. Department of Justice, "DOJ" (whether via Office of Inspector
General or Office of Professional Responsibility) and Internal Revenue Service ("IRS"),
regarding (1) corruption by or with one or more members of the Department of Justice and
the Internal Revenue Service related to the abovenamed case, and (2) entrapment based
upon deceptions. Thus the sole witness in the relevant Grand Juries appears to obviously
have mislead or otherwise deceived the Grand Juries and others (which of course that
would affect me as well); see 18 U.S.C. §§ 1621-23. The below is true to the best of my
knowledge.

          Regarding the first matter, please see the below cited "bullet" sampling of
impossibilities and/or reasons or support for impossibilities in my Indictment herein. After
accepting numerous Lighter signed returns in the 8-12-2010 Lighter production, especially
in herein docket items 204-5,

1.        the DOJ accepted my original 5-5-2011,5-23-2011, 5-24-2011 and 6-9-2011,
          administrative complaint, and original tax returns dated 10-17-2011 and 10-22-2011;
2.        but sought to bar my original administrative complaints dated 7-11-2011 and 9-2-
          2011,
          and bar my original tax returns with administrative complaints dated 7-5-2011, 8-5-
          2011, 8-30-2011, 9-2-2011, 9-6-2011, 9-21-2011, 9-27-2011 and 10-11-2011.
          Said signed under penalty of perjury tax returns were bared, inter alia, for the absurd
reason of being hearsay. Special agent Bonano knows from interviewing Dr. Wing C. Ng,
C.P.A. in Hawaii that I paid Dr. Ng to invest five hours to research if there is any bar to
interim returns, and there is not.

          Regarding the second matter, although former co-defendant Samuel Fung is no
authentic friend of mine, he does not deserve the fate of entrapment; and neither of us
deserve a tampered with Grand Jury. Mr. Fung pled guilty recently in the instant case due
to the seeming insurmountability of defense concerns regarding alleged extortion,
blackmail and tampering charges arising from two or more FBI monitored telephone calls

between Mr. Fung and Mr. Irwin Gootnick (an alleged victim herein). Mr. Fung threatened that unless Mr. Gootnick settled a civil case with me (Lighter, et al.), that I (Lighter) would turn Mr. Gootnick into the authorities, especially since the IRS was allegedly calling me to try and get support to arrest Mr. Gootnick.

However, (1) I (Lighter), (2) Mr. Gootnick, and (3) the DOJ/IRS all knew that I (Lighter) and my C.P.A. Dr. Wing C. Ng had materially completed a fraud audit of some five bankers boxes of original records I bought from Mr. Gootnick AND knew that I and Dr. Ng had already and redundantly turned the Gootnicks over to the IRS together with redundant and express notice to the Gootnicks (there were two contentious bankruptcies on or about that time with a plethora of open litigation related thereto). Also, the IRS was not calling me. It seems that Mr. Fung and Mr. Fung's counsel herein were "tricked" into attempting to (a bad faith) plea bargain based on alleged threats that were, unknown to Mr. Fung, quite impossible. Besides, I held a general release from Gootnick, did not want to settle and so informed Mr. Fung. I had nothing to do with said alleged threats, as seen in part below.

My barred administrative complaints include:

- how even though alleged victims, the Gootnicks, supposedly settled with IRS early in 2006, the IRS yet refuses to release or satisfy a "fake" $250,000 plus recorded tax lien against the Gootnick Family Trust using Lighter's address and the (according to IRS) authentic Federal ID no, while having settling using a fictitious (not recognized according to the IRS) Federal ID no. therefore

- the IRS refuses to accept as security a $3,050,000 mortgage against a Kauai Royal Patent with only a $200,000 first mortgage which is or can be pledged, a picture of the sandy beachfront view is shown below the signature line hereto; there are three houses and a beach cottage on the site which is close to the area of Poipu resort



- or to accept a Volcano, Hawaii first mortgage as security for a $125,000 tax lien against Lighter's relative whose $500,000 plus life savings was used to pledge as partial security for the herein alleged victims and/or in material part pay the generous settlement with the Gootnick which occurred even though Lighter held a

valid general release from the Gootnicks who in fact defrauded Lighter
- Meanwhile the IRS is protecting the alleged victims who have committed huge tax crimes
- and one alleged victim even forged my name on a fake mortgage and note, and a tax return I could not have had anything to do with
  - the prior Court gave him immunity but not his crime benefitting, false tax return signing wife
  - he thereafter changed his testimony, but changed it again after my handwriting expert inspected the forgeries

Thus, it seems that Lighter was indicted for the retaliatory reasons of agreeing with the government and paying/laboring to pay reasonable and honest taxes. The below is presented as summaries of factual matters which are true to the best of my knowledge.

BACKGROUND PREFACE

- 3-17-2001, the Lighter family entities joint venture for tax purposes [*10-22-2011 Lighter tax return Exhibit "1" and elsewhere*]

- 2-1-2003, Lighter receives Hawaiian Colony Hotel Corporation ("HCHC") stock for $1,000,000 debt to Lighter entities, which by then were controlled by Joan Prescott-Lighter and her mother; subject to Lighter receiving a penalty of $200 per day if any third party is not honest, etc. and Lighter does swiftly cure same [*10-22-2011 Lighter tax return Exhibit "2", and elsewhere*]
  - Lighter is tasked to cause financing and/or securities funding to consolidate and develop Waikiki hotel located three parcels from the main intersection in Waikiki, and with a very broad street frontage; below is a picture of a proposed development and map location in Waikiki

 

- <u>Dixon v. Commissioner</u>, 315 F.3d 1041 (CA9 2003) as amended; case Lighter helped case via whistlesleblowing on IRS (especially former Hawaii IRS District Counsel William Sims), this massive IRS corruption scandal is a key source of IRS retaliation against Lighter, see also,

- 5-31-1991 <u>Federal Register</u>, pp 24836-43, Lighter v. Sims
- various Lighter cases, including many personal visits including at least two trips to Washington, D.C., re: Lighter v. Sims
- <u>Hartman v. Commissioner</u>, T.C.Memo 08-124, tries to resolve <u>Dixon</u>
- it seems that Lighter was indicted for the retaliatory reasons of agreeing with the government and paying/laboring to pay reasonable and honest taxes.

- Debenture Offerings, as amended, filed 11-1-2004, 11-8-2004 and 11-16-2004 [*8-12-2010 Lighter facts CD production to AUSA, see Dr Ng/Wing Ng Audit CD/Debentures*]; which was the main purpose of attempting to transact with Fung, Brocks, Bourdiers and Gootnicks; the other purposes being to assist in alternative, institutional financing and/or other Hawaii real estate development paths for the subject hotel and royal patent lands

- 1-4-2005 Lighter, et al. to SEC confirms $500,000 cash available and pledged to Gootnick, plus other supporting documents [*10-22-2011 Lighter tax return Exhibits "3" and "4", and elsewhere*]

- 8-12-2005 Terminated Securities Offering Disclosure [*10-22-2011 Lighter tax return Exhibit "8" and elsewhere*] includes details of how it is impossible that Lighter participated in forged Bourdier/Heart Mind Corporation tax return

- 2-28-2006 Terminated Securities Offering Disclosure Update [*10-22-2011 Lighter tax return Exhibit "9" and elsewhere*][1] includes details of how it is impossible that

---

[1]     Said document and related tax return can be seen at docket items 204-5, <u>USA v. Lighter</u>, CR 05-0215 EJD, USDC NDCA, San Jose. Said document, with exhibits, and together with other documents presented to the S.E.C., were confirmed as contemporaneously received by Robert C. Measel, Jr. in his 11-18-2011 Friend of the Court communication to the Honorable Edward J. Davila, USDC NDCA, San Jose, copy attached hereto as Exhibit "A"  (and regarding the first page contents, the correct URL for LG Hawaii is http://lghawaiiproperties.com/Home.html whose principal includes two attorneys who are the buyers of the subject Waikiki hotel development interests and are currently in Nicaragua inspecting their 322,000 acre oil concession in Western Nicaragua).

One of these attorneys used to be associated with Marriott hotels in Hawaii promoting timeshare project(s), and reportedly the expert/professional he relies upon confirms the subject Waikiki hotel timeshare permit can be reinstated so that upon refurbishing even the existing three stories of 90 studios with full kitchens (4,500 week intervals salable) are salable at between $9,000 to $14,000 per week for a gross sales of $40.5 - $63 million with a pre-tax net of about half that gross, with said 4,500 week intervals being convertible to units in the allowed 35 plus stories highrise allowed; yielding an estimated additional $25 to $50 million net profit. Additionally, about two acres of adjacent, mostly small lots can be acquired for a "super block" (the other parcels can only be rationally utilized by the subject hotel) in view of the billion dollar Hilton Hawaiian Village resort across the street (and the Waikiki Trump Tower). Also, it seems said hotel is the portal into the general election approved Waikiki (and now being built) $5.5 billion Oahu mass transit project. Lighter filed various certified appraisal with Lighter, et al.'s returns.

HCHC's interest in the development rights are protected by a federal stipulation, five

4

Lighter participated in Fung's extortion attempt of Gootnick, specifically that Fung threatened Gootnick that Lighter would turn Gootnick over to the IRS if Gootnick did not settle a lawsuit with Lighter,

- however Lighter did not want to settle, told Fung that, and Lighter and Dr. Wing C. Ng, CPA, already turned Gootnick over to the authorities with express notice to Gootnick, plus Lighter described how Fung was crass and delusional just as the monitored phone calls transcripts reveal
- the point is that Lighter never told Fung that the Gootick audit was materially completed and that Lighter already turned Gootnick over to the authorities
  - that is, Fung "invented" (fabricated, delusional or otherwise) the threat that the IRS was calling Lighter regarding Gootnick, when in fact the IRS was not so doing
  - that is, Fung "invented" (fabricated, delusional or otherwise) the threat that Lighter was going to turn Gootnick over to the IRS if Gootnick did not settle or cooperate with Fung, when in fact such a threat was impossible since Lighter already turned Gootnick over to the IRS
- plus those transcripts show that Fung repeatedly responded to Gootnicks' inquiries (entrapment) as to Lighter's role in the phone calls by Fung stating

state final orders and two state judgments. There was an order foreclosing upon an air rights easement but the Hawaii Supreme Court ruled said order was merely interlocutory (advisory, moot). The plaintiff bank lost all standing (was paid off) without obtaining a final order, and the statute of limitations has run. What survived are the final orders, judgments and federal stipulation, plus HCHC's title is guaranteed by the Hawaii Land Court torrens registration system.

The government has this information but misspoke to the Grand Jury anyway. Even the alleged victims were given this information, i.e see the attachments to the 3-28-2003 Assignment signed by the Brocks, HCHC and Lighter. Bourdier admits that Lighter spoke at length about said Waikiki hotel project. Although Gootnicks were not secured directly with the hotel interests, same was detailed in the early November 2004 securities offerings the Gootnicks redundantly acknowledged fair notice of. Also, the Gootnicks' civil litigation discovery includes said Hawaii Supreme Court order and related key documents subject to Lighter, et al.'s hotel development rights, interests and/or claims, plus same is seen in other Gootnicks related litigation as well as in many public record documents. Additionally, the oil concession attorneys bought the contract which Royal Development Corporation (headed by the former nation director of operations for American Legion, whose interest is in utilizing the subject hotel to service members of the armed forced, since the subject hotel is via a park across the street from the military's Hale Koa resort) bought from Robert C. Measel, Jr. and David Horne, whom the IRS interviewed mid-2008, and thus the IRS further knew and knows first hand that HCHC's subject hotel development interests are very valuable.

The sole Grand Jury witness, an IRS agent, prejudicially and maliciously described the subject hotel as a dilapidated two story building. First it is 3 stories with 90 studios with full kitchens. It is blunderous to evaluate resort real estate merely by a "drive by". One must seek the facts, which are that according to a certified structural engineer the poured in place hollow tile building is fortress like stable; and the zoning is resort-commercial with a 350 foot height limit, although for this highrise corridor the local government has consented to a 600 foot height limit. 11 of the 90 units have completed upgrading.

that Lighter had nothing to do with said phone calls or (extortion) efforts (which is obvious since Lighter and Gootnick--and the government–all knew that Lighter already turned Gootnick over to the IRS)

- and this was ENTRAPEMENT[2]

---

[2]     From said 2-28-2006 Terminated Securities Offering Disclosure Update,

"After learning that Fung had deceived the government by omission (see Exhibit "2" of said 8-9-05 Decl.) Lighter dropped Fung's tax matters (saying, "You are on your own now"). Lighter left open the Hawaii real estate development opportunities, for the sake of the then hoped for Debenture Offering or other similar, competent and demanded to be (by Lighter) a honest fundraising effort. On or about July 2002, Lighter personally returned Fung's good faith deposit, whereupon Fung represented to Lighter that Fung was a "hard money" lender and wanted a "good" interest. Lighter [believes he] gave Fung $500 in interest) [Lighter does not specifically recall the amount of the loan, a now distant event, but same is believed to have been $1,500. Lighter relies upon verifiable written documents to recall history, especially since Lighter's speech impediment and other physical disabilities can cause or contribute to mis-communications.] No negative action by the tax authorities was ever made against Fung for the NTS repudiation related work I did perform; specifically steps "a" and "b" of the above detailed five step plan.

Fung always made it clear that he was only being compensated by his other clients relating to any referrals, but that upon actual funding of the hotel and/or other Hawaii real estate project, Lighter would then insist that Fung receive five per cent (5%) of the profits from his real estate referral. However, if Fung himself was the hotel developer, his cost would only be five per cent (5%) more than the pre-set aggregate costs, as noted in Lighter's May 16, 2005 letter to Fung (Exhibit "2" of said 8-9-05 Decl.).

Moreover, said May 16 and 17, 2002 letters to Fung describe Fung's explanation that he "lost" his records and therefore did not produce them for the IRS, nor told the IRS he "lost" them, nor attempted reconstructed his records. In a recent (May 1, 2005) letter to Lt. Col. (ret.) John Salter, it notes that Fung told Lighter that day that Fung was going to destroy all of his records anyway for himself and likely even those of his clients.

[Over the years, Lighter has spent most of his telephone time with Fung explaining the Christian foundational concepts, prayer and answering questions about application of Christian principals, and a minority of the call time being open and informative regarding relevant business matters focused only on development of the Hawaii real estate projects. However, Fung appears to be listening less and less over the years. At this point, it seems that Fung is now a crass (he never used to swear much), loose canon; a person of unpredictable behavior. Lighter spoke to Fung three weeks ago and he seemed uncontrolled and kept repeating himself over and over without making much sense. Worse, Fung was imaginatively inventing "facts" that simply were not true. For example, Fung kept saying, "The IRS is calling you because they want to put Gootnick in jail, right?" I had to keep telling Fung, approximately, "No, so far the IRS seems to be protecting Gootnick's huge tax violations, and the IRS never called me."

Lighter has seen that kind of behavior for years at the below described Institute for Human Services for the homeless, usually related to drug abuse or a medical condition or a mental condition (even if only periodic); or a combination.

Lighter also talked to Fung briefly weeks ago in order to try to pray with him or to get him to go see a Pastor for counseling or at least a medical doctor, but to no avail. Lighter expects the worst kind of behavior from Fung and has already recommended to Fung that he turn himself over to the authorities and plead guilty to whatever sins he has committed. Fung told Lighter he would do so, but Lighter suspects that was just a false commitment from Fung. Further, from reviewing the totality of facts and issues, Lighter now believes that Fung was likely from the beginning trying to "set up" Lighter, et al. to be blamed for the tax violations of Fung and his NTS clients, plus wrongfully 'take" the assets of Lighter, et al. Perhaps if Lighter spends time speaking to Fung that

- Lighter did not want to settle in order to obtain a court order releasing Lighter from the Gootnick tax liability, plus Lighter had a notarized and recorded general release from Gootnick so that Lighter did not have any reason to settle

- There are abundant documents detailing the properties pledged to the Gootnicks and others, i.e Exhibits "D" and "F" of the 10-22-2011 Lighter tax return. Further, the various Lighter family properties are highly documented, and often with appraisals, within and appurtenant to the many Lighter produced tax returns of Lighter, et al.

- Lighter has had and has no interest in any tax protester theories, and believes that his focus on protecting the IRS's honest and reasonable application of the law fits in with the "Jesus plan", which is to pay "Ceasar" what he is due; yet corruption must be opposed

- Therefore Lighter should not even be criticized for his continuous efforts to agree with the IRS and pay taxes, as well as Lighter's seeking to have his business associates agree with the IRS and pay taxes[3]

_Fung will reveal the truth of these matters, since spending time speaking to Fung already had Fung reveal that he destroyed the records he promised the IRS. Besides, maybe Lighter might convince Fung to get professional help for whatever his "condition" is. The point, though, is that Fung while was seemingly conniving and manipulative (including together with Gootnick), Fung may now be somewhat delusional._

_Since Lighter hasn't spoken to Fung in weeks, Fung couldn't know the Gootnick fraud audit is complete and that Gootnick is on express notice of such completion and the contents of the findings and related documents which were turned over to the IRS, see attached receipts from Gootnicks' attorney. It is none of Fung's business at any rate. This is mentioned since Fung suggested that he might call the Gootnicks as a good will gesture. Lighter specifically told Fung that Fung is not to represent or speak for Lighter, et al. in any way since they have counsel and there is ongoing litigation, and that Lighter had no desire or intention of settling with the Gootnicks. It is hoped that Fung will respect Lighter's stern request since Fung has already greatly damaged Lighter, et al., including materially causing the termination of the subject Debenture Offering. In balance, though, Lighter was taught to carefully not rush to abandon someone in trouble but who is still reaching out for help; as Lighter spent two years in offsite Christian seminary training with the University of the South at Sewanee and years as a director of the Institute for Human Services which is Hawaii's largest shelter for the homeless and for their meals. Lighter was recommended for both by the Bishop of the National Cathedral in Washington, D.C._]"

[3]   From said 2-28-2006 Terminated Securities Offering Disclosure Update,

"A.   Background

The focus of the terminated securities offering was to be mainly focused on two projects. HCHC has a hotel project in Waikiki, Hawaii, HCHC's subsidiary has Royal Patent lands projects in Maui and Kauai comprising over 13,000 acres. The Maui land titles are [believed to be] still in probate but the necessary inheritance rights have been acquired. The Kauai lands are free and clear with the undisputed portion improved with three houses and a sandy beachfront cottage. The hotel is now 3 stories with 90 units but it is zoned resort commercial for almost 40 stories. There is an unobstructed ocean view from about the roof of the third floor and up. The site is the expected mass transit portal into Waikiki. HCHC's interest in the development rights are protected by a

federal stipulation, five state final orders and two state judgments. There was an order foreclosing upon an air rights easement but the Hawaii Supreme Court ruled said order was merely interlocutory (advisory, moot) and what survived are the final orders, judgments and federal stipulation, plus HCHC's title is guaranteed by the Hawaii Land Court torrens registration system.

Prior to said Debenture Offering, but pursuant to the clear intent to file said Debenture Offering, HCHC solicited participation in one or the other of the two projects (or intended project) of HCHC or its actual or intended subsidiaries. In furtherance of this solicited participation, Samuel Fung ("Fung") introduced certain of his real estate and his tax preparation business clients to HCHC or its subsidiary. Fung was awarded the highest real estate designation, that of Certified Commercial and Investment Member, or CCIM. Fung is not and never has been a "partner", "client", shareholder, officer or director of HCHC or its subsidiaries. For a one week period Fung was offered an officership, but Fung rejected that offer. HCHC, HCHC's subsidiaries and associates, including Lighter personally, are all merely clients of Fung.

The problems that caused the Debenture Offering the be terminated was that Fung and certain of his clients are members on the National Trust Services ("NTS"), a tax evasion program which HCHC, its subsidiaries and Lighter all agree is in violation of the tax codes.

However, there was a plan to cure that.

2.      The Main Cure To Tax Troubles

a.      First, get the NTS member to admit to the IRS in writing what the member believes is actually owed (if and when it is perceived that said NTS member did or is deceiving either the tax authorities or HCHC, et al., then terminate the process) **[This imposes equitable tax liens without contest, to better "clean up" the party seeking Lighter, et al. assets. For rational reasons, Lighter has continuously sought and acted to defend the reasonable, fair and honest interests of the IRS and the USA.]**

b.      Secondly, get the NTS member to agree with the IRS in writing with the IRS position regarding NTS (or else terminate the process).

c.      Thirdly, get the tax authorities to specify how much in taxes they believe is owed (or else terminate the process).

d.      Fourthly, after receiving confirmation from the tax authorities as to what they believe is owed, promptly pay the full amount the tax authorities demand (or else terminate the process).

e.      Fifthly, guarantee and/or enforce that the proper taxes get promptly paid once the tax authorities make a dollar certain demand. That simple cure is to make prompt payment of all proper taxes due, according to reasonable reading of the tax codes and relevant facts, especially pursuant to the standards of the American Institute of Certified Public Accountants (AICPA), Generally Accepted Accounting Principals (GAAP), and the Generally Accepted Government Accounting Standards (GAGAS).

3.      The Plan

The fifth step may be difficult since NTS members are reputed to be tax evaders at heart. Therefore as a preface, by HCHC or related party buying all or a portion of the business trust or other entity (not personal entities such as Grantor type trusts), HCHC has standing to insist on a sum certain due from the tax authorities and prompt payment from the tax debtor. Since the specific plan was to solicit the filed but never solicited Debenture Offering, the acquisition of such assets by the Offeror VDI, et al. would be and was correct and proper. Further, full disclosure of all acquisitions was made together with all relevant comments; which comments were generally detailed.

It is within Lighter's Christian outreach values to labor to support people to honor the honest tax administrators and follow the Jesus tax plan, which is to pay the government that which is the government's; and not be judgmental regarding judging a speck in your neighbor's eye while ignoring the beam in your own eye. The rule then is to insist on full disclosure and prompt payment of reasonably demanded taxes. If that can be deemed "tax advice", then that is the only "tax advice"

- The government also wrongly attempts to hold against me an expunged no contest second degree theft plea that was erased including due to the fact of impossibility concerning a car title sold to my late father where even after my father gave the seller full payment that seller never delivered the physical vehicle, the title is still in my father's probate estate, I never held or controlled that vehicle or title to same, and two courts ordered that the above facts are true

FUNG

- 4-15-2002 Lighter declaration in <u>Fung v. Brown</u>, where Lighter attempts to assist Fung in complying with IRS Code and agreeing with IRS, case dismissed same day declaration filed

- 5-1-2002, Lighter has Fung agree in writing with the IRS plus agree in writing with the IRS regarding National Trust Service ("NTS")

- 5-15-2002 and 5-16-2002, Lighter objects to Fung not informing Lighter or the IRS that Fung "lost" all of his tax and tax preparation business records; Lighter tells Fung in writing that Fung is "on his own" regarding his taxes, but is still welcome to fund or arrange funding for the Waikiki hotel development [*10-22-2011 Lighter tax return, Exhibit "2" of Exhibit "3", and elsewhere*]

- 4-6-2004 Lighter prepares court filed declaration regarding how in mid June 2002 Fung took Lighter to interview NTS founder Roy Fritts , wherein said declaration Lighter concludes that Fritts and NTS are corrupt [*10-22-2011 Lighter tax return Exhibit "11" and elsewhere*]; however Lighter objects to the DOJ/IRS obtaining a court order in <u>USA v. Roderick Prescott</u> that NTS AND its members are essentially guilty of illegal acts but without serving any notice to said NTS members thus found guilty

- 5-18-2005 Gootnick original civil suit, and 5-16-2006 amended Complaint, both fail to mention or complain about Lighter receiving $10,000 from Gootnick in any manner; and the original Complaint was verified by Susan Gootnick

- 11-18-2005 Fung Affidavit filed in Gootnick civil case, never withdrawn, states $10,000 cash from Gootnick about mid April 2004 was for Fung not Lighter (Fung was Gootnicks' trustee for years), and Fung introduced Gootnick to Lighter for real

---

Lighter ever gave. Yet, some of the history may still linger, so potentially lingering matters are noted below. Lighter, et al.'s telephone records and well organized accounting and other records support the following. Lighter, et al.'s records were made to be well organized as a result of years of unwanted litigation. These records prove that, among other things, it is impossible that Lighter came to California anytime in 2004 prior to the December 17, 2004 first meeting between Lighter and the herebelow noted Gootnick; and despite Gootnick falsely so claiming in his civil complaint captioned on the enclosed CD's 8-7 (& 9)-05 Decl."

estate investment and not taxes [*10-22-2011 Lighter tax return Exhibit "16" and elsewhere*]

- 1-15-2007 letter from Lighter to Fung complaining about Fung lying about Lighter in his deposition conducted by Gootnicks [*10-22-2011 Lighter tax return Exhibit "24" and elsewhere*], for example, that Fung gave Gootnick a receipt for $10,000 cash in a bag Fung did not open and inspect the contents therein

- Fung had none of his trusts collapsed, since and therefore,
  - the IRS does not dispute or allege that Fung's' tax returns (corporate or personal) reflect or contain NTS type false information

- The IRS assessed Fung a large tax bill almost exclusively for the reason that Fung's not cooperating with Fung, et al.'s audit, and therefore the IRS included all deposits and transfers as income but denied any deductions
  - And this is the core issues of Fung's long standing U.S. Tax Court case
  - Despite his promises otherwise, for about ten years Fung never produced requested records for the IRS, and it seems that it would not be helpful to Fung to do so now
  - One theory is that apparently Fung destroyed all records in an effort to "twisting" of the meaning of documents and thereby avoid being falsely accused of possessing the missing $100 million of NTS founder Fritts, et al.

- Despite the government's prior interest in the subject, Lighter has no comment regarding any allegation that Fung has the alleged missing $100 million dollars of NTS founder Roy Fritts, except that Fung may indeed know the whereabouts of same in whole or in part (over $75 million of these or related funds have been recovered, i.e. Cash-4-Title bankruptcy)

- Lighter's position towards Fung was that he should fille due returns, correct wrong returns, produce all available IRS requested records, and pay whatever he could afford to pay towards known tax liabilities
  - Fund apparently did follow most of these requests, ,but was wrong for not producing all records requested, and wrong for any errors or bad practices he did not promptly correct
  - Lighter never saw any Fung source documents
  - Lighter did not personally sign any Fung, et al. returns other than the abovesaid 5-1-2002 Omnibus Fung statement/agreement with the IRS regarding NTS matters, etc.

- Fung always told Lighter that Fung had been instructed by NTS that the NTS system of taking personal expenses was legal, until the issuance of the 6-24-2002 and 6-25-2002 David Prince, Esq. legal opinion letter
  - and after the issuance of the Prince legal opinion letter, which essentially said that NTS's system was illegal, Fung gave the letter or its contents to all of his clients so that after the Prince letter neither Fung nor his clients had any excuse for following the NTS system

- However, the alleged victims herein utilized innovate non-NTS methods of tax evasion
- Fung told Lighter and the IRS (in the Omnibus advisory return) that all of his clients should sell their trusts but in any case there should be no "trouble" if taxes due were agreed to be paid and a good faith effort was made to determine and pay the true taxes owed (paid by either Fung's clients of the buyers of the NTS type trusts)
- Fung told Lighter that Fung was indicted for agreeing with the government simply because all the taxes due from him and his clients was not paid, and that Fung was facing "debtor's prison"

BROCK (late Morris Brock and Mrs. Brock, aka Catherine Haney)

- Transaction did not close due to multiple unmet condition precedents

- Brock gave no money to Lighter that was not returned (receipt for same acknowledged by Brock), but Lighter put up half of hotel interests (and gave same to Brock), and Brock was to control both Brock and hotel assets based upon his convincing promise to consolidate and develop the hotel
    - That was the weakness of the attempted transaction and the source of Brocks victimizing Lighter, et al. and Fung

- IRS debt was to be paid about or at closing, and Lighter, et al. guaranteed payment to IRS until IRS was paid what Brock represented was about $50,000 due

- Lighter published relevant documents and promised payment to IRS, via contemporaneous HCHC tax returns

- Lighter disclosed legal status of hotel in and attached to Assignment, plus Clarification and HCHC tax returns [see 4-10-2007 Lighter Declaration Exhibits "1"- "100", Exhibits "93" (4-7-2003) and "96" (4-14-2003) and "97" (5-12-2003)]

- Brock was always to control multiple party checkbook of HCHC, and he alone the checkbook for the oncoming West Coast corporation

- Attorneys were to prepare documents for closing, expected time was about three months, see Brock diary

- Brock was to have 100% liens on his assets, Lighter was to have no new liens on hotel assets, thus Lighter equity at risk (from Brock and Brock creditor(s), i.e. IRS) but Brock equity not at risk

- Hotel assets were able to accept tax liens

- Brock assets already had paramount (senior) equitable liens pursuant to acknowledgment of tax debt in transaction document(s) and HCHC tax returns, since the "sale" of Brock assets to HCHC was not a true arms length, holder in due

11

course transaction but rather it was done to facilitate financing for the hotel

- Proof that Lighter insisted on honesty from Brocks, plus insisted on protecting the IRS's interest is seen in Lighter joining Fung turning Brocks over to IRS based on belief or suspicion of tax fraud by Brocks

- Brocks lied to Lighter about their true tax liabilities, which liabilities greatly exceeded their representation of only about $50,000

- Brock was to be in full control of yet to be created West Coast corp (Oregon corp), as well as the HCHC checkbook. HCHC was to own Brock assets subject to 100% liens in favor of Brocks, but Brock and West Coast Corp were the hotel developers with full control over the hotel except for building design (see Bill of Sale and Clarification); HCHC and Lighter owed $2,285,000 to Brock and West Coast corp.

- 11-2-2004 letter to Fung confirming 11-1-2004 letter to Fung, states [see Exhibit "B" of 9-21-2011 Lighter tax return, ie. Exhibit "B" of 8-12-2005 Terminated Securities Offering Disclosures, and elsewhere]
  "Fraud by Brocks includes refusal to cancel
  1. $2,285,000 promissory note from HCHC
  2. disclosed and undisclosed taxes guaranteed by Lighter and Fung
  3. other obligations and liabilities guaranteed by Lighter and Fung
     including payment of $2,285,000 note until paid off"

- Brocks were collateralized by Lighter, et al. with assets Lighter, et al. put at risk and/or pledged:
-       $ 500,000 cash available from Lighter's mother-in-law
-       $2,000,000 in hotel interests
-       $ 500,000 Honolulu 6/4 house, Spencer St.
-       $1,500,000 5 Volcano Hawaii properties

BOURDIER (Jean Paul and Minh-ha Trinh, aka Mrs. Bourdier)

- Bourdier gave no money to Lighter that was not returned (receipt for same acknowledged by Bourdier)

- Bourdier says he could not have typed the receipt since he then did not know how to type; which is truly unbelievable since
  - he was then for years a University of Berkeley professor, and
  - he said he had access to and used email, including the Berkeley University email service used by all university professors there
  - he had already published at least three comprehensive architectural books, see http://www.jeanpaulbourdier.com

- Lighter signed no completed or filed tax return, nor did Lighter authorize his signature on same, but Lighter's signature was instead forged thereon as can be attested to by Lighter's handwriting expert

- Lighter signed no Bourdier mortgage and note, nor did Lighter authorize his signature on same, but Lighter's signature was instead forged thereon as can be attested to by Lighter's handwriting expert (the forger even misspelled Lighter's name in the forged handwriting, twice omitting the "g" which is the most prominent feature of Lighter's signature)

- Said fake mortgage and note forge Lighter's signature on documents claiming to be signed for Heart and not Heart Mind, plus claiming to be signed years before Lighter ever knew about the Bourdiers

- Bourdier claims that the fake mortgage and note were created long after Heart Mind was incorporated, yet the fake mortgage and note state that the creditor therefore was Heart and not Heart Mind

- Lighter gave Bourdiers' and Fung his notes on two page draft of Heart tax return which was never filed, see attachment to SEC [*8-15-2005 Terminated Securities Offering Disclosure, per 10-22-2011 Lighter tax return Exhibit "8" and elsewhere*] and Bourdier diary

- Said two page draft of the never filed Heart Corporation tax return had Lighter's handwritten notes on same, seeking source documents for the statements thereon, plus requested a C.P.A. to audit those source documents; and those pages with notes were given to at least both Bourdiers before Lighter left the Bourdiers

- Said draft Heart tax return was used as the model to forge Lighter's name on the Heart Mind tax return; and Lighter's fingerprints are not on said forged tax return
  - and even included the Lighter initials symbol Lighter wrote on the draft Heart Corporation tax return even though only the Heart tax return had a corrected error that required such initials and the Heart Mind forged tax return had no such error, i.e. the forger merely (poorly and blunderously) copied Lighter real signature and initials but without there being any need or reason to also try and copy Lighter's initials symbol therewith

- All three pages of the attachments to the forged Heart Mind Corporation return are for Heart Corporation and not Heart Mind Corporation, thus the information on the attachments were prepared before Heart Mind was incorporated

- One attachment was an inventory of Bourdier's trust assets, which Bourdier admits Lighter did perform for the sole sake of a mutual exchange of stock

- The Heart Mind Corporation forged tax return three attachments include stock distribution between Bourdier (90%) and HCHC (10%), so the stock distribution musts have been agreed to as stated on the Mutual Exchange of Stock, which was before Heart Mind Corporation was incorporated

- The Mutual Exchange of Stock contract is for Heart and not Heart Mind, and

Bourdier says he signed it; so did Mrs. Bourdier

- The By-Laws for Heart Mind Corporation state in their title line "Heart Mind Corporation" but in the body state "Heart Corporation"

- Bourdier says Lighter "took care of" the articles of incorporation for Heart Mind Corporation, but Lighter was in Hawaii and those articles are signed by both Bourdiers; yet the articles were approved 10-23-2003 so the original articles must have been mailed or hand delivered to the Oregon receiving clerk's office earlier, and Lighter only got back to Hawaii late on 10-20-2003

- Additionally, the address of the registered agent was changed (crossed out and corrected) so that took more time; moreover, the Bourdiers had to learn that the name Heart was already registered, and they could not have so learned while Lighter was with them or their would be paperwork that Lighter signed for Heart Mind.

- The only document related to Heart Mind Corporation that Lighter signed is the 11-1-2004 Debenture Offering (not amended for the 11-16-2004 amended Debenture Offering since Lighter had not yet received confirmation from Bourdier regarding the relevant disclosures from Fung) where Lighter then still believed Heart Corporation was a dba of Heart Mind Corporation, pursuant to, *inter alia*, IRS notices to Bourdier that Heart was a dba of Heart Mind, Bourdier "replacement" stock, and a handwritten note to Lighter that Heart Corporation was "inactive"

- Although on or about 11-1-2004 Fung informed Lighter regarding the Heart Mind status, Lighter had no confirmation until the 12-22-2004 certified letter from Bourdier

- Heart Corporation has a different Federal I.D. number that Heart Mind Corporation, which Lighter never noticed (in the IRS notices Bourdier sent Lighter) until late November 2004

- Bourdier's interviews never address Heart Corporation, and neither do the government's production (except for the forged, fake mortgage and note)

- Lighter's travel receipts [*9-6-2011 Lighter tax return, and elsewhere*] show that Lighter returned to Hawaii 10-20-2003, and in contrast the second "Heart" corporation was incorporated 10-23-2003, and its tax return had Lighter's name forged next to the printed date of 10-29-2003, and that tax return filed on or about 11-3-2003 (all dates after Lighter left California)

- Bourdier trusts were never required to be collapsed, and IRS audit revealed no taxes due from the trusts

- Although the trusts were not collapsed and owed no taxes, the Bourdiers individually owed taxes and individually took the fake mortgage interest deduction for years; and Lighter had no involvement in Bourdier's personal tax situation except the fake

14

mortgage and note having Lighter's name forged by Bourdier

- However the Bourdiers lied to Lighter about their true tax liabilities, which liabilities greatly exceeded their representation of zero

- A second Heart corporation was formed and tax return filed without notice to Lighter, with two separate Federal ID nos.; the first Heart corp. received its Fed ID no. 10-28-2003 (per mail from Bourdier mid February 2004)

- Heart or Heart Mind corp(s) $10,000 income affirmed on Heart Mind amended tax return, without notice to Lighter

- Heart or Heart Mind corp(s) $300,000, offshore, "Cash-4-Title" type investment loss was removed from Heart Mind amended tax return, but for reason of mis-characterization and not fraud, and without notice to Lighter

- Which loss according to Bourdier was the reason to exchange his stock for HCHC stock, i.e. to attempt to recoup his losses via a no cash investment into an oncoming securities offering (which offering was filed with the SEC about one year later)

- Heart or Heart Mind corp(s) assets stripped from corp(s) with Heart Mind, but without notice to Lighter amended tax return; and despite Lighter timely informing the Bourdiers that HCHC acquired a free and clear Oregon ranch on 12-22-2003 that was worth approximately $350,000

- Heart stock given to Lighter was backdated by both Bourdiers, and mailed to Lighter in Hawaii; later on February 14, 2003 "replacement stock" given mailed to Lighter but dated 10-23-2003 (still, that was after Lighter was back in Hawaii)

- Said Heart stock certificate was dated 6-7-2003, long before Lighter ever met the Bourdiers, and both Bourdiers endorsed over that Heart stock certificate to Lighter on 10-19-2003

- Bourdier does not specifically mention Heart in his interviews, but Bourdier does acknowledge signing the stock certificates; thus acknowledging both the backdated Heart stock both Bourdiers signed, as well as the "replacement" Heart Mind stock

- Also sent to Lighter in February 2003 was a copy of Bourdier's handwritten notice to IRS that Heart corp. was an "inactive" corporation

- Later Lighter received from Bourdier a 6-26-2004 notice from IRS to both Heart and Heart Mind corp as dba names of the same corporation

- Lighter was mislead by Bourdier (with the aid of IRS alleged misunderstanding therefore) into believing there was only one Heart corporations with a single Federal ID, when in fact there were two entities each with its own Federal ID no.

- On 11-1-2004 Lighter objected to Fung and Bourdiers' failure to provide Heart support documents [10-22-2011 Lighter tax return Exhibit "2" of Exhibit "C" and elsewhere], and despite that Lighter disclosed Bourdiers' interest in HCHC on the original 11-1-2004 Debenture Offering

- Thereafter Fung told Lighter that there was a second Heart corporation and that Fung had forged Lighter's signature on its filed tax return, but that the second Heart corporation was being dissolved and the first Heart corporation was never incorporated

- On 11-8-2004 Lighter wrote to SEC and IRS and repudiated all Heart tax returns (as well as repudiated Gootnick Charitable Trust, Inc. tax returns pursuant to discovery of secret $1,300,000 Gootnick first mortgage) [see 4-15-2005 Declaration of Dean Robin at 10-22-2011 Lighter tax return  Exhibit "25" at Exhibit "B", and elsewhere]

- On 12-22-2004 Lighter receives certified mail from Bourdier noticing Lighter of Heart Mind corp.'s dissolution and returned the HCHC stock Lighter had mailed to Bourdier; thus making the issues moot

- Said 12-22-2004 letter from Bourdier ratifies the 10-19-2003 stock exchange agreement as valid and transacted for valuable consideration, and states in relevant part,
  "Pursuant to the dissolution [of Heart Mind Corporation], the value of the Hawaiian Colony Hotel Corporation's ten per cent (10%) of the remaining assets on dissolution has been determined to be equal to the value of the one hundred (100) shares of stock which Heart Mind Corporation held in Hawaiian Colony Hotel Corporation. Pursuant to that determination, those shares are being returned as Hawaiian Colony Hotel Corporation's pro rata share of assets remaining after dissolution. The stock certificate for those shares is enclosed."
  - HCHC had and has large, authentic value
  - save for Bourdier stripping Heart/Heart Mind of assets (without notice to Lighter), Bourdier acknowledges it/they too would have authentic value
  - to say it in reverse, Bourdier acknowledges that HCHC had/has authentic value and that the mutual exchange of stock was legitimate

- John Paul gave one story, received immunity herein, and then changed his story again after Lighter's handwriting expert reviewed the Bourdier forgeries; for example,
  - Bourdier originally told IRS that he never received any HCHC stock from Lighter even though he returned same via certified mail
  - Bourdier originally stated that Lighter never saw or reviewed ANY Bourdier documents, and later changed his story that Lighter looked at some documents on the third (last) day of his visit (10-19-2003)

- At least Bourdier, in his most recent interview, finally admits that regarding the forged Heart Mind Corporation tax return, that Bourdier himself "provided the return information" (paragraph no. 19), although Fung was the return preparer and not Lighter

- Mrs. Bourdier does not have immunity, yet she benefitted from years of fake mortgage interest deductions and she signed returns as well

- Bourdiers were collateralized by Lighter, et al. with assets Lighter, et al. put at risk and/or pledged:
- $  500,000 cash available from Lighter's mother-in-law
- $2,000,000 in hotel interests
- $  500,000 Honolulu 6/4 house, Spencer St.
- $1,500,000 5 Volcano Hawaii properties
- $  350,000 Oregon ranch after 12-22-2003
- $  500,000 Kauai development agreement after 8-27-2004

GOOTNICKS (Irwin and Susan)

- 3-30-2004 letter from Lighter to Gootnick regarding Gootnick not investing in the Waikiki hotel but rather Royal Patent lands [*10-22-2011 Lighter tax return Exhibit "5" and elsewhere*]; the letter confirms that Gootnick told Lighter his firm Gootnick Charitable Trust, Inc. ("GCTI") had a consolidated net worth of about $250,000

- 4-3-2004 Mutual Exchange of Stock between Lighter and Gootnick [*10-22-2011 Lighter tax return Exhibit "6" and elsewhere*] drafted before 3-30-2004 letter, with draft sent by email, completed by Gootnick and then mailed to Lighter
  - Gootnick did not disclose to Lighter that Gootnick's firm was not incorporated
  - but Sam Fung's 11-18-2005 Affidavit (Fung was GCTI trusts trustee for years)and Gootnick produced trust and corporate minutes confirm that said entity GCTI was always intended to be incorporated

- 9-27-2004 letter from Lighter to Gootnick updating 3-30-2004 letter from Lighter to Gootnick, and confirming pledge to Gootnick of all equity in Oregon ranch [*10-22-2011 Lighter tax return Exhibit "7" and elsewhere*]

- 4-7-2004 Lighter has Gootnicks agree in writing with the IRS plus agrees in writing with the IRS regarding NTS [*10-22-2011 Lighter tax return Exhibit "10" and elsewhere*]; attached to which is the 4-6-2004 court filed Lighter declaration regarding how in mid June 2002 Fung took Lighter to interview NTS founder Roy Fritts , wherein said declaration Lighter concludes that Fritts and NTS are corrupt [*10-22-2011 Lighter tax return Exhibit "11" and elsewhere*]

- 4-23-2004 (recorded 6-15-2004) secret $1,300,000 first mortgage placed by Gootnick on small San Francisco office building ("California St. property") [*10-22-2011 Lighter tax return Exhibit "17" and elsewhere*]
  - were the "lender/mortgagee" is J & J Trust, Inc., a non-existent corporation
  - due to such non-existence the mortgage ownership reverts to the Gootnicks individually
  - thus the Gootnicks must consent in writing before said secret mortgage can be released
  - neither the Gootnicks' 5-18-2005 original verified complaint nor Plaintiffs' 5-

16-2006 amended complaint allege, complain of nor request the release of the secret $1,300,000 first mortgage secured by the California St.

- both the original complaint and amended complaint by Gootnicks attached a title report with verified said secret $1,300,000 mortgage attached, thus the Gootnicks certified that their $1,300,000 mortgage was their own doing without objection of any kind by them
- thus the Gootnicks intentionally defrauded Lighter, et al.

- Exhibit "C" to Exhibit "8" of the 10-22-2011 Lighter tax return (and elsewhere) is the 10-10-2004 General Agreement which includes Lighter, et al.'s reaction to discovery that despite the Gootnicks agreeing under oath that California St. property; which was to be transferred free and clear, but instead the Gootnicks secretly placed a $1,300,000 mortgage on the property.
  - Even so, Lighter had then not yet discovered that the beneficiary/mortgagee of that secret mortgage was J and J Trust, Inc., which was then and still not a corporation at all despite Gootnick signing as its President.
  - Said General Agreement was a plan to prevent further "gamesmanship" by the Gootnicks which in large part is the reason the instant Debenture Offering was terminated. However, page 21 of the amended Debenture Offering reflects that al the equity (no more than $1,500,000 on that building is taken by a single note secured by mortgages, which note is held by Gootnick in favor of Gootnick in the name of his fictitious corporation.
  - The 11-1-2004 Debenture Offering shows that building as free and clear, which at that time Lighter believed he could release said Gootnick first mortgage without Gootnicks' consent, but later realized that was incorrect. Lighter was not interested in suing the Gootnicks for their fraud inasmuch as the priority was that there be no clouds over the Debenture Offering.
  - There is only one note even though there are three mortgages. The two junior mortgages were and are held in whatever name utilized for the benefit of and control by the Gootnicks, since they could never sell a mortgage of a fictitious corporation. That is, the assets of the fictitious corporation must be their personal assets since a fictitious corporation is by definition the alter ego or mere business name of the flesh and blood individual who postured to be a real corporation

- Lighter purchased the GCTI assets for value, and in view of the secret mortgage Lighter paid at least $1,300,000 too much; nevertheless Lighter had every right to encumber his own property in any manner he chose to do so; especially since Lighter received a general release from Gootnick AND the Gootnicks ratified the transaction in their Oregon Complaint to seize the Oregon ranch pledged to the Gootnicks

- 5-19-2004 first mortgage from GCTI to Lighter firm Volcano Gardens, Inc. secured by free and clear Volcano, Hawaii 3 acre lot purchased for $75,000 years earlier [*10-22-2011 Lighter tax return Exhibit "13" and elsewhere*]
  - Gootnick would not fund the mortgage until a typographical error had been corrected
  - Contrary to allegations of Gootnick, the funds went mostly to pay taxes and

18

almost all of the balance for attorney fees  [*10-22-2011 Lighter tax return Exhibit "12" and elsewhere*]

- 10-3-2004 to10-6-2006 Gootnick sent to Lighter handwritten and printed GCTI financial disclosures, i.e balance sheet and income statement [*10-22-2011 Lighter tax return Exhibit "18" and elsewhere*] with no mention of secret $1,300,000 first mortgage

- 10-8-2004 main Gootnick transaction documents, notarized and recorded [*10-22-2011 Lighter tax return Exhibit "19" and elsewhere*] wherein Gootnicks
    - in exchange for the 90% balance of GCTI stock, the Gootnicks were given a $2,000,000 note from Lighter and Lighter's assumption of all tax liability
    - falsely claim they resign from all positions of officer, director, trustee, etc.
    - falsely claim the California St. property is free and clear
    - falsely claim the trusts had nothing to do with the Gootnicks' medical practices
    - Lied to Lighter about their true tax liabilities, which liabilities greatly exceeded their representation of about $1,500 for both state and federal taxes, and which liabilities the Gootnicks tricked Lighter into assuming

- In said 10-8-2004 transaction the Gootnicks also testified that they performed due diligence with their own professionals,
    - the Bill of Sale signed before a notary by both Irwin and Susan Gootnick states in relevant part on page 2 thereof,
        "The parties hereto have been encouraged, agreed to and did receive independent professional advice regarding the matter directly and indirectly related hereto." [*10-22-2011 Lighter tax return Exhibit "19" and elsewhere*]
    - Also related, included with Exhibit "C" of the 1-4-2005 letter Lighter sent to the S.E.C. [*10-22-2011 Lighter tax return Exhibit "2" and elsewhere*] is the 11-16-2004 letter agreement between Lighter and Irwin, which document was filed in federal court and states in relevant part,
        "Again, we have encouraged each other to have professional, legal, accounting and other appropriate advice herefore, just as we did prior to and for our closing of said October 8, 2004 transaction; subject of course to further due diligence as necessary and reasonable."

- Among other things, at the time of the April 3, 2004 Mutual Exchange of stock (10% of HCHC for 10% of GCTI), Lighter pledged all the equity of the Oregon ranch and other assets (on 10-8-2004 Lighter purchased the 90% balance of GCTI stock)
    - At the time of the 10-8-2004 transaction, Lighter confirmed the pledge of the Oregon ranch, $500,000 cash available, and other properties, in exchange for a $2 million note from Lighter together with Lighter's assumption of all the purchased entities' tax liability (stated under oath by the Gootnicks to be about $1,500 for both state and federal taxes)
    - however since Lighter had not yet met any Gootnick personally and Lighter's focus was on filing the then immediately oncoming securities offering, Lighter was still documenting such asset pledges from Lighter, et al.
    - And in addition, the real owners of the $500,000 cash and properties, Joan

Prescott-Lighter ("Joan") and her mother, wanted to meet at least one Gootnick personally, which occurred on December 24, 2004 in Hawaii; which is AFTER the Debenture Offering, as amended, was filed

- In the meantime Lighter discovered that Gootnicks had some 6 months earlier secretly place a $1.3 million first mortgage on the California St. property actually worth only $1.3 million
- At the 12-24-2004 meeting, Joan and her mother agreed to honor all of the pledges Lighter made to the Gootnicks as long as no further "misunderstandings" occurred such as the secret $1.3 million mortgage
- Lighter originally agreed to return the California St. property after 10 years as a payment towards the $2 million not, but after discovering the secret $1.3 million mortgage Lighter realized that all that was necessary was to pay off said property's first mortgage and Gootnick agreed
- There was supposed to be only $250,00 to $300,000 cash or market securities in the purchased firm, but without notice to Lighter and before Lighter met Gotnick (but after 10-8-2004) Gootnick had his son payoff a listed longterm note for $200,000, then out of those funds Gootnick and his son paid themselves at least $70,000 and sent the balance to Lighter
- Lighter eventually documented the pledges, but upon commencement of the surprise litigation by the Gootnicks at least the $500,000 cash pledge was terminated
- pledges that remained to secure the $2 million note included the Oregon ranch pledge, the Spencer Street pledge, the overall Kauai pledge (not the $850,000 1st mortgage for Gootnick), and the Volcano properties pledges
- Lighter, et al. acted as such to attempt to preserve the viability of the securities registration in order to consolidate and develop the hotel and develop the Royal Patent lands
- Related, just the day before the 10-8-2004 sale of the assets to Lighter, the Gootnicks, with Lighter's knowledge, transferred out of the trusts the family residence and the 3 San Bruno lots
  - The only assets remaining in GCT, Inc., at the time of the transfer, were (a) the medical building (supposedly free and clear, with a fair market value of $1.3 million) and (b) some stock and cash (worth about $300,000)
  - and afterwards, Lighter found out that, about 6 months before the sale of the GCT, Inc. assets to Lighter, Gootnick had already placed a phony mortgage of $1.3 million on the medical building, thereby making it worthless (net value/equity wise)
  - and that first mortgage was held by beneficiary J&J, Inc., a phony, non-existing company so that the ownership of the $1.3 million mortgage reverted to the Gootnicks personally

- 3-24-2005 Bill of Sale for 10% of stock in Royal Patent firm, Diamond Credit Bureau, Inc. ("DCBI"),
  - granting Lighter, et al. a general release
  - reduced the $2,000,000 note by $350,000 (including because the Gootnicks sold the California St. property at too high a price
  - The U.S. Supreme Court and the U.S. Ninth Circuit Courts have ruled and

still hold that the Hawaiian Royal Patent is the highest allodial title
- <u>Damon v. Hawaii</u>, 194 U.S. 154, 48 L.ed. 916, 24 Sup.Ct.Rep. 617 (1904)
- <u>Carter v. Territory of Hawaii</u>, 200 U.S. 255 (1906)
- <u>Napeahi v. Paty</u>, 921 F2d 897 (CA9 1990)
- Kauai Royal Patent development agreement effective 8-27-2004, Doc. No. 2005-053146, Royal Patent transferred by Doc. No. 2005-053145
- Kauai property includes sandy beachfront and four houses, with title undisputed for over 6 years
- Gootnicks' share of 10% of DCBI valued at least $300,000 although potentially very much higher; therefore the general release given by Gootnicks to Lighter, et al. was valid and authentic

- Thereafter the 3-24-2004 Bill of Sale, the actual debt owed by Lighter on said $2,000,000 note, after deducting the $1,300,000 secret mortgage of the California St. property was only $188,904.18 [*10-22-2011 Lighter tax return Exhibit "22" and elsewhere*]
  - and Lighter had approximately five years remaining on the promissory note before same came due, and Lighter was never in default on that note

- Gootnick was also pledged up to $850,000 of the 1045 Spencer Street, Honolulu, Hawaii 96822 property [*see 4-15-2005 Declaration of Dean Robin at 10-22-2011 Lighter tax return Exhibit "25" at Exhibit "A", and Exhibit "26" of said tax return, and elsewhere*]

- Supposedly the Gootnicks settled with IRS early 2006, yet the IRS refuses to release or satisfy a "fake" $250,00 plus tax lien against the Gootnick Family Trust using Lighter's address, see pages 31 - 38 and Exhibit "21" of the 10-22-2011 Lighter tax return and elsewhere
  - wherein and elsewhere it is also described how the IRS refuses to accept as security a $3,050,000 mortgage against the Kauai Royal Patent or to accept a Volcano first mortgage as security for a $125,000 tax lien against Lighter's mother-in-law

- 6-20-2006 Gootnick sues Lighter, et al. to enforce the Lighter, et al. pledge of the Oregon ranch equity to Gootnick as security for the stock exchange, and later as security for the $2,000,000 note [*10-22-2011 Lighter tax return Exhibit "14" and elsewhere*]
  - In Lighter's Answer Lighter, et al. agrees that the pledge of equity has been and still is good and valid [*10-22-2011 Lighter tax return Exhibit "15" and elsewhere*]
  - In Gootnicks' Complaint, Gootnicks ratify and confirm the validity of the transactions with Lighter, et al.
  - and thereby repudiating Gootnicks claims of fraud against Lighter, et al.

- The 10-3-2006 Expert Opinion letter of Dr. Wing C. Ng, CPA, Esq. [*10-22-2011*

*Lighter tax return Exhibit "27" and elsewhere*] confirms the contents of the 5 bankers boxes of Gootnick records which Lighter bought on 10-8-2004

- which records Dr. Ng audited and found at least $2,000,000 in wrongful deductions by the Gootnicks
- as variously reported to the US Attorney General and IRS Chief Counsel *8-12-2010 Lighter facts CD production to AUSA, see Dr NG*]

- Exhibit "28 of the 10-22-2011 Lighter tax return is the 4-10-2007 Declaration of Eric Aaron Lighter, Re: Supplement To April 9, 2007 Declaration Regarding Non-Essential Disclosures, Re: Willfulness
  - This pleading describes how Fung, Gootnick and other of Fung's NTS clients such as the Brocks and Bourdiers, all knew since the 6-24 and 25-2002 legal opinion of David Prince was issued that the NTS system was illegal
  - and for years also knew that Olga Ortiz Rios went to prison for her involvement with NTS
  - Exhibit "29 of the 10-22-2011 Lighter tax return is said 4-10-2007 Declaration's copy of said 6-24 and 25, 2002 David Prince legal opinion regarding NTS, and related documents
  - Gootnick testified that as a result of the Prince legal opinion letter the Gootnick trusts were reformed, yet the reformed trust(s) are dated and signed in 1997, and the Prince legal opinion letter was dated, paid for and issued in mid 2002

- The Gootnicks knew the Waikiki hotel development rights were not foreclosed upon, see page 41 of the 10-22-2011 Lighter tax return, and elsewhere
  - The AUSA and IRS also knew the development rights were not foreclosed upon
    - see 7-23-2008 and 7-23-2008 Memorandums of Interview of Dr. Wing C. Ng, CPA, Esq. (Lighter, et al.'s CPA)
    - 11-16-1989 Hawaii Supreme Court order declaring the development rights foreclosure order as interlocutory is entered twice in the documents production by the government
    - it is public record that the plaintiff bank in said 1988 foreclosure was paid off and lost standing the finalize said interlocutory order
    - it is public record that what survived the two hotel foreclosures are at least five final orders, two judgments and a federal stipulation, all subject to Lighter, et al.'s development rights

- Exhibit "P" of the 10-22-2011 Lighter tax return is the 4-11-2007 Declaration of Eric Aaron Lighter, Re: Supplement to April 10, 2007 Declaration Regarding Non-essential Disclosures; Exhibits "101"-"112"; Certificate of Service, with exhibits "101"-"112"; Exhibit "112" thereof includes original Gootnick (including notarized) documents that prove that the Gootnicks INTENDED to defraud the tax authorities

- Gootnicks were collateralized by Lighter, et al. with assets Lighter, et al. put at risk and/or pledged:
- $  500,000 cash available from Lighter's mother-in-law *

- $2,000,000 indirectly in hotel interests
- $   500,000 Honolulu 6/4 house, Spencer St.
- $1,500,000 5 Volcano Hawaii properties
- $   500,000 Oregon ranch
- $   500,000 Kauai development agreement after 8-27-2004
- $2,500,000 Kauai property with 4 houses after 2-17-2005 **
- $ ?              Maui properties after 1-25-2005
- $   350,000 two Kona lots after 9-22-2006

\*       Lighter agreed to minimize discussion of Gootnicks losing this pledge (which loss was caused by Gootnicks' not honoring their contracts with Lighter, et al.), especially in order to prevent or minimize the threat of Lighter's mother-in-law, et al. being also maliciously sued by the Gootnicks; Lighter settled with the Gootnicks only at the judges insistence, very generously giving the Gootnicks over $400,000 cash

\*\*       The Gootnicks were also expressly pledged a notarized $850,000 first mortgage against said Kauai property [*10-22-2011 Lighter tax return Exhibit "23" and elsewhere; plus 8-7-2007 Affidavit of Robert Measel, Jr. attached to 10-17-2011 Lighter tax return and elsewhere*]

Sincerely,

Eric Lighter
attachment
cc:
Jerry Y. Fong, Esq.
Carey & Carey
P.O. Box 1040
Palo Alto, CA 94302-1040

Peter A. Leeming, Esq.
108 Locust St., Suite 7
Santa Cruz, CA 95062

Charles A. O'Reilly, Esq.
Blake D. Stamm, Esq.
9 th Floor Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco, CA 94102

EXHIBIT "A"

FRIEND OF THE COURT MEMORANDUM AND NOTICE OF OPPOSITION

Sent by email

To      :       Honorable Judge Edward J. Davila, USDC NDCA San Jose,
                (408) 535-5356; EJDpo@cand.uscourts.gov

From    :       Robert C. Measel, Jr., (808) 769-4953; measeljr@gmail.com

Date    :       November 18, 2011

Re      :       USA v. Lighter, CR. 05-215 EJD

Your Honor,

        Regarding the government's Motion in Limine, docket items 204 and 205 of the
above case, as a friend of the Court I object since it is nonsense. The motion's attached
and cited document is authentic. Please excuse my pro se format, but the motion is
supposed to be heard on Monday November 21, 2011. Please see my Declaration of
Robert C. Measel, Jr. dated November 16, 2011, with attachments.
        For further information please see:
   http://www.royaldevelopmentcorp.info and http://www.lghawaiiproperties.com. In short,
my Hawaii real estate development contract was sold to Royal Development Corporation,
who sold it to two attorneys with a large oil concession.
        Further for example, it is impossible that the subject hotel development rights
were foreclosed upon per a 1988 order since that order was ruled interlocutory by the
Hawaii Supreme Court on November 16, 1989, then the plaintiff bank was paid off, lost
standing and the statutes of limitation ran years ago. Also there is a federal stipulation,
five final orders and at least two judgments all on State guaranteed torrens system title
and subject to the various rights, interests and/or claims for developing the now three
story building to at least a 350 foot resort-commercial zoned highrise. Also, there never
was a bank lien on the development rights for this oceanview, Waikiki site.
        Likewise, it is impossible that the related sandy beachfront Kauai Royal Patent
land with 4 houses has no value, including since title for the core land has been
undisputed for over 6 years.

Sincerely,

Robert C. Measel, Jr.
attachment

cc:     Blake.D.Stamm2@usdoj.gov
        jf@careyandcareylaw.com
        palemming@sbcglobal.net

DECLARATION OF ROBERT C. MEASEL, JR.

I, Robert C. Measel, Jr. declare under penalty of perjury that regarding the following documents,

a.      I received complete copies of the documents cited as items 1, 2 and 3 below on or about the day these documents are dated, and

b.      I signed the documents cited as item 4 below on the dates of those documents.

1.      January 4, 2005 Notice from Volcano Village Corporation ("V V C") to U.S. Securities and Exchange Commission ("SEC"), 16 pages total, first page attached, and I am a signatory to the Development Agreement attached thereto;

2.      August 12, 2005 Terminated Securities Offering Disclosure to SEC, 43 pages total, first page attached;

3.      February 28, 2006 Terminated Securities Offering Disclosures Followup from V V C to SEC, 28 pages total, first page attached;

4.      July 29, 2008 and November 15, 2008 Declarations of Robert C. Measel, Jr., 4 pages total.

The abovesaid documents are and continue to be valid and true to the best of my knowledge.

DATED: Hilo, Hawaii, November 16, 2011.

Robert C. Measel, Jr.

MEMO

From  :   Eric Aaron Lighter; P.O. Box 2556, Honolulu, Hawaii 96804; (808) 533-8801
To      :   U.S. Securities and Exchange Commission; Washington, D.C. 20549 ("SEC")
Date   :   January 4, 2005
Re      :   Volcano Village Corporation, Fed. I. D. No.27-0108858 ("V V C")
               Gootnick Charitable Trust, Inc., Fed. I.D. No. 68-0409902 ("GCTI")

Sirs,

On 12-17-2004 the SEC received the 11-16-2004 amended Debenture Offering ("D.O.") for GCTI, dba Volcano Development; and this letter supports or supplements same. On 12-24-2004 I, my wife Joan and her mother Claire Prescott ("Claire") met at an oceanside resort in Kona, Hawaii with Irwin Gootnick ("Irwin"). I bought GCTI and its subsidiaries from the Gootnicks on 10-8-2004 in consideration of a $2,000,000 note due from me plus millions of dollars in pledges of property to the Gootnicks, as described in part in said SEC filing(s), including (1) a first mortgage on a 10 acre Oregon ranch improved with over 6,000 square feet of improvements, (2) a 6/4 two story apartment zoned downtown Honolulu building with Diamond Head/ocean view, (3) an 8-27-2004 Development Agreement and 2000 lease of free and clear Kauai property with three houses and a cottage on a sandy beachfront, (4) two Volcano vacation rentals, one whose pre-litigation first mortgage is now being purchased, and another with three houses each with its own kitchen; plus 3 vacant lots in Volcano, (5) indirectly by general guarantee from V V C, et al., their rights, interests and/or claims in a Waikiki hotel which is now a 3 story building but is zoned for 350 feet as resort-commercial, and (6) various other interests and/or claims as detailed in part in said D.O.(s). One of the assets acquired on 10-8-2004 was a small building in San Francisco which was supposed to be free and clear. However, the Gootnicks secretly placed a $1,300,000 first mortgage thereon in favor of their alter ego (a non-existent corporation) and thus in favor of themselves individually; and there seems no way to release it without the Gootnicks' express written consent, which they will not grant. In order for the D.O. to proceed without litigation for fraud by the Gootnicks, V V C, et al. decided to let the Gootnicks just keep their $1,300,000 mortgage and later seek set-off accounting, subject to title restraints against further "gamesmanship". It is hoped that the Hawaii recorded 10-8-2004 contracts with the Gootnicks have no other frauds therein by the Gootnicks, including the Gootnicks notarized testimony that they only owe $1,500 in state and federal taxes, and that they resigned as officers, directors and trustees of the entities purchased 10-8-2004. Based on a contract dated 10-21-2000, on 3-17-2001 Claire made a capital contribution to V V C, the actual entity which filed said D.O., as disclosed therein. On 9-8-2003 Joan held Claire's power of attorney, copy attached, including in order to transfer the interests in the net proceeds of Claire's estate to V V C, and liquidate same. At said 12-24-2004 Kona meeting with Irwin, Claire and Joan confirmed and ratified Eric's early October 2004 to pledge $500,000 cash as additional security for payment of said $2,000,000 promissory note. They did this in order to further the goals of said D.O. As Joan politely told Irwin personally, and Claire agreed, this cash pledge of cash is terminated upon her discovery of any further "misunderstandings" (fraud and deceit) by the Gootnicks. Please call or write me as necessary. Said 12-24-2004 meeting is referred to in a letter from Irwin, see Exhibit "C" of attached 1-3-2005 bankruptcy filing, who prepared and filed more mortgages on his own.

Sincerely,

Eric Aaron Lighter
enclosure and cc: as appropriate

# TERMINATED SECURITIES OFFERING DISCLOSURES

To    :    U.S. Securities and Exchange Commission, Washington, D.C. 20549
           ("SEC")
           Internal Revenue Service ("IRS"), Fresno 93888

From  :    Gootnick Charitable Trust, Inc., aka Volcano Development ("VDI"), Fed. I.D.
           No. 68-0409902;
           Hawaiian Colony Hotel Corporation ("HCHC"), Fed. I.D. No. 99-0248331

Date  :    August 12, 2005

Enclosure:    CD in pdf file format

Attention Please:

      This presentation is made under penalty of perjury by Eric Aaron Lighter ("Lighter")
and to the best his knowledge is true and correct. During November and December 2004,
one Debenture Offer and two amended Debenture Offers were filed by VDI with the SEC.
The Debenture Offer, as amended, has been terminated voluntarily. Enclosed herewith is
a CD containing in pdf file format:

1.    1 file entitled 2005-8-7 Lighter Decl 1-2, 355 Kbyte, re: Declaration of Eric Aaron
      Lighter; Exhibits "1" - "2", prepared for but not filed in <u>Gootnick v. Lighter</u>, C-05-
      02787 SI, USDC NC ("8-7-05 Decl.", since actually dated August 7, 2005, and are
      amended); and

2.    1 folder entitled 2005-6-9 Lighter Decl 1-8, 16 file, 5.56 Mbyte, re: Declaration of
      Eric Aaron Lighter, Part One; Exhibits "1" - "8", prepared for but not filed in <u>Gootnick</u>
      <u>v. Lighter</u>, C-05-02787 SI, USDC NC ("8-9-05 Decl.", since actually dated August
      9, 2005 and are hereby so amended).

A.    <u>Background</u>

      The focus of the terminated securities offering was to be mainly focused on two
projects. HCHC has a hotel project in Waikiki, Hawaii, HCHC's subsidiary has Royal Patent
lands projects in Maui and Kauai comprising over 13,000 acres. The Maui land titles are
still in probate but the necessary inheritance rights have been acquired. The Kauai lands
are free and clear with the undisputed portion improved with three houses and a sandy
beachfront cottage. The hotel is now 3 stories with 90 units but it is zoned resort
commercial for almost 40 stories. There is an unobstructed ocean view from about the roof

# TERMINATED SECURITIES OFFERING DISCLOSURES FOLLOWUP

To      :   U.S. Securities and Exchange Commission, Washington, D.C. 20549
            ("SEC")
            Internal Revenue Service ("IRS") as appropriate

From   :   Gootnick Charitable Trust, Inc., aka Volcano Development ("VDI"), Fed. I.D.
            No. 68-0409902;
            Volcano Village Corporation, Fed. I.D. No. 27-0208858
            Hawaiian Colony Hotel Corporation ("HCHC"), Fed. I.D. No. 99-0248331

Date   :   February 28, 2006

Enclosure:   CD in pdf file format

Attention Please:

This presentation is made under penalty of perjury by Eric Aaron Lighter ("Lighter")
and to the best his knowledge is true and correct.

On August 12, 2005 we wrote you and stated:

==================================================================

"This presentation is made under penalty of perjury by Eric Aaron Lighter ("Lighter")
and to the best his knowledge is true and correct. During November and December 2004,
one Debenture Offer and two amended Debenture Offers were filed by VDI with the SEC.
The Debenture Offer, as amended, has been terminated voluntarily. Enclosed herewith is
a CD containing in pdf file format:

1.      1 file entitled 2005-8-7 Lighter Decl 1-2, 355 Kbyte, re: Declaration of Eric Aaron
Lighter; Exhibits "1" - "2", prepared for but not filed in Gootnick v. Lighter, C-05-02787 SI,
USDC NC ("8-7-05 Decl.", since actually dated August 7, 2005, and are amended); and

2.      1 folder entitled 2005-6-9 Lighter Decl 1-8, 16 file, 5.56 Mbyte, re: Declaration of Eric
Aaron Lighter, Part One; Exhibits "1" - "8", prepared for but not filed in Gootnick v. Lighter,
C-05-02787 SI, USDC NC ("8-9-05 Decl.", since actually dated August 9, 2005 and are
hereby so amended).

A.      Background

The focus of the terminated securities offering was to be mainly focused on two
projects. HCHC has a hotel project in Waikiki, Hawaii, HCHC's subsidiary has Royal Patent
lands projects in Maui and Kauai comprising over 13,000 acres. The Maui land titles are
[*believed to be*] still in probate but the necessary inheritance rights have been acquired.
The Kauai lands are free and clear with the undisputed portion improved with three houses
and a sandy beachfront cottage. The hotel is now 3 stories with 90 units but it is zoned
resort commercial for almost 40 stories. There is an unobstructed ocean view from about
the roof of the third floor and up. The site is the expected mass transit portal into Waikiki.
HCHC's interest in the development rights are protected by a federal stipulation, five state
final orders and two state judgments. There was an order foreclosing upon an air rights
easement but the Hawaii Supreme Court ruled said order was merely interlocutory
(advisory, moot) and what survived are the final orders, judgments and federal stipulation,
plus HCHC's title is guaranteed by the Hawaii Land Court torrens registration system.

Prior to said Debenture Offering, but pursuant to the clear intent to file said
Debenture Offering, HCHC solicited participation in one or the other of the two projects
(or intended project) of HCHC or its actual or intended subsidiaries.  In furtherance of this

## DECLARATION OF ROBERT C. MEASEL, JR.

I, ROBERT C. MEASEL, JR. declare under penalty of perjury that the following is true and correct to the best of my knowledge. The following is language I partially edited from a recent communication from Eric Lighter which I agree with. I also added the fraud language. The following is the position and understanding of the buyers of the Hawaiian Colony air rights and other development rights, a true and accurate copy of the conditional assignment of same, and cover letter, attached hereto. I am one of the guarantors of the purchase contracts and attached assignment.

Reportedly, the Appellate Courts never ruled on legitimacy of interlocutory, non-binding, void and/or advisory 1988 order. Those Courts merely ruled that former Third Circuit Judge Riki May Amano ruled that air rights secured notes are "worthless" because the development rights easement was "foreclosed" upon pursuant to a 1988 order. Said 1988 "foreclosure" order was supposedly pursuant to an impossibility, that the fee simple title, leaseholds and condo owners all "merged" in a unity of interest, which event never occurred.

Judge Amano had no jurisdiction to thus devalue the hotel development "air rights" easement, or foreclose upon that property without due process and rather by judicial fiat; especially since the owner of said property was not named or served and the hotel property is located in the First Circuit. In 1989 the Supreme Court of Hawaii already ruled that said order is merely interlocutory. The Courts were wrong to ignore the four final orders and two judgments in the related two foreclosures of the ground leases, in 1988 and 1994, all of which invalidate said ineffective, inoperative 1988 order. In 1997 the alleged recipient of the "foreclosed" easement acknowledged under oath that the easement does exist and is exclusively claimed by Lighter, et al. The Courts took their wrong position based on intentionally false statements by Ronald Ober and his attorney Enver W. Painter, Jr.

Mr. Ober and Mr. Painter alleged that two $100,000 notes secured by said development rights assignment by attached assignment, were non-recourse and worthless. That is false, and at trial Mr. Lighter never testified regarding those notes. The attached assignment, and the buyers' contracts therefore, are subject to paying those notes, which notes never came due until about one year ago. Those notes were not admitted in trial. Had Mr. Painter asked Mr. Lighter at trial, Mr. Lighter would have denied that said notes were non-recourse or "worthless" or due before March 3, 2007. Said maturity date was after the Third Circuit Court granted a final order that settled all claims with Hawaiian Colony Hotel Corporation. That settlement has been broken, and those claims are again active and valuable.

Such fraud was not only upon Lighter, et al., but upon the Courts. However such fraud was also on the recent buyers of said development rights easement. Mr. Ober and Mr. Painter were put on express notice that development rights were sold to the buyer partnership. Mr. Ober and Mr. Painter have also forced the illegal amendment of the project condominium declaration in order to accomplish their fraud. The Affidavits of myself and David L. Horne were filed May 28, 2008 and June 20, 2008 in the Hawaii Bureau of Conveyances as Document Nos. 2008-086096 and 2008-100395 respectively. Said buyers have been damaged. They correctly relied upon the facts on title at the project, especially the two Notices of Implied or Constructive Trust Nos.

3736879 and 3737298 filed April 18, 2008 and April 21, 2008 respectively at the Hawaii Bureau of Conveyances. The first time Mr. Lighter and Mr. Horne met was March 12, 2008, the date the current, pre-amendment buyers' contract was executed as a backup to the September 1, 2006 contract, as amended (whose principal has spent over $60,000 in expenses such as legal and architect fees). I signed the letter of Intent on February 15, 2008.

Mr. Lighter obviously did not defraud Mr. Ober, et al. The Courts' rulings that he did is like convicting Mr. Lighter of murder, and then the alleged murder victim--said buyers--show up a live and healthy. It was all lies regarding the alleged "foreclosure" of the air rights easement which the Courts current position is based upon.

The buyers and guarantors may sue for fraud by and damages from Mr. Ober and Mr. Painter. Said buyers have already invested more that $250,000 in the Hawaiian Colony project, and on July 1, 2008 they secured title to the development rights and claims, see attached. The development claims have value since there are approximately 230,000 pages of documents directly recorded or recorded by reference against the project Land Court title, which can therefore only, reasonably be cleared by the owner of the claims said buyers recently took title to. That is the real reason why the project was never developed, and can not otherwise be developed even now. Those claims are therefore part of the "air rights easement and other development rights" package purchased from Hawaiian Colony Hotel Corporation.

Said buyers already delivered a well received commitment to the Mayor of Honolulu for an easement for mass transit through the site into Waikiki, at no cost. Said buyers have private funding and income sources, and will pay the $2 million principal balance due Hawaiian Colony Hotel Corporation. Based on the nearby Waikiki Trump Tower land sale of $781 per square foot two years ago which confirmed my earlier valuations for the Hawaiian Colony project, the $2 million principal price is quite inexpensive, and Mr. Lighter is being generous.

It is impossible that the hotel air and other development rights are "foreclosed" upon or "worthless". Any Court orders that so declare are void for impossibility. Attached also is a copy of the June 14, 2008 notice of intent to tender payment on said two $100,000 notes. In good faith and in order to avoid litigation, the buyers of said development rights hereby volunteer to tender and enforce said tender on behalf of and/or with our creditor, Hawaiian Colony Hotel Corporation.

DATED, Keaau, Hawaii, July 29, 2008.

ROBERT C. MEASEL JR.

## DECLARATION OF ROBERT MEASEL, JR.

I, ROBERT MEASEL, JR. declare under penalty of perjury that the following is true and correct to the best of my knowledge. I hereby amend part of my Declaration dated July 29, 2008 and filed July 31, 2008 in the Bureau of Conveyances for the State of Hawaii as Document No. 2008-122546, a UCC-1 Financing Statement amended August 1, 2008 and filed as aforesaid as Document No. 2008-123405.

Said Declaration stated in part,

"Reportedly, the Appellate Courts never ruled on legitimacy of interlocutory, non-binding, void and/or advisory 1988 order. Those Courts merely ruled that former Third Circuit Judge Riki May Amano ruled that air rights secured notes are "worthless" because the development rights easement was "foreclosed" upon pursuant to a 1988 order. Said 1988 "foreclosure" order was supposedly pursuant to an impossibility, that the fee simple title, leaseholds and condo owners all "merged" in a unity of interest, which event never occurred.

Judge Amano had no jurisdiction to thus devalue the hotel development "air rights" easement, or foreclose upon that property without due process and rather by judicial fiat; especially since the owner of said property was not named or served and the hotel property is located in the First Circuit. In 1989 the Supreme Court of Hawaii already ruled that said order is merely interlocutory. The Courts were wrong to ignore the four final orders and two judgments in the related two foreclosures of the ground leases, in 1988 and 1994, all of which invalidate said ineffective, inoperative 1988 order. In 1997 the alleged recipient of the "foreclosed" easement acknowledged under oath that the easement does exist and is exclusively claimed by Lighter, et al. The Courts took their wrong position based on intentionally false statements by Ronald Ober and his attorney Enver W. Painter, Jr."

Said language is now amended to read,

Reportedly, the Appellate Courts never ruled on legitimacy of an interlocutory, non-binding, void and/or advisory 1988 order issued by First Circuit Judge Philip Chun. In an exercise of multiple hearsay, the Appellate Courts merely ruled that former Third Circuit (wrong circuit) Judge Riki May Amano ruled that air rights secured notes are "worthless" because the development rights easement was "foreclosed" upon pursuant to a 1988 order. Said 1988 "foreclosure" order was supposedly pursuant to an impossibility, that the fee simple title, leaseholds and condo owners all "merged" in a unity of interest, which event never occurred.

Judge Amano had no jurisdiction to thus devalue the hotel development "air rights" easement, or foreclose upon that property without due process and rather by judicial fiat; especially since the owner of said property was not named or served and the hotel property is located in the First Circuit. In 1989 the Supreme Court of Hawaii already ruled that said order is merely interlocutory. The Courts were wrong to ignore the four final orders and two judgments in the related two foreclosures of the ground

leases, in 1988 and 1994, all of which invalidate said ineffective, inoperative 1988 order. In 1997 the alleged recipient of the "foreclosed" easement acknowledged under oath that the easement does exist and is exclusively claimed by Hawaiian Colony Hotel Corporation, et al. The Courts took the wrong position based on intentionally false statements by Ronald Ober and his attorney Enver W. Painter, Jr.

DATED, Keaau, Hawaii, November 15, 2008.

ROBERT MEASEL, JR.

UNITED STATES POSTAL SERVICE

EXPRESS MAIL

Flat Rate Mailing Envelope

For Domestic and International Use

PRESS HARD. YOU ARE MAKING 3 COPIES.

Place Mail

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code

Day of Delivery
☐ Next ☑ 2nd Day ☐ 3rd Day

Date Accepted

Scheduled Date of Delivery

Postage
$

Time Accepted
☐ AM
☑ PM

Scheduled Time of Delivery
☐ Noon ☐ 3 PM

Return Receipt Fee
$

COD Fee
$

Military
☐ 2nd Day ☐ 3rd Day

Flat Rate ☑ or Weight
lbs.        ozs.

Int'l Alpha Country Code

Total Postage & Fees
$

Acceptance Emp. Initials

Insurance Fee

FROM: (PLEASE PRINT)   PHONE ( )

Eric Lighter
PO Box 2556
Honolulu, Hawaii 96804

802-533-8801

FOR PICKUP OR TRACKING
Visit  WWW.USPS.COM
Call 1-800-222-1811

UNITED STATES POSTAL SERVICE

EXPRESS MAIL

Post Office To Addressee

DELIVERY (POSTAL SERVICE USE ONLY)

Delivery Attempt
Mo. Day        Time
☐ AM ☐ PM   Employee Signature

Delivery Attempt
Mo. Day        Time
☐ AM ☐ PM   Employee Signature

Delivery Date
Mo. Day        Time
☐ AM ☐ PM   Employee Signature

CUSTOMER USE ONLY

☐ WAIVER OF SIGNATURE (Domestic Mail Only)

☐ NO DELIVERY
☐ Weekend ☐ Holiday

Waiver Signature

TO: (PLEASE PRINT)   PHONE ( )   408-535-5364

Clerk of the Court
US District Court, NDCA San Jose
attn Judge Edward J. Davila
280 S. First St #4050
San Jose, CA 95113

ZIP + 4 (U.S. ADDRESSES ONLY, DO NOT USE FOR FOREIGN POSTAL CODES)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

Recycled

Addressee Copy
Label 11-B, March 2004

UNITED STATES POSTAL SERVICE

HONOLULU, HI
96822

AMOUNT
$18.30
00051085-05

1007

If used internationally
customs declarations
(Form 2976, or 2976A).

USPS packaging products have been
awarded Cradle to Cradle Certification
for their ecologically-intelligent design.
For more information go to
mbdc.com/usps.

Cradle to Cradle Certified is a certification mark of MBDC.