08:24:17

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4


5     UNITED STATES OF          )  CR-05-00215-EJD
      AMERICA,                  )
6                               )  DECEMBER 19, 2011
                PLAINTIFF,      )
7                               )  VOLUME 10
                V.              )
8                               )  PAGES 1 - 202
      ERIC AARON LIGHTER,       )
9                               )
                DEFENDANT.      )
10    _____  )

11

12            THE PROCEEDINGS WERE HELD BEFORE

13         THE HONORABLE UNITED STATES DISTRICT

14              JUDGE EDWARD J. DAVILA

15    A P P E A R A N C E S:

16


17    FOR THE PLAINTIFF:  U.S. DEPARTMENT OF JUSTICE
                          BY:  CHARLES A. O'REILLY
18                             KATHERINE WONG
                          P.O.BOX 972
19                        WASHINGTON, D.C. 20044

20

21    FOR THE DEFENDANT:  CAREY & CAREY
                          BY:  JERRY Y. FONG
                          706 COWPER STREET
22                        PALO ALTO, CALIFORNIA 94301

23        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

24

25    OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                               CERTIFICATE NUMBER 8074


                                                        1

1    A P P E A R A N C E S: (CONT'D)

2

3    ALSO PRESENT:                INTERNAL REVENUE SERVICE
                                  BY:  CHARLES TONNA
                                  450 GOLDEN GATE AVENUE
4                                 6TH FLOOR
                                  SAN FRANCISCO, CALIFORNIA
5                                 94102

6                                 DEPARTMENT OF THE TREASURY
                                  BY:  WILLIAM LEE
7                                      KENNETH BONANO
                                  450 GOLDEN GATE AVENUE
8                                 7TH FLOOR, SUITE 7-2506
                                  SAN FRANCISCO, CALIFORNIA
9                                 94102

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                           2

1                    INDEX OF PROCEEDINGS

2

3        FOR THE GOVERNMENT:

4        **ERIC LIGHTER**
              DIRECT EXAM BY MR. FONG            P. 6

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1                        INDEX OF EXHIBITS

2                             IDENT.        EVIDENCE

3

     GOVERNMENT'S
4

5

6

7

8    DEFENDANT'S:

9    RR                                        198

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                       4

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | SAN JOSE, CALIFORNIA                    DECEMBER 19, 2011     |
|       | 2  |                  P R O C E E D I N G S                       |
|       | 3  |                                                              |
|       | 4  |                                                              |
|       | 5  |            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE         |
| 08:36:27 | 6  | HELD IN THE PRESENCE OF THE JURY:)                        |
| 08:36:27 | 7  |           THE COURT:  WE'RE BACK ON THE RECORD IN          |
| 08:36:29 | 8  | THE LIGHTER MATTER.  OUR JURY AND ALTERNATES ARE           |
| 08:36:31 | 9  | PRESENT.  ALL COUNSEL AND THE DEFENDANT IS PRESENT.        |
| 08:36:34 | 10 |           BEFORE WE BEGIN, I WANT TO ADDRESS OUR           |
| 08:36:36 | 11 | SCHEDULE.  I THINK THAT MIGHT BE OF SOME INTEREST          |
| 08:36:39 | 12 | TO YOU.                                                    |
| 08:36:39 | 13 |           WERE BEHIND SCHEDULE AND I APOLOGIZE FOR         |
| 08:36:46 | 14 | THAT.                                                      |
| 08:36:46 | 15 |           MY SENSE IS THAT YOU WILL HAVE THIS CASE         |
| 08:36:51 | 16 | TOMORROW AND THE EVIDENCE WILL CONCLUDE TOMORROW           |
| 08:36:53 | 17 | AND YOU WILL BEGIN YOUR DELIBERATIONS TOMORROW.            |
| 08:36:55 | 18 |           THAT'S THE BEST INFORMATION THAT I HAVE          |
| 08:36:57 | 19 | THIS MORNING FOR YOU.                                      |
| 08:36:59 | 20 |           SO WE'RE GOING TO PROCEED THIS MORNING.          |
| 08:37:01 | 21 |           I EXPECT THAT WE'LL START AT 8:30                |
| 08:37:05 | 22 | TOMORROW, UNLESS THERE'S -- 8:00 A.M. START IS            |
| 08:37:10 | 23 | POSSIBLE.  I DON'T KNOW HOW INCONVENIENT THAT IS TO        |
| 08:37:12 | 24 | YOU.                                                       |
| 08:37:13 | 25 |           PERHAPS YOU CAN DISCUSS THAT AMONGST            |

5

08:37:15  1    YOURSELVES.  THAT'S ANOTHER POSSIBILITY TO CAPTURE

08:37:17  2    SOME TIME AS WELL.

08:37:19  3         BUT THAT'S THE BEST ESTIMATE OF THE TIME

08:37:21  4    AS OF THIS MOMENT.

08:37:24  5         SO LET'S BEGIN.  AGAIN, MR. FONG, IF YOU

08:37:28  6    COULD HAVE YOUR CLIENT.

08:37:29  7         MR. FONG:  THANK YOU, YOUR HONOR.

08:37:30  8         THE COURT:  MR. LIGHTER, IF YOU WOULD

08:37:34  9    RESUME THE STAND, PLEASE.

08:37:36  10              **ERIC AARON LIGHTER,**

08:37:36  11   BEING RECALLED AS A WITNESS ON BEHALF OF HIMSELF,

08:37:36  12   HAVING BEEN PREVIOUSLY SWORN, WAS FURTHER EXAMINED

08:37:55  13   AND TESTIFIED AS FOLLOWS:

08:37:55  14        THE COURT:  I'LL REMIND YOU, SIR, THAT

08:37:57  15   YOU'RE STILL UNDER OATH.  PLEASE ADJUST THE CHAIR

08:38:00  16   AND THE MICROPHONE IF YOU WOULD.

08:38:03  17        MR. FONG.

08:38:04  18        MR. FONG:  THANK YOU, YOUR HONOR.

08:38:06  19            **DIRECT EXAMINATION** (RESUMED)

08:38:08  20   BY MR. FONG:

08:38:08  21   Q    GOOD MORNING, MR. LIGHTER.

08:38:09  22   A    GOOD MORNING, MR. FONG.

08:38:11  23   Q    I JUST WANTED TO START OUT THIS MORNING ABOUT

08:38:13  24   FOLLOWING UP ON SOME OF THE TESTIMONY THAT YOU GAVE

08:38:15  25   LAST FRIDAY REGARDING YOUR RELATIONSHIP WITH SAM

6

08:38:19 1    FUNG.

08:38:19 2              I'M GOING TO SHOW -- I'M GOING TO PUBLISH

08:38:25 3    A DOCUMENT THAT IS ALREADY IN EVIDENCE AS

08:38:29 4    GOVERNMENT'S EXHIBIT 42.

08:38:30 5              AND I'LL HAND YOU A COPY.  YOU CAN FOLLOW

08:38:41 6    ALONG ON THE DOCUMENT OR GO ALONG THE SCREEN WITH

08:38:44 7    EVERYBODY ELSE IN THE COURTROOM.

08:38:45 8              FIRST OF ALL, SIR, DO YOU SEE THAT

08:38:47 9    DOCUMENT IN FRONT OF YOU?

08:38:48 10   A    YES.

08:38:49 11   Q    AND THANK YOU FOR SPEAKING UP.  I APPRECIATE

08:38:51 12   IT.

08:38:53 13             AND DO YOU RECOGNIZE THAT DOCUMENT?

08:38:54 14   A    YES, I DO.

08:38:55 15   Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT

08:38:58 16   THAT DOCUMENT IS?

08:38:59 17   A    IT'S A FOLLOW-UP OR A SUPPLEMENT TO THE FUNG

08:39:05 18   OMNIBUS RETURN.

08:39:07 19   Q    OKAY.  AND DID YOU HAVE ANY PART IN THE --

08:39:13 20   WELL, FIRST OF ALL, DID YOU SIGN THIS PARTICULAR

08:39:15 21   DOCUMENT?

08:39:15 22   A    NO.  NO.

08:39:17 23   Q    AND DID YOU HAVE ANY PART IN THE PREPARATION

08:39:20 24   OF THIS DOCUMENT?

08:39:21 25   A    I DRAFTED PART OF IT.

7

08:39:24  1    Q    OKAY.  AND WHAT IS YOUR -- WHAT WAS THE

08:39:26  2    PURPOSE OF YOUR PARTICIPATING IN THE DRAFTING OF

08:39:30  3    THIS DOCUMENT?

08:39:30  4    A    WELL, I CANCELLED MY COMMITMENT TO HELP FUNG

08:39:46  5    WITH HIS TAXES, BUT IT SEEMED REASONABLE TO GIVE AN

08:39:53  6    UPDATE ON THE OMNIBUS RETURN BECAUSE THAT WAS

08:39:58  7    ALREADY SUBMITTED TO THE I.R.S. AND HE WAS GOING TO

08:40:00  8    CONFIRM IT AND THAT WAS ABOUT IT.

08:40:06  9    Q    AND DO YOU REMEMBER APPROXIMATELY WHEN YOU

08:40:08 10    PREPARED YOUR PART OF EXHIBIT 42?

08:40:10 11    A    I'D HAVE TO LOOK AT THE DATE.

08:40:15 12    Q    ALL RIGHT.  IF YOU COULD LOOK AT THE DOCUMENT,

08:40:17 13    PERHAPS, THAT WOULD REFRESH YOUR RECOLLECTION.

08:40:19 14    A    IT'S DATED AUGUST 27TH, 2003.  SO BEFORE THEN.

08:40:23 15    PROBABLY A MONTH BEFORE THEN.  I WAS IN HAWAII.

08:40:25 16    Q    ALL RIGHT.  NOW, BEFORE TODAY, YOU HAVE HAD A

08:40:33 17    CHANCE TO READ EXHIBIT 42 IN ITS ENTIRETY; RIGHT?

08:40:37 18    A    YES.

08:40:37 19    Q    NOW, ARE THERE WRITINGS IN THERE THAT YOU DID

08:40:41 20    NOT PREPARE?

08:40:41 21    A    CORRECT.

08:40:42 22    Q    OKAY.  I'M JUST GOING TO DIRECT YOUR ATTENTION

08:40:49 23    TO -- OH, DO YOU KNOW WHO PREPARED THOSE PARTS OR

08:40:56 24    BESIDES YOU, DO YOU KNOW WHO ELSE PREPARED ANY PART

08:40:59 25    OF EXHIBIT 42?

8

08:41:00 1    A    NO.  SAM HAD TAX TYPE FRIENDS THAT I DIDN'T

08:41:06 2    KNOW.

08:41:08 3              MS. WONG:  OBJECTION, HEARSAY.

08:41:10 4              THE COURT:  THE LAST PORTION OF THE

08:41:12 5    ANSWER IS STRICKEN.  "SAM HAD TAX FRIENDS THAT I

08:41:17 6    DIDN'T KNOW," THAT PORTION IS STRICKEN.

08:41:19 7              MR. FONG:  THAT'S FINE.

08:41:20 8              THE COURT:  THAT PORTION IS STRICKEN,

08:41:21 9    LADIES AND GENTLEMEN.

08:41:22 10             THE WITNESS:  MAY I RESTATE?

08:41:23 11             THE COURT:  YOU CAN ASK ANOTHER QUESTION

08:41:25 12   IF YOU WISH.

08:41:26 13             MR. FONG:  YES.

08:41:27 14   Q    SO BESIDES YOURSELF, DO YOU KNOW WHO PREPARED

08:41:31 15   ANY PART OF -- WHO ELSE PREPARED ANY PART OF

08:41:35 16   EXHIBIT 42?

08:41:35 17             MS. WONG:  OBJECTION, ASKED AND ANSWERED.

08:41:37 18   LACK OF PERSONAL KNOWLEDGE.

08:41:41 19             THE COURT:  SUSTAINED.

08:41:42 20             MR. FONG:  ALL RIGHT.

08:41:43 21   Q    DID YOU GIVE THIS DOCUMENT TO MR. FUNG

08:41:49 22   BEFORE -- WELL, LET ME ASK YOU THIS, DID YOU SEND

08:41:52 23   IN THIS DOCUMENT TO CID IN WASHINGTON?

08:41:54 24   A    NO.

08:41:54 25   Q    OKAY.  DID YOU GIVE WHATEVER PART OF THE

9

08:41:58 1    DOCUMENT THAT YOU PREPARED TO MR. FUNG?

08:42:03 2    A    YES.

08:42:03 3    Q    AND DID YOU DO SO BEFORE THE DATE THAT THE

08:42:07 4    AUGUST 2003 DATE THAT IS SET FORTH IN THE DOCUMENT?

08:42:11 5              MS. WONG:  OBJECTION, ASKED AND ANSWERED.

08:42:13 6              THE COURT:  OVERRULED.  YOU CAN ANSWER,

08:42:16 7    SIR.

08:42:16 8              THE WITNESS:  YES.

08:42:17 9    BY MR. FONG:

08:42:17 10   Q    ALL RIGHT.  NOW, DIRECTING YOUR ATTENTION TO

08:42:23 11   PAGE 2 OF THE DOCUMENT OF EXHIBIT 42, IT'S THE

08:42:30 12   THIRD FULL PARAGRAPH.

08:42:31 13             DO YOU SEE THAT?

08:42:32 14   A    YES.

08:42:33 15   Q    OKAY.  "THAT IS, FUNG HEREBY CONFESSES TO

08:42:38 16   CONSPIRACY TO COMMIT THE SAME ACTS AS COMPLAINED OF

08:42:40 17   IN THE ATTACHMENTS TO THE INSTANT OMNIBUS TAX

08:42:43 18   RETURN FILED ON MAY 1ST, 2002, WHICH ACTS CAUSED NO

08:42:48 19   CONVICTIONS FOR WHATEVER REASONS AND ADDITIONALLY

08:42:51 20   CONFIRMS THE FELONY CONFESSIONS MADE WITHIN AND

08:42:54 21   PART OF THE ATTACHMENT TO THE INSTANT OMNIBUS

08:42:59 22   RETURNS PREVIOUSLY FILED."

08:43:02 23             DO YOU SEE THAT PARAGRAPH, SIR?

08:43:04 24   A    YES.

08:43:04 25   Q    AND OKAY.  DO YOU KNOW WHO PREPARED THAT

                                                          10

08:43:07  1    PARTICULAR PARAGRAPH?

08:43:07  2    A    NOT SPECIFICALLY BUT THAT'S MY LANGUAGE.

08:43:10  3    Q    ALL RIGHT.  DIRECTING YOUR ATTENTION TO THE

08:43:19  4    LAST PARAGRAPH ON PAGE 2 OF EXHIBIT 42 IT STARTS

08:43:22  5    WITH "NOW, FUNG, TAXPAYER HEREIN HEREBY DECLARES

08:43:27  6    THAT, FUNG HEREBY FURTHER REPUDIATES THE THEORY AND

08:43:31  7    PRACTICE OF NATIONAL TRUST SERVICES MORE

08:43:34  8    SPECIFICALLY ALL OF THE TEACHING AND LEARNING HOW

08:43:36  9    TO PREPARE COMPLEX TRUST REPORTING FORM 1041'S."

08:43:41 10            DO YOU SEE THAT?

08:43:42 11    A    YES.

08:43:42 12    Q    OKAY.  NOW, DO YOU KNOW -- DO YOU REMEMBER WHO

08:43:45 13    PREPARED THAT PARTICULAR SENTENCE?

08:43:46 14    A    THAT'S -- I WROTE THAT ONE SENTENCE.  THE REST

08:43:51 15    OF THE PARAGRAPH IS NOT MINE.

08:43:53 16    Q    ALL RIGHT.  DIRECTING YOUR ATTENTION TO PAGE 6

08:44:14 17    OF EXHIBIT 42.  DO YOU SEE THAT, SIR?

08:44:17 18    A    YES.

08:44:17 19    Q    OKAY.  I'M GOING TO DIRECT YOUR ATTENTION TO

08:44:19 20    THE FIRST FULL PARAGRAPH OF EXHIBIT 40 OF -- PAGE 6

08:44:23 21    OF EXHIBIT 42.

08:44:25 22            IT READS, "FURTHER, FUNG HEREBY FURTHER

08:44:28 23    COMMITS TO DO HIS BEST TO CONTINUE TO CONVERT

08:44:31 24    NATIONAL TRUST SERVICES CLIENTS AND TRUSTS OVER TO

08:44:33 25    CORPORATE TAX FILINGS AND OTHERWISE CONVENTIONAL

11

08:44:36  1    PAYMENT OF ALL THEREBY DUE TAXES AS REASONABLY

08:44:39  2    PERCEIVED BY THE INTERNAL REVENUE SERVICE HEREBY

08:44:43  3    FURTHER FULFILLING FUNG'S COMMITMENT TO FULL

08:44:46  4    COOPERATION AND REASONABLE AGREEMENT THE INTERNAL

08:44:49  5    REVENUE SERVICE."

08:44:51  6            DO YOU SEE THAT PARAGRAPH, SIR?

08:44:54  7    A    YES, YES.

08:44:54  8    Q    AND DO YOU KNOW WHO PREPARED THE LANGUAGE OF

08:44:56  9    THAT PARAGRAPH?

08:44:57 10    A    IT LOOKS LIKE A MERGER OF I -- SOME OF IT IS

08:45:08 11    MINE.  I CAN'T TELL YOU WHICH LANGUAGE IS.

08:45:11 12    Q    OKAY.  BUT YOU DO RECOGNIZE SOME OF THE

08:45:17 13    LANGUAGE AS YOURS?

08:45:18 14    A    YES.

08:45:18 15    Q    AND WHAT ABOUT THE TERM "CONVENTIONAL PAYMENT

08:45:22 16    OF ALL THEREBY DUE TAXES AS REASONABLY PERCEIVED BY

08:45:26 17    THE INTERNAL REVENUE SERVICE," IS THAT CLAUSE

08:45:31 18    SOMETHING THAT YOU WERE FAMILIAR WITH?

08:45:32 19    A    YES.

08:45:32 20    Q    AND IS THAT CLAUSE SOMETHING THAT YOU HAD USED

08:45:35 21    PREVIOUSLY?

08:45:35 22    A    YES.

08:45:35 23    Q    SO IT WOULD BE FAIR TO SAY THAT AT LEAST EVEN

08:45:42 24    THOUGH YOU DON'T REMEMBER EXACTLY WHICH PART OF THE

08:45:44 25    FIRST FULL PARAGRAPH OF PAGE 6 OF EXHIBIT 42 THAT

                                                              12

08:45:47 1    YOU HAD ACTUALLY PREPARED AS OPPOSED TO SOMEBODY

08:45:51 2    ELSE, THAT LANGUAGE THEN WE JUST TALKED ABOUT WAS

08:45:54 3    LANGUAGE THAT YOU REMEMBERED PREPARING?

08:45:58 4    A    YES.

08:45:59 5    Q    NOW, I WANT TO MOVE ON THEN TO ANOTHER TOPIC.

08:46:12 6         FIRST OF ALL, AFTER YOUR HELPING MR. FUNG

08:46:14 7    PREPARE EXHIBIT 42, DID YOU HAVE -- WHAT WAS -- DID

08:46:17 8    YOU HAVE ANY SUBSEQUENT DEALINGS WITH MR. FUNG?

08:46:20 9    A    YES.  HE INTRODUCED ME TO THREE POTENTIAL

08:46:27 10   PARTNERS IN THE HOTEL AND THE SECURITIES OFFERING.

08:46:36 11   Q    AND DID YOU TELL -- WERE YOU AWARE -- DID YOU

08:46:39 12   TELL MR. FUNG ABOUT YOUR ATTEMPTS TO DEVELOP THE

08:46:47 13   HOTEL IN HAWAII?

08:46:49 14   A    YES, EXTENSIVE DOCUMENTATION WAS IN THE

08:46:54 15   EXHIBITS IN THE OMNIBUS RETURN.

08:46:56 16   Q    NOW, WHAT WAS YOUR PURPOSE IN TALKING TO

08:47:00 17   MR. FUNG ABOUT THE HOTEL DEVELOPMENT RIGHTS IN

08:47:02 18   HAWAII?

08:47:02 19   A    TO FIND EITHER A PARTNER OR SOMEONE TO TAKE

08:47:12 20   OVER AND BE THE DEVELOPER, INCLUDING EVEN SAM FUNG.

08:47:15 21   Q    ALL RIGHT.  NOW, WHY DID YOU THINK THAT

08:47:20 22   MR. FUNG COULD HELP YOU WITH THAT?

08:47:21 23   A    TWO REASONS.  HE WAS A CCIM, AS I DISCUSSED

08:47:29 24   EARLIER, AND HE KNEW -- THREE REASONS -- AND HE

08:47:33 25   KNEW HAWAII PRETTY WELL; AND, THREE, HE EXPLAINED

13

08:47:38 1   TO ME OR TO ME THE KIND OF TRANSACTIONS THAT HE HAD

08:47:42 2   CLOSED AND THERE WAS A SIGNIFICANT NUMBER OF

08:47:44 3   COMMERCIAL TRANSACTIONS AND DEALINGS WITH

08:47:52 4   DEVELOPERS.

08:47:53 5   Q    YOU SAID A LITTLE BIT EARLIER THAT SUBSEQUENT

08:47:55 6   TO YOUR HELPING MR. FUNG PREPARE EXHIBIT 42, HE

08:47:59 7   REFERRED SOME CLIENTS TO YOU, SOME OF HIS CLIENTS

08:48:02 8   TO YOU.  IS THAT CORRECT?

08:48:04 9   A    IN REAL ESTATE, YES.

08:48:07 10   Q    OKAY.  NOW, WHO WAS THE FIRST -- WELL, FIRST

08:48:12 11   OF ALL, ARE THESE THREE CLIENTS DR. BROCK,

08:48:17 12   DR. MORRIS BROCK, JEAN-PAUL BOURDIER, AND DR. IRWIN

08:48:20 13   GOOTNICK?

08:48:20 14   A    YES.

08:48:20 15   Q    OKAY.  SO AMONG THE THREE, WHO WAS THE FIRST

08:48:25 16   CLIENT OF MR. FUNG'S THAT HE INTRODUCED TO YOU?

08:48:28 17   A    MORRIS BROCK.

08:48:30 18   Q    AND DO YOU REMEMBER APPROXIMATELY WHEN

08:48:33 19   MR. FUNG FIRST INTRODUCED MR. BROCK OR DR. BROCK, I

08:48:37 20   SHOULD SAY, TO YOU?

08:48:38 21   A    I MET WITH DR. BROCK NOT THAT LONG AFTER HE

08:48:49 22   FIRST CALLED ME, WHICH WAS MARCH 28TH, 2003.

08:48:53 23   Q    NOW, YOU SAID MARCH 28TH, 2003.  WHY DOES THAT

08:48:57 24   DATE STICK OUT FOR YOU?

08:48:58 25   A    THAT'S WHEN SAM FUNG, I, MYSELF, AND DR. HANEY

14

08:49:04  1    AND DR. BROCK ALL MET IN -- AND THERE WAS THE BROCK

08:49:09  2    RESIDENCE.

08:49:10  3    Q     AND THAT WAS IN THE SAN FRANCISCO BAY AREA; IS

08:49:13  4    THAT CORRECT?

08:49:13  5    A     CORRECT.

08:49:17  6    Q     AND DO YOU HAPPEN TO KNOW WHAT CITY THAT WAS

08:49:20  7    IN?

08:49:28  8    A     SAN SOMETHING.

08:49:29  9    Q     THAT NARROWS IT DOWN.  SANTA ROSA MAYBE?

08:49:33 10    A     SANTA ROSA.

08:49:34 11    Q     THANK YOU.

08:49:39 12          FIRST OF ALL, YOU FLEW IN FROM HAWAII FOR

08:49:42 13    THIS MEETING, I GATHER?

08:49:43 14    A     I DID.

08:49:44 15    Q     AND WHERE DID YOU STAY -- OH, HOW LONG WERE

08:49:46 16    YOU ACTUALLY HERE FOR THAT PARTICULAR TRIP AND

08:49:49 17    MEETING WITH DRS. BROCK AND HANEY?

08:49:52 18    A     TWO OR THREE DAYS.  I STAYED AT THE VILLAGE

08:49:57 19    CREEK HOTEL WHICH IS PARTLY OWNED BY DR. BROCK.

08:50:00 20    Q     AND WAS THAT NEAR THE DR. BROCK AND

08:50:07 21    DR. HANEY'S HOME?

08:50:08 22    A     WELL, NOT IN HAWAII TERMS BUT IN CALIFORNIA

08:50:10 23    TERMS, YES.

08:50:11 24    Q     WHAT WAS IT, 10 MINUTES BY CAR OR 15 MINUTES?

08:50:14 25    A     YES.

                                                              15

08:50:14  1    Q    OKAY.  NOW, WHEN YOU CAME HERE, HAD YOU HAD

08:50:23  2    CONVERSATIONS WITH DR. MORRIS BROCK BEFOREHAND?

08:50:26  3    A    I DID.

08:50:27  4    Q    AND DID YOU HAVE CONVERSATIONS WITH SAM FUNG

08:50:29  5    REGARDING THIS PARTICULAR MEETING WITH DR. MORRIS

08:50:32  6    BROCK?

08:50:32  7    A    I DID.

08:50:35  8    Q    AND DID YOU HAVE ANY SUCH TELEPHONE

08:50:37  9    CONVERSATIONS WITH DR. CATHERINE HANEY?

08:50:39 10    A    NO.

08:50:39 11    Q    OKAY.  NOW, WHEN YOU CAME TO THE SAN FRANCISCO

08:50:48 12    BAY AREA FOR THIS MEETING, WHAT WAS YOUR INTENTION

08:50:51 13    IN TERMS OF WHAT YOU WERE GOING TO DO?

08:50:56 14    A    WELL, BY THE TIME I GOT TO CALIFORNIA, I KNEW

08:50:59 15    THAT DR. BROCK WAS AN N.T.S. CLIENT.

08:51:04 16    Q    N.T.S. CLIENT OF WHOM?

08:51:06 17    A    SAM FUNG.  SO I WANTED TO MAKE SURE THEY

08:51:10 18    LEARNED THE TRANSACTION THAT WE DID, THAT THE

08:51:12 19    I.R.S. WAS PAID AND HAD THEIR LIEN AND WOULDN'T

08:51:18 20    INTERFERE WITH THE DEVELOPMENT OF THE HOTEL.

08:51:20 21    Q    OKAY.  AND, MR. LIGHTER, I NOTICE THAT YOUR

08:51:26 22    VOICE IS DROPPING A LITTLE BIT?

08:51:27 23    A    SORRY.

08:51:28 24    Q    THAT'S OKAY.  IF YOU COULD HAVE THE MICROPHONE

08:51:30 25    CLOSER TO YOU.  THAT WOULD BE GREAT.  I APPRECIATE

                                                      16

08:51:33 1  IT.

08:51:43 2            NOW, DID YOU HAVE ANY EXPECTATION THAT

08:51:45 3  DR. BROCK WOULD BE INTERESTED IN ANY OF THE HAWAII

08:51:49 4  HOTEL PROJECTS THAT YOU WERE INVOLVED IN?

08:51:53 5  A    I DID.

08:51:53 6  Q    AND WHAT WAS THE BASIS OF YOUR EXPECTATION?

08:51:57 7  A    I ASKED HIM IF HE WAS INTERESTED AND DESIROUS

08:52:05 8  OF BUILDING A HIGH RISE NEAR THE BEACH.

08:52:14 9  Q    NOW, BEFORE THAT, BEFORE YOU CAME TO SAN

08:52:17 10 FRANCISCO TO MEET WITH DR. BROCK AND DR. HANEY AND

08:52:19 11 SAM FUNG, DID YOU -- BEFORE THAT HAD YOU HAD ANY

08:52:23 12 INFORMATION OR BELIEF AS TO WHAT DR. BROCK WAS --

08:52:28 13 WHAT HIS INTERESTS WERE IN TERMS OF INVESTMENTS AND

08:52:34 14 WHATNOT?

08:52:34 15 A    NO.

08:52:38 16 Q    AND WHAT ABOUT HIS EXPERIENCE AS AN INVESTOR?

08:52:41 17 A    WELL, HE TOLD ME HE OWNED PART OF A BRAND NEW

08:52:48 18 HOTEL AND THAT'S WHERE I WOULD BE STAYING AND

08:52:50 19 INDEED THAT'S WHERE I STAYED.

08:52:51 20 Q    ALL RIGHT.  AND WHEN YOU FIRST ARRIVED IN THE

08:52:55 21 BAY AREA, WHAT ELSE DID YOU KNOW ABOUT WHAT KIND OF

08:53:00 22 INVESTMENTS DR. BROCK HAD?

08:53:01 23 A    I DIDN'T.

08:53:07 24 Q    OKAY.  THEN YOU WENT TO THIS HOTEL NEAR THE

08:53:11 25 BROCKS' HOUSE AND AT SOME POINT I GATHER YOU WENT

17

08:53:15  1    TO DR. BROCK'S HOME, RIGHT?

08:53:20  2    A    I DID.

08:53:20  3    Q    AND DID YOU GO THERE BY YOURSELF?

08:53:23  4    A    NO, WITH MR. FUNG.

08:53:24  5    Q    AND HOW IS IT THAT YOU AND MR. FUNG WENT TO

08:53:30  6    THE BROCKS' HOME TOGETHER?

08:53:33  7    A    HE CAME TO THE VILLAGE CREEK HOTEL, I THINK

08:53:36  8    THAT'S THE NAME, AND WE TOOK ONE CAR.

08:53:38  9    Q    ALL RIGHT.  DO YOU REMEMBER WHOSE CAR IT WAS,

08:53:40 10    YOURS OR MR. FUNG'S?

08:53:41 11    A    I THINK IT WAS MINE BECAUSE I HAD A LOT OF

08:53:52 12    DOCUMENTS TO GIVE BROCK REGARDING THE HOTEL AND HIS

08:53:59 13    CAR WAS --

08:54:00 14    Q    AND NOW, BEFORE YOU AND SAM FUNG DROVE OVER TO

08:54:05 15    BROCKS' HOME, HAD YOU HAD ANY CONTACT WITH

08:54:07 16    DR. BROCK OR DR. HANEY?

08:54:09 17    A    I HAD DINNER WITH THEM THE NIGHT BEFORE.

08:54:14 18    Q    AND DURING THAT DINNER -- WELL, FIRST OF ALL,

08:54:16 19    WAS SAM FUNG THERE?

08:54:17 20    A    NO.

08:54:17 21    Q    AND DURING THAT DINNER, DID YOU DISCUSS ANY

08:54:20 22    KIND OF BUSINESS AT ALL?

08:54:21 23    A    WE COULD HAVE.  I DON'T RECALL SPECIFICALLY.

08:54:28 24    Q    THEN YOU AND SAM FUNG DROVE TO THE BROCKS'

08:54:32 25    HOME.  WAS THAT THE SAME DAY THAT YOU AND THE

                                                              18

08:54:37 1    BROCKS ENDED UP SIGN SOMETHING DOCUMENTS?

08:54:39 2    A    SOME PRELIMINARY DOCUMENTS, YES.

08:54:41 3    Q    AND THAT WOULD HAVE BEEN?

08:54:42 4    A    THE 28TH OF MARCH.

08:54:44 5    Q    OF 2003?

08:54:46 6    A    MARCH 28TH, 2003.

08:54:49 7    Q    ALL RIGHT.  SO MARCH 28TH, 2003 WOULD HAVE

08:54:52 8    BEEN THE DAY YOU WENT OVER THEIR HOUSE?

08:54:54 9    A    CORRECT.

08:54:54 10   Q    AND HOW LONG DID THIS MEETING TAKE AT THE

08:54:57 11   BROCKS' HOME?

08:55:00 12   A    APPROXIMATELY FIVE HOURS.

08:55:06 13   Q    AND DURING THE COURSE OF THE FIVE HOURS, WHAT

08:55:08 14   WAS DONE?  WHAT HAPPENED?

08:55:10 15   A    WELL, I HAD TO GIVE A FIRSTHAND DISSERTATION

08:55:20 16   ON THE HOTEL AND DISCLOSE EVERYTHING I KNEW ABOUT

08:55:22 17   THE HOTEL AND TRIED TO GO OVER AS MANY OF THE

08:55:25 18   DOCUMENTS THAT I HAD BROUGHT EXTENSIVELY.

08:55:29 19   Q    AND WHEN YOU SAY, "THE HOTEL," CAN YOU TELL US

08:55:31 20   SPECIFICALLY -- I'M SORRY, WE TALKED OVER EACH

08:55:33 21   OTHER, WHICH IS BAD FOR MADAM COURT REPORTER.  I'LL

08:55:38 22   START AGAIN.

08:55:39 23        WHEN YOU SAID YOU TOLD HIM ABOUT THE

08:55:41 24   HOTEL, WHICH HOTEL WERE YOU REFERRING TO

08:55:43 25   SPECIFICALLY?

19

08:55:43 1    A    HAWAIIN COLONY HOTEL CORPORATION WAIKIKI.

08:55:48 2    Q    OKAY.  SO YOU TOLD HIM ABOUT THE HOTEL.  AND

08:55:51 3    WHAT DID YOU SAY ABOUT THE HOTEL?

08:55:53 4    A    THAT THE INTEREST OF HCHC CHIEFLY COMPRISED OF

08:56:04 5    DEVELOPMENT RIGHTS TO BUILD A HIGH RISE WITH

08:56:07 6    REVERSION UNTIL THE YEAR 2015 AND THE NATURE OF THE

08:56:13 7    OPPORTUNITY TO BUILD A -- BECAUSE OF THE ZONING,

08:56:19 8    THE HEIGHT LIMIT, POTENTIAL FOR THE MASS TRANSIT TO

08:56:24 9    GO THROUGH AND EVEN SERVICE OF MILITARY BECAUSE

08:56:29 10   ACROSS THE STREET WAS A MAIN MILITARY HOTEL AND ONE

08:56:33 11   OF THE MAIN MILITARY HOTELS IN THE UNITED STATES.

08:56:39 12   Q    NOW, DID DR. MORRIS BROCK ASK YOU ANY

08:56:45 13   QUESTIONS ABOUT YOUR HOTEL PROJECT?

08:56:47 14   A    VERY MANY.

08:56:48 15   Q    OKAY.  AND DID YOU COME AWAY WITH ANY BELIEF

08:56:55 16   AS TO WHETHER OR NOT DR. MORRIS BROCK WAS

08:56:58 17   INTERESTED IN INVESTING IN THE PROJECT?

08:57:01 18   A    YES.

08:57:01 19   Q    OKAY.  AND, NOW, DID THEN THE FOUR OF YOU TALK

08:57:09 20   ABOUT SORT OF HOW -- IF SOMEBODY WAS INTERESTED IN

08:57:14 21   INVESTING IN THIS HOTEL PROJECT IN HAWAII, HOW THAT

08:57:17 22   WOULD BE DONE?

08:57:17 23   A    WE GOT INTO THE DETAILS, OH, BUT THE OVERVIEW

08:57:20 24   WAS TO GIVE HCHC, THE HAWAIIN COLONY HOTEL

08:57:28 25   CORPORATION, AND SAFELY GIVE HCHC ENOUGH ASSETS SO

20

08:57:31  1    IT COULD BORROW $3 TO $5 MILLION TO CONSOLIDATE THE

08:57:42  2    INTEREST IN THE PROJECT OR TO CREDIBLY SWITCH THE

08:57:54  3    YET-TO-BE DRAFTED SECURITIES OFFERING.

08:57:57  4    Q    SO WHAT DO YOU MEAN BY "YET-TO-BE DRAFTED

08:58:01  5    SECURITIES OFFERING"?  WHAT ARE YOU REFERRING TO?

08:58:04  6    A    WELL, IN NOVEMBER OF 2004 A SECURITIES

08:58:09  7    OFFERING WAS EVENTUALLY FILED WITH THE S.E.C. TO

08:58:12  8    FUND THE CONSOLIDATION AND DEVELOPMENT EFFORTS OF

08:58:16  9    THE HAWAIIN COLONY HOTEL CORPORATION AMONG OTHER

08:58:17 10    ITEMS.

08:58:19 11    Q    AND DID YOU HAVE ANYTHING TO DO WITH THAT

08:58:21 12    SECURITIES OFFERING?

08:58:21 13    A    I WROTE IT.

08:58:23 14    Q    OKAY.  SO YOU WERE BEHIND -- YOU WERE THE

08:58:26 15    PERSON BEHIND IT, RIGHT?

08:58:27 16    A    I AND DEAN ROBIN WROTE IT.  HE'S A SECURITIES

08:58:34 17    EXPERT.

08:58:34 18    Q    ALL RIGHT.  OKAY.  BUT IT WAS DONE -- IT WAS

08:58:37 19    YOUR INITIATIVE?

08:58:38 20    A    YES.

08:58:39 21    Q    NOW, DID YOU MENTION -- DID YOU TELL THE

08:58:46 22    BROCKS ABOUT THIS FUTURE SECURITIES OFFERING?

08:58:49 23    A    YES.

08:58:49 24    Q    NOW, DURING THESE MEETINGS WITH THE BROCKS,

08:58:56 25    YOU KNOW, THE FOUR OR FIVE HOURS, WAS THERE ANY

                                                           21

08:58:58  1    DISCUSSION ABOUT DR. BROCK AND DR. HANEY'S TAX

08:59:01  2    SITUATION?

08:59:01  3    A    YES, THEY SAID THEY OWED APPROXIMATELY

08:59:06  4    $50,000.

08:59:07  5    Q    NOW, AT THAT POINT IN THE MEETING WHEN THEY

08:59:10  6    SAID THEY OWED APPROXIMATELY $50,000 -- I GATHER

08:59:14  7    $50,000 IN TAXES, RIGHT?

08:59:16  8    A    IN TAXES DUE.

08:59:17  9    Q    TAXES DUE.  NOW, HAD YOU -- AT THAT POINT HAD

08:59:21 10    YOU SEEN ANY DOCUMENTS REGARDING THEIR TAX

08:59:25 11    SITUATION?

08:59:26 12    A    NO.  EVENTUALLY THEY BROUGHT OUT THEIR RECORDS

08:59:31 13    THAT I LOOKED AT FOR ABOUT FIVE MINUTES AND THEY

08:59:33 14    GAVE THEIR RECORDS TO SAM FUNG.

08:59:34 15    Q    OKAY.  SO AT THAT POINT THAT THEY TOLD YOU

08:59:37 16    THAT, LOOK, WE BELIEVE WE HAVE ABOUT $50,000 OF

08:59:41 17    TAX, BACK TAXES DUE, YOU HAD NOT SEEN ANY SOURCE

08:59:45 18    DOCUMENT; IS THAT CORRECT?

08:59:47 19             MS. WONG:  OBJECTION, ASKED AND ANSWERED.

08:59:49 20             THE COURT:  YOU CAN ANSWER THE QUESTION

08:59:53 21    IF YOU HAVE SEEN ANY SOURCE DOCUMENTS.

08:59:56 22             THE WITNESS:  I DID NOT REVIEW SOURCE

08:59:57 23    DOCUMENTS OTHER THAN THE FIVE-MINUTE CURSORY SCAN.

09:00:01 24    BY MR. FONG:

09:00:02 25    Q    ALL RIGHT.

                                                              22

09:00:02 1     A     AND I'M NOT POSITIVE -- AND THOSE DID NOT

09:00:04 2     INCLUDE ANY RECEIPTS OR INVOICES OR TYPICAL SOURCE

09:00:11 3     DOCUMENTS THAT I WOULD NORMALLY ASK FOR.

09:00:14 4     Q     NOW, AT THE TIME -- WHEN YOU LEFT THAT

09:00:17 5     MEETING, DID YOU HAVE IN YOUR MIND A GOOD IDEA AS

09:00:21 6     TO THE NATURE OR EXTENT OF ANY I.R.S. PROBLEMS THAT

09:00:26 7     DR. BROCK OR DR. HANEY MIGHT HAVE?

09:00:29 8     A     NO, AND I DID NOT KNOW THEY RECEIVED THE AUDIT

09:00:33 9     NOTICE OR ANYTHING LIKE THAT.

09:00:34 10    Q     ALL RIGHT.  OKAY.  WAS THERE SUBSEQUENT -- AT

09:00:43 11    THAT MEETING, DID YOU DRAFT ANY DOCUMENTS?

09:00:45 12    A     I DID.

09:00:46 13    Q     AND WHAT DID YOU DRAFT OR PREPARE?

09:00:58 14    A     THERE ARE FOUR MAIN DOCUMENTS.

09:00:59 15    Q     OKAY.  TO THE BEST OF YOUR ABILITY, IF YOU

09:01:04 16    COULD GO OVER TO THE BEST OF YOUR RECOLLECTION WHAT

09:01:06 17    THOSE FOUR MAIN DOCUMENTS ARE?

09:01:08 18    A     THERE'S THE BILL OF SALE.

09:01:11 19    Q     OKAY.

09:01:13 20    A     AN ASSIGNMENT, A PROMISSORY NOTE, AND A

09:01:16 21    CLARIFICATION.

09:01:17 22    Q     WERE ALL FOUR DOCUMENTS DRAFTED ON THAT SAME

09:01:20 23    DAY OR PREPARED ON THAT SAME DAY?

09:01:24 24    A     YES, WITH A CLARIFICATION IT WAS DRAFTED BACK

09:01:27 25    IN -- AFTER I LEFT THE BROCKS, THE SAME DAY BUT

                                                              23

09:01:30 1    AFTER I LEFT THE BROCKS.

09:01:31 2    Q    OKAY.  SO THE THREE DOCUMENTS THAT YOU DID

09:01:35 3    PREPARE WHILE YOU WERE AT DR. BROCK'S HOME WERE THE

09:01:38 4    BILL OF SALE, THE ASSIGNMENT, AND A PROMISSORY

09:01:44 5    NOTE?

09:01:44 6    A    CORRECT.

09:01:44 7    Q    SO TELL US -- THE BILL OF SALE, FIRST OF ALL,

09:01:48 8    THAT'S -- IS THAT -- THAT'S A DOCUMENT THAT

09:01:58 9    DR. HANEY TESTIFIED TO EARLIER IN THIS TRIAL; IS

09:02:00 10   THAT CORRECT?

09:02:00 11   A    YES.

09:02:01 12   Q    I'M GOING TO SHOW YOU A DOCUMENT THAT HAS BEEN

09:02:14 13   PUBLISHED -- I'M SORRY -- ADMITTED INTO EVIDENCE AS

09:02:17 14   GOVERNMENT'S EXHIBIT 192.

09:02:45 15           I'LL GIVE YOU A COPY.  FIRST OF ALL, DO

09:02:47 16   YOU SEE THE FIRST PAGE OF EXHIBIT 192 IN THE

09:02:50 17   DOCUMENT IN FRONT OF YOU ON THE SCREEN?

09:02:52 18   A    I DO.

09:02:53 19   Q    AND IS THIS THE BILL OF SALE THAT YOU

09:02:56 20   MENTIONED A LITTLE BIT EARLIER?

09:02:57 21   A    IT IS.

09:03:14 22   Q    AND DID YOU PREPARE THIS DOCUMENT?

09:03:16 23   A    I DID, WITH INPUT FROM THE BROCKS.

09:03:18 24   Q    OKAY.  AND WHAT DID YOU UNDERSTAND THIS

09:03:20 25   DOCUMENT IS SUPPOSED TO DO, BILL OF SALE, THAT'S

                                                              24

09:03:23 1    GOVERNMENT'S EXHIBIT 192?

09:03:25 2    A    WELL, SUBJECT TO CERTAIN THINGS HAVEN'T

09:03:34 3    HAPPENED YET, THE IDEA WAS TO TAKE THE BROCKS'

09:03:46 4    TRUST THAT THEY HELD ASSETS SO THE LIABILITIES,

09:03:54 5    INCLUDING TAX LIABILITIES, AND TRANSFER THEM, THE

09:03:57 6    OWNERSHIP CERTIFICATES IT'S CALLED BENEFICIAL

09:04:01 7    INTEREST CERTIFICATES, IT'S LIKE STOCK BUT FOR

09:04:05 8    TRUSTS, AND TRANSFER THEM TO HCHC, AGAIN, SUBJECT

09:04:12 9    TO THE BROCKS RECEIVING 100 PERCENT LIENS IN THEIR

09:04:26 10   FAVOR, OF COURSE, THAT WOULD BE JUNIOR TO THE

09:04:33 11   PARAMOUNT LIENS TO THE I.R.S. BY THE TIME THIS LIEN

09:04:37 12   CLOSED BECAUSE I WAS GOING TO FILE AN OMNIBUS

09:04:40 13   RETURN.

09:04:40 14   Q    SO YOU MENTIONED -- THIS IS A STARTING POINT.

09:04:43 15   THIS IS A WAY -- THIS DOCUMENT, YOU UNDERSTOOD THIS

09:04:45 16   DOCUMENT TO TRANSFER FROM THE -- FROM DR. BROCK AND

09:04:49 17   DR. HANEY THEIR TRUST ASSETS TO HCHC, THE COMPANY

09:04:53 18   THAT YOU CONTROLLED AT THE TIME; IS THAT CORRECT?

09:04:56 19   A    SUBJECT TO ALL OF THESE THINGS, YES.

09:04:58 20   Q    OKAY.  BUT THAT WAS THE FIRST STEP?

09:05:00 21   A    FIRST STEP.

09:05:01 22   Q    ALL RIGHT.  OKAY.  NOW, AT THE TIME YOU

09:05:08 23   DRAFTED THIS DOCUMENT, DO YOU KNOW WHAT KIND OF

09:05:10 24   ASSETS DR. BROCK AND DR. HANEY HAD IN THEIR TRUST?

09:05:15 25   A    IT CAME LATER ON IN THE MEETING HE WROTE IT

                                                      25

09:05:17  1    OUT A LIST OF A FINANCIAL STATEMENT.

09:05:23  2    Q    NOW, I'M GOING TO DIRECT YOUR ATTENTION TO THE

09:05:26  3    FIRST, THE FIRST NUMBERED PARAGRAPH OF PAGE 1 OF

09:05:33  4    EXHIBIT 192.  IT READS:  "SAID TRUSTS ARE

09:05:37  5    ENCUMBERED WITH NON-RECOURSE LIENS IN FAVOR OF THE

09:05:40  6    DESIGNATED CORPORATION WHICH GRANTOR'S ARE

09:05:43  7    EXECUTIVE OFFICERS OF.  UNTIL SAID LIENS ARE

09:05:46  8    SATISFIED."

09:05:48  9          FIRST OF ALL, WHO WERE THE GRANTORS IN

09:05:50  10   THIS DOCUMENT?

09:05:51  11   A    THE BROCKS.

09:05:52  12   Q    OKAY.  THAT WOULD BE DR. MORRIS BROCK AND

09:05:57  13   DR. CATHERINE HANEY?

09:05:57  14   A    CORRECT.

09:05:57  15   Q    NOW, WHAT DID YOU UNDERSTAND PARAGRAPH 1 WAS

09:06:04  16   GOING TO TRY TO ACCOMPLISH?

09:06:11  17   A    WE WERE GOING TO HAVE THE ATTORNEYS CREATE

09:06:14  18   LIENS ON EITHER THE PERSONAL OR THE REAL PROPERTY

09:06:16  19   SO THAT THE, SO THAT TO SECURE THE PROMISSORY NOTE

09:06:24  20   DUE FROM HCHC.

09:06:26  21   Q    OKAY.  SO YOU MENTIONED PROMISSORY NOTE.  HOW

09:06:29  22   DOES THE PROMISSORY NOTE FIT INTO THIS TRANSACTION?

09:06:32  23   A    WELL, MORRIS AND CATHERINE BROCK WERE SELLING

09:06:40  24   THEIR ASSETS, THEIR TRUST ASSETS, ACTUALLY THEIR

09:06:47  25   TRUSTS, NOT THEIR ASSETS, THE TRUST TO HCHC.  HCHC

                                                          26

09:06:52  1    WAS GIVING OR GAVE THE BROCKS A PROMISSORY NOTE FOR

09:06:55  2    2.285 MILLION SECURED BY A LIEN ONCOMING, NOT YET

09:07:00  3    DRAFTED BY ATTORNEYS, LIENS ON ALL OF THE ASSETS OF

09:07:04  4    THE TRUSTS.

09:07:06  5    Q    ALL RIGHT.  SO THE -- SO IS IT FAIR, JUST LIKE

09:07:10  6    I CAN SUM IT UP SO THAT I UNDERSTAND IT, THE IDEA

09:07:14  7    WAS THAT --

09:07:15  8             MS. WONG:  OBJECTION, ASKED AND ANSWERED.

09:07:22  9             THE COURT:  SUSTAINED.  SO YOU CAN ASK

09:07:28 10    ANOTHER QUESTION.

09:07:29 11             MR. FONG:  THANK YOU, YOUR HONOR.

09:07:30 12    Q    NOW, YOU SAID THERE WAS A PROMISSORY NOTE FOR

09:07:34 13    $2.285 MILLION; IS THAT CORRECT?

09:07:36 14    A    I BELIEVE THAT'S THE FIGURE.

09:07:37 15    Q    AND THEN THE PROMISSORY NOTE WOULD BE SECURE

09:07:39 16    BY WHAT?

09:07:39 17    A    LET ME THINK.  IT WOULD BE SECURED BY THE

09:08:05 18    ASSETS OF THE TRUST.

09:08:07 19    Q    THE VERY SAME ASSETS THAT THE BROCKS, BY

09:08:10 20    THIS -- BY THE BILL OF SALE WERE SELLING TO HCHC;

09:08:14 21    RIGHT?

09:08:14 22    A    CORRECT.

09:08:14 23    Q    NOW, HAD YOU SEEN THESE TYPE OF TRANSACTIONS

09:08:19 24    BEFORE WHERE SOMEBODY SELLS SOME ASSETS TO

09:08:22 25    SOMEBODY, THE SELLER SELLS ASSETS TO BUYER.  THE

                                                          27

09:08:29 1    BUYER GETS -- EXCUSE ME.  THE BUYER WOULD GET BACK

09:08:32 2    SOME KIND OF SECURITY INTEREST IN THE ASSETS THAT

09:08:34 3    THE BUYER JUST ACQUIRED TO SECURE WHAT THE BUYER

09:08:37 4    OWES TO THE SELLER?

09:08:39 5              MS. WONG:  OBJECTION.  RELEVANCE.

09:08:42 6              THE COURT:  OVERRULED.  YOU CAN ANSWER

09:08:44 7    THE QUESTION.

09:08:44 8              THE WITNESS:  IT'S EXTREMELY COMMON LIKE

09:08:46 9    A PURCHASE MONEY MORTGAGE OR A DEED OF TRUST, IT'S

09:08:50 10   THE SAME CONCEPT THAT I WAS TRYING TO CONDUCT HERE.

09:08:54 11   BY MR. FONG:

09:08:54 12   Q    NOW, YOU MENTIONED THE TERM "PURCHASE MONEY

09:08:57 13   MORTGAGE."  WHAT IS YOUR UNDERSTANDING OF WHAT IS A

09:09:00 14   PURCHASE MONEY MORTGAGE?

09:09:05 15   A    LET'S SAY I BUY YOUR HOUSE FOR $500,000 AND I

09:09:15 16   PUT $100,000 DOWN.  I OWE YOU $400,000.

09:09:15 17   Q    MR. LIGHTER, YOU MAY HAVE TO START OVER.  TRY

09:09:18 18   IT AGAIN IF YOU DON'T MIND.

09:09:19 19   A    LET'S SAY I BUY YOUR HOUSE FOR $500,000.  I

09:09:26 20   PUT $100,000 DOWN PAYMENT, AND THEN I OWE YOU

09:09:30 21   $400,000.  SO I'M THE OWNER OF THE HOUSE NOW, BUT I

09:09:37 22   PUT A MORTGAGE OR A TRUSTEE IN THE AMOUNT OF

09:09:41 23   $400,000 PAYABLE TO YOU.

09:09:42 24   Q    THE SELLER?

09:09:43 25   A    THE SELLER.

                                                              28

09:09:44  1      Q      AND THAT'S YOUR UNDERSTANDING OF WHAT A

09:09:47  2   PURCHASE MONEY MORTGAGE IS?

09:09:49  3      A      CORRECT.

09:09:49  4      Q      OKAY.  AND YOU BELIEVED THAT WHAT YOU WERE --

09:09:54  5   WHAT THE TRANSACTION THAT WE HAVE BEEN TALKING

09:09:57  6   ABOUT, THE BILL OF SALE AND THE PROMISSORY NOTE AND

09:09:58  7   THE LIENS WERE KIND OF THE EQUIVALENT OF A PURCHASE

09:10:02  8   MONEY MORTGAGE?

09:10:03  9      A      YES, THE DIFFERENCE IS THAT THERE IS PERSONAL

09:10:07 10   AND REAL PROPERTY SO THE ATTORNEYS WILL HAVE TO

09:10:10 11   SORT THAT OUT.

09:10:10 12      Q      ALL RIGHT.  THAT BRINGS UP ANOTHER QUESTION,

09:10:14 13   WAS THIS -- FIRST OF ALL, THIS BILL OF SALE WAS

09:10:17 14   SIGNED BY THE BROCKS AND YOURSELF AND SAM FUNG; IS

09:10:23 15   THAT TRUE?

09:10:23 16      A      YES.

09:10:23 17      Q      NOW, IF THAT'S A SIGNED DOCUMENT, DID YOU --

09:10:31 18   WAS IT YOUR INTENTION THAT THIS BILL OF SALE WOULD

09:10:34 19   BE THE FINAL DOCUMENT IN THIS TRANSACTION?

09:10:37 20      A      NO, I WANTED TO -- I JUST WANTED TO HAVE

09:10:41 21   ENOUGH STANDING TO FILE AN OMNIBUS RETURN TO

09:10:45 22   ENFORCE THE I.R.S. LIEN TO GATHER THE ASSETS SO IT

09:10:52 23   COULD CLEAN UP ANY N.T.S. TYPE PROBLEMS WITH THE

09:10:57 24   I.R.S. BEFORE I GOT INTO BED AND DID BUSINESS WITH

09:10:59 25   THESE PEOPLE.  I WANTED TO CLEAN THEM UP.

                                                            29

09:11:01 1      Q    ALL RIGHT.  NOW, DIRECTING YOUR ATTENTION

09:11:02 2    AGAIN TO THE FIRST PAGE OF EXHIBIT 192.  DO YOU SEE

09:11:11 3    IT SAYS THAT THERE SHALL BE THREE PARTY CHECKS FOR

09:11:15 4    ALL DISBURSEMENTS OF THE FUNDS OF THE GUARANTEE

09:11:18 5    WITH ONE SIGNATORY IRREVOCABLY CHOSEN BY THE

09:11:23 6    GRANTOR.

09:11:23 7           FIRST OF ALL, THIS WORD "GRANTEE IN THIS

09:11:26 8    DOCUMENT THE BILL OF SALE, WHAT IS YOUR

09:11:28 9    UNDERSTANDING, WHO DOES THAT REFER TO?

09:11:29 10     A    THE GRANTEE IS THE HAWAIIN HCHC, THE HAWAIIN

09:11:34 11   COLONY HOTEL CORPORATION.

09:11:34 12     Q    OKAY.  SO THE GRANTEE IS THE BUYER IN ESSENCE?

09:11:38 13     A    THE BUYER.

09:11:39 14     Q    OKAY.  WHAT IS YOUR UNDERSTANDING OF WHY

09:11:41 15   PARAGRAPH 2 WAS THERE?  AND WHY WOULD THERE BE --

09:11:45 16   AND, OF COURSE, THE GRANTOR WOULD BE DRS. BROCK AND

09:11:51 17   HANEY; RIGHT?

09:11:52 18     A    CORRECT.

09:11:53 19     Q    OKAY.  NOW, WHY WOULD HCHC'S CHECKING ACCOUNT,

09:11:59 20   WHY WOULD THERE BE -- WHY WOULD THE BROCKS HAVE

09:12:01 21   CONTROL OVER THE SIGNATOR OF THAT CHECKING ACCOUNT?

09:12:06 22   WHAT WAS THE PURPOSE?

09:12:06 23     A    TO GIVE BROCK CONTROL OVER ALL FUNDS, IN OTHER

09:12:11 24   WORDS, MY CHECKBOOK.

09:12:13 25           I'M GIVING BROCK 50 PERCENT OF MY ASSETS,

30

09:12:16 1    CONTROL OF THE CHECKBOOK ON HIS ORAL PROMISE TO

09:12:25 2    BUILD A HIGH RISE.  IT WAS NOT A GREAT DEAL FOR ME

09:12:29 3    IN HINDSIGHT.

09:12:29 4    Q    SO YOU SAID THAT YOU WERE GIVING 50 PERCENT OF

09:12:32 5    YOUR WHAT?

09:12:33 6    A    OF THE HOTEL AND ASSETS.

09:12:34 7    Q    BUT THAT PART OF THE TRANSACTION IS NOT PART

09:12:38 8    OF THE BILL OF SALE; RIGHT?

09:12:40 9    A    THAT'S THE ASSIGNMENT.

09:12:41 10   Q    OKAY.  SO THAT'S THE DOCUMENT LATER?

09:12:43 11   A    LATER.

09:12:43 12   Q    OKAY.  BUT I MEAN, THE SAME DAY BUT THAT'S A

09:12:46 13   DOCUMENT THAT WE HAVE NOT LOOKED AT YET, RIGHT?

09:12:48 14   A    YES.

09:12:49 15   Q    OKAY.  AND PARAGRAPH 4 IT READS "GRANTEE."

09:13:01 16   AGAIN, THAT'S HCHC, RIGHT?

09:13:01 17   A    YES.

09:13:01 18   Q    AND "ASSUMES ALL LIABILITIES OF SAID TRUSTS

09:13:06 19   INCLUDING ALL ACCRUED AND CURRENT TAXES, WHICH TAX

09:13:09 20   LIABILITY MAY BE OVER $50,000."

09:13:11 21           OKAY.  NOW WHAT DOES THAT MEAN?  WHAT IS

09:13:15 22   YOUR UNDERSTANDING OF WHAT THAT PARAGRAPH 4 MEANT?

09:13:19 23   A    WELL, HCHC WAS BUYING THE TRUST SO IT SHOULD

09:13:29 24   ALSO ASSUME LIABILITIES.  THAT'S THE RESPONSIBLE

09:13:32 25   THING TO DO.

31

09:13:32 1      Q    NOW, AT THE TIME THAT YOU AGREED TO SIGN

09:13:36 2      EXHIBIT 192, INCLUDING THE HAVING HCHC YOUR COMPANY

09:13:41 3      ASSUME ALL LIABILITIES FOR DR. BROCK AND

09:13:45 4      DR. HANEY'S TRUSTS, INCLUDING THEIR TAX LIABILITY,

09:13:51 5      YOU DID NOT KNOW THE TRUE EXTENT OR NATURE OF THEIR

09:13:56 6      TAX LIABILITY?

09:13:57 7      A    ABSOLUTELY.

09:14:00 8                MS. WONG:  OBJECTION.  LEADING.

09:14:03 9                THE COURT:  THE QUESTION IS LEADING.

09:14:05 10               DO YOU WANT TO ASK IT IN A DIFFERENT

09:14:07 11     MANNER OR FORM?

09:14:08 12               MR. FONG:  SURE.

09:14:09 13               THE COURT:  SUSTAINED.

09:14:10 14     BY MR. FONG:

09:14:11 15     Q    WHEN YOU DRAFTED OR WHEN YOU SIGNED

09:14:14 16     EXHIBIT 192, DID YOU KNOW THE TRUE -- THE FULL

09:14:19 17     EXTENT AND NATURE OF DR. BROCK AND DR. HANEY'S TAX

09:14:24 18     LIABILITY?

09:14:25 19     A    NO.

09:14:26 20     Q    OKAY.  AND -- BUT YOU WERE WILLING TO HAVE

09:14:30 21     YOUR COMPANY ASSUME THEIR LIABILITIES, INCLUDING

09:14:34 22     TAX LIABILITIES.  WHY?

09:14:36 23     A    I'M TAKING THEIR WORD FOR IT, BUT AT THIS

09:14:42 24     STAGE IT'S STILL PRELIMINARY AND I'M GOING TO ASK

09:14:44 25     FOR MORE INFORMATION, OF COURSE.

                                                              32

09:14:55 1    Q    NOW, BY THE WAY, DURING THIS DISCUSSION THAT

09:14:58 2    RESULTED IN THE BILL OF SALE BEING SIGNED, WAS

09:15:01 3    THERE ANY DISCUSSION ABOUT WHETHER OR NOT SAM FUNG

09:15:06 4    WOULD BE INVOLVED IN THIS PROJECT?

09:15:08 5    A    YES, HE WAS PROMISED $2,000 OF MY SALARY.

09:15:17 6    Q    AND FOR WHAT?

09:15:19 7    A    TWO THINGS:  ONE IS TO SEEK FURTHER ADVICE OR

09:15:26 8    NEW PROJECTS OR THAT SORT OF BROKER ROLE, BUT ALSO

09:15:30 9    TO HELP MANAGE THE ASSETS BECAUSE THE ASSETS WERE

09:15:34 10   ON THE MAINLAND AND I'M IN HAWAII.

09:15:38 11   Q    SO THAT MR. FUNG WAS SUPPOSED TO HELP OUT IN

09:15:44 12   THIS PROJECT?

09:15:44 13   A    LIKE A MANAGING ROLE.

09:15:46 14   Q    ALL RIGHT.  AND --

09:15:50 15   A    AND HE WAS LICENSED TO DO THAT.

09:15:52 16   Q    OKAY.  BY THE WAY, WAS THERE ANY DISCUSSION

09:15:54 17   ABOUT YOU GETTING A YEARLY COMPENSATION LIKE YOU

09:15:58 18   GUYS TALKED ABOUT FOR MR. FUNG?

09:16:00 19   A    NO.

09:16:00 20   Q    OKAY.  I'M GOING TO SHOW YOU A DOCUMENT THAT

09:16:16 21   HAS BEEN ADMITTED INTO EVIDENCE AS 194, AND I'LL

09:16:19 22   GIVE YOU A COPY OF THAT AS WELL.

09:16:42 23        I'LL PUBLISH THAT ON THE ELMO.  FIRST OF

09:16:44 24   ALL, MR. LIGHTER, DO YOU SEE THE DOCUMENT THAT I

09:16:47 25   JUST HANDED YOU THAT IS MARKED AS GOVERNMENT'S

33

09:16:49  1     EXHIBIT 194?

09:16:50  2     A     I DO.

09:16:51  3     Q     OKAY.  AND IT'S A TWO-PAGE DOCUMENT; IS THAT

09:16:58  4     CORRECT?

09:16:58  5     A     YES.

09:16:58  6     Q     AND DO YOU RECOGNIZE THE DOCUMENT?

09:16:59  7     A     YES.

09:17:00  8     Q     AND WHAT IS YOUR UNDERSTANDING OF WHAT

09:17:03  9     EXHIBIT 194 IS?

09:17:04 10     A     THIS IS THE ASSIGNMENT, ALL OF THE INTERESTS

09:17:16 11     OF THE INCOMING ASSETS TO A CORPORATION AND THE

09:17:27 12     NAME OF THE CORPORATION IS TO MORRIS BROCK.

09:17:32 13     Q     I'M SORRY.  I COULDN'T HEAR YOU.

09:17:34 14     A     THIS ASSIGNS ALL OF THE ASSETS OF THE HAWAIIN

09:17:38 15     COLONY HOTEL CORPORATION TO THE BROCKS

09:17:39 16     INDIVIDUALLY.

09:17:39 17     Q     OKAY.  NOW, BEFORE WE GET TO MORE OF THE

09:17:42 18     CONTENT OF THE DOCUMENT, YOU DID SIGN THIS

09:17:48 19     PARTICULAR DOCUMENT, RIGHT?

09:17:49 20     A     I DID.

09:17:50 21     Q     AND DID YOU SEE THE BROCKS SIGN ON PAGE 2?

09:17:55 22     A     I DID.

09:17:56 23     Q     AND THIS WAS ALL PREPARED AND SIGNED ON MARCH

09:18:03 24     28TH, 2003; IS THAT CORRECT?

09:18:06 25     A     YES.

                                                              34

09:18:06  1      Q     OKAY.  SO YOU JUST TESTIFIED THAT THE INTENT

09:18:18  2      OF THIS DOCUMENT WAS TO TRANSFER THE HCHC'S

09:18:22  3      DEVELOPMENT RIGHTS TO THE BROCKS; IS THAT CORRECT?

09:18:24  4      A     YES.

09:18:24  5      Q     OKAY.  WHAT IS YOUR UNDERSTANDING OF WHAT THE

09:18:33  6      BROCKS WOULD BE PAYING -- OR WHAT WERE THEY PAYING

09:18:35  7      SOMETHING OR GIVING SOMETHING TO ACQUIRE THESE

09:18:37  8      RIGHTS?

09:18:38  9      A     WELL, THIS ASSIGNMENT WAS MODIFIED BY A

09:18:47 10      CLARIFICATION.  SO THEY ONLY GOT HALF OF THE

09:18:50 11      ASSETS.

09:18:50 12      Q     OKAY.  BUT EVEN HALF, WHAT WAS YOUR

09:18:56 13      UNDERSTANDING OF WHAT THE BROCKS WERE GIVING, IF

09:18:59 14      ANYTHING, TO RECEIVE THE HALF OF HCHC'S DEVELOPMENT

09:19:08 15      RIGHTS?

09:19:08 16      A     THAT'S A GOOD QUESTION.  THEY WERE GIVING THE

09:19:10 17      PROMISE TO BUILD A HIGH RISE, THE PROMISE TO

09:19:13 18      CONSOLIDATE OR DEVELOP THE HOTEL IN WAIKIKI AND

09:19:17 19      THEY KEPT FULL CONTROL OVER THEIR ASSETS AND MY

09:19:25 20      ASSETS.

09:19:25 21      Q     OKAY.  BUT WHY WOULD YOU BE WILLING TO DO

09:19:28 22      THAT?

09:19:28 23      A     I FIGURED THAT THE REASON WAS

09:19:39 24      MYSELF-MOTIVATION OR SELF-BENEFIT WAS ENOUGH TO

09:19:42 25      MOTIVATE DR. BROCK IF HE HAD HAD THE HOTEL, HE

                                                           35

09:19:46  1    WOULD PROBABLY DEVELOP IT.

09:19:47  2    Q    OKAY.  WELL, WHAT WOULD YOU GET OUT OF IT IF

09:19:50  3    THE HOTEL WAS DEVELOPED THE WAY YOU WANTED IT TO

09:19:53  4    BE?

09:19:53  5    A    THE OTHER HALF.

09:19:54  6    Q    SO YOU STILL HAVE HALF OF THE INTEREST?

09:19:55  7    A    YES.

09:19:56  8    Q    OKAY.  NOW, THIS DOCUMENT REFERS TO CERTAIN

09:20:07  9    DEVELOPMENT ASSETS.  OKAY.

09:20:10 10         WHAT ARE OR WERE THOSE DEVELOPMENT

09:20:12 11    ASSETS?

09:20:13 12    A    THE VERTICAL DEVELOPMENT RIGHTS AND THE

09:20:18 13    REVERSION OF THE BUILDING TO THE LEASE EXTENSION

09:20:21 14    FROM 2015 TO 2050.

09:20:25 15    Q    ALL RIGHT.  NOW -- AND SO THESE ARE THE

09:20:28 16    DEVELOPMENT RIGHTS OF HCHC?

09:20:30 17    A    THE ONES THAT PHIL WILKERSON BOUGHT.

09:20:34 18    Q    OKAY.  NOW, I WANT TO DIRECT YOUR ATTENTION --

09:20:38 19    AND YOU PREPARED THIS DOCUMENT, RIGHT?

09:20:40 20    A    I DID.

09:20:41 21    Q    DID DR. BROCK, MORRIS BROCK HAVE ANY INPUT

09:20:49 22    INTO THE PREPARATION OF THIS DOCUMENT?

09:20:50 23    A    HE GAVE ME THE TRUST NAME AND THE EMPLOYER

09:20:54 24    IDENTIFICATION NUMBERS AND WE DISCUSSED, OF COURSE,

09:21:00 25    AT LENGTH BEFORE ANYBODY SIGNED ANY DOCUMENTS.

36

09:21:03 1    Q    AND NOW, WAS THIS DOCUMENT INTENDED TO BE KIND

09:21:06 2    OF THE FINAL WORD ON THIS AGREEMENT THAT YOU WERE

09:21:14 3    REACHING WITH DR. BROCK AND DR. HANEY?

09:21:16 4    A    NO.  IT WAS MORE TO GIVE ME STANDING AND TO

09:21:20 5    ASSIST ME IN GETTING STANDING IN THE TRANSACTION SO

09:21:24 6    I COULD ENFORCE CLEARING THESE PEOPLE UP WITH THE

09:21:29 7    I.R.S. AND TO GUIDE THE ATTORNEYS IN AN ESCROW TYPE

09:21:39 8    CLOSING, A FORMAL CLOSING.

09:21:41 9    Q    SO YOU WERE ANTICIPATING THAT ULTIMATELY THE

09:21:44 10   ATTORNEYS WOULD GET INVOLVED AND DRAFT AND PREPARE

09:21:46 11   THE FINAL DOCUMENTS?

09:21:47 12   A    YES.  IT'S TOO COMPLEX NOT TO HAVE ATTORNEYS

09:21:50 13   INVOLVED.

09:21:51 14   Q    ALL RIGHT.  I'M GOING TO DIRECT YOUR ATTENTION

09:21:57 15   TO THE LAST SENTENCE OF THE -- TO THE ONE, TWO,

09:22:04 16   THREE -- THE FOURTH PARAGRAPH DOWN ON PAGE 1.

09:22:08 17        DO YOU SEE WHERE I'M POINTING AT?

09:22:10 18   A    YES.

09:22:10 19   Q    AND IT READS, "NO WARRANTY OF ANY KIND IS

09:22:13 20   PROVIDED AS TO THE VALUE OF SAID ASSETS."

09:22:17 21        DO YOU SEE THAT?

09:22:18 22   A    YES.

09:22:18 23   Q    OKAY.  NOW, WHAT IS YOUR UNDERSTANDING OF WHAT

09:22:24 24   THAT SENTENCE MEANT?

09:22:25 25   A    IT'S THE SAME AS BROCKS MAKING NO WARRANTY ON

37

09:22:29  1    THE VALUE OF THEIR TRUST.

09:22:33  2            THIS IS A CONCEPTUAL TRANSACTION AT THIS

09:22:37  3    POINT AND THERE'S NO APPRAISALS, THERE'S NO TITLE

09:22:40  4    SEARCHS.

09:22:41  5    Q    AND THE ASSET THAT WAS REFERRED TO FOR WHICH

09:22:46  6    THERE WAS NO WARRANTY, THE ASSETS WERE THE

09:22:50  7    DEVELOPMENT RIGHTS OF HCHC; IS THAT CORRECT?

09:22:53  8    A    CORRECT.

09:22:53  9    Q    OKAY.  AND THEN IT SAYS, "ASSIGNEE WILL MAKE

09:22:59 10    ALL REASONABLE EFFORTS TO CONSOLIDATE AND DEVELOP

09:23:01 11    THE HAWAIIN COLONY HOTEL CORPORATION AS PROVIDED IN

09:23:03 12    SAID DOCUMENT," AND IT HAS A BUNCH OF NUMBERS.

09:23:08 13            NOW, AGAIN -- FIRST OF ALL, WHO WAS THE

09:23:10 14    ASSIGNEE IN THIS PARTICULAR DOCUMENT?

09:23:12 15    A    THE BROCKS.

09:23:16 16    Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF THE

09:23:21 17    OF THE MEANING OF THIS SENTENCE THAT WE JUST LOOKED

09:23:26 18    AT "ASSIGNEE WILL MAKE ALL REASONABLE EFFORTS TO

09:23:30 19    CONSOLIDATE AND DEVELOP THE HAWAIIN COLONY HOTEL

09:23:32 20    CORPORATION"?

09:23:34 21    A    TO CONSOLIDATE THE HOTEL, THERE NEEDED TO BE

09:23:36 22    ENOUGH FUNDS TO BUY THE TITLE BECAUSE ALL WE HAD

09:23:41 23    WAS LEASE OLD INTEREST, FOR EXAMPLE.

09:23:43 24    Q    OKAY.  I'M GOING TO DIRECT YOUR ATTENTION TO

09:23:48 25    THE BOTTOM OF PAGE 1 OF EXHIBIT 194.

                                                          38

09:23:53 1          IT READS, "NO PARTY OF ANY KIND IS

09:23:56 2    PROVIDED AS TO THE VALUE OF THE ABOVESAID BUSINESS

09:23:59 3    TRUSTS."

09:24:00 4          DO YOU SEE THAT?

09:24:02 5    A    I DO.

09:24:02 6    Q    AND WHAT IS THAT REFERRING TO?

09:24:04 7    A    THE BROCKS ASSETS WERE ASSIGNED NO VALUE

09:24:10 8    BECAUSE THERE WAS NO PROPER DUE DILIGENCE DONE AT

09:24:13 9    THIS POINT.  THIS IS FOR THE REASONS THAT I ALREADY

09:24:17 10   STATED.

09:24:17 11   Q    OKAY.  BUT -- SO YOU JUST TESTIFIED THAT NO

09:24:22 12   DUE DILIGENCE HAD BEEN DONE BY EITHER SIDE?

09:24:25 13          MS. WONG:  OBJECTION, ASKED AND ANSWERED.

09:24:26 14          THE COURT:  SUSTAINED.

09:24:31 15   BY MR. FONG:

09:24:31 16   Q    BEARING IN MIND WHAT YOU JUST TESTIFIED TO,

09:24:33 17   NOW, MR. LIGHTER, THE NEXT SENTENCE READS "ALL

09:24:36 18   REASONABLE DUE DILIGENCE HAS BEEN PERFORMED BY THE

09:24:38 19   PARTIES, INCLUDING PROFESSIONAL CONSULTATION BY

09:24:41 20   ATTORNEYS, ACCOUNTANTS, AND OTHER PROFESSIONAL

09:24:47 21   CONSULTANTS."

09:24:49 22          NOW, FIRST OF ALL, YOU UNDERSTAND WHAT

09:24:50 23   THAT SENTENCE MEANS, RIGHT?

09:24:52 24   A    I DO.

09:24:52 25   Q    OKAY.  AND WE MEANT THAT -- WELL, WHAT DOES IT

                                                        39

09:24:57 1    MEAN TO YOU, THAT SENTENCE?

09:24:58 2    A    WELL, SOME DUE DILIGENCE HAD BEEN MADE.  WE

09:25:06 3    WENT THROUGH DOCUMENTS AND DISCUSSED ASPECTS OF

09:25:10 4    BOTH SIDES.  BUT THE INTENT WAS TO HAVE AND

09:25:13 5    ENCOURAGE OTHER PROFESSIONALS TO COME IN AND

09:25:19 6    SUBSTANTIATE THE STATEMENTS.

09:25:21 7    Q    NOW I'M GOING TO DIRECT YOUR ATTENTION TO THE

09:25:24 8    VERY LAST PARAGRAPH, WHICH HAPPENS TO BE THE FIRST

09:25:27 9    PARAGRAPH ON PAGE 2 OF EXHIBIT 194.

09:25:32 10            DO YOU SEE WHERE I'M POINTING?

09:25:34 11   A    YES.

09:25:35 12   Q    OKAY.  "ATTACHED HERETO AND MADE APART HEREOF

09:25:39 13   BY THIS REFERENCE ARE TRUE AND ACCURATE COPIES,"

09:25:41 14   AND THEN IT APPEARS TO BE THREE DIFFERENT DOCUMENTS

09:25:46 15   JANUARY 3RD, 1997, REPLY BRIEF OF ERIC LIGHTER IN

09:25:50 16   THE FIRST HAWAIIN BANK -- IS IT V. ALOHA VAIL --

09:25:57 17   A    VAIL.

09:25:57 18   Q    VAIL, I'M SORRY.

09:25:58 19            AND THEN JULY 14TH, 1998, ACKNOWLEDGEMENT

09:26:02 20   BRIEF OF MR. LIGHTER IN HAWAII SUPREME COURT; AND

09:26:06 21   THEN NOVEMBER 15TH, 1996, OPENING BRIEF OF

09:26:09 22   MR. LIGHTER IN THE HAWAII SUPREME COURT IN THE

09:26:11 23   FIRST HAWAIIN BANK V. ALOHA VAIL.

09:26:16 24            DO YOU SEE THAT PARAGRAPH?

09:26:19 25   A    I DO.

                                                          40

09:26:20  1    Q     AND WHAT WAS THE MEANING OF THAT PARAGRAPH?

09:26:21  2    I'M SORRY, GO AHEAD.   I INTERRUPTED YOU.

09:26:24  3    A     IT WAS PART OF THE EXTENSIVE DOCUMENTATION I

09:26:27  4    GAVE DR. BROCK AND SPECIFICALLY IT WENT INTO DETAIL

09:26:32  5    AS TO THE ASSETS OF THE FREE AND CLEAR DEVELOPMENT

09:26:39  6    ASSETS OF HCHC.

09:26:40  7    Q     OKAY.   NOW -- BUT AT THE TIME THAT YOU SIGNED

09:26:42  8    THIS DOCUMENT, YOU KNEW THAT THERE WAS A DISPUTE

09:26:46  9    OVER WHETHER OR NOT -- OVER THE DEVELOPMENT RIGHTS

09:26:51  10   OF THE VERTICAL DEVELOPMENT RIGHTS, RIGHT?

09:26:55  11   A     THE DISPUTE WAS OVER SLANDER OF TITLE.   THERE

09:27:10  12   WAS NO DISPUTE AS TO THE FORECLOSURE BECAUSE THE

09:27:16  13   SUPREME COURT HAD RULED THE ALLEGED FORECLOSURE TO

09:27:21  14   BE AN INTERLOCUTORY.   THERE WAS FIVE FINAL ORDERS

09:27:24  15   AND TWO JUDGMENTS SUBJECT TO THE DEVELOPMENT RIGHTS

09:27:27  16   AND THE AIR RIGHTS EASEMENT.

09:27:35  17   Q     BUT YOU JUST TESTIFIED TO THAT WAS YOUR

09:27:37  18   UNDERSTANDING OF WHAT WAS GOING ON, RIGHT?

09:27:38  19   A     AND THESE ARE THE DOCUMENTS THAT I HAVE

09:27:42  20   ATTACHED TO THIS ASSIGNMENT.

09:27:43  21   Q     SO BY ATTACHING THESE DOCUMENTS AND GIVING

09:27:45  22   THEM TO THE BROCKS AS PART OF THIS TRANSACTION,

09:27:48  23   WHAT WERE YOU TRYING TO DO?

09:27:50  24   A     PUT THEM ON NOTICE AND GOOD FAITH DISCLOSURE

09:27:56  25   AS TO THE ACTUAL FACTS, MANY OF THE ACTUAL FACTS

41

09:28:01  1    THAT I COULD REASONABLY AND CONCISELY AS POSSIBLE

09:28:06  2    GIVE THEM.

09:28:07  3    Q    OKAY.  NOW, BUT WITHIN THESE DOCUMENTS THAT

09:28:11  4    YOU GAVE TO THE BROCKS, IT SAYS IN THERE THAT

09:28:18  5    HEY --

09:28:19  6              MS. WONG:  OBJECTION, HEARSAY.

09:28:20  7              THE COURT:  YOU'RE REFERRING TO THE

09:28:22  8    DOCUMENTS SO I'LL SUSTAIN THE OBJECTION.

09:28:23  9    BY MR. FONG:

09:28:24  10   Q    OKAY.  DID YOU UNDERSTAND WHEN YOU GAVE THESE

09:28:26  11   DOCUMENTS TO THE BROCKS THAT THEY -- THAT YOU WERE

09:28:30  12   CONVEYING INFORMATION AS TO THE FACT THAT THERE WAS

09:28:32  13   A DISPUTE OVER THE VERTICAL DEVELOPMENT RIGHTS?

09:28:37  14   A    YES.

09:28:38  15             MS. WONG:  OBJECTION, ASKED AND ANSWERED.

09:28:39  16   ALSO HEARSAY.

09:28:40  17             THE COURT:  I'LL SUSTAIN THE HEARSAY

09:28:42  18   OBJECTION.

09:28:42  19   BY MR. FONG:

09:28:43  20   Q    OKAY.  WHAT WAS YOUR UNDERSTANDING OF WHAT WAS

09:28:56  21   CONTAINED IN THOSE DOCUMENTS IN TERMS OF THE STATUS

09:28:59  22   OF THE VERTICAL DEVELOPMENT RIGHTS?

09:29:02  23             MS. WONG:  OBJECTION, HEARSAY.  IT CALLS

09:29:04  24   FOR A HEARSAY ANSWER.

09:29:08  25             THE COURT:  IT DOES CALL FOR HEARSAY.  I

                                                              42

09:29:10 1    THINK HE TESTIFIED TO THIS ALSO.  I BELIEVE HE HAS

09:29:12 2    ALREADY GIVEN HIS OPINION ON THIS.  YOU CAN ASK

09:29:23 3    ANOTHER QUESTION, MR. FONG.

09:29:25 4    BY MR. FONG:

09:29:25 5    Q    NOW, WAS THERE ANOTHER DOCUMENT THAT WAS

09:29:26 6    PREPARED AND SIGNED AT THAT MEETING WITH THE

09:29:29 7    BROCKS?

09:29:29 8    A    THE PROMISSORY NOTE.

09:29:31 9    Q    OKAY.  AND WHAT DOES THE PROMISSORY NOTE --

09:29:50 10   AND WHAT DOES THE PROMISSORY NOTE SAY, IF YOU

09:29:52 11   REMEMBER?

09:29:52 12   A    IT WAS A NORMAL PROMISSORY NOTE BUT WITH ONE

09:29:54 13   SIGNATURE, A DEBTOR, HAWAIIN COLONY HOTEL

09:30:03 14   CORPORATION.

09:30:03 15   Q    OKAY.  ALL RIGHT.  I'M GOING TO SHOW YOU --

09:30:07 16   A    AND --

09:30:08 17   Q    I'M SORRY.  WHAT?

09:30:09 18   A    AND IN ADDITION IT GAVE THE DEBTOR A DOLLAR

09:30:14 19   FOR DOLLAR CREDIT ON ANY TAXES PAID.

09:30:20 20   Q    OKAY.

09:30:21 21   A    TO THE CREDITOR OF THE CREDITOR.

09:30:23 22   Q    WELL, FIRST OF ALL, LET'S BACK UP.  YOU SAID

09:30:26 23   THAT THE PROMISSORY NOTE WAS FROM WHOM TO WHOM?

09:30:29 24   A    HCHC.  AND I DIDN'T SAY TO WHOM, BUT IT WAS TO

09:30:33 25   THE BROCKS.

43

09:30:34 1    Q    ALL RIGHT.  AND HOW MUCH WAS IT FOR?

09:30:36 2    A    $2,285,000.

09:30:40 3    Q    I'M SORRY?

09:30:41 4    A    2.285 MILLION.

09:30:43 5    Q    OKAY.  2.285 MILLION.

09:30:46 6    A    OKAY.

09:30:46 7    Q    AND YOU ALSO TESTIFIED THAT THERE WAS SOME

09:30:52 8    KIND OF A DOLLAR FOR DOLLAR CREDIT?

09:30:55 9    A    YES.

09:30:55 10         MS. WONG:  OBJECTION.  ASKED AND

09:30:57 11   ANSWERED.

09:30:57 12         THE COURT:  IT WAS.  I'LL ALLOW IT TO

09:30:58 13   REMAIN.  YOU CAN ASK THE NEXT QUESTION.

09:31:05 14   BY MR. FONG:

09:31:06 15   Q    WHAT WERE YOU REFERRING TO IN TERMS OF THE

09:31:08 16   DOLLAR FOR DOLLAR CREDIT?  WHAT WERE YOU TRYING

09:31:10 17   ACCOMPLISH?

09:31:10 18   A    IF HCHC PAID A DOLLAR, THE BROCKS HAD ALL OF

09:31:22 19   THEIR TRUST -- REALLY WHAT I MEANT WAS THAT THE

09:31:25 20   BROCKS' TAXES AND THEN HCHC WOULD OWE $1 LESS ON

09:31:31 21   THE PROMISSORY NOTE.

09:31:35 22   Q    SO IT WAS A DOLLAR FOR DOLLAR CREDIT?

09:31:37 23   A    CORRECT.

09:31:38 24   Q    AND WHY WAS THAT PROVISION PUT IN THE

09:31:40 25   PROMISSORY NOTE?

                                                      44

09:31:40  1    A    TO THROW ME A FEW CRUMBS.

09:31:54  2    Q    WELL, AT THE TIME DID YOU KNOW THE TAX

09:31:57  3    LIABILITY THAT HCHC WAS ASSUMING?

09:32:01  4    A    NO, I HAD A REPRESENTATION FROM THE BROCKS

09:32:04  5    THAT IT WAS AROUND $50,000 AND THAT WAS IN THE BILL

09:32:08  6    OF SALE.

09:32:08  7    Q    NOW.  I WANT TO SHOW YOU A COPY OF THE

09:32:11  8    PROMISSORY NOTE WHICH IS GOVERNMENT'S EXHIBIT

09:32:18  9    194 THAT HAS NOT BEEN ADMITTED INTO EVIDENCE --

09:32:21 10    193, EXCUSE ME.  I APOLOGIZE.  193 HAS NOT BEEN

09:32:24 11    ADMIT THE INTO EVIDENCE.

09:32:25 12          FIRST OF ALL, DO YOU SEE THE DOCUMENT IN

09:32:28 13    FRONT OF YOU?

09:32:28 14    A    YES, I DID.  I MADE A MISTAKE ON WHO THE

09:32:31 15    CREDITOR WAS.

09:32:32 16          MR. O'REILLY:  EXCUSE ME, YOUR HONOR.  I

09:32:33 17    DO BELIEVE THAT 193 HAS BEEN ADMITTED INTO

09:32:36 18    EVIDENCE.

09:32:36 19          MR. FONG:  WELL, THANK YOU.  I APPRECIATE

09:32:37 20    IT.

09:32:38 21          THE WITNESS:  AND I MADE A MISTAKE AS TO

09:32:40 22    WHO THE CREDITOR WAS.

09:32:42 23    BY MR. FONG:

09:32:43 24    Q    OKAY.  WELL, WHO WAS -- WELL, TO WHOM WAS THE

09:32:50 25    NOTE CREDIBLE?

                                                            45

09:32:52 1    A    WEST COAST CREDIT AND DEVELOPMENT CORPORATION.

09:32:57 2    Q    AND, NOW, YOU TESTIFIED EARLIER THAT YOU

09:32:59 3    THOUGHT THE NOTE HAD BEEN PAYABLE TO THE BROCKS.

09:33:01 4    TELL ME WHAT IS THE WEST COAST CREDIT AND

09:33:04 5    DEVELOPMENT CORPORATION?

09:33:05 6    A    IT WAS AN ONCOMING NOT YET FORMED CORPORATION

09:33:12 7    THAT SAM FUNG WAS GOING TO BE THE REGISTERED AGENT

09:33:20 8    FOR THE BROCKS.

09:33:20 9    Q    OKAY.  AND WHAT WAS THE PURPOSE OF FORMING

09:33:23 10   WEST COAST CREDIT AND DEVELOPMENT CORPORATION?

09:33:38 11   A    TO HOLD THE PROMISSORY NOTE AND THE LIENS AND

09:33:49 12   FOR THE BROCK'S BENEFIT TO CONTROL THEIR ASSETS AND

09:33:52 13   THE HOTEL ASSETS SUBJECT TO THE LIENS OF THE I.R.S.

09:33:57 14   Q    NOW, AT THE TIME THAT THIS DOCUMENT WAS SIGNED

09:34:03 15   ON MARCH 28TH, 2003, WHAT WAS YOUR UNDERSTANDING

09:34:10 16   AND INTENTION IN TERMS OF WHO WOULD OWN WEST COAST

09:34:12 17   CREDIT AND DEVELOPMENT CORPORATION?

09:34:14 18   A    THERE'S NO DOUBT IT WAS THE BROCKS.

09:34:15 19   Q    100 PERCENT?

09:34:17 20   A    YES.

09:34:17 21   Q    AND WOULD YOU HAVE ANY OWNERSHIP RIGHTS OR

09:34:20 22   INTEREST IN WEST COAST CREDIT AND DEVELOPMENT

09:34:23 23   CORPORATION?

09:34:24 24   A    NO.

09:34:24 25   Q    NOW, I'M GOING TO SHOW YOU, YOU TESTIFIED

                                                              46

09:34:37  1    EARLIER AND I THINK THIS DOCUMENT IS ALREADY IN

09:34:39  2    EVIDENCE, THAT THERE WAS A SUBSEQUENT CONFIRMATION

09:34:42  3    AND CLARIFICATION OF THE ASSIGNMENT.  DO YOU

09:34:49  4    REMEMBER THAT?

09:34:50  5    A    I DO.

09:34:51  6    Q    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AND

09:34:53  7    ADMITTED AS GOVERNMENT'S EXHIBIT 197.

09:34:55  8           I'LL GIVE YOU A PAPER COPY AS WELL.

09:35:14  9    A    THANK YOU.

09:35:15 10    Q    FIRST OF ALL, DO YOU SEE THAT SINGLE PAGE

09:35:17 11    DOCUMENT, SIR?

09:35:17 12    A    I DO.

09:35:18 13    Q    AND THAT'S GOVERNMENT'S EXHIBIT 197; IS THAT

09:35:21 14    CORRECT?

09:35:21 15    A    CORRECT.

09:35:21 16    Q    AND WE SEE TWO SIGNATURES HERE.

09:35:23 17           FIRST OF ALL, THE FIRST ONE THAT I'M

09:35:26 18    POINTING TO, THE HIGHER ONE OF THE TWO, IS THAT

09:35:29 19    YOUR SIGNATURE?

09:35:30 20    A    YES.

09:35:30 21    Q    AND THEN THE SECOND ONE, IS THAT ALSO YOUR

09:35:33 22    SIGNATURE?

09:35:33 23    A    YES.

09:35:34 24    Q    OKAY.  AND THE TITLE OF THIS DOCUMENT IS

09:35:36 25    "CONFIRMATION AND CLARIFICATION OF ASSIGNMENT."

                                                              47

09:35:38 1           DO YOU SEE THAT?

09:35:39 2    A    YES.

09:35:39 3    Q    OKAY.  AND WHEN WAS THIS DOCUMENT PREPARED?

09:35:44 4    A    MARCH 28TH, BUT I HAD ALREADY LEFT THE BROCKS.

09:35:49 5    Q    SO IT WAS NOT PREPARED AND SIGNED IN FRONT OF

09:35:53 6    THE BROCKS?

09:35:54 7    A    NO.

09:35:54 8    Q    OKAY.  AND WHAT WAS THE PURPOSE -- DID YOU

09:35:57 9    PREPARE THIS DOCUMENT, RIGHT?

09:35:59 10   A    I DID.

09:35:59 11   Q    AND WHAT WAS THE PURPOSE IN PREPARING THIS

09:36:01 12   DOCUMENT?

09:36:01 13   A    WELL, THE FIRST REASON WAS THAT TO CORRECT THE

09:36:06 14   MODIFIED ASSIGNMENT BECAUSE I READ IT AGAIN AND

09:36:12 15   I -- THE ASSIGNMENT GAVE 100 PERCENT OF HCHC'S

09:36:17 16   ASSETS TO THE BROCKS.  IT WAS ONLY SUPPOSED TO BE

09:36:20 17   50 PERCENT.

09:36:21 18   Q    OKAY.  OKAY.

09:36:28 19           IS THAT WHAT SENTENCE NUMBER ONE DOES IS

09:36:31 20   "ASSIGNEE'S RECEIVED PERCENTAGE INTEREST IS

09:36:35 21   50 PERCENT."

09:36:36 22   A    YES.

09:36:36 23   Q    AND THEN IT GOES ON, "ASSETS ASSIGNEE RECEIVED

09:36:40 24   IS SAID 50 PERCENT OF ALL OF THE DEVELOPMENT RIGHTS

09:36:45 25   OF LIGHTER IN THE HAWAIIN COLONY HOTEL."

48

```
09:36:47  1              DO YOU SEE THAT?

09:36:49  2    A    YES.

09:36:53  3    Q    "TOGETHER WITH AN IDENTICAL PERCENTAGE OF ALL

09:36:54  4    DEVELOPMENT RIGHTS IN SAID HAWAIIN COLONY HOTEL

09:36:55  5    CORPORATION HELD BY ANY AND ALL ENTITIES UNDER THE

09:36:57  6    CONTROL OF LIGHTER."

09:36:58  7              DO YOU SEE THAT?

09:36:59  8    A    I DO.

09:36:59  9    Q    "AND INCLUDING THE EXTENSION LEASE WITH FULL

09:37:03  10   REVERSIONS OF ALL IMPROVEMENTS FROM 2014 TO 2050."

09:37:08  11             DO YOU SEE THAT?

09:37:08  12   A    YES.

09:37:08  13   Q    AND WHAT DOES THAT REFER TO, THE LAST PART

09:37:12  14   ABOUT THE REVERSION?

09:37:13  15   A    THAT'S THE LEASE EXTENSION.  IT WAS A SEPARATE

09:37:21  16   INDENTURE WITH SEPARATE CONSIDERATION FREE AND

09:37:24  17   CLEAR AND IT HAD BEEN LITIGATED IN THE BANKRUPTCY

09:37:26  18   AND I HAD A VERBAL STIPULATION WITH THE "P OWNER"

09:37:32  19   AND THE BANK REGARDING THIS.

09:37:34  20   Q    OKAY.  AND DID YOU BELIEVE THAT THE REVERSION

09:37:41  21   INTEREST WOULD HAVE VALUE?

09:37:42  22   A    IMMENSE VALUE.

09:37:47  23   Q    HOW SO?

09:37:53  24   A    UNLIKE THE MAINLAND HERE IN CALIFORNIA, HALF

09:37:57  25   OF THE PROPERTIES IN COASTAL HAWAII ARE LEASE HOLD,
```

49

09:38:00 1    OWNED BY BIG LAND OWNERS AND SUGAR PLANTATION

09:38:09 2    PARENTS BASICALLY.  SO MOST WAIKIKI HOTELS ARE ON

09:38:13 3    LEASE HOLD LAND.  SO, THEREFORE, IF YOU HAVE A LONG

09:38:19 4    GROUND LEASE, IT'S WORTH BUILDING A HIGH RISE.

09:38:31 5    Q    OKAY.  BUT AT THE TIME THIS DOCUMENT WAS

09:38:33 6    SIGNED AROUND LATE MARCH OF 2003, WHAT WAS THE

09:38:36 7    STATUS OF THE GROUND LEASE FOR THE HAWAIIN COLONY

09:38:41 8    HOTEL CORPORATION?  WHO CONTROLLED IT?

09:38:42 9    A    HCHC.

09:38:43 10   Q    OKAY.

09:38:45 11   A    THE EXTENSION LEASE.  THE GROUND LEASE THAT

09:38:48 12   ENDS IN 2015 OR 2014 OR 15, WHATEVER IT IS, WAS

09:38:54 13   OWNED BY ANOTHER PARTY.

09:38:59 14   Q    SO AT THE TIME THAT THIS DOCUMENT WAS PREPARED

09:39:01 15   AND SIGNED, ANOTHER PARTY, NOT HCHC, SOMEBODY OTHER

09:39:06 16   THAN YOURSELF OWNED THE LEASE, THE GROUND LEASE TO

09:39:10 17   THE HAWAIIN COLONY HOTEL CORPORATION?

09:39:12 18   A    CORRECT.

09:39:12 19   Q    BUT THAT WAS -- YOUR UNDERSTANDING WAS THAT IN

09:39:15 20   THE YEAR 2014 OR SO, IT WOULD REVERT BACK TO HCHC?

09:39:21 21   A    CORRECT.

09:39:21 22          MS. WONG:  OBJECTION, ASKED AND ANSWERED.

09:39:23 23          THE COURT:  SUSTAINED.  THE ANSWER WILL

09:39:26 24   BE STRICKEN.

09:39:26 25   BY MR. FONG:

                                                        50

```
09:39:28  1        Q    ALL RIGHT.  THEN LET ME MOVE ON THEN TO THE

09:39:31  2    THIRD PARAGRAPH.

09:39:31  3              IT SAYS, "LIGHTER RESERVES ALL RIGHTS TO

09:39:34  4    CONTROL DESIGN AND ARCHITECTURE OF ANY DEVELOPMENT

09:39:37  5    AT SAID CORPORATION, THE WEST COAST CREDIT

09:39:41  6    DEVELOPMENT COMPANY."

09:39:44  7              DO YOU SEE THAT?

09:39:44  8        A    YOU SKIPPED A LINE.

09:39:45  9        Q    I'M SORRY.  I APOLOGIZE.  YOU'RE ABSOLUTELY

09:39:48 10    RIGHT.

09:39:51 11              PARAGRAPH 3 READS:  "LIGHTER RESERVES ALL

09:39:54 12    RIGHTS TO CONTROL DESIGN AND ARCHITECTURE OF ANY

09:39:58 13    DEVELOPMENT AT SAID HAWAIIN COLONY HOTEL

09:40:00 14    CORPORATION?"

09:40:01 15              DO YOU SEE THAT?

09:40:02 16        A    YES.

09:40:02 17        Q    OKAY.  WHAT WAS YOUR INTENTION IN PUTTING THAT

09:40:08 18    SENTENCE IN?

09:40:08 19        A    THERE WERE PERSONAL REASONS.  I WANTED TO HAVE

09:40:14 20    DESIGN CONTROL.

09:40:19 21        Q    AND BESIDES THE -- WELL, LET ME MOVE ON TO THE

09:40:23 22    NEXT SENTENCE.  "WEST COAST CREDIT AND DEVELOPMENT

09:40:31 23    ONE, INC., AN OREGON CORPORATION, WHICH IN ALL

09:40:35 24    OTHER RESPECTS IS THE HIGH RISE DEVELOPER FOR THE

09:40:41 25    HAWAIIN COLONY HOTEL PROJECT."
```

51

09:40:43 1                    DO YOU SEE THAT?

09:40:44 2    A    YES.  YES.

09:40:46 3                    MS. WONG:  OBJECTION, YOUR HONOR.  THE

09:40:47 4    DOCUMENT SPEAKS FOR ITSELF.

09:40:48 5                    MR. FONG:  I WAS GOING FOLLOW UP WITH A

09:40:51 6    QUESTION, YOUR HONOR.

09:40:51 7                    THE COURT:  OKAY.  IF HE UNDERSTANDS

09:40:53 8    THIS.  I'M NOT SURE WHAT THE PURPOSE OF READING IT

09:40:57 9    IF HE HAS IT IN FRONT OF HIM BUT GO AHEAD AND ASK

09:40:59 10   THE QUESTION, MR. FONG.

09:41:00 11                   MR. FONG:  OKAY.

09:41:01 12   Q    WHO WOULD END UP, IF THIS PROJECT WITH THE

09:41:06 13   BROCKS WOULD GO THROUGH, WHO WOULD END UP WITH THE

09:41:10 14   CONTROL OVER THE DEVELOPMENT RIGHTS OF THE HAWAIIN

09:41:14 15   COLONY HOTEL CORPORATION?

09:41:14 16   A    MORRIS BROCK AND HIS CORPORATION.

09:41:16 17   Q    AND -- BUT YOU DID RESERVE FOR YOURSELF THE

09:41:20 18   RIGHT TO CONTROL THE DESIGN AND ARCHITECTURE,

09:41:23 19   RIGHT?

09:41:23 20   A    THAT'S ALL.

09:41:23 21   Q    NOW, IN THIS DOCUMENT YOU ALSO GAVE AN

09:41:34 22   ESTIMATE OF HOW MUCH MONEY IT MIGHT TAKE FOR THE

09:41:36 23   DEVELOPMENT TO BE CARRIED OUT, RIGHT?

09:41:38 24   A    I DID.

09:41:38 25   Q    AND WHAT WERE THOSE NUMBERS?

                                                              52

09:41:40  1    A    THE CONSOLIDATION AND THE INTERESTS AND THE

09:41:50  2    FEE AT THE TIME I ESTIMATED AT ABOUT 6 MILLION.

09:41:54  3    Q    OKAY.  AND DID THAT INCLUDE ATTORNEY'S FEES?

09:42:01  4    A    I'M SURE IT DID.  MAYBE NOT.  IT WAS

09:42:11  5    CONSOLIDATION COSTS.

09:42:12  6    Q    AND THERE'S A REFERENCE ON PAGE 5 THAT

09:42:15  7    ASSIGNEE RECOGNIZES THAT IT IS ESTIMATED THAT

09:42:17  8    APPROXIMATELY $250,000 IN LEGAL EXPENSES -- DO YOU

09:42:22  9    SEE THAT?

09:42:23 10    A    THAT REFRESHES MY MEMORY.

09:42:25 11    Q    OKAY.  AND WHAT LEGAL EXPENSES WERE YOU

09:42:27 12    ANTICIPATING?

09:42:28 13    A    IT'S VERY COMMON FOR DEVELOPERS TO BE SUED BY

09:42:36 14    A LOT OF PEOPLE.

09:42:38 15    Q    ALL RIGHT.

09:42:39 16    A    SO WHEN YOU'RE DOING A DEVELOPMENT, YOU HAVE

09:42:41 17    TO -- AND I SEE THE ESTIMATE MADE THERE WAS 5

09:42:49 18    MILLION WITH THE CONSOLIDATION THAT SOUNDS RIGHT.

09:42:51 19    Q    ALL RIGHT.  WELL, DID YOU SEND THIS DOCUMENT,

09:43:03 20    EXHIBIT 197, TO ANYBODY?

09:43:04 21    A    I FAXED IT TO THE BROCKS' RESIDENCE.

09:43:07 22    Q    OKAY.  AND DO YOU RECALL APPROXIMATELY WHEN

09:43:13 23    YOU FAXED IT TO THE BROCKS?

09:43:14 24    A    A FEW DAYS LATER WHEN I GOT BACK TO HAWAII.

09:43:17 25    Q    OKAY.  WAS THERE ANYTHING ELSE THAT WAS

53

09:43:26  1    DISCUSSED AT THE MEETING AT THE BROCKS' HOUSE THAT

09:43:28  2    WE HAVE NOT TALKED ABOUT?

09:43:30  3    A    NOT THAT I CAN RECALL AT THIS TIME.

09:43:46  4    Q    AND YOU TESTIFIED A LITTLE BIT EARLIER THAT

09:43:48  5    THE BROCKS GAVE SOME DOCUMENTS, RIGHT?

09:43:50  6    A    TO SAM FUNG.

09:43:51  7    Q    ALL RIGHT.  AND DID YOU EVER KEEP POSSESSION

09:44:00  8    OF THESE DOCUMENTS AFTER YOU LEFT THE BROCKS'

09:44:04  9    HOUSE?

09:44:04  10   A    NO.

09:44:05  11   Q    NOW, WHEN YOU LEFT THE BROCK MEETING, HOW WERE

09:44:10  12   YOU FEELING ABOUT THE PROSPECT OF DOING THIS

09:44:13  13   BUSINESS WITH DR. BROCK?

09:44:14  14   A    OPTIMISTIC.  HE WAS A VERY ENERGETIC FELLOW.

09:44:18  15   Q    ALL RIGHT.  AND DID THIS OPTIMISM OF YOURS,

09:44:24  16   DID THAT STAY IN PLACE FOR A LITTLE WHILE?

09:44:26  17   A    YES.  DR. BROCK WROTE ME A LETTER ON MARCH

09:44:29  18   30TH, TWO DAYS LATER.

09:44:31  19   Q    DR. BROCK SENT YOU A LETTER.  OKAY.  AND LET

09:44:34  20   ME SHOW YOU A DOCUMENT THAT HAS BEEN IDENTIFIED AS

09:44:42  21   GOVERNMENT'S EXHIBIT 196 THAT HAS NOT BEEN ADMITTED

09:44:52  22   INTO EVIDENCE YET.

09:45:03  23         SIR, DO YOU SEE THE PAGE THAT IS IN FRONT

09:45:05  24   OF YOU MARKED AS GOVERNMENT'S EXHIBIT 196?

09:45:07  25   A    I DO.

54

09:45:07 1   Q   AND DO YOU RECOGNIZE IT?

09:45:08 2   A   I DO.

09:45:09 3   Q   AND DID YOU RECEIVE EXHIBIT 196 THAT IS --

09:45:13 4   A   I DID.

09:45:14 5   Q   OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT

09:45:17 6   EXHIBIT 196 IS?

09:45:18 7   A   WELL, IT HAS TWO MAIN THINGS.

09:45:24 8   Q   WELL, I'M NOT TALKING ABOUT THE CONTENT.  WHAT

09:45:26 9   IS IT?

09:45:27 10  A   IT'S A LETTER FROM DR. BROCK ADDRESSING OUR

09:45:31 11  MEETING.

09:45:31 12  Q   OKAY.

09:45:33 13  A   TWO DAYS EARLIER.

09:45:34 14  Q   AND WAS THAT THE LETTER THAT YOU JUST

09:45:36 15  TESTIFIED TO A LITTLE BIT EARLIER?

09:45:38 16  A   IT IS.

09:45:39 17        MR. FONG:  YOUR HONOR, I WANT TO MOVE

09:45:41 18  INTO EVIDENCE GOVERNMENT'S EXHIBIT 196.

09:45:43 19        MS. WONG:  OBJECTION, HEARSAY.

09:45:49 20        MR. FONG:  YOUR HONOR, FIRST OF ALL, THE

09:45:51 21  FOUNDATION HAS BEEN LAID BY CATHERINE HANEY IN HER

09:45:54 22  TESTIMONY THAT SHE RECOGNIZES THIS AS HER

09:45:57 23  HUSBAND'S -- HER LATE HUSBAND'S HANDWRITING AND IT

09:45:59 24  CERTAINLY SHOULD COME IN UNDER RULE 807, THE

09:46:06 25  CATCHALL HEARSAY EXCEPTION, BECAUSE THERE'S NO

55

09:46:08  1      DOUBT THAT THIS CAME FROM DR. BROCK AND MR. LIGHTER

09:46:11  2      HAS TESTIFIED TO IT.

09:46:12  3               IT'S CERTAINLY RELEVANT TO WHAT IS GOING

09:46:16  4      ON AND IT'S MEANT TO REBUT ANY CHARGES OF

09:46:19  5      FABRICATION OR ANY LIES IN TERMS OF WHAT

09:46:25  6      MR. LIGHTER IS TESTIFYING TO AS TO WHAT WENT ON AT

09:46:27  7      THE MEETING.

09:46:31  8               THE COURT:  ARE YOU OFFERING IT FOR THE

09:46:32  9      TRUTH OF THE MATTER ASSERTED?

09:46:36 10               MR. FONG:  IT COMES IN, YOUR HONOR, I

09:46:37 11      BELIEVE AS A PRIOR INCONSISTENT STATEMENT.

09:46:39 12               THE COURT:  OF?  OF THE DECEDENT?

09:46:42 13               MR. FONG:  I'M SORRY.  IT COMES IN UNDER

09:46:45 14      807, THE CATCH ALL?

09:46:49 15               THE COURT:  ANY RESPONSE?

09:46:51 16               MS. WONG:  IT'S OBVIOUSLY NOT A PRIOR

09:46:53 17      CONSISTENT STATEMENT OF MR. LIGHTER AS THE

09:46:56 18      TESTIMONY SUGGESTED IT'S BY DR. BROCK.

09:46:58 19               AND IN TERMS OF THE RELIABILITY, IT IS

09:47:01 20      BEING OFFERED FOR ITS TRUTH AND IT DOESN'T FALL

09:47:04 21      WITHIN ANY OF THE HEARSAY EXCEPTIONS.

09:47:09 22               THE COURT:  I'M GOING TO SUSTAIN THE

09:47:10 23      OBJECTION.

09:47:11 24               MR. FONG:  ALL RIGHT.  THANK YOU, YOUR

09:47:12 25      HONOR.

                                                              56

09:47:13 1                    THE COURT:  YOU'RE WELCOME.

09:47:14 2     BY MR. FONG:

09:47:14 3     Q    ALL RIGHT.  MR. LIGHTER, AFTER YOU RECEIVED

09:47:16 4     GOVERNMENT'S EXHIBIT 196, DID YOUR FEELINGS ABOUT,

09:47:25 5     DID YOUR FEELINGS OF OPTIMISM CHANGE IN TERMS OF

09:47:27 6     YOUR WORKING WITH DR. BROCK ON THE HCHC PROJECT?

09:47:31 7     A    SLIGHTLY.  NOT THAT MUCH.

09:47:34 8     Q    OKAY.  AND HOW DID IT CHANGE?

09:47:36 9     A    I WAS GLAD THAT DR. BROCK READ AND GENERALLY

09:47:42 10    AGREED WITH.

09:47:47 11              MS. WONG:  OBJECTION, HEARSAY, TO THE

09:47:49 12    EXTENT THAT HE'S TESTIFYING ABOUT THE CONTENTS OF

09:47:51 13    THE LETTER.

09:47:51 14              THE COURT:  HE IS TESTIFYING ABOUT THE

09:47:52 15    CONTENTS.  THE OBJECTION IS SUSTAINED AND IT'S

09:47:55 16    STRICKEN.  YOU CAN ASK ANOTHER QUESTION.

09:47:59 17    BY MR. FONG:

09:47:59 18    Q    I'M -- I DON'T -- I'M NOT ASKING YOU ABOUT THE

09:48:01 19    CONTENT OF THE LETTER, I'M TALKING ABOUT YOU SAID

09:48:03 20    THAT YOUR FEELING HAD CHANGED A LITTLE.

09:48:05 21              WHAT CHANGED SPECIFICALLY?

09:48:07 22    A    I WAS GLAD THAT DR. BROCK AGREED THAT THE

09:48:14 23    HOTEL WAS VALUABLE.

09:48:15 24              MS. WONG:  OBJECTION, HEARSAY.

09:48:16 25              THE COURT:  SUSTAINED.  THAT PORTION IS

                                                              57

09:48:18   1     STRICKEN.

09:48:25   2     BY MR. FONG:

09:48:26   3     Q     WELL, WHAT CHANGED IN TERMS OF YOUR -- WHAT

09:48:28   4     CHANGED IN TERMS OF YOUR OPTIMISM ABOUT THE DEAL

09:48:31   5     AFTER YOU RECEIVED EXHIBIT 196?

09:48:35   6     A     WELL, I WAS DISAPPOINTED THAT DR. BROCK DIDN'T

09:48:41   7     WANT TO PAY SAM FUNG $2,000 A MONTH ANY MORE.

09:48:44   8              MS. WONG:  OBJECTION.

09:48:45   9              THE COURT:  THAT PORTION IS STRICKEN.

09:48:48  10     SUSTAINED.

09:48:48  11     BY MR. FONG:

09:48:49  12     Q     ALL RIGHT.  AFTER YOU RECEIVED GOVERNMENT'S

09:48:50  13     EXHIBIT 196, DID YOU HAVE A CONVERSATION WITH SAM

09:48:53  14     FUNG?

09:48:55  15     A     I DID.

09:48:56  16     Q     AND WHAT WAS THE SUBJECT OF THAT CONVERSATION?

09:48:58  17     A     I TOLD HIM THAT DR. BROCK DID NOT WANT TO PAY

09:49:04  18     HIM THE $2,000 A MONTH.

09:49:07  19              MS. WONG:  OBJECTION.  HEARSAY.

09:49:08  20              THE COURT:  SUSTAINED.  IT'S STRICKEN.

09:49:10  21     BY MR. FONG:

09:49:16  22     Q     BUT YOU DID HAVE A CONVERSATION WITH SAM FUNG?

09:49:18  23     A     I DID.

09:49:18  24     Q     OKAY.  NOW, AT THE TIME YOU RECEIVED

09:49:34  25     GOVERNMENT'S EXHIBIT 196, DID YOU THINK THAT THE

                                                              58

09:49:37 1    DEAL WAS GOING TO CONTINUE TO GO THROUGH?

09:49:38 2    A    YES, BUT PROBABLY NOT WITH SAM FUNG.

09:49:46 3    Q    ALL RIGHT.  I CAN STOP THERE.

09:49:47 4         OKAY.  NOW, WHAT DID YOU DO NEXT IN TERMS

09:49:50 5    OF CARRYING OUT WHAT YOU AND DRS. BROCK AND HANEY

09:49:59 6    AGREED TO IN TERMS OF THE PROJECT, WHAT DID YOU DO

09:50:02 7    NEXT?

09:50:03 8    A    I WROTE ANOTHER LETTER ON APRIL 7TH ANNOUNCING

09:50:06 9    THAT I WAS GOING TO THE I.R.S. CID WITH THE

09:50:08 10   DOCUMENTS, THE WAY IT'S SIGNED, THE TRANSACTION

09:50:12 11   DOCUMENTS AND THE FINANCIAL STATEMENT THAT

09:50:16 12   DR. BROCK HAD PREPARED WHICH HAD BEEN RETYPED.

09:50:22 13   Q    OKAY.  NOW, WHAT WAS THE PURPOSE OF YOU GOING

09:50:28 14   TO CID?

09:50:32 15   A    WELL, MY VIEW WAS THAT I HAD STANDING BECAUSE

09:50:39 16   OF THE PRELIMINARY DOCUMENTS, I HAD STANDING TO GO

09:50:42 17   TO THE I.R.S. AND DISCLOSE THE TAX LIABILITY THERE

09:50:45 18   BY IMPOSING THE I.R.S. LIEN ON THE ASSETS INVOLVED.

09:50:56 19   Q    ALL RIGHT.  NOW, DID YOU -- WHAT DID YOU DO TO

09:51:00 20   CARRY OUT THIS PLAN TO COMMUNICATE WITH CID?

09:51:03 21   A    ON APRIL 7TH, I FILED AN OMNIBUS RETURN, AND

09:51:06 22   HCHC FILED AN OMNIBUS RETURN, AND THEN IT STILL WAS

09:51:09 23   ENTITLED AN OMNIBUS RETURN AND ATTACHED THE

09:51:11 24   TRANSACTION DOCUMENTS, INCLUDING THE CLARIFICATION.

09:51:15 25   Q    AND WHEN YOU SAY, "THE TRANSACTION DOCUMENTS,"

59

09:51:17 1   ARE YOU REFERRING TO THE BILL OF SALE, THE

09:51:20 2   PROMISSORY NOTE, AND THE ASSIGNMENT AND THE

09:51:22 3   CLARIFICATION DOCUMENTS WITH THE BROCKS THAT WE

09:51:24 4   HAVE BEEN TALKING ABOUT THIS MORNING?

09:51:25 5   A   YES, BUT I DON'T THINK I INCLUDED THE

09:51:27 6   PROMISSORY NOTE, JUST REFERENCE TO IT.

09:51:34 7   Q   ALL RIGHT.  AND WHAT ELSE DID YOU INCLUDE IN

09:51:35 8   YOUR COMMUNICATION WITH CID?

09:51:37 9   A   YOU HAVE A COPY, RIGHT?

09:51:57 10  Q   WOULD YOU LIKE TO BE REFRESHED?

09:51:59 11  A   I SENT IT CERTIFIED MAIL AND I HAVE THE

09:52:02 12  ORIGINAL MAILING CERTIFICATE RECEIPT.

09:52:13 13  Q   I'M GOING TO SHOW YOU A DOCUMENT THAT HAS BEEN

09:52:15 14  PREMARKED FOR IDENTIFICATION AS NNN, THREE N'S, AS

09:52:19 15  IN NANCY.

09:52:29 16          DO YOU SEE THAT DOCUMENT, SIR?

09:52:31 17  A   I DO.

09:52:31 18  Q   AND, WELL, WHAT IS THAT DOCUMENT?  WITHOUT

09:52:33 19  GOING INTO THE CONTENTS, WHAT IS THE NATURE OF THE

09:52:35 20  DOCUMENT?

09:52:35 21  A   IT IS AN --

09:52:43 22  Q   WHAT IS IT?

09:52:44 23  A   IT'S A THIN OMNIBUS RETURN.

09:52:46 24  Q   ALL RIGHT.  OKAY.  AND LOOKING AT WHAT HAS

09:52:47 25  BEEN MARKED AS DEFENDANT'S NNN, DOES THAT REFRESH

60

09:52:50 1    YOUR RECOLLECTION AS TO WHAT YOU SENT TO CID?

09:52:55 2    A    YES, IT DOES.

09:52:56 3    Q    AND WHAT DID YOU SEND TO CID?

09:52:59 4    A    WHAT I SAID THE BILL OF SALE, THE ASSIGNMENT,

09:53:02 5    THE CLARIFICATION.

09:53:12 6    Q    AND THIS WAS SENT WHEN?

09:53:13 7    A    APRIL 7TH.

09:53:15 8    Q    SO WITHIN A WEEK OR SO OF YOUR MEETING WITH

09:53:18 9    DR. HANEY AND DR. BROCK AND SAM FUNG YOU FORWARDED

09:53:23 10   TO THE CID OF THE I.R.S. IN WASHINGTON ALL OF THE

09:53:28 11   PERTINENT DOCUMENTS THAT YOU HAD PREPARED AND

09:53:30 12   SIGNED WITH THE BROCKS?

09:53:31 13   A    YES, I WAS STILL ON FRIENDLY TERMS WITH

09:53:38 14   DR. BROCK AND THE TRANSACTION WAS GOING FORWARD.

09:53:40 15   Q    AND WHAT WAS YOUR PURPOSE?  WHY DID YOU DO

09:53:42 16   THIS?  WHY SEND THESE DOCUMENTS TO CID?  WHAT WAS

09:53:45 17   YOUR PURPOSE IN DOING THAT?

09:53:46 18   A    AGAIN, IT'S TO ENFORCE THE PARAMOUNT LIEN, AND

09:53:52 19   MY FIRST POSITION LIEN IN FAVOR OF THE I.R.S. IS MY

09:53:56 20   UNDERSTANDING AS A MATTER OF LAW BASED ON THE

09:53:59 21   DISCLOSURE OF TAX LIABILITY TO THE I.R.S.

09:54:05 22        WHAT IS IMPOSED IS THE ACTUAL TAX

09:54:07 23   LIABILITY, WHETHER IT'S A DOLLAR OR $5 MILLION.

09:54:15 24   Q    AND WHY WAS THAT IMPORTANT TO YOU TO

09:54:17 25   COMMUNICATE THIS TO THE CID?

61

09:54:18  1     A     BECAUSE I JUST HAD BROCK'S WORD FOR IT THAT HE

09:54:25  2     OWED $50,000 AND I KNOW THAT HE'S WITH N.T.S. WHICH

09:54:28  3     IS QUESTIONABLE ETHICS AT THE MINIMUM.

09:54:39  4     Q     NOW, DID YOU -- AND THIS WAS SENT ON APRIL 7TH

09:54:44  5     OF 2003.

09:54:46  6                 DID YOU SEND ANYTHING ELSE REGARDING YOUR

09:54:48  7     TRANSACTIONS WITH THE BROCKS TO CID AT ANY OTHER

09:54:52  8     TIME?

09:54:52  9     A     I DID ON APRIL 14TH I -- AS OF APRIL 14TH I

09:55:02  10    SENT A SUPPLEMENT TO THE OMNIBUS RETURN.

09:55:06  11    Q     AND WHAT WAS CONTAINED IN THE SUPPLEMENT TO

09:55:09  12    THE OMNIBUS THAT YOU FILED OR SENT TO THE CID ON

09:55:14  13    APRIL 7TH?

09:55:14  14    A     WELL, BY THEN I LEARNED OR HAD HEARD THAT

09:55:25  15    DR. BROCK HAD PROBABLY COMMITTED GROSS TAX FRAUD

09:55:28  16    AND SO I TOLD THE I.R.S. THAT THERE'S PROBABLY A

09:55:31  17    LOT MORE THAN IS ALLEGED THAN THE REPORTED $50,000.

09:55:34  18                 MS. WONG:  OBJECTION TO THE EXTENT THAT

09:55:36  19    HE'S TESTIFYING ABOUT THE CONTEXT OF THAT

09:55:39  20    SUPPLEMENT.  HEARSAY.

09:55:45  21                 THE COURT:  I'LL ALLOW IT TO REMAIN.  YOU

09:55:46  22    CAN ASK THE NEXT QUESTION.

09:55:47  23    BY MR. FONG:

09:55:48  24    Q     OKAY.  DID YOU COMMUNICATE TO CID THE AMOUNT

09:55:51  25    OF TAXES THAT HCHC HAD ASSUMED FROM THE BROCKS

62

09:55:59 1    TRUST?

09:55:59 2    A    ON APRIL 7TH THE ANSWER IS YES.

09:56:02 3    Q    AND WHAT DID YOU SAY?

09:56:03 4    A    $50,000 -- WELL, THE DOCUMENT SPEAKS FOR

09:56:06 5    ITSELF.  IT DISCLOSES AT LEAST $50,000 IN TAXES

09:56:11 6    DUE.

09:56:11 7            MS. WONG:  OBJECTION, HEARSAY.

09:56:12 8            THE COURT:  SUSTAINED.  STRIKE THAT.

09:56:14 9            HIS LAST ANSWER WILL REMAIN.  HE'S

09:56:17 10    REFERRING A DOCUMENT NOW.

09:56:18 11            MR. FONG:  OKAY.

09:56:33 12    Q    LET ME TAKE THOSE DOCUMENTS BACK FROM YOU,

09:56:35 13    MR. LIGHTER.

09:56:36 14            NOW, DID YOU HAVE -- OTHER THAN WHAT YOU

09:56:38 15    JUST TESTIFIED TO, IN TERMS OF THE BILL OF SALE,

09:56:40 16    PROMISSORY NOTE, ASSIGNMENT AND THE CLARIFICATION,

09:56:46 17    DID YOU HAVE ANY OTHER BUSINESS TRANSACTIONS WITH

09:56:50 18    THE BROCKS?

09:56:52 19    A    NO.

09:56:52 20    Q    OKAY.  NOW, I WANT -- LET ME MOVE ON THEN TO

09:56:59 21    PROFESSOR JEAN-PAUL BOURDIER.

09:57:04 22            WHEN DID, WHEN DID MR. FUNG, WHEN DID

09:57:08 23    MR. FUNG FIRST TALK TO YOU ABOUT PROFESSOR

09:57:12 24    BOURDIER?

09:57:12 25    A    I DON'T RECALL, BUT IT WAS PROBABLY AROUND

                                                        63

09:57:20  1    SEPTEMBER OF 2003.

09:57:22  2    Q    ALL RIGHT.  OKAY.  AND WHAT DID MR. FUNG TELL

09:57:26  3    YOU ABOUT PROFESSOR BOURDIER?

09:57:28  4    A    HE TOLD ME THAT ANOTHER NATIONAL TRUST

09:57:32  5    SERVICES CLIENT OF HIS DIDN'T OWE ANY TAX BUT HAD

09:57:40  6    INVESTED IN N.T.S. OFFSHORE INVESTMENTS AND LOST

09:57:44  7    ABOUT $300,000 AND IT'S WHAT IS CALLED A CASH FOR

09:57:53  8    TITLE TYPE OF INVESTMENT.

09:57:54  9    Q    AND OKAY.  NOW, WHAT WAS -- DID YOU AGREE TO

09:57:57 10    MEET WITH MR. BOURDIER?

09:58:00 11    A    YES.

09:58:02 12    Q    AND WHAT WAS YOUR, WHAT WAS YOUR INTENTION IN

09:58:05 13    TERMS OF WHAT YOU WOULD DO?

09:58:06 14    A    I WANTED TO FIND OUT FROM HIM PERSONALLY AND

09:58:19 15    IN A PERSONAL MEETING THAT HIS POSITION WAS THAT HE

09:58:24 16    REALLY OWED NO TAX.

09:58:26 17    Q    WELL --

09:58:27 18    A    AND SECONDLY, IS THAT I WANTED TO OFFER A WAY

09:58:31 19    THAT HE COULD GET POTENTIALLY HOPEFULLY RECOUP HIS

09:58:38 20    $20,000 BASED ON THE INCOMING SECURITIES OFFERING.

09:58:42 21    Q    I'M SORRY.  I'M NOT QUITE SURE I HEARD THE

09:58:45 22    LAST ANSWER.  MAY I TROUBLE YOU TO SAY THAT AGAIN,

09:58:47 23    THE SECOND POINT?

09:58:48 24    A    SECONDLY, TO OFFER HIM A PROPOSED HOPEFUL

09:58:53 25    RETURN ON REPLACING THE LOST INVESTMENT MONEY BY

                                                              64

09:59:01 1    WAY OF A SECURITIES -- TAKING A PIECE OF THE -- AN

09:59:09 2    INTEREST IN THE ONCOMING YET-TO-BE DRAFTED

09:59:17 3    SECURITIES OFFERING FOR THE HOTEL.

09:59:19 4    Q    AND WHEN YOU SAY, "THE HOTEL," YOU'RE

09:59:21 5    REFERRING TO THE HAWAIIN COLONY HOTEL CORPORATION?

09:59:21 6    A    I AM.

09:59:22 7    Q    OKAY.  NOW, SO DID YOU THINK THAT YOU WOULD BE

09:59:28 8    INTERESTED IN POSSIBLY WORKING WITH PROFESSOR

09:59:32 9    BOURDIER AS A PARTNER?

09:59:34 10   A    AS A PARTNER.

09:59:35 11   Q    ALL RIGHT.  AND WHY WAS THAT?  WHY WOULD YOU

09:59:39 12   BE INTERESTED IN WORKING WITH PROFESSOR BOURDIER?

09:59:42 13   A    WELL, ASSUMING THAT HE'S CLEANED UP WITH HIS

09:59:49 14   TAXES, WHAT HE OFFERED HCHC HE'S A MORE DIVERSIFIED

10:00:00 15   PORTFOLIO FOR THE SECURITIES OFFERING.

10:00:02 16   Q    OKAY.  SO YOU SAID THAT -- AND WHY DID YOU

10:00:06 17   BELIEVE, FIRST OF ALL, THAT HE WOULD, PROFESSOR

10:00:09 18   BOURDIER, IF HE DID BUSINESS WITH YOU, WOULD OFFER

10:00:12 19   A MORE DIVERSIFIED PORTFOLIO FOR HCHC?  WHY DID YOU

10:00:18 20   BELIEVE THAT?

10:00:19 21   A    IT'S JUST COMMON SENSE THAT THE INVESTMENT AND

10:00:27 22   THE HOLDING COMPANIES AND THE DEVELOPMENT COMPANIES

10:00:30 23   SECURITY OFFERING, OFFEROR COMPANY OWNS MORE

10:00:37 24   DIVERSE ASSETS IT MEANS LESS RISK FOR THE INVESTOR

10:00:44 25   SOLICITED BY THE SECURITY OFFERING.

65

10:00:46 1    Q    AND SO YOU THOUGHT THAT BY BRINGING ON

10:00:50 2    PROFESSOR BOURDIER INTO THE PROJECT, YOU WOULD MAKE

10:00:52 3    YOUR SECURITIES OFFERING MORE ATTRACTIVE?

10:00:55 4    A    MORE ATTRACTIVE, YES.

10:00:56 5              MS. WONG:  OBJECTION, ASKED AND ANSWERED.

10:00:58 6              THE COURT:  IT WAS, BUT I'LL ALLOW IT TO

10:00:59 7    REMAIN.  ASK YOUR NEXT QUESTION.

10:01:02 8              MR. FONG:  OKAY.

10:01:03 9    Q    NOW, WHAT DID YOU UNDERSTAND -- BEFORE -- AT

10:01:08 10   SOME POINT YOU WENT TO MR. BOURDIER'S HOUSE; RIGHT?

10:01:10 11   A    YEAH, I DID.

10:01:12 12   Q    BUT BEFORE YOU WENT THERE, DID YOU HAVE ANY

10:01:14 13   UNDERSTANDING OF WHAT KIND OF ASSETS PROFESSOR

10:01:16 14   BOURDIER HAD?

10:01:17 15   A    NO, AND I ALSO DIDN'T KNOW IF HE REALLY -- HE

10:01:21 16   MIGHT NEED AN OMNIBUS RETURN AFTER ALL AND IT TURNS

10:01:27 17   OUT HE DIDN'T.

10:01:28 18   Q    ALL RIGHT.  SO DID YOU HAVE -- AFTER SAM FUNG

10:01:31 19   MADE THE INITIAL INTRODUCTION, DID YOU HAVE ANY

10:01:34 20   CONVERSATIONS WITH PROFESSOR BOURDIER BEFORE YOU

10:01:37 21   ACTUALLY WENT TO HIS HOUSE?

10:01:38 22   A    EXTENSIVE CONVERSATIONS.

10:01:43 23   Q    ALL RIGHT.  WHAT DID THE TWO OF YOU TALK ABOUT

10:01:45 24   IN THOSE TELEPHONE CONVERSATIONS BEFORE YOU WENT TO

10:01:48 25   HIS HOUSE?

                                                          66

10:01:50 1                    MS. WONG:  OBJECTION, HEARSAY.

10:01:51 2                    THE COURT:  SUSTAINED.

10:01:54 3      BY MR. FONG:

10:01:55 4      Q    AND AT SOME POINT YOU WENT TO PROFESSOR

10:01:58 5      BOURDIER'S HOUSE, RIGHT?

10:01:59 6      A    YES.

10:01:59 7      Q    OKAY.  AND AGAIN, IT WAS -- HOW LONG OF A TIME

10:02:02 8      PERIOD WAS IT WHEN YOU FIRST STARTED TALKING WITH

10:02:06 9      PROFESSOR BOURDIER TO THE TIME THAT YOU ACTUALLY

10:02:10 10     WENT TO HIS HOUSE?

10:02:13 11     A    I HAVE SEEN THE PHONE RECORDS SO I STILL CAN'T

10:02:18 12     RECALL EXACTLY, A MONTH OR TWO.

10:02:20 13     Q    BUT IT WAS A MONTH OR TWO.  IT WASN'T, SAY,

10:02:25 14     SIX MONTHS, RIGHT?

10:02:26 15     A    NO.

10:02:27 16     Q    AND DO YOU REMEMBER THE -- WELL, FIRST OF ALL,

10:02:30 17     HOW LONG WERE YOU ACTUALLY AT PROFESSOR BOURDIER'S

10:02:33 18     HOUSE WHEN YOU MET WITH HIM?

10:02:34 19     A    THREE DAYS.

10:02:35 20     Q    AND DO YOU REMEMBER THE DATE?

10:02:36 21     A    OCTOBER 16TH OR 17TH TO OCTOBER 19TH.

10:02:46 22     Q    AND OCTOBER 19TH -- WHAT YEAR, FIRST OF ALL?

10:02:50 23     A    2003.

10:02:51 24     Q    SO OCTOBER 19TH OF 2003 WAS THE LAST DAY THAT

10:02:53 25     YOU WENT TO PROFESSOR BOURDIER'S HOUSE?

                                                        67

10:02:55  1     A     CORRECT.

10:02:56  2     Q     AND BESIDES THAT THREE OR FOUR-DAY PERIOD THAT

10:03:03  3     YOU WERE AT PROFESSOR BOURDIER'S HOUSE IN

10:03:05  4     MID-OCTOBER OF 2003, HAD YOU EVER BEEN TO HIS HOUSE

10:03:08  5     BEFORE OR AFTER?

10:03:09  6     A     NO.

10:03:09  7     Q     AND HAD YOU EVER TALKED TO HIM IN PERSON OTHER

10:03:13  8     THAN THAT MEETING IN MID-OCTOBER 2003?

10:03:17  9     A     NO.

10:03:17 10     Q     OKAY.  NOW, WHAT DID YOU DO -- WELL, FIRST OF

10:03:23 11     ALL, WHERE DID YOU STAY WHEN YOU WENT TO VISIT

10:03:26 12     PROFESSOR BOURDIER?

10:03:27 13     A     AT BOURDIER'S HOUSE.

10:03:29 14     Q     AND -- AND THE ENTIRE TIME THAT YOU WERE

10:03:33 15     THERE?

10:03:33 16     A     I HAD A RENTAL CAR SO I COULD DO ERRANDS.

10:03:39 17     Q     BUT YOU STAYED AT HIS HOUSE FOR THOSE THREE OR

10:03:43 18     FOUR DAYS, CORRECT?

10:03:44 19     A     CORRECT.

10:03:45 20     Q     AND WHAT DID YOU DO WHEN YOU WERE THERE FOR

10:03:47 21     THOSE COUPLE OF DAYS?

10:03:48 22     A     THE FIRST DAY NOTHING.  THE SECOND DAY WE

10:03:57 23     TALKED AND I HELPED HIM -- HE ASSISTED ME IN DOING

10:04:00 24     AN INVENTORY.

10:04:01 25     Q     ALL RIGHT.  AN INVENTORY OF WHAT?

                                                              68

10:04:02 1       A    OF THE ASSETS OF HIS TRUST.

10:04:05 2       Q    OKAY.  AND WHAT DID YOU -- DID YOU ACTUALLY

10:04:08 3       SEE THE ASSETS OF HIS TRUST?

10:04:10 4       A    SOME OF THEM.

10:04:12 5       Q    AND WHAT WERE THEY?

10:04:13 6       A    THE GREAT BULK OF THE VALUE WAS IN ART.

10:04:20 7       Q    I'M SORRY.  WHAT KIND OF ART I WAS GOING TO

10:04:26 8       ASK YOU.

10:04:27 9       A    PAINTINGS, PHOTOGRAPHS, MOVIES, MASTERS, BOOK

10:04:30 10      MASTERS.

10:04:31 11      Q    WAS -- HOW EXTENSIVE WERE THE -- WERE THESE

10:04:36 12      ITEMS THAT YOU TOOK INVENTORY OF?

10:04:38 13      A    HE HAD THOUSANDS OF PHOTOGRAPHS IN -- I'M NOT

10:04:44 14      A JUDGE OF THE QUALITY, BUT IT LOOKED TO ME LIKE

10:04:47 15      VERY HIGH QUALITY.

10:04:48 16      Q    OKAY.  AND NOW, DID THE TWO OF YOU -- WELL,

10:04:57 17      WHAT DID YOU DO AFTER YOU PHYSICALLY LOOKED AT THE

10:05:01 18      INVENTORY OF THE ASSETS?

10:05:02 19      A    SAM FUNG CAME THE THIRD DAY.

10:05:11 20           I DON'T THINK HE SPENT THE NIGHT.  I

10:05:13 21      THINK HE ACTUALLY CAME IN THE MORNING OF THE THIRD

10:05:17 22      MORNING OF THE THIRD DAY.  I DON'T RECALL EXACTLY,

10:05:20 23      BUT IT WAS NEAR THE END OF MY TRIP.

10:05:22 24      Q    ALL RIGHT.

10:05:23 25      A    AND JEAN-PAUL AND I GAVE TO SAM THE DRAFT

69

10:05:43 1    NUMBERS OF THE INVENTORY SO THAT HE COULD PRINT IT

10:05:49 2    OUT ON HIS COMPUTER.

10:05:51 3    Q    OKAY.  DID YOU, OVER THE COURSE OF THOSE

10:05:55 4    COUPLE OF DAYS, DID YOU PUT TOGETHER A LIST OF THE

10:05:58 5    INVENTORY OF THE ASSETS?

10:06:00 6    A    IN DRAFT FORM HANDWRITTEN.

10:06:05 7    Q    OKAY.  AND DID ANYBODY ASSIGN ANY VALUE TO

10:06:08 8    THESE ASSETS?

10:06:09 9    A    YES.

10:06:11 10    Q    AND WHO DID?

10:06:15 11    A    WELL, SOME OF THE ITEMS I COULD RECOGNIZE AS

10:06:17 12    OFFICE EQUIPMENT AND THINGS LIKE THAT, I COULD

10:06:19 13    ESTIMATE THE VALUE.  BUT THE ART I HAD NO IDEA.  I

10:06:22 14    TOOK JEAN-PAUL'S WORD FOR IT.

10:06:24 15    Q    SO PROFESSOR BOURDIER GAVE YOU HIS ESTIMATE OF

10:06:29 16    WHAT THE ARTWORK MIGHT BE WORTH?

10:06:31 17    A    YES, AND I REVIEWED -- I LOOKED AT A LOT OF

10:06:34 18    THE PHOTOGRAPHS AND THE ART AND -- BUT NOT ALL OF

10:06:37 19    IT, NOT EVEN NEAR ALL OF IT.

10:06:44 20    Q    NOW, AT THE TIME THAT SAM FUNG CAME OVER ON

10:06:47 21    THAT LAST DAY, WHAT WAS YOUR INTENTION?  WHAT WERE

10:06:49 22    YOU GOING TO DO IN TERMS OF WORKING WITH PROFESSOR

10:06:52 23    BOURDIER?

10:06:52 24    A    A MUTUAL EXCHANGE OF STOCK.

10:06:57 25    Q    YOU SAID A MUTUAL EXCHANGE OF STOCK.  WHAT,

70

10:07:07 1    BETWEEN WHAT AND WHAT?

10:07:08 2    A    WELL, THEY SAID THEY HAD A COMPANY CALLED

10:07:11 3    HEART CORPORATION.

10:07:11 4    Q    I'M SORRY.  WHEN YOU SAY, "THEY" WHO ARE YOU

10:07:14 5    REFERRING TO?

10:07:14 6    A    SAM FUNG AND BOURDIER -- ACTUALLY BOURDIER.

10:07:20 7    Q    SAID THAT THEY HAD A COMPANY?

10:07:21 8    A    THAT BOURDIER HAD A COMPANY, A CORPORATION

10:07:24 9    CALLED HEART CORPORATION.

10:07:25 10   Q    OKAY.  NOW, THEY SAID THE COMPANY WAS NAMED

10:07:32 11   HEART CORPORATION?

10:07:33 12   A    CORRECT.

10:07:33 13   Q    AND, NOW, DID YOU HEAR THE TERM OR THE NAME

10:07:36 14   HEART MIND CORPORATION WHEN YOU WERE THERE?

10:07:38 15   A    NO.

10:07:38 16   Q    NOW, YOU SAID THAT YOUR INTENTION WAS TO DO AN

10:07:49 17   EXCHANGE OF STOCK.  OKAY.

10:07:52 18         SO BETWEEN WHICH TWO COMPANIES, EXCHANGE

10:07:56 19   OF WHAT TWO COMPANIES?

10:07:58 20   A    BETWEEN THE HEART CORPORATION AND HCHC.

10:08:03 21   Q    OKAY.  AND, NOW, HOW MUCH WAS GOING TO BE

10:08:05 22   EXCHANGED BETWEEN THESE TWO COMPANIES?

10:08:07 23   A    10 PERCENT OR 10 PERCENT -- 100 SHARES OUT OF

10:08:13 24   1,000 AND 100 SHARES OUT OF 1,000.

10:08:16 25   Q    SO EACH COMPANY HAD 1,000 SHARES AND THEY WERE

71

10:08:20  1    GOING TO EXCHANGE 100 SHARES EACH?

10:08:22  2    A    CORRECT.

10:08:22  3    Q    AND WHAT WAS THE PURPOSE BEHIND THAT?

10:08:25  4    A    WELL, 100 SHARES DOESN'T SOUND LIKE A LOT BUT

10:08:29  5    IN A SECURITIES OFFERING IT WOULD BE SUBSTANTIAL.

10:08:36  6           SO BOURDIER WOULD GET 10 PERCENT OF THE

10:08:38  7    PROFITS AND THE DEVELOPMENT WORK OF THE HOTEL IN

10:08:42  8    WAIKIKI AND WHAT HCHC WOULD GET IS ALLEGEDLY

10:08:51  9    10 PERCENT OF THE ART MAINLY AND THEN THE MORE

10:08:55  10   ATTRACTIVE SECURITIES OFFERING.

10:08:56  11   Q    BECAUSE IT WOULD BE MORE DIVERSIFIED?

10:08:58  12   A    MORE DIVERSIFIED, YES.

10:09:00  13   Q    OKAY.  I'M GOING TO SHOW YOU A DOCUMENT THAT

10:09:25  14   HAS ALREADY BEEN ADMITTED INTO EVIDENCE.  THAT'S

10:09:27  15   GOVERNMENT'S EXHIBIT 115.

10:09:29  16           FIRST OF ALL, SIR, DO YOU SEE THAT

10:09:32  17   DOCUMENT?

10:09:32  18   A    I DO.

10:09:32  19   Q    AND I'M GOING TO DISPLAY THE FIRST PAGE OF

10:09:35  20   EXHIBIT 115 ON THE ELMO.

10:09:38  21           DO YOU RECOGNIZE THAT DOCUMENT?

10:09:39  22   A    YES.

10:09:39  23   Q    AND THIS IS THE MUTUAL ASSIGNMENT OF SHARES?

10:09:43  24   A    YES.

10:09:43  25   Q    AND THAT'S YOUR SIGNATURE AT THE -- ABOUT

72

10:09:48  1    MIDWAY DOWN FROM THE DOCUMENT?

10:09:50  2    A    YES.

10:09:50  3    Q    AND THERE'S ANOTHER ONE OF YOUR SIGNATURES

10:09:58  4    BELOW?

10:09:59  5    A    YES.

10:09:59  6    Q    AND WHO PREPARED THIS DOCUMENT?

10:10:00  7    A    I DID.

10:10:01  8    Q    AND DID YOU PREPARE THIS WHILE YOU WERE AT

10:10:05  9    PROFESSOR BOURDIER'S HOME?

10:10:07 10    A    YES, IT WAS ACTUALLY PRINTED OUT ON SAM FUNG'S

10:10:09 11    COMPUTER, PORTABLE PRINTER.

10:10:12 12    Q    OKAY.  AND IS THIS THE -- AND WHAT THIS

10:10:18 13    DOCUMENT DID WAS EFFECTUATE THE EXCHANGE OF 100

10:10:21 14    SHARES FOR 100 SHARES; RIGHT?

10:10:24 15    A    CORRECT.

10:10:25 16    Q    WHAT ELSE DID YOU DO -- OH, I'M SORRY.  AND

10:10:38 17    DID YOU ALSO SEE PROFESSOR BOURDIER SIGN 115?

10:10:43 18    A    I DID AND THE SAME WITH HIS WIFE.

10:10:45 19    Q    AND, NOW, WHAT ELSE DID YOU DO WHEN YOU WERE

10:10:47 20    THERE IN TERMS OF DOCUMENT?  DID YOU PREPARE ANY

10:10:49 21    OTHER DOCUMENTS?

10:10:50 22    A    NO, BUT I SIGNED ONE.

10:10:59 23    Q    NOW, I'M GOING TO SHOW YOU WHAT HAS BEEN

10:11:01 24    ADMITTED INTO EVIDENCE ALREADY AS GOVERNMENT'S

10:11:05 25    EXHIBIT 116 -- 118 -- EXCUSE ME.

73

10:11:29 1         FIRST OF ALL, SIR, DO YOU SEE THAT

10:11:31 2    DOCUMENT IN FRONT OF YOU?

10:11:32 3    A    I DO, I DO.

10:11:35 4    Q    AND DIRECTING YOUR ATTENTION TO THE SECOND

10:11:37 5    PAGE OF GOVERNMENT'S EXHIBIT 118.  IT'S THE -- IT

10:11:42 6    APPEARS TO BE THE FIRST PAGE OF A 2002 U.S.

10:11:47 7    CORPORATION INCOME TAX RETURN FOR HEART MIND

10:11:50 8    CORPORATION.

10:11:50 9         DO YOU SEE THAT, SIR?

10:11:51 10   A    YES.

10:11:52 11   Q    AND I'M GOING TO DIRECT YOUR ATTENTION --

10:11:56 12   WELL, FIRST OF ALL, YOU HAVE SEEN THIS DOCUMENT

10:11:58 13   BEFORE, RIGHT?

10:11:58 14   A    YES.

10:11:59 15   Q    OKAY.  AND LET ME DIRECT YOUR ATTENTION TO THE

10:12:05 16   SIGNATURE THAT IS JUST TO THE RIGHT OF PREPARER'S

10:12:09 17   USE ONLY.

10:12:10 18        DO YOU SEE THAT?

10:12:11 19   A    YES.

10:12:11 20   Q    OKAY.  AND IT APPEARS TO BE A SIGNATURE BELOW

10:12:18 21   THE WRITTEN -- THE PRINTED WORDS OF HAWAIIN COLONY

10:12:24 22   HOTEL CORP.  DO YOU SEE THAT?

10:12:25 23   A    YES.

10:12:25 24   Q    AND IT HAS THE WORD "BY," B-Y, RIGHT?

10:12:30 25   A    YES.

74

10:12:31  1    Q    AND THEN THE NAME, THE SIGNATURE TO THE RIGHT

10:12:33  2    OF IT, CAN YOU MAKE OUT THAT SIGNATURE?

10:12:36  3    A    I CAN SEE WHAT IT SAYS, BUT I --

10:12:41  4    Q    WELL, FIRST OF ALL, WHAT DO YOU THINK IT SAYS?

10:12:43  5    WHAT DOES IT APPEAR TO BE?

10:12:45  6    A    IT PURPORTS TO BE MY SIGNATURE.

10:12:47  7    Q    ERIC LIGHTER?

10:12:48  8    A    YES.

10:12:48  9    Q    OKAY.  DID YOU -- IS THIS -- DID YOU SIGN THIS

10:12:51 10    DOCUMENT?

10:12:51 11    A    NO.

10:12:52 12    Q    OKAY.  AND DIRECTING YOUR ATTENTION TO THE

10:12:56 13    DATE ON THE RIGHT OF IT 10-29-2003.  DO YOU SEE

10:13:00 14    THAT?

10:13:01 15    A    YES.

10:13:01 16    Q    AND WHERE WERE YOU ON OCTOBER 29TH, 2003?

10:13:06 17    A    TEN DAYS PRIOR TO THIS DATE I WAS IN HAWAII.

10:13:13 18    Q    SO YOU WERE ALREADY BACK IN HAWAII AT THE

10:13:15 19    TIME?

10:13:15 20    A    CORRECT, CORRECT.

10:13:17 21    Q    NOW, I WANT TO DIRECT YOUR ATTENTION TO A HAND

10:13:20 22    PRINTED DATE ABOVE THE SIGNATURE THAT WE JUST

10:13:25 23    LOOKED AT.  IT'S JUST TO THE RIGHT OF "SIGN HERE."

10:13:31 24              DO YOU SEE THAT?

10:13:32 25    A    YES.

                                                              75

10:13:32  1    Q    OKAY.  AND IT HAS THE HANDWRITTEN DATE APPEARS

10:13:37  2    TO BE NOVEMBER 5TH, 2003.

10:13:40  3    A    YES.

10:13:40  4    Q    OKAY.  NOW, WHERE WERE YOU ON NOVEMBER 5TH,

10:13:46  5    2003, IF YOU HAPPEN TO KNOW?

10:13:49  6    A    HAWAII.  I WAS IN HAWAII ON OCTOBER 19TH FROM

10:13:56  7    THE 20TH THROUGH DECEMBER 17TH, 2004.  OVER A YEAR.

10:14:05  8    Q    NOW, HAVE YOU SEEN -- WHEN YOU WERE AT

10:14:08  9    PROFESSOR BOURDIER'S HOUSE, DID YOU SEE THE

10:14:11 10    DOCUMENT THAT IS GOVERNMENT'S EXHIBIT 118?

10:14:13 11    A    NO, I NEVER HEARD THE NAME OF HEART MIND --

10:14:18 12    Q    OKAY.

10:14:21 13    A    -- BACK THEN.

10:14:22 14    Q    OKAY.  NOW, DIRECTING YOUR ATTENTION TO THE

10:14:24 15    NAME OF THE ENTITY THAT IS FILING THE RETURN.  YOU

10:14:30 16    JUST TESTIFIED THAT YOU HAD NOT HEARD THE NAME

10:14:32 17    HEART MIND CORPORATION BEFORE THEY WERE AT

10:14:34 18    PROFESSOR BOURDIER'S HOUSE.

10:14:36 19           NOW, LET ME DIRECT YOUR ATTENTION TO THE

10:14:40 20    COLUMN, OR THE BOX I SHOULD SAY, BOX B AS IN BOY.

10:14:43 21           IT'S THE EMPLOYER IDENTIFICATION NUMBER.

10:14:46 22    AND IT HAS A PRINTED NUMBER 87-0711919.

10:14:57 23           FIRST OF ALL, DO YOU SEE THAT ENTRY, SIR?

10:14:59 24    A    YES, YES, I DO.

10:15:02 25    Q    AND DID YOU SEE THIS EIN AT ANY TIME WHEN YOU

                                                              76

10:15:09  1    WERE AT PROFESSOR BOURDIER'S HOUSE?

10:15:10  2    A    NO, NO.

10:15:11  3    Q    OKAY.  DID ANYBODY TELL YOU THAT PROFESSOR

10:15:16  4    BOURDIER'S COMPANY, REGARDLESS OF HIS HEART OR

10:15:20  5    HEART MIND OR WHATEVER, HAD ALREADY ACQUIRED AN

10:15:23  6    EIN?

10:15:24  7    A    ON THE CONTRARY.  THEY SAID THERE WAS NO EIN.

10:15:30  8    Q    OKAY.  NOW, DIRECTING YOUR ATTENTION TO PAGE 8

10:15:40  9    OF EXHIBIT 118.

10:15:47  10          DO YOU SEE THAT, SIR?

10:15:48  11   A    I DO.

10:15:49  12   Q    NOW, IT'S -- IT HAS THE TITLE INVENTORY OF

10:15:55  13   HEART CORPORATION.  DO YOU SEE THAT?

10:15:57  14   A    CORRECT.

10:15:57  15   Q    NOW, FIRST OF ALL, DO YOU RECOGNIZE THIS

10:16:00  16   PARTICULAR PAGE WITH THE INVENTORY OF HEART

10:16:04  17   CORPORATION THAT IS PAGE 8 OF EXHIBIT 118?

10:16:09  18   A    IT LOOKS LIKE IT IS, YES.

10:16:11  19   Q    OKAY.  I COULD NOT HEAR YOU.

10:16:14  20   A    I RECOGNIZE IT, YES.

10:16:15  21   Q    OKAY.  SO YOU RECOGNIZE IT.  AND WHAT DO YOU

10:16:19  22   RECOGNIZE IT AS?

10:16:22  23   A    THE INVENTORY OF HEART CORPORATION, NOT HEART

10:16:25  24   MIND.

10:16:25  25   Q    AND IS THIS THE INVENTORY LIST THAT YOU AND

77

10:16:29 1    PROFESSOR BOURDIER PUT TOGETHER?

10:16:30 2    A    YES, AND LOOKING BACK IT WAS NOT VERY WELL

10:16:33 3    DONE BUT THAT'S THE LIST.

10:16:33 4    Q    OKAY.  NOW, DIRECTING YOUR ATTENTION AGAIN TO

10:16:42 5    SPECIFICALLY PAGE 2 OF EXHIBIT 118.  OKAY.

10:16:45 6            AND JUST THIS PAGE, DO YOU SEE THAT, SIR?

10:16:47 7    A    YES.

10:16:48 8    Q    OKAY.  AND YOU SEE THERE ARE NUMBERS ON THE

10:16:53 9    RIGHT-HAND COLUMN, FOR EXAMPLE, ON LINE 10 THERE'S

10:16:57 10   THE NUMBER OF $10,000, AND LINE 11, $10,000, AND

10:17:03 11   LINE 15, $302,000.

10:17:07 12           DO YOU SEE THOSE NUMBERS?

10:17:08 13   A    YES.

10:17:08 14   Q    OKAY.  NOW, DID YOU EVER -- AGAIN, WELL, LET

10:17:14 15   ME ASK YOU, DID YOU PREPARE ANY PART OF

10:17:21 16   EXHIBIT 118, IN PARTICULAR, THIS PARTICULAR PAGE OF

10:17:25 17   EXHIBIT 118, PAGE 2?

10:17:27 18   A    NO.

10:17:27 19   Q    AND NOW, DID YOU EVER PREPARE, WHILE YOU WERE

10:17:29 20   AT PROFESSOR BOURDIER'S HOUSE, DID YOU EVER PREPARE

10:17:32 21   ANY DOCUMENT THAT IS SIMILAR TO PAGE 2 OF

10:17:36 22   EXHIBIT 118?

10:17:36 23   A    SAM FUNG'S PRINTOUT ON HIS PORTABLE COMPUTER A

10:17:44 24   SIMILAR DRAFT TAX RETURN, PARTIAL TAX RETURN FOR

10:17:49 25   HEART CORPORATION.

78

10:17:51 1    Q    OKAY.  AND WOULD THAT BE FOR WHAT YEAR?

10:17:54 2    A    THE SAME NUMBERS.

10:17:56 3    Q    ALL RIGHT.  OKAY.

10:18:02 4         NOW, DID YOU -- THIS DOCUMENT THAT SAM

10:18:04 5    FUNG PREPARED, OKAY, FIRST OF ALL, LET ME JUST FOR

10:18:09 6    IDENTIFICATION PURPOSES I'VE PUT IN FRONT OF YOU A

10:18:37 7    TWO-PAGE DOCUMENT THAT HAS BEEN MARKED FOR

10:18:40 8    IDENTIFICATION ONLY AS DEFENDANT'S G AS IN GARY.

10:18:43 9         DO YOU SEE THAT, SIR?

10:18:44 10   A    I DO.

10:18:45 11   Q    AND HAVE YOU SEEN THIS DOCUMENT BEFORE TODAY?

10:18:49 12   A    YES.

10:18:49 13   Q    AND WHAT IS THE DOCUMENT THAT YOU HAVE IN

10:18:56 14   FRONT OF YOU AS EXHIBIT G?

10:18:57 15   A    IT'S THE DRAFT, TWO PAGES OF THE INCOMPLETE

10:19:01 16   HEART CORPORATION RETURN PREPARED AND IT'S SIGNED

10:19:06 17   IN DRAFTS ON OCTOBER 19TH, 2003.

10:19:10 18   Q    NOW, I WANT TO DIRECT YOUR ATTENTION TO THE

10:19:14 19   BOTTOM OF THE FIRST PAGE OF EXHIBIT G AS IN GARY TO

10:19:20 20   THE RIGHT OF THE BOX WHERE IT LEADS "PAID

10:19:23 21   PREPARER'S USE ONLY."

10:19:27 22        AND THEN TO THE RIGHT OF THERE THERE'S A

10:19:29 23   PREPARER'S SIGNATURE.  DO YOU SEE WHERE I'M

10:19:32 24   REFERRING TO, SIR?

10:19:33 25   A    YES, I DO.

                                                              79

10:19:33 1    Q    OKAY.  TO THE RIGHT OF IT APPEARS TO BE A

10:19:36 2    SIGNATURE.  AND ABOVE THAT SIGNATURE I SEE THE

10:19:42 3    WORD, THE PRINTED WORD HAWAIIN COLONY HOTEL

10:19:45 4    CORPORATION.

10:19:45 5              DO YOU SEE WHAT I'M REFERRING TO?

10:19:47 6    A    YES, I DO.

10:19:48 7    Q    OKAY.  NOW, WHOSE SIGNATURE IS THAT?

10:19:51 8    A    THAT'S MINE.

10:19:51 9    Q    OKAY.  AND DID YOU SIGN THAT THIS -- DID YOU

10:19:56 10   SIGN YOUR SIGNATURE, DID YOU SIGN THE SIGNATURE

10:20:02 11   THAT IS SHOWN ON EXHIBIT G?

10:20:03 12   A    I DID.

10:20:04 13   Q    OKAY.  AND WHEN DID YOU SIGN IT?

10:20:06 14   A    OCTOBER 19TH.

10:20:09 15   Q    WHAT YEAR?

10:20:10 16   A    2003.

10:20:11 17   Q    AND WHERE DID YOU SIGN IT?

10:20:12 18   A    IN BOURDIER'S LIVING ROOM.

10:20:15 19   Q    OKAY.  NOW, ABOVE YOUR SIGNATURE ON EXHIBIT G,

10:20:21 20   NOT EXHIBIT 118, BUT EXHIBIT G, THERE'S A "SIGN

10:20:28 21   HERE" SIGNATURE.  DO YOU SEE THAT?

10:20:31 22   A    I DO.

10:20:32 23   Q    AND DO YOU RECOGNIZE THAT SIGNATURE?

10:20:33 24   A    I DO.

10:20:34 25   Q    AND WHOSE SIGNATURE IS THAT?

                                                            80

10:20:35 1       A       JEAN-PAUL BOURDIER.

10:20:36 2       Q       AND DID YOU SEE PROFESSOR BOURDIER SIGN THAT

10:20:41 3       SIGNATURE?

10:20:41 4       A       I DID.

10:20:42 5       Q       OKAY.  AND I'M SORRY.  I'M PAUSING A LITTLE.

10:20:45 6       PLEASE LET ME FINISH MY QUESTION BEFORE YOU ANSWER.

10:20:48 7       OKAY.

10:20:49 8               NOW, TO THE RIGHT OF THE SIGNATURE THAT

10:20:55 9       YOU JUST TESTIFIED THAT YOU BELIEVED WAS PROFESSOR

10:20:58 10      BOURDIER'S THERE'S A HANDWRITTEN DATE.

10:21:01 11              DO YOU SEE THAT?

10:21:02 12      A       YES.

10:21:02 13      Q       AND WHAT IS THE HANDWRITTEN DATE THAT IS SHOWN

10:21:05 14      ON THE FIRST PAGE OF EXHIBIT G?

10:21:07 15      A       OCTOBER 19TH, '03.

10:21:10 16      Q       OKAY.  NOW, THERE ARE -- ON THE FIRST -- ON

10:21:14 17      THE UPPER RIGHT-HAND CORNER OF EXHIBIT G DO YOU SEE

10:21:21 18      SOME HANDWRITING?

10:21:22 19      A       I DO.

10:21:23 20      Q       OKAY.  FIRST OF ALL, I DON'T WANT YOU TO YET

10:21:26 21      TESTIFY AS TO THE CONTENT OF THOSE WRITINGS, BUT,

10:21:29 22      FIRST OF ALL, DO YOU RECOGNIZE THOSE HANDWRITINGS?

10:21:33 23      A       IT'S MY HANDWRITING.

10:21:34 24      Q       OKAY.  AND THERE ARE ALSO SOME HANDWRITING

10:21:43 25      WITH ARROWS POINTING TOWARDS THE RIGHT-HAND COLUMN

                                                                 81

10:21:46 1    OF EXHIBIT G.  DO YOU SEE THAT?

10:21:50 2    A    YEAH, I DO.

10:21:51 3    Q    AND WHOSE HANDWRITING IS THAT?

10:21:52 4    A    THAT'S MINE AND THOSE ARE MY ARROWS.

10:21:54 5    Q    OKAY.  AND DIRECTING YOUR ATTENTION TO PAGE 2

10:22:00 6    OF EXHIBIT G.  DO YOU SEE THAT, SIR?

10:22:02 7    A    YES.

10:22:14 8    Q    OKAY.  DESCRIBE IN GENERAL, WITHOUT GETTING

10:22:16 9    INTO ANY SPECIFIC CONTENTS, WHAT DO YOU SEE ON PAGE

10:22:20 10   2 OF EXHIBIT G?

10:22:23 11   A    IT'S A LIST OF HEART MIND SUBSIDIARIES.

10:22:26 12   Q    HEART MIND?

10:22:30 13   A    HEART CORPORATION'S SUBSIDIARIES.

10:22:33 14   Q    AND IS THERE ANY HANDWRITING ON THE SECOND

10:22:36 15   PAGE OF EXHIBIT G?

10:22:37 16   A    TWO LINES.

10:22:37 17   Q    OKAY.  AND THE FIRST LINE, PLEASE DESCRIBE

10:22:47 18   WHERE ON THAT PAGE IT APPEARS?

10:22:48 19   A    THE HEADING.

10:22:48 20   Q    OKAY.  THERE ARE SOME PRESENTED WORDS ON

10:22:56 21   EXHIBIT G, PAGE 2 OF EXHIBIT G?

10:22:58 22   A    YES.

10:22:58 23   Q    AND, IN FACT, THERE'S A LAST SENTENCE OR

10:23:01 24   PARAGRAPH KIND OF ABOUT A LITTLE MORE THAN HALFWAY

10:23:04 25   DOWN FROM THE TOP OF THE PAGE; IS THAT CORRECT?

82

10:23:06 1    A    YES, IT'S ACTUALLY SCRIPT.

10:23:13 2    Q    OKAY.  BUT -- I'M SORRY.  THERE ARE

10:23:15 3    TYPEWRITTEN WORDS THAT ABOUT TWO-THIRDS -- ABOUT

10:23:20 4    TWO-THIRDS OF THE WAY DOWN FROM THE TOP OF THE

10:23:23 5    PAGE; IS THAT CORRECT?

10:23:24 6    A    YES.

10:23:24 7    Q    AND TO THE RIGHT OF IT IS SOME HANDWRITING,

10:23:27 8    RIGHT?

10:23:27 9    A    YES.

10:23:27 10   Q    AND DO YOU RECOGNIZE THE HANDWRITING?

10:23:29 11   A    THAT'S MY HANDWRITING.

10:23:32 12            MR. FONG:  YOUR HONOR, I'M GOING TO MOVE

10:23:33 13   INTO EVIDENCE DEFENDANT'S EXHIBIT G.

10:23:36 14            MS. WONG:  OBJECTION, HEARSAY.

10:23:38 15            THE COURT:  ALL RIGHT.  WE'LL TAKE OUR

10:23:39 16   MORNING RECESS, FOLKS.  WE'LL TAKE ABOUT

10:23:42 17   12 MINUTES.  THANK YOU.  WE'LL BE IN RECESS.  YOU

10:23:44 18   MAY STAND DOWN, SIR.

10:37:36 19            (WHEREUPON, A RECESS WAS TAKEN.)

10:37:37 20            THE COURT:  WE'RE BACK ON THE RECORD.

10:37:38 21   OUR JURORS AND ALTERNATES ARE PRESENT.  THE

10:37:40 22   DEFENDANT IS ON THE STAND.  ALL COUNSEL ARE

10:37:43 23   PRESENT.

10:37:43 24            AND LET'S SEE, THERE WAS A HEARSAY

10:37:47 25   OBJECTION I THINK AS TO G?

83

10:37:50  1          MR. FONG:  YES, YOUR HONOR.

10:37:51  2          THE COURT:  ANY RESPONSE?

10:37:52  3          MR. FONG:  YES, YOUR HONOR.  IT'S NOT

10:37:56  4     OFFERED FOR THE TRUTH OF THE MATTER ASSERTED, JUST

10:37:58  5     THAT MR. LIGHTER WROTE CERTAIN WORDS AND ADAPT

10:38:02  6     THOSE WORDS TO PROVIDE NOTICE TO MR. FUNG AND

10:38:08  7     MR. BOURDIER.  IT'S NOTICE, YOUR HONOR.

10:38:09  8          IT IS NOT A MATTER OF TRUTH OF THE MATTER

10:38:12  9     ASSERTED.

10:38:16 10          THE WORDS THAT MR. LIGHTER WROTE PUT

10:38:19 11     MR. FUNG AND MR. BOURDIER ON NOTICE.

10:38:21 12          THE COURT:  WELL, THAT'S -- ISN'T THAT

10:38:25 13     SUBJECT TO ARGUMENT?  ISN'T THAT -- ARE YOU ASKING

10:38:28 14     THAT THIS BE ADMITTED FOR NOTICE PURPOSES AS YOU

10:38:31 15     SAY, WOULDN'T THAT BE FOR THE TRUTH OF THE MATTER

10:38:34 16     ASSERTED, NOT NECESSARILY THE WRITINGS BUT FOR THE

10:38:37 17     PURPOSE?

10:38:40 18          MR. FONG:  YOUR HONOR, I BELIEVE THAT THE

10:38:44 19     DOCUMENT IS ABSOLUTELY ADMISSIBLE.

10:38:46 20          IT CERTAINLY --

10:38:48 21          THE COURT:  WELL, YOU JUST TOLD ME THAT

10:38:49 22     YOU WERE ASKING FOR IT TO BE ADMITTED, NOT FOR THE

10:38:53 23     TRUTH OF THE MATTER ASSERTED.

10:38:54 24          MR. FONG:  RIGHT.  BUT THE FACT THAT

10:38:56 25     MR. FUNG AND MR. BOURDIER HAD BEEN PLACED ON NOTICE

                                                          84

10:39:00  1    AS TO WHAT IS GOING ON.

10:39:05  2              THE COURT:  WELL, I DON'T THINK THERE'S

10:39:07  3    ANY FOUNDATIONAL EVIDENCE OF THAT OTHER THAN WHAT

10:39:13  4    OCCURRED DURING FOUNDATION.

10:39:16  5              SO YOU'RE ASKING FOR AN INTERPRETATION

10:39:18  6    THAT YOU MIGHT ARGUE, I SUPPOSE.

10:39:20  7              BUT IF YOU'RE ASKING THAT THIS BE

10:39:22  8    ADMITTED FOR NOTICE, THAT GIVES AN IMPRIMATUR THAT

10:39:26  9    IT IS NOTICE.

10:39:29 10              MR. FONG:  WELL, BUT WITHOUT THE DOCUMENT

10:39:30 11    BEING ADMITTED, THERE IS NO EVIDENCE.

10:39:35 12              THE COURT:  WELL, I UNDERSTAND.  RIGHT

10:39:37 13    NOW WE'RE HAVING COLLOQUY ABOUT WHETHER OR NOT THE

10:39:41 14    DOCUMENT SHOULD COME IN.

10:39:42 15              AND YOU'RE ASKING THAT IT SHOULD NOT COME

10:39:45 16    IN FOR THE TRUTH OF THE MATTER ASSERTED IN THE

10:39:47 17    DOCUMENT.

10:39:47 18              MR. FONG:  YOUR HONOR, I BELIEVE THAT IT

10:39:49 19    CAN COME IN FOR A VARIETY OF REASONS:  FIRST OF

10:39:52 20    ALL, FOR COMPLETENESS BECAUSE 118 IS ALREADY IN,

10:39:55 21    THIS DOCUMENT.

10:39:59 22              MR. O'REILLY:  EXCUSE ME, YOUR HONOR.  I

10:40:01 23    APOLOGIZE, BUT COULD WE TAKE THIS UP AT THE

10:40:03 24    SIDE-BAR?

10:40:03 25              THE COURT:  YES.  THANK YOU.  FOLKS,

85

10:40:05 1   WE'LL HAVE A SIDE-BAR CONVERSATION.  FOLKS, YOU CAN

10:40:07 2   STAND IF YOU WISH.

10:40:08 3             (SIDE-BAR CONFERENCE ON THE RECORD.)

10:49:51 4             THE COURT:  OKAY.  WE'RE AT SIDE-BAR

10:49:51 5   OUTSIDE OF THE PRESENCE OF THE JURY.

10:49:51 6             SO MY CONCERN IS THAT, MR. FONG, YOU SAID

10:49:51 7   THAT YOU'RE ASKING IT TO COME IN NOT FOR THE TRUTH

10:49:51 8   OF THE MATTER ASSERTED.

10:49:51 9             DOES THAT MEAN NONE OF THE WRITINGS OR

10:49:52 10  THE WORDS?

10:49:52 11            MR. FONG:  IT CAN COME IN ON THREE

10:49:52 12  DIFFERENT BASES.  IT CAN COME IN ON COMPLETENESS.

10:49:52 13  118 IS IN.  THIS IS THE DRAFT TO 118.

10:49:52 14            TWO, IT COMES IN UNDER 807 BECAUSE IT

10:49:52 15  CERTAINLY -- WHAT MR. LIGHTER TESTIFIED TO GIVES IT

10:49:52 16  RELIABILITY IN TERMS OF HOW CLOSE IN TIME -- IN

10:49:52 17  FACT, IT BEARS SIGNATURES ON DATES IN WHICH WE HAVE

10:49:52 18  I THINK EVERYBODY AGREES THAT WHEN EVERYBODY WAS

10:49:52 19  PRESENT AS OPPOSED TO EXHIBIT 118.

10:49:52 20            AND THEN, FINALLY, IF NOTHING ELSE, IT

10:49:52 21  COMES IN BECAUSE IT PUTS MR. BOURDIER AND MR. FUNG

10:49:52 22  ON NOTICE AS TO WHAT THEY WERE SUPPOSED TO DO.

10:49:52 23            THE COURT:  I THINK AS TO THE LATTER ONE

10:49:52 24  THAT'S NOT REALLY RELEVANT.  I THINK YOU'RE ASKING

10:49:52 25  FOR TOO MUCH.  WHETHER OR NOT IT PUTS THEM ON

86

10:49:52 1     NOTICE IS A QUESTION OF FACT.  YOU CAN ARGUE, BUT

10:49:52 2     THIS -- BOTH SIDES CAN ARGUE.

10:49:52 3               MR. FONG:  BUT THIS DOESN'T COME IN.

10:49:52 4               THE COURT:  WELL, LET ME GO BACK TO THE

10:49:52 5     TWO OTHER POINTS, AND I'LL ASK THE GOVERNMENT TO

10:49:52 6     RESPOND NOW.

10:49:52 7               THIS WITNESS HAS, IN REGARDS TO

10:49:52 8     RELIABILITY, THIS WITNESS HAS NOW INDICATED AND

10:49:52 9     INDICATES THAT THESE MARKS ARE HIS AND THAT THEY'RE

10:49:52 10    HIS WRITING.

10:49:52 11              SO IN ONE SENSE THAT DOES, AS TO THE

10:49:52 12    DOCUMENT, THAT DOES RESOLVE ANY TRUSTWORTHINESS OR

10:49:52 13    RELIABILITY TYPE ISSUE IN REGARDS TO THE WRITING.

10:49:52 14              SO IT MIGHT OTHERWISE BE ADMISSIBLE BASED

10:49:52 15    ON THAT FACT.

10:49:52 16              DO YOU WANT TO RESPOND TO THAT?

10:49:52 17              MR. O'REILLY:  YES, YOUR HONOR.  THIS IS

10:49:52 18    A SUGGESTION THAT WE HAVE HAD SEVERAL TIMES ALREADY

10:49:52 19    ABOUT THIS VERY DOCUMENT.

10:49:52 20              THERE'S NO ISSUE.  THE DEFENDANT WROTE

10:49:52 21    THESE.  HOWEVER -- I APOLOGIZE -- WITHOUT

10:49:52 22    MISREPRESENTATION, JEAN-PAUL ASKED WHETHER THIS WAS

10:49:52 23    ON HERE AND HE SAID HE DIDN'T REMEMBER SEEING IT

10:49:52 24    AND IT DEFIES LOGIC, YOU DON'T SIGN A DRAFT

10:49:52 25    DOCUMENT AND THEN YOU DON'T SIGN AND THEN SAY

                                                        87

10:49:52 1    SOMEBODY ELSE YOU NEED A SIGNATURE FOR THE

10:49:52 2    PREPARER.

10:49:52 3            THE COURT:  WELL, THAT GOES TO, I

10:49:52 4    SUPPOSE, THE WEIGHT OF THIS DOCUMENT IF IT'S

10:49:52 5    ADMITTED.

10:49:52 6            NOW, I SHOULD TELL YOU THAT I'M NOT SURE

10:49:52 7    THERE'S ENOUGH FOUNDATION YET BASED ON WE DO HAVE

10:49:52 8    BOURDIER SAYING HE DOESN'T REMEMBER SEEING THIS AND

10:49:52 9    WHETHER THAT MEANS IT'S THERE OR NOT I DON'T KNOW,

10:49:52 10   HE JUST DOESN'T REMEMBER.

10:49:52 11           MR. O'REILLY:  BUT, YOUR HONOR, IT IS

10:49:52 12   HEARSAY.  IT IS AN OUT-OF-COURT STATEMENT OFFERED

10:49:52 13   AND THE ONLY PURPOSE IS FOR ITS TRUTH THAT THESE

10:49:52 14   STATEMENTS WERE MADE TO MR. BOURDIER AND MR. FUNG.

10:49:52 15   THAT'S THE TRUTH.  IT'S TRIED TO BE PUT IN THROUGH

10:49:52 16   THIS DOCUMENT.

10:49:52 17           THE COURT:  THERE'S NO --

10:49:52 18           MR. O'REILLY:  BUT HE'S SAYING I GAVE HIM

10:49:52 19   A DOCUMENT THAT SHOWED THAT THINGS THAT HE NEEDED

10:49:52 20   TO DO.  WE'RE NOT GOING TO OBJECT TO HIM TESTIFYING

10:49:52 21   ABOUT IT.  THIS DOCUMENT ITSELF, HOWEVER, IS

10:49:52 22   HEARSAY.

10:49:52 23           THE COURT:  OKAY.  ANY RESPONSE TO THAT?

10:49:52 24           MR. FONG:  YOUR HONOR, AS A DISTINCTIONAL

10:49:52 25   DIFFERENCE, MR. LIGHTER CAN CERTAINLY TESTIFY TO

88

10:49:52 1    THE FACT THAT HE WROTE THESE WORDS ON THERE, BUT,

10:49:52 2    AGAIN, IN TERMS OF COMPLETENESS, WHY IS IT THAT THE

10:49:52 3    JURORS ARE ALLOWED TO SEE 118 BUT NOT EXHIBIT G?

10:49:52 4         THE COURT:  BECAUSE THERE'S AN OBJECTION

10:49:52 5    NOW AND THAT'S WHAT WE'RE TALKING ABOUT WHETHER OR

10:49:52 6    NOT YOU CAN OVERCOME THE HEARSAY OBJECTION.

10:49:52 7         MR. FONG:  BUT, YOUR HONOR, UNDER 807

10:49:52 8    THIS DOCUMENT HAS A GREAT DEGREE OF RELIABILITY.

10:49:52 9         THE GOVERNMENT CAN CERTAINLY

10:49:52 10   CROSS-EXAMINE MR. LIGHTER ABOUT IT AND ASK HIM

10:49:52 11   WHETHER OR NOT HE ACTUALLY WROTE THESE THINGS.

10:49:52 12        BUT IN TERMS OF RELIABILITY, IT ALMOST

10:49:52 13   MIRRORS -- IT DOES LOOK LIKE A DRAFT OF 118.

10:49:52 14        THE COURT:  WELL, THAT'S YOUR OPINION.  I

10:49:52 15   MEAN, THAT'S WHAT -- IF YOU'RE GOING ADMIT THIS TO

10:49:52 16   SAY THIS IS A DRAFT, THEN I DON'T THINK IT'S

10:49:52 17   ADMISSIBLE.

10:49:52 18        YOUR CLIENT CAN TESTIFY TO WHATEVER HE

10:49:52 19   WANTS OR WHATEVER HIS BELIEF IS.  HE CAN TESTIFY

10:49:52 20   ABOUT WHEN THESE ITEMS WERE PUT ON THERE, WHETHER

10:49:52 21   OR NOT IT WAS IN THE SENSE OF THESE OTHER PARTIES

10:49:52 22   OR NOT AND THE JURY IS GOING TO BELIEVE HIM OR NOT

10:49:52 23   BELIEVE HIM AND IT'S GOING TO GO TO HIS

10:49:52 24   CREDIBILITY.

10:49:52 25        BUT YOU TOLD ME EARLIER THAT YOU'RE

89

10:49:52 1    ASKING THAT IT BE ADMITTED NOT FOR THE TRUTH OF THE

10:49:52 2    MATTER ASSERTED.

10:49:52 3              MR. FONG:  I BELIEVE IT CAN COME IN, LIKE

10:49:52 4    I SAID, ON THREE DIFFERENT BASES, YOUR HONOR.  ONE

10:49:52 5    IS THAT IT PUTS THEM ON NOTICE BECAUSE EVEN IF THE

10:49:52 6    WORDS --

10:49:52 7              THE COURT:  I GUESS I DON'T UNDERSTAND

10:49:52 8    THE NOTICE EXCEPTION.

10:49:52 9              MR. FONG:  WELL, YOUR HONOR, IF I SAY

10:49:52 10   THAT, YOU KNOW, IF I SAY THAT I HAD A MILLION

10:49:52 11   DOLLARS IN MY POCKET RIGHT NOW TO YOU, YOU ARE ON

10:49:52 12   NOTICE THAT I SAID THAT, NOT THAT IT IS -- NOT THAT

10:49:52 13   I NECESSARILY HAVE A MILLION DOLLARS IN MY POCKET.

10:49:52 14             SO THAT LATER ON, IF THE ISSUE COMES UP

10:49:52 15   DID MR. FONG EVER TELL YOU HE HAD A MILLION DOLLARS

10:49:54 16   IN YOUR POCKET, YOUR ANSWER WOULD BE, YES, HE TOLD

10:49:54 17   ME THAT.  YOU MAY NOT BELIEVE HIM.

10:49:54 18             THE COURT:  BUT AS MR. O'REILLY SAYS, THE

10:49:54 19   OTHER WITNESS SAYS HE DOESN'T REMEMBER THESE BEING

10:49:54 20   ON HERE.

10:49:54 21             MR. FONG:  YOUR HONOR, FIRST OF ALL,

10:49:54 22   PROFESSOR BOURDIER DOESN'T REMEMBER ANYTHING, WHICH

10:49:54 23   IS FINE.

10:49:54 24             MR. O'REILLY:  OBJECTION, THAT'S A

10:49:54 25   MISCHARACTERIZATION OF MR. BOURDIER.

90

10:49:54  1          MR. FONG:  BUT THE POINT IS THAT

10:49:54  2    MR. LIGHTER CAN TESTIFY THAT I PUT HIM ON THERE,

10:49:54  3    AND THEN IT GOES TO THE CREDIBILITY WHETHER HE

10:49:54  4    ACTUALLY DID.

10:49:54  5          THE COURT:  I THINK HE TESTIFIED THAT HE

10:49:54  6    WROTE THIS.

10:49:54  7          MR. FONG:  RIGHT, AND I THINK THAT'S A

10:49:54  8    SUFFICIENT FOUNDATION BUT THE JURORS DON'T KNOW YET

10:49:54  9    WHAT IT IS THAT HE WROTE.

10:49:54 10          MR. O'REILLY:  YOUR HONOR, IT'S PURE AND

10:49:54 11    SIMPLE HEARSAY.  IT'S THE DEFENDANT'S OWN STATEMENT

10:49:54 12    OFFERED FOR THE TRUTH.

10:49:54 13          THE COURT:  THERE'S NO QUESTION ABOUT IT

10:49:54 14    THAT IT'S HEARSAY AND THE QUESTION NOW IS WHETHER

10:49:54 15    THERE'S AN EXCEPTION THAT ALLOWS IT TO COME IN AND

10:49:54 16    THAT'S THE PART WE'RE DISCUSSING HERE.  IT IS

10:49:54 17    HEARSAY.  THERE'S NO QUESTION ABOUT IT.

10:49:54 18          MR. O'REILLY:  I DON'T KNOW ANY

10:49:54 19    EXCEPTION.

10:49:54 20          MR. FONG:  WELL, IT'S A PRIOR

10:49:54 21    INCONSISTENT STATEMENT AS TO HIS, AS TO -- IT'S

10:49:54 22    801(D) EITHER (D)(2), YOUR HONOR, THAT PRIOR

10:49:54 23    CONSISTENT STATEMENT BY MR. LIGHTER THAT TO PROVE

10:49:54 24    THAT HE DIDN'T FABRICATE HIS REASONED TESTIMONY

10:49:54 25    THAT HE HAD BEEN WARNING THESE PEOPLE AS TO WHAT

91

10:49:54 1    THEY SHOULD DO.

10:49:54 2              THE COURT:  THAT REQUIRES AN ARGUMENT OF

10:49:54 3    FABRICATION FIRST TO OVERCOME --

10:49:54 4              MR. FONG:  BUT THAT'S THE GOVERNMENT'S

10:49:54 5    CASE.

10:49:54 6              THE COURT:  I DON'T KNOW IF THEY HAVE

10:49:54 7    INDICATED THAT THERE'S FABRICATION.  THEY HAVEN'T

10:49:54 8    PRESENTED THAT YET.  AND I HAVEN'T HEARD THAT THERE

10:49:54 9    HAS BEEN EVIDENCE.

10:49:54 10             IS THERE EVIDENCE THAT HE FABRICATED

10:49:54 11   THIS?  AND I HAVEN'T HEARD.  IF THERE IS, TELL ME.

10:49:54 12             MR. FONG:  WELL, IF THIS DOCUMENT IS TO

10:49:54 13   REBUT THE CHARGES OF FABRICATION ABOUT WHETHER OR

10:49:54 14   NOT MR. LIGHTER HAD BEEN WARNING THESE PEOPLE WHAT

10:49:54 15   THEY SHOULD DO RELEVANT TO THE I.R.S.

10:49:54 16             MR. O'REILLY:  YOUR HONOR, THIS KIND OF

10:49:54 17   DOCUMENT SHOULD HAVE BEEN BROUGHT UP AT THE

10:49:54 18   PRETRIAL CONFERENCE AND IT'S REQUIRED UNDER THE

10:49:54 19   LOCAL RULES.

10:49:54 20             THE COURT:  IT IS.

10:49:54 21             WE SHOULD HAVE HAD THIS CONVERSATION, YOU

10:49:54 22   KNOW, MR. FONG, AND THERE WAS NO PRETRIAL

10:49:55 23   CONFERENCE STATEMENT PREPARED FROM THE DEFENSE SO

10:49:55 24   NOW WE HAVE TO BRING THIS UP HERE.  I UNDERSTAND

10:49:55 25   THIS IS NOT THE RIGHT PLACE AND RIGHT TIME AND I

92

DON'T KNOW WHAT HAPPENED THERE BUT HERE WE ARE

DISCUSSING THIS.

ANYTHING ELSE YOU WANT ME TO KNOW?

MR. FONG:  NO, YOUR HONOR.

MR. O'REILLY:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  LET ME JUST TELL

YOU I AM INCLINED TO ADMIT IT AT THIS TIME AND I'LL

ALLOW SOME EXAMINATION ON THIS AND I'M GOING TO --

IT DOES -- THE RELIABILITY BASED ON THE FACT THAT

HE IS HERE AND HE DID ADOPT THIS AND HE DID -- HE

CAN TESTIFY ABOUT HIS WRITING ON HERE.  THE

GOVERNMENT CAN CROSS-EXAMINE HIM.

MR. O'REILLY:  OKAY.  BUT, YOUR HONOR,

UNDER WHAT HEARSAY EXCEPTION IS IT BEING ADMITTED?

THE COURT:  WELL, I'M LOOKING AT THIS

UNDER I THINK IT'S 807 OR 801.

MR. FONG:  807.

THE COURT:  WHERE THIS -- I'M FOCUSSED ON

THE RELIABILITY OF THIS STATEMENT.  HE'S TESTIFIED

ABOUT IT AND HE'S ADOPTED THESE SIGNATURES AS HIS.

NOW, IS IT BEING OFFERED FOR THE TRUTH OF

THE MATTER ASSERTED THAT THIS IS A DRAFT ONLY AND,

NO, I'M NOT SUGGESTING THAT IT IS.  BUT THE

RELEVANCE OF IT IS THAT HE HAS INDICATED THAT THESE

ARE HIS SIGNATURES, HE'S INDICATED THAT HE HAS HAD

93

10:49:55  1    TESTIMONY ABOUT WHAT HE THOUGHT HE WAS DOING IN

10:49:55  2    THIS REGARD.  THERE'S BEEN TESTIMONY ABOUT THAT.

10:49:55  3             MR. O'REILLY:  OKAY, YOUR HONOR.  I WOULD

10:49:55  4    SAY WITH RESPECT TO THE RELIABILITY, I THINK WHAT

10:49:55  5    IS VERY RELIABLE IS THAT HE PREPARED THIS AFTER THE

10:49:55  6    FACT BECAUSE YOU DON'T SIGN A DRAFT DOCUMENT AS I

10:49:55  7    INDICATED EARLIER, HE -- YOU DON'T SIGN THE

10:49:55  8    DOCUMENT AS A PREPARER AND INDICATE SAM FUNG AS

10:49:55  9    PREPARER.  AND YOU DON'T INDICATE AN EIN.

10:49:55 10             THE COURT:  I RECOGNIZE THAT AND THAT

10:49:55 11    GOES TO THE WEIGHT OF THIS EVIDENCE, WHETHER OR NOT

10:49:55 12    THE JURY IS GOING TO BELIEVE ANYTHING ON HERE AS TO

10:49:55 13    THIS WITNESS.

10:49:55 14             MR. O'REILLY:  I WILL REPRESENT TO THE

10:49:55 15    COURT THAT WE WILL RECALL MR. LIGHTER TO TESTIFY

10:49:56 16    ABOUT THIS.

10:49:56 17             THE COURT:  ALL RIGHT.  ANYTHING ELSE?

10:49:56 18             MR. FONG:  NO.

10:49:56 19             (SIDE-BAR CONFERENCE CONCLUDED.)

10:49:56 20             THE COURT:  ALL RIGHT.  THANK YOU,

10:49:58 21    COUNSEL.  I'M GOING TO ADMIT G.  G WILL BE ADMITTED

10:50:01 22    AT THIS TIME.

10:50:02 23             MR. FONG:  THANK YOU, YOUR HONOR.

10:50:02 24    Q    AT THIS TIME I WANT TO PUBLISH DEFENSE EXHIBIT

10:50:06 25    G.

                                                          94

10:50:08   1          MR. LIGHTER, DO YOU HAVE A COPY OF G IN

10:50:11   2   FRONT OF YOU?

10:50:11   3   A    I DO.

10:50:12   4   Q    OKAY.  AND AS YOU TESTIFIED, THAT IS INDEED

10:50:20   5   YOUR SIGNATURE?

10:50:21   6   A    CORRECT.

10:50:21   7   Q    AND IN THE "PAID PREPARER'S USE ONLY" BOX,

10:50:27   8   RIGHT?

10:50:27   9   A    CORRECT.

10:50:27  10   Q    AND YOU DID SIGN THIS ON OCTOBER 19TH, 2003?

10:50:31  11   A    YES.

10:50:31  12   Q    AND YOU DID SEE MR. BOURDIER SIGN HIS NAME AND

10:50:36  13   DATE IT ON OCTOBER 19TH, 2003?

10:50:40  14   A    YES.

10:50:40  15   Q    NOW, DIRECTING YOUR ATTENTION TO THE

10:50:42  16   HANDWRITING THAT YOU TESTIFIED TO A LITTLE EARLIER.

10:50:45  17   DO YOU SEE THE WORDS "DRAFT ONLY," WITH AN

10:50:49  18   EXCLAMATION POINT ABOVE THE TITLE U.S. CORPORATION

10:50:54  19   INCOME TAX RETURN?

10:50:55  20   A    YES.

10:50:55  21   Q    AND YOU TESTIFIED THAT'S YOUR HANDWRITING,

10:50:58  22   RIGHT?

10:50:58  23   A    YES.

10:50:58  24   Q    AND WHAT WAS YOUR INTENT IN WRITING THE WORDS

10:51:01  25   "DRAFT ONLY" ON THIS DOCUMENT?

95

10:51:03 1        MS. WONG:  OBJECTION, YOUR HONOR.  THE

10:51:04 2   DOCUMENT SPEAKS FOR ITSELF.

10:51:10 3        MR. FONG:  I'M ONLY ASKING HIS INTENT,

10:51:12 4   YOUR HONOR.

10:51:16 5        THE COURT:  OVERRULED.  YOU CAN ANSWER

10:51:17 6   THE QUESTION, SIR.

10:51:18 7        THE WITNESS:  THANK YOU.  SINCE I HAD NOT

10:51:22 8   SEEN ANY SOURCE DOCUMENTS REGARDING THE FACTS

10:51:30 9   RELATED TO HEART CORPORATION AND SUBSIDIARIES, I

10:51:40 10  WAS ONLY AGREEING TO THIS IN DRAFT FORM AND

10:51:47 11  ESPECIALLY SUBJECT TO A C.P.A. REVIEWING AND

10:51:50 12  PREPARING THE RETURN.  THIS IS GUIDANCE FOR A

10:51:54 13  C.P.A.'S PERFORMANCE.

10:51:56 14  BY MR. FONG:

10:51:57 15  Q    OKAY.  NOW, THE WORDS HERE TO THE RIGHT OF THE

10:52:00 16  WORDS "DRAFT ONLY," WHAT DOES THAT SAY?  I'M NOT

10:52:04 17  SURE I CAN COMPLETELY READ IT.

10:52:05 18  A    "NEEDS PAGES 2, 3, 4 OF FORM 1120."

10:52:11 19  Q    AND WHAT DO YOU MEAN BY THAT?

10:52:13 20  A    WELL, BACK THEN THE FORM 1120, WHICH IS FOR

10:52:21 21  CORPORATIONS, HAD MORE PAGES THAN THE NORMAL I.R.S.

10:52:24 22  FORM AND THIS DRAFT PAGES 2, 3, AND 4 HAD NOT BEEN

10:52:32 23  PREPARED BY ANYBODY.

10:52:36 24  Q    NOW, DIRECTING YOUR ATTENTION TO THE LINE THAT

10:52:38 25  READS NAME ON THE TOP -- TOWARD THE TOP OF THE

96

10:52:43  1     PAGE.

10:52:44  2             AND WHAT IS THE NAME OF THE CORPORATION

10:52:46  3     THAT IS FILING THE RETURN OR FOR WHICH THIS RETURN

10:52:49  4     WAS PREPARED?

10:52:50  5     A    IT'S HEART CORPORATION.

10:52:53  6     Q    OKAY.  NOW, AND THEN TO THE RIGHT OF IT

10:52:55  7     THERE'S THE BOX B WITH THE EMPLOYER IDENTIFICATION

10:52:59  8     NUMBER.

10:53:00  9             DO YOU SEE THAT BOX?

10:53:01 10     A    YES.

10:53:01 11     Q    AND THERE'S A QUESTION MARK HERE WITHIN THAT

10:53:05 12     BOX?

10:53:05 13     A    YES.

10:53:05 14     Q    IS THAT YOUR HANDWRITING?

10:53:07 15     A    YES.

10:53:07 16     Q    AND WHAT DO YOU MEAN BY THE QUESTION MARK?

10:53:10 17     A    SAM FUNG AND JEAN-PAUL BOURDIER TOLD ME THAT

10:53:18 18     THIS CORPORATION HAD ALREADY BEEN IN EXISTENCE.  SO

10:53:23 19     I'M ASKING FOR THE FORM SS4, WHICH IS THE

10:53:28 20     APPLICATION FOR FEDERAL I.D. NUMBER.

10:53:34 21     Q    OKAY.  NOW, IT SHOWS HERE ON BOX C THAT THE

10:53:37 22     DATE INCORPORATED WAS 12-9-1990.

10:53:40 23             DO YOU SEE THAT, SIR?

10:53:41 24     A    YES.

10:53:42 25     Q    OKAY.  WHO PUT THAT INFORMATION IN?

                                                            97

10:53:45 1    A    SAM FUNG.

10:53:46 2    Q    OKAY.  DID YOU HAVE ANY INPUT WITH PREPARING

10:53:56 3    THIS ENTRY 12-9-1990?

10:53:59 4    A    I HAD NO INPUT IN PREPARING THE ENTRY.  SAM

10:54:01 5    FUNG PREPARED THE RETURN.

10:54:02 6    Q    WHEN YOU TALK ABOUT THE ENTRY, ARE YOU TALKING

10:54:05 7    ABOUT THE TYPED WRITTEN ENTRIES?

10:54:06 8    A    YES.

10:54:07 9    Q    OKAY.  NOW, DIRECTING YOUR ATTENTION TO THE

10:54:11 10   TOP RIGHT-NUMBER IN THE RIGHT-HAND COLUMN IN TERMS

10:54:15 11   OF THE BOX D, TOTAL ASSETS.

10:54:17 12            DO YOU SEE THAT, SIR?

10:54:19 13   A    YES.

10:54:19 14   Q    AND THE NUMBER 2, THERE'S A NUMBER OF

10:54:29 15   2,559,000.  DO YOU SEE THAT, SIR?

10:54:30 16   A    YES.

10:54:30 17   Q    AND, FIRST OF ALL, DID YOU PUT THAT NUMBER

10:54:33 18   THERE?

10:54:33 19   A    NO.  I THINK SAM TOOK THAT INVENTORY THAT WAS

10:54:36 20   DONE BY JEAN-PAUL BOURDIER.

10:54:37 21   Q    OKAY.  NOW, THERE'S AN ARROW, A CIRCLE AND AN

10:54:41 22   ARROW POINTING BACK TO SOME HANDWRITING READING

10:54:45 23   "NEEDS SOURCE DOCUMENT."

10:54:48 24            DO YOU SEE THAT, SIR?

10:54:49 25   A    YES.

                                                        98

10:54:49  1     Q     AND THAT'S YOUR HANDWRITING, IS IT?

10:54:51  2     A     YES.

10:54:52  3     Q     AND WHAT DID YOU MEAN BY IT "NEEDS SOURCE

10:54:59  4     DOCUMENT"?

10:55:00  5     A     WELL, I'M JUST TAKING THEIR WORD FOR IT.  I

10:55:03  6     HAVEN'T SEEN THE DOCUMENT THAT SUPPORTS THE NUMBERS

10:55:07  7     OR HOWEVER FEW THERE ARE.

10:55:09  8     Q     AND THERE'S AN ARROW WITH THE, ANOTHER ARROW

10:55:14  9     FROM THE WORDS "NEEDS SOURCE DOCUMENTS" TO THE LINE

10:55:18 10     10, THE $10,000 FIGURE.

10:55:21 11             DO YOU SEE THAT?

10:55:21 12     A     YES, I DO.

10:55:22 13     Q     AND WHAT DO YOU MEAN BY THAT?

10:55:23 14     A     I DIDN'T SEE A CHECKBOOK OR A CHECK REGISTER.

10:55:35 15     Q     AND THERE'S ALSO AN ARROW TO LINE 15 WHICH HAS

10:55:38 16     THE ENTRY OF $302,000.

10:55:43 17             DO YOU SEE THAT?

10:55:43 18     A     YES.

10:55:44 19     Q     AND, FIRST OF ALL, WHAT DID YOU UNDERSTAND

10:55:45 20     LINE 15 TO BE, TO REPRESENT?

10:55:47 21     A     THE OFFSHORE INVESTMENT LOSS RELATED TO N.T.S.

10:55:54 22     Q     WHOSE LOSS?

10:55:55 23     A     JEAN-PAUL -- MOSTLY HIS WIFE.

10:55:59 24     Q     AND WHY IS THAT LOSS -- DO YOU KNOW WHY THAT

10:56:04 25     LOSS NUMBER IS ENTERED AS $302,000?

                                                              99

10:56:11 1    A    THAT'S THE AMOUNT OF CASH THAT HE SAID HE

10:56:14 2    INVESTED OFFSHORE AND LOST AND I THINK IT WAS CASH

10:56:19 3    FOR TITLE.  I'M NOT REALLY -- I WASN'T REALLY SURE.

10:56:25 4    Q    OKAY.  AT THE TIME THAT YOU WROTE "NEEDS

10:56:27 5    SOURCE DOCUMENTS," WITH THE ARROW POINTING TO LINE

10:56:30 6    15, THE $302,000 ENTRY, DID YOU KNOW -- DID YOU

10:56:37 7    HAVE A BELIEF AS TO WHETHER OR NOT THAT $302,000

10:56:42 8    WAS ACTUALLY A DEDUCTIBLE LOSS?

10:56:43 9    A    IF HE LOST $300,000 IN AN INVESTMENT, I WOULD

10:56:51 10   BELIEVE THAT WOULD BE SOME KIND OF A LOSS.

10:56:54 11   Q    OKAY.  AND WHY DID YOU DRAW THE ARROW THEN

10:56:57 12   "NEEDS SOURCE DOCUMENTS."

10:57:01 13   A    I ONLY HAD HIS WORD FOR IT, THE NUMBER.

10:57:05 14           MS. WONG:  ASKED AND ANSWERED.

10:57:05 15           THE COURT:  EXCUSE ME, SIR.  SUSTAINED.

10:57:08 16   BY MR. FONG:

10:57:14 17   Q    DIRECTING YOUR ATTENTION NOW TO THE SECOND

10:57:15 18   PAGE OF EXHIBIT G.

10:57:19 19           OKAY.  THE -- TO THE RIGHT OF THE ENTRY

10:57:24 20   HEART CORPORATION, LIST OF SUBSIDIARIES THERE ARE

10:57:27 21   THE WORDS "DRAFT ONLY."

10:57:30 22           IS THAT YOUR HANDWRITING?

10:57:31 23   A    YES.

10:57:31 24   Q    AND THEN THE LAST LINE ON PAGE 2 IT READS

10:57:37 25   "RETURNS --" WERE, ACTUALLY THE LAST PARAGRAPHS --

100

10:57:41 1    "RETURNS FOR THE ABOVE FOR YEARS PRIOR TO 2002 HAVE

10:57:45 2    BEEN ACCEPTED AS FILED."

10:57:46 3             DO YOU SEE THAT?

10:57:47 4    A    YES.

10:57:47 5    Q    AND "INTERNAL AUDIT FOR ALL ISSUES IS ONGOING

10:57:51 6    AND RESULTS WILL BE PROMPTLY FORWARDED."

10:57:55 7             DO YOU SEE THAT?

10:57:55 8    A    YES.

10:57:55 9    Q    AND TO THE RIGHT OF THAT THERE'S AN ARROW AND

10:57:58 10    POINTING TO THE PARAGRAPH AND IT SAYS, "NEEDS TO

10:58:02 11    HIRE C.P.A."

10:58:04 12             DO YOU SEE THAT?

10:58:05 13    A    YES.

10:58:05 14    Q    AND WHOSE HANDWRITING IS THAT WITH THE ARROW

10:58:08 15    AND "NEED TO HIRE C.P.A.," I SHOULD SAY?

10:58:15 16             WHO PUT THAT THERE?

10:58:17 17    A    THAT'S MY HANDWRITING.

10:58:18 18    Q    AND WHY DID YOU PUT IT THERE?

10:58:20 19    A    BECAUSE IT SAYS THE RETURNS SUBSIDIARIES WERE

10:58:26 20    ACCEPTED AS FILED BUT I HADN'T SEEN ANY RETURNS.

10:58:30 21    Q    OKAY.  AND SO WERE YOU -- WHAT WERE YOU -- I'M

10:58:35 22    SORRY, GO AHEAD.

10:58:35 23    A    AND I'M LEAVING THAT DAY BACK TO HAWAII.

10:58:39 24    Q    OKAY.  NOW, DID YOU MAKE THESE WRITINGS IN

10:58:42 25    FRONT OF MR. BOURDIER?

101

10:58:43  1    A    YES.

10:58:44  2    Q    WHAT ABOUT IN FRONT OF SAM FUNG?

10:58:47  3    A    YES.

10:58:47  4    Q    OKAY.  NOW I'M GOING TO SWITCH TO GOVERNMENT'S

10:59:00  5    EXHIBIT 118.  DO YOU SEE THAT, SIR?

10:59:02  6    A    YES.

10:59:02  7    Q    AND, NOW, ON THE SIGNATURE THAT YOU ALREADY

10:59:05  8    TESTIFIED THAT YOU HAD NOT SIGNED, MY QUESTION TO

10:59:07  9    YOU, THOUGH, IS DID YOU EVER AUTHORIZE ANYBODY TO

10:59:10 10    SIGN YOUR SIGNATURE ONTO THIS DOCUMENT GOVERNMENT'S

10:59:14 11    EXHIBIT 118?

10:59:14 12    A    ABSOLUTELY NO.

10:59:17 13    Q    OKAY.  MAY I TROUBLE YOU, MS. BURGESS, TO

10:59:51 14    BRING UP EXHIBIT 111.  AND THANK YOU.

10:59:54 15             AND THAT HAS ALREADY BEEN ADMITTED INTO

10:59:56 16    EVIDENCE.  DO YOU SEE THAT DOCUMENT IN FRONT OF

10:59:58 17    YOU, MR. LIGHTER?

10:59:59 18    A    YES.

10:59:59 19    Q    AND, MS. BURGESS, IF YOU DON'T MIND -- FIRST

11:00:03 20    OF ALL, WHAT IS THAT DOCUMENT?  WELL, WHAT DO YOU

11:00:06 21    READ THAT DOCUMENT TO SAY?

11:00:07 22             THE COURT:  DO YOU WANT HIM TO READ THE

11:00:09 23    WHOLE DOCUMENT?

11:00:10 24             MR. FONG:  NO, JUST THE TITLE.

11:00:11 25             THE WITNESS:  IT PURPORTS TO BE A

                                                            102

11:00:13 1    PROMISSORY NOTE.

11:00:13 2             MR. FONG:  AND MAY I TROUBLE YOU,

11:00:16 3    MS. BURGESS, TO SCROLL UP SO WE CAN SEE BOTH

11:00:20 4    SIGNATURES.

11:00:25 5    Q    AND ON THE BOTTOM OF THE PAGE EXHIBIT 111 DO

11:00:30 6    YOU SEE THAT THERE'S A SIGNATURE FOR JEAN-PAUL?

11:00:34 7    A    YES.

11:00:34 8    Q    AND THEN BELOW THAT IT HAS A SIGNATURE SPACE

11:00:39 9    FOR HEART CORPORATION BY, AND THEN IN TYPED WORDS

11:00:44 10   ERIC AARON LIGHTER, SECRETARY.

11:00:47 11            DO YOU SEE THAT?

11:00:48 12   A    ACTUALLY IT SAYS ERIC AARON LIGHTER -- THERE'S

11:00:53 13   NO "G."

11:00:55 14   Q    NO.  I'M TALKING ABOUT THE TYPED WRITTEN

11:00:57 15   WORDS.

11:00:58 16   A    OH, YES.

11:00:58 17   Q    SECRETARY.  DO YOU SEE THAT?

11:01:00 18   A    YES.

11:01:00 19   Q    AND ABOVE THAT SIGNATURE SPACE THERE'S A

11:01:02 20   SIGNATURE.

11:01:03 21            DO YOU SEE THAT?

11:01:04 22   A    YES.

11:01:05 23   Q    AND IS THAT YOUR SIGNATURE, SIR?

11:01:07 24   A    ABSOLUTELY, NO.

11:01:08 25   Q    AND, NOW, DID YOU EVER AUTHORIZE ANYBODY TO

                                                            103

11:01:13  1    SIGN YOUR NAME ON THIS DOCUMENT, THE PROMISSORY

11:01:19  2    NOTE?

11:01:19  3    A     ABSOLUTELY NO.

11:01:25  4    Q     OKAY.

11:01:26  5    A     AND LET ME ADD, IN ANY NOTES, PROMISSORY NOTES

11:01:36  6    THAT I HAVE DRAFTED IN 30 YEARS I CAN'T RECALL ONE

11:01:41  7    TIME WHERE I INCLUDED A SIGNATURE BLOCK FOR A

11:01:45  8    CREDITOR THAT NOTES TO BE SIGNED BY ONLY DEBTORS

11:01:53  9    AND GUARANTORS.

11:01:55 10    Q     OKAY.  SO YOU DID NOT SIGN THIS DOCUMENT AND

11:01:57 11    ALSO YOU DID NOT AUTHORIZE ANYBODY TO SIGN THIS

11:01:59 12    DOCUMENT?

11:01:59 13              MS. WONG:  OBJECTION.  ASKED AND

11:02:01 14    ANSWERED.

11:02:01 15              THE COURT:  SUSTAINED.

11:02:03 16    BY MR. FONG:

11:02:03 17    Q     DID MR. BOURDIER ASK YOU FOR PERMISSION TO

11:02:06 18    SIGN YOUR NAME ONTO ANY DOCUMENT?

11:02:14 19    A     NO.

11:02:14 20              MR. FONG:  MAY I TROUBLE YOU, MS.

11:02:15 21    BURGESS, TO BRING UP 112, PLEASE?  YEAH, 112, THE

11:02:20 22    FIRST PAGE.  THANK YOU.

11:02:27 23    Q     I'M DISPLAYING AND PUBLISHING ON THE SCREEN

11:02:30 24    EXHIBIT 112, WHICH IS ALREADY ADMITTED INTO

11:02:32 25    EVIDENCE.  IT SAYS THAT THE HEADING READS, "AFTER

                                                        104

11:02:36 1    RECORDING, RETURN BY MAIL."

11:02:39 2              AND THEN IT READS "ERIC LIGHTER, VICE

11:02:42 3    PRESIDENT, HEART CORPORATION, 1678 SHATTUCK AVENUE,

11:02:46 4    NUMBER 249, BERKELEY, CALIFORNIA?"

11:02:49 5              AND THEN IT SAYS BELOW THAT THERE'S A

11:02:52 6    LINE READING "REAL PROPERTY MORTGAGE."

11:02:55 7              FIRST OF ALL, DO YOU SEE THOSE WORDS,

11:02:58 8    SIR?

11:02:58 9    A    YES.

11:02:58 10   Q    DO YOU RECOGNIZE THE ADDRESS 1678 SHATTUCK

11:03:04 11   AVENUE, NUMBER 249 IN BERKELEY, CALIFORNIA?

11:03:08 12   A    I HAVE NO CLUE.

11:03:09 13   Q    OKAY.  HAVE YOU EVER BEEN TO, AS FAR AS YOU

11:03:12 14   KNOW, 1678 SHATTUCK AVENUE, 249 IN BERKELEY,

11:03:17 15   CALIFORNIA?

11:03:18 16   A    NO.

11:03:18 17   Q    AND THIS IS A MORTGAGE, IT APPEARS TO BE FOR

11:03:29 18   $350,000 OWING TO HEART CORPORATION FROM JEAN-PAUL

11:03:33 19   BOURDIER.

11:03:37 20              DO YOU SEE THAT, SIR?

11:03:38 21   A    YES.

11:03:38 22   Q    AND MAY I TROUBLE YOU, MS. BURGESS, TO BE TO

11:03:41 23   THE -- I THINK IT'S THE THIRD PAGE WHERE THE

11:03:45 24   SIGNATURE BLOCK IS.

11:03:56 25              DO YOU SEE THE ENLARGEMENT OF THE THIRD

                                                              105

11:03:59  1    PAGE SIGNATURE BLOCK ON GOVERNMENT'S EXHIBIT 112,

11:04:02  2    SIR?

11:04:02  3    A    I DO.

11:04:08  4    Q    AND YOU SEE AT THE TOP ARE TWO SIGNATURE

11:04:10  5    BLOCKS; IS THAT CORRECT?

11:04:11  6    A    YES.

11:04:11  7    Q    AND THE FIRST ONE HAS THE NAME TYPED OF

11:04:14  8    JEAN-PAUL BOURDIER AND THEN JUST BELOW THAT THE

11:04:20  9    WORDS MORTGAGOR.

11:04:21  10           DO YOU SEE THAT?

11:04:22  11   A    YES.

11:04:23  12   Q    AND, FIRST OF ALL, DO YOU RECOGNIZE THAT

11:04:30  13   SIGNATURE IN THE BLOCK OF JEAN-PAUL BOURDIER?

11:04:32  14   A    YES, IT LOOKS LIKE HIS SIGNATURE, THAT'S ALL I

11:04:35  15   COULD SAY.

11:04:35  16   Q    AND DID YOU SEE MR. BOURDIER SIGN THIS

11:04:37  17   DOCUMENT?

11:04:37  18   A    NO.

11:04:38  19   Q    OKAY.  NOW, BELOW THAT IT HAS A SIGNATURE FOR

11:04:44  20   HEART CORPORATION BY AND THEN THE TYPED WRITTEN

11:04:46  21   WORDS ERIC AARON LIGHTER, SECRETARY, AND THEN BELOW

11:04:52  22   THAT MORTGAGEE.

11:04:54  23           DO YOU SEE THAT?  DO YOU SEE THAT?

11:04:57  24   A    YES.

11:04:57  25   Q    AND THERE'S A SIGNATURE ON THAT LINE JUST

                                                    106

11:05:05 1    BELOW HEART CORPORATION AND THE NAME ERIC AARON

11:05:09 2    LIGHTER.

11:05:09 3              DO YOU SEE THAT?

11:05:10 4    A    YES.

11:05:10 5    Q    AND IS THAT YOUR SIGNATURE, SIR?

11:05:12 6    A    NOT EVEN CLOSE.

11:05:13 7    Q    SO THE ANSWER IS NO?

11:05:15 8    A    THE ANSWER IS NO.

11:05:15 9    Q    AND DID YOU AUTHORIZE MR. BOURDIER TO SIGN

11:05:21 10   THAT ON YOUR BEHALF?

11:05:23 11   A    ABSOLUTELY, NO.

11:05:25 12   Q    AND DID YOU AUTHORIZE ANYBODY TO SIGN THAT ON

11:05:27 13   YOUR BEHALF?

11:05:28 14   A    NO.

11:05:28 15   Q    AND DID MR. BOURDIER ASK YOU FOR PERMISSION TO

11:05:35 16   SIGN YOUR NAME ONTO A MORTGAGE?

11:05:37 17   A    NO.

11:05:38 18   Q    THANK YOU VERY MUCH.

11:05:56 19              BY THE WAY, DID YOU HAVE ANY OTHER

11:05:58 20   BUSINESS TRANSACTIONS WITH PROFESSOR BOURDIER OTHER

11:06:00 21   THAN WHAT WE HAVE TESTIFIED -- OTHER THAN WHAT YOU

11:06:05 22   HAVE TESTIFIED HERE TO TODAY?

11:06:12 23   A    I CALLED HIM SOME MONTHS LATER AFTER MY VISIT

11:06:18 24   TO LET HIM KNOW THAT HCHC BOUGHT AN OREGON RANCH

11:06:23 25   AND THAT WAY IT HAD NO DEBT ON IT AND SO THAT HIS

107

11:06:26 1    10 PERCENT WAS WORTH MORE THAN THEY ORIGINALLY

11:06:30 2    THOUGHT.

11:06:30 3    Q    OKAY.  AND AT SOME POINT DID YOU RECEIVE

11:06:36 4    NOTICE THAT EITHER HEART OR HEART MIND CORPORATION

11:06:42 5    HAD BEEN DISSOLVED?

11:06:49 6    A    IN DECEMBER OF 2004 I GOT A LETTER BUT

11:06:53 7    MR. FUNG TOLD ME EARLIER, NOT MUCH EARLIER.

11:07:01 8    Q    AND DID YOU EVER GET NOTICE OFFICIALLY FROM

11:07:03 9    THE CORPORATION, BE IT HEART CORPORATION OR HEART

11:07:08 10   MIND CORPORATION, THAT LOOK, HCHC, YOU'RE A

11:07:11 11   SHAREHOLDER, AND WE'RE NOTIFYING YOU THAT WE'RE

11:07:14 12   CONSIDERING OR VOTING TO DISSOLVE THE CORPORATION?

11:07:17 13           MS. WONG:  OBJECTION, ASKED AND ANSWERED.

11:07:18 14           THE COURT:  SUSTAINED.

11:07:30 15   BY MR. FONG:

11:07:31 16   Q    I'M GOING TO SHOW YOU A DOCUMENT THAT HAS BEEN

11:07:33 17   MARKED AS DEFENSE EXHIBIT MM AS IN MARY.

11:07:46 18           DO YOU SEE THAT, SIR?

11:07:47 19   A    I DO.

11:07:48 20   Q    NOW, DID YOU EVER -- BEFORE TODAY, HAVE YOU

11:07:51 21   SEEN THIS DOCUMENT BEFORE?

11:07:52 22   A    YES.

11:07:52 23   Q    OKAY.  AND WHEN -- APPROXIMATELY WHEN DID YOU

11:07:55 24   SEE IT?

11:07:56 25   A    LATE DECEMBER OF 2004.

108

11:07:59 1    Q    OKAY.  AND WHAT WAS YOUR UNDERSTANDING AS TO

11:08:04 2   THE GENERAL DESCRIPTION OF THIS DOCUMENT WITHOUT

11:08:06 3   GOING INTO THE CONTENT?

11:08:07 4    A    I'D SAY NOTICE TO ME REGARDING THE STATUS OF

11:08:18 5   HEART MIND CORPORATION.

11:08:20 6    Q    IS IT A LETTER?

11:08:21 7    A    IT'S A LETTER SENT THROUGH MAIL.

11:08:26 8            MR. FONG:  YOUR HONOR, I'M GOING TO ASK

11:08:29 9   TO MOVE IN DEFENSE EXHIBIT MM.

11:08:32 10            MS. WONG:  OBJECTION AS TO BOTH HEARSAY

11:08:34 11   AND RELEVANCE.

11:08:38 12            THE COURT:  AS TO THE HEARSAY OBJECTION,

11:08:40 13   IS THERE AN EXCEPTION?

11:08:41 14            MR. FONG:  YES, IT PLACED MR. LIGHTER ON

11:08:43 15   NOTICE AS TO THE STATUS OF HEART MIND CORPORATION.

11:08:46 16            THE COURT:  YOU'RE ASKING IT BE ADMITTED

11:08:48 17   FOR THE TRUTH OF THE MATTER ASSERTED?

11:08:50 18            MR. FONG:  NO.  IT'S JUST THAT -- WHAT IT

11:08:53 19   DOES, YOUR HONOR, IS THAT IT'S A REPRESENTATION

11:08:55 20   FROM JEAN-PAUL BOURDIER.

11:09:01 21            THE COURT:  YOU DON'T HAVE TO TELL US

11:09:02 22   WHAT IT IS.  IT'S A LETTER FROM SOMEONE OTHER THAN

11:09:05 23   THIS WITNESS?

11:09:06 24            MR. FONG:  YES.

11:09:06 25            THE COURT:  I'LL SUSTAIN THE OBJECTION.

109

11:09:07  1          MR. FONG:  OKAY.

11:09:10  2    Q    AT SOME POINT, MR. LIGHTER, DID YOU EVER LEARN

11:09:15  3    WHAT HAPPENED TO HCHC'S 100 SHARES OF HEART

11:09:23  4    CORPORATION OR HEART MIND CORPORATION?

11:09:24  5    A    YES.

11:09:29  6    Q    OKAY.  NOW, WHAT IS YOUR UNDERSTANDING AS TO

11:09:34  7    WHAT HAPPENED -- WHAT HAPPENED -- WELL, AT SOME

11:09:37  8    POINT YOU LEARNED THAT HEART OR HEART MIND

11:09:40  9    CORPORATION HAD BEEN DISSOLVED; IS THAT CORRECT?

11:09:41 10    A    IN DECEMBER OF 2004 I LEARNED THAT IT WAS

11:09:48 11    DISSOLVED AND IT HAD STRIPPED THE CORPORATION OF

11:09:54 12    ASSETS.

11:09:55 13    Q    NOW, DID YOU EVER RECEIVE ANY -- DID HCHC EVER

11:10:01 14    RECEIVE ANY FORM OF CONSIDERATION OR ANYTHING OF

11:10:05 15    VALUE FOR ITS 100 SHARES OF HEART OR HEART MIND

11:10:11 16    CORPORATION?

11:10:11 17    A    I RECEIVED -- IN THE DISSOLUTION.

11:10:20 18    Q    NO, I'M TALKING ABOUT ANY TIME.

11:10:22 19    A    I EXCHANGED 10 PERCENT OF HCHC AND HEART.

11:10:28 20    Q    AND HOW WAS THAT DONE?

11:10:29 21    A    A SIMPLE EXCHANGE.  A MUTUAL EXCHANGE OF

11:10:33 22    STOCK.

11:10:33 23    Q    AND -- BUT AS TO THE 10 PERCENT OF HEART OR

11:10:38 24    HEART MIND CORPORATION THAT HCHC HELD, DID HCHC

11:10:42 25    EVER RECEIVE ANYTHING OF VALUE FOR IT?  ANY KIND OF

                                                        110

11:10:47 1    MONETARY OR ANY KIND OF TANGIBLE ASSET?

11:10:53 2            MS. WONG:  OBJECTION AS TO RELEVANCE TO

11:10:55 3    THIS LINE OF QUESTIONING.

11:10:56 4            MR. FONG:  YOUR HONOR, IT GOES TO THE

11:10:57 5    LEGITIMACY OF THE TRANSACTION BETWEEN MR. BOURDIER

11:10:59 6    AND MR. LIGHTER.

11:11:03 7            THE COURT:  YOU CAN ANSWER THE QUESTION

11:11:05 8    YES OR NO IF YOU RECEIVED ANYTHING.

11:11:06 9            THE WITNESS:  I RECEIVED 10 PERCENT OF

11:11:08 10   THE STOCK, WHICH IS IT HAS INTEREST VALUE BECAUSE

11:11:15 11   THEY KNOW ABOUT THE INVENTORY TO ANSWER YOUR

11:11:17 12   QUESTION.

11:11:17 13   BY MR. FONG:

11:11:18 14   Q    WELL, LET ME ASK YOU THIS, THE 10 PERCENT, THE

11:11:21 15   100 SHARES OF HCHC THAT HAD BEEN TRANSFERRED OVER

11:11:24 16   TO MR. BOURDIER'S COMPANY, OKAY, WHAT HAPPENED TO

11:11:28 17   THAT?

11:11:28 18   A    HE KEPT IT UNTIL HE SENT IT BACK OUT FOR

11:11:35 19   DISSOLUTION.

11:11:36 20   Q    SO THE 100 SHARES OF HCHC WHICH HAD BEEN

11:11:43 21   EXCHANGED WITH MR. BOURDIER'S COMPANY EARLIER,

11:11:50 22   ABOUT A YEAR EARLIER, WAS SUBSEQUENTLY SENT BACK TO

11:11:52 23   YOU?

11:11:53 24   A    YES.

11:11:56 25           MS. WONG:  OBJECTION, ASKED AND ANSWERED.

                                                           111

11:11:57 1        THE COURT:  SUSTAINED.  THE ANSWER WILL

11:11:59 2    BE STRICKEN.

11:12:00 3        MR. FONG:  I'LL MOVE ON, YOUR HONOR.

11:12:01 4    Q    MR. LIGHTER, LET ME ASK YOU ABOUT YOUR

11:12:04 5    DEALINGS WITH DR. IRWIN GOOTNICK, OKAY?

11:12:07 6    A    OKAY.

11:12:07 7    Q    NOW, WHEN DID YOU -- WHEN DID YOU FIRST HEAR

11:12:10 8    ABOUT DR. GOOTNICK?

11:12:11 9    A    I THINK MARCH OF 2004.

11:12:20 10   Q    OKAY.  AND WHO BROUGHT DR. GOOTNICK TO YOUR

11:12:25 11   ATTENTION?

11:12:25 12   A    SAM FUNG.

11:12:26 13   Q    AND DID YOU HAVE SOME CONVERSATIONS WITH

11:12:29 14   DR. GOOTNICK AFTER SAM FUNG MADE THE INITIAL

11:12:33 15   INTRODUCTION?

11:12:33 16   A    SAM FUNG GAVE HIM MY PHONE NUMBER I UNDERSTAND

11:12:38 17   AND THEN HE -- GOOTNICK CALLED ME.

11:12:40 18   Q    OKAY.  DID YOU HAVE SOME TELEPHONE

11:12:42 19   CONVERSATIONS WITH DR. GOOTNICK?

11:12:43 20   A    YES.

11:12:44 21   Q    OKAY.  AND WHAT DID YOU AND DR. GOOTNICK TALK

11:12:50 22   ABOUT IN THOSE TELEPHONE CONVERSATIONS?

11:12:52 23        MS. WONG:  OBJECTION.  IT CALLS FOR

11:12:53 24   HEARSAY, YOUR HONOR.

11:12:54 25        MR. FONG:  COMPLETENESS.  DR. GOOTNICK

                                                      112

11:12:56 1    TESTIFIED EXTENSIVELY --

11:12:58 2                THE COURT:  SUSTAINED.  YOU CAN ASK

11:12:59 3    ANOTHER QUESTION.

11:13:00 4                MR. FONG:  OKAY.

11:13:01 5    Q    WHAT DID YOU -- DID YOU EVER COME TO HAVE

11:13:05 6    ANY -- DID YOU EVER ENTER INTO ANY BUSINESS

11:13:07 7    TRANSACTIONS WITH DR. GOOTNICK, DR. IRWIN GOOTNICK?

11:13:11 8    A    I DID.  IT WAS ALMOST AN IDENTICAL MUTUAL

11:13:16 9    EXCHANGE OF STOCK AS THE BOURDIERS.

11:13:18 10   Q    AND -- EXCUSE ME, YOUR HONOR.  LET ME JUST

11:13:23 11   GRAB A DIFFERENT FOLDER.

11:14:04 12               NOW, MR. LIGHTER, YOU STARTED TALKING TO

11:14:07 13   DR. GOOTNICK APPROXIMATELY WHEN?

11:14:08 14   A    SOME TIME IN MARCH OF 2004.

11:14:10 15   Q    ALL RIGHT.  AND WHAT WAS YOUR INTENTION IN

11:14:12 16   TERMS OF YOUR -- WHY YOU WERE TALKING TO

11:14:17 17   DR. GOOTNICK?

11:14:17 18   A    HOPEFULLY I COULD OBTAIN A PARTNER OR

11:14:21 19   DEVELOPER FOR THE HOTEL AND/OR THE ROYAL PATENTS

11:14:28 20   PROJECT THAT WAS HOPED TO HAVE COME TO FRUITION

11:14:33 21   SOON.

11:14:33 22   Q    OKAY.  AND THE HOTEL I THINK YOU HAVE ALREADY

11:14:37 23   TESTIFIED TO.

11:14:37 24               WHAT IS THE ROYAL PATENT -- IS THAT A

11:14:42 25   DEVELOPMENT PROJECT?

                                                              113

11:14:43  1       A    YES.

11:14:45  2       Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF THE

11:14:48  3    ROYAL PATENT DEVELOPMENT PROJECT FROM YOUR

11:14:50  4    PERSPECTIVE?

11:14:51  5       A    WELL, FIRST OF ALL, YOU HAVE TO KNOW WHAT A

11:14:55  6    ROYAL PATENT IS.  MAY I SAY THAT?

11:14:59  7       Q    WELL, WHATEVER YOU NEED TO EXPLAIN YOUR

11:15:02  8    UNDERSTANDING OF WHAT THE -- WHAT YOU REFER TO AS

11:15:04  9    THE ROYAL PATENT DEVELOPMENT PROJECT.

11:15:07 10            EXPLAIN TO US WHAT YOU MEAN BY THAT?

11:15:09 11       A    WELL, THE ROYAL PATENT --

11:15:14 12            MS. WONG:  OBJECTION.  THIS LINE OF

11:15:17 13    QUESTIONING HAS ALREADY BEEN DEVELOPED ON FRIDAY

11:15:19 14    AND --

11:15:20 15            THE COURT:  I THINK YOU DEVELOPED SOME OF

11:15:23 16    THIS ON FRIDAY.

11:15:24 17            MR. FONG:  I DO NOT BELIEVE WE HAVE

11:15:25 18    GOTTEN INTO THE SPECIFIC DETAILS BUT --

11:15:29 19            THE COURT:  LET ME ALLOW YOU SOME

11:15:31 20    LATITUDE HERE.

11:15:37 21            YOU CAN ANSWER THE QUESTION, SIR.

11:15:40 22    BY MR. FONG:

11:15:42 23       Q    MR. LIGHTER --

11:15:43 24            THE COURT:  GO AHEAD AND ASK THE

11:15:44 25    QUESTION.

                                                            114

BY MR. FONG:

Q    OH, I'M SORRY.  CAN YOU GIVE US A CONCISE

SUMMARY OF WHAT THE ROYAL PATENT PROJECT WAS?

A    BRIEF?

Q    YES, BRIEF AS YOU CAN BUT -- SO THAT IT MAKES

SENSE.

A    THE ROYAL PATENT IS A WARRANTY DEED

GUARANTEEING TITLE BY THE KINGDOM OF HAWAII AS

CONFIRMED IN MY RESEARCH BY THE U.S. SUPREME COURT

AND THE NINTH CIRCUIT COURT OF APPEALS.

        MS. WONG:  OBJECTION, YOUR HONOR.  MOVE

TO STRIKE THE LAST PART OF THE DEFENDANT'S ANSWER

AS HEARSAY.

        THE COURT:  I'LL SUSTAIN THAT.

        MR. FONG:  THAT'S FINE, YOUR HONOR.  IT

ACTUALLY GOES TO HIS UNDERSTANDING, BUT I'M HAPPY

TO MOVE ON, YOUR HONOR.

        THE COURT:  THANK YOU.

BY MR. FONG:

Q    MR. LIGHTER, WITHOUT GOING INTO THE HISTORICAL

ASPECT OF IT, FROM YOUR PERSPECTIVE, WHY WAS THE

ROYAL PATENT, DID YOU THINK IT WAS A VALUABLE ASSET

FOR YOUR COMPANY?

A    YES, BECAUSE IT USUALLY INVOLVES LARGE TRACKS

OF LAND, IT WAS A WARRANTY DEED FROM THE

115

11:16:50  1  GOVERNMENT, THE PRIOR GOVERNMENT, AND ANYBODY WITH

11:16:57  2  ANY REAL WEALTH IN HAWAII PRETTY MUCH GOT THEIR

11:17:01  3  WEALTH BY OWNING ROYAL PATENTS.

11:17:02  4  Q    ALL RIGHT.  OKAY.  SO DID YOU -- DID A COMPANY

11:17:05  5  OF YOURS EVENTUALLY ACQUIRE ANY RIGHTS TO A -- TO A

11:17:11  6  -- TO A REAL ESTATE DEVELOPMENT AS RELATED TO THE

11:17:15  7  ROYAL PATENTS?

11:17:16  8  A    YES, FIVE ROYAL PATENTS COMPRISING

11:17:18  9  APPROXIMATELY 13,500 ACRES.

11:17:21  10  Q    OKAY.  AND I GATHER THESE WERE 13,000 ACRES IN

11:17:25  11  THE STATE OF HAWAII?

11:17:25  12  A    YES, MAUI AND KAUAI.

11:17:28  13  Q    AND WHAT -- DESCRIBE FOR US WHAT DID YOU

11:17:33  14  UNDERSTAND THE RIGHTS TO BE INSOFAR AS THEY RELATE

11:17:36  15  TO THE ISLAND OF KAUAI?

11:17:41  16  A    KAUAI WAS AROUND 2 ACRES WITH FOUR HOUSES AND

11:17:45  17  A BEAUTIFUL SANDY BEACH AND A GLORIOUS SANDY BEACH.

11:17:49  18  AND IT WAS UNDISPUTED.  AND 1800 ACRES ADJACENT TO

11:17:54  19  IT THAT HAD A DISPUTE.  A SUGAR ROBBER BARON WROTE

11:18:03  20  A DEED TO HIMSELF.

11:18:04  21  Q    AND DID THE COMPANY THAT YOU HAD AN INTEREST

11:18:07  22  IN, DID IT ACQUIRE THE RIGHTS TO THE ROYAL PATENT

11:18:11  23  AS THEY RELATE TO THAT 1300 ACRES THAT YOU JUST

11:18:15  24  TESTIFIED TO, RIGHT?

11:18:16  25            MS. WONG:  OBJECTION, YOUR HONOR, ASKED

116

11:18:19  1    AND ANSWERED.

11:18:19  2                THE COURT:  IS THIS FOUNDATIONAL TO

11:18:20  3    ANOTHER QUESTION?

11:18:20  4                MR. FONG:  YES, YES, YOUR HONOR.

11:18:22  5                THE COURT:  OKAY.  WHY DON'T YOU ASK THE

11:18:23  6    OTHER QUESTION.

11:18:24  7                MR. FONG:  OKAY.  SURE.

11:18:25  8    Q    WHAT IS THE NAME OF THE COMPANY THAT ACQUIRED

11:18:27  9    THE ROYAL PATENT RIGHTS AS INSOFAR AS THE

11:18:30 10    1300 ACRES IN THE STATE OF KAUAI -- ON THE ISLAND

11:18:35 11    OF KAUAI?

11:18:36 12    A    WELL, I PERSONALLY OBTAINED TITLE AND THE

11:18:45 13    DIAMOND CREDIT BUREAU OBTAINED THE DEVELOPMENT

11:18:48 14    RIGHTS BECAUSE I ASSIGNED THE CREDIT RIGHTS TO

11:18:50 15    DIAMOND CREDIT BUREAU.

11:18:51 16    Q    IS DIAMOND CREDIT BUREAU A COMPANY THAT YOU

11:18:55 17    FORMED?

11:18:55 18    A    YES, IT'S OWNED BY HCHC.

11:18:58 19    Q    AND TELL US WHAT KIND OF PROPERTY INTEREST ARE

11:19:08 20    WE TALKING ABOUT INSOFAR AS THE ROYAL PATENTS AS

11:19:10 21    THEY RELATE TO THE ISLAND OF MAUI?

11:19:13 22    A    THERE'S FOUR PARCELS STILL IN THREE PROBATES

11:19:20 23    AND WHAT HCHC SUBSIDIARY WITH ME IS THE INHERITANCE

11:19:29 24    RIGHTS TO CLOSE THE PROBATES.

11:19:31 25    Q    AND THAT WOULD -- AND IF THE PROBATES WERE

117

11:19:34 1   CLOSED IN YOUR FAVOR FROM YOUR PERSPECTIVE, WHAT

11:19:37 2   WOULD THAT GIVE YOU?

11:19:38 3   A    VERY VALUABLE LAND.  MAUI IS VERY EXPENSIVE.

11:19:43 4   Q    AND HOW MANY ACRES ON MAUI ARE WE TALKING

11:19:46 5   ABOUT?

11:19:46 6   A    13,500.

11:19:48 7   Q    OKAY.  BUT NOW, THERE IS A LEGAL DISPUTE OVER

11:19:55 8   WHETHER OR NOT THAT YOU RIGHTFULLY ACQUIRE OR

11:19:57 9   WHETHER OR NOT YOU ACTUALLY OWN THESE PATENT

11:20:01 10  RIGHTS; IS THAT TRUE?

11:20:02 11  A    I DIDN'T OWN THE LAND.  I OWN THE INHERITANCE

11:20:06 12  RIGHTS.  THE TITLE OF THE LAND IS IN COURT IN

11:20:09 13  PROBATE.

11:20:09 14  Q    BUT THERE'S, THERE'S A LEGAL DISPUTE OVER WHO

11:20:12 15  GETS THE -- WHO GETS THE DEVELOPMENT RIGHTS; IS

11:20:16 16  THAT CORRECT?

11:20:16 17  A    IN MAUI, YES.

11:20:18 18  Q    OKAY.  NOW, IS THAT ALSO TRUE -- BUT THAT'S AS

11:20:21 19  TO THE ENTIRE 13,000 ACRES IN MAUI, RIGHT?

11:20:25 20  A    CORRECT.

11:20:26 21  Q    NOW, AS TO KAUAI, THERE WAS ALSO LITIGATION OR

11:20:30 22  DISPUTE AS TO WHO OWNS WHAT AS TO THOSE 1800 ACRES

11:20:34 23  IN KAUAI; IS THAT CORRECT?

11:20:35 24  A    BUT NOT THE PROPERTY WITH THE FOUR HOUSES.

11:20:40 25  Q    SO WHAT -- TELL US WHAT THE FOUR HOUSES ARE?

118

11:20:44  1      A    WELL, ONE IS A BEACH HOUSE ON A SANDY BEACH

11:20:50  2   AND THE THREE OF THE HOUSES ARE IN MOUNTAINS,

11:20:56  3   HIGHER UP IN THE MOUNTAINS.

11:20:57  4      Q    ON THE ISLAND OF KAUAI?

11:20:59  5      A    KAUAI.

11:21:00  6      Q    OKAY.  NOW, WHO OWNS THOSE FOUR HOUSES AS OF

11:21:04  7   RIGHT NOW?

11:21:04  8      A    I OWN THE TITLE AND DIAMOND CREDIT BUREAU HAS

11:21:11  9   THE DEVELOPMENT RIGHTS EXCEPT THE DIAMOND CREDIT

11:21:15 10   BUREAU SOLD TO ROYAL DEVELOPMENT CORPORATION PHIL

11:21:20 11   WILKERSON TESTIFIED.

11:21:21 12      Q    THE GENTLEMAN WHO TESTIFIED HERE LAST WEEK?

11:21:23 13      A    YEAH, HE'S 25 PERCENT IN CONTROL.

11:21:30 14      Q    BUT BACK IN 2004, WHO OWNED THOSE FOUR

11:21:33 15   HOUSES -- WHO OWNED RIGHTS TO THOSE FOUR HOUSES ON

11:21:36 16   THE ISLAND OF KAUAI THAT YOU TALKED ABOUT?

11:21:40 17      A    THE HAWAIIANS.  I DIDN'T CLOSE THE DEVELOPMENT

11:21:43 18   AGREEMENT UNTIL AUGUST TO 27TH BASED ON THE EARLIER

11:21:52 19   AUGUST AGREEMENT.

11:21:55 20      Q    AND AUGUST 27TH OF WHAT YEAR?

11:21:58 21      A    2004.

11:21:58 22      Q    SO AFTER AUGUST 27TH OF 2004 AND BEFORE THE

11:22:02 23   RIGHTS WERE THEN SUBSEQUENTLY TRANSFERRED TO RDC,

11:22:08 24   WHO HELD THE RIGHTS TO THOSE FOUR HOUSES?

11:22:10 25      A    DIAMOND CREDIT BUREAU.

119

11:22:11 1    Q    THE COMPANY THAT YOU FORMED?

11:22:12 2    A    HCHC SUBSIDARY, YES.

11:22:16 3    Q    OKAY.  NOW, THESE FOUR HOUSES, DO THEY SIT ON

11:22:21 4    SOME TRACK OF LAND?

11:22:21 5    A    THERE'S FOUR LITTLE PARCELS THAT COMPRISE THE

11:22:32 6    TITLE, THE UNDISPUTED TITLE.

11:22:37 7    Q    AND THOSE -- THE FOUR PARCELS, APPROXIMATELY

11:22:41 8    HOW MANY ACRES DO THEY MAKE UP?

11:22:42 9            MS. WONG:  OBJECTION, YOUR HONOR,

11:22:44 10   RELEVANCE AS TO THIS LINE OF QUESTIONING.

11:22:45 11           MR. FONG:  YOUR HONOR, THIS IS FOUNDATION

11:22:47 12   FOR THESE TRANSACTIONS THAT MR. LIGHTER ENTERED

11:22:51 13   INTO WITH DR. GOOTNICK.

11:22:52 14           THE COURT:  DO WE NEED TO KNOW ALL OF

11:22:55 15   THIS INFORMATION ABOUT EACH OF THE TRACKS AND THE

11:22:58 16   VIEWS OF THE HOMES AND THAT?  I MEAN, ISN'T IT JUST

11:23:03 17   THE FACT THAT THE PROPERTIES EXIST?

11:23:08 18           MR. FONG:  AND THEIR VALUE.

11:23:09 19           THE COURT:  PERHAPS YOU CAN ASK HIM WHAT

11:23:10 20   THE VALUE IS AND HE CAN STATE A VALUE.

11:23:18 21   BY MR. FONG:

11:23:19 22   Q    SURE.  AFTER YOU AND YOUR COMPANY ACQUIRED THE

11:23:21 23   RIGHTS TO THESE FOUR HOUSES ON THE ISLAND OF KAUAI,

11:23:25 24   DID YOU HAVE A BELIEF AS TO THE VALUE OF THOSE FOUR

11:23:28 25   HOUSES AND THE PARCELS THAT THEY SIT ON?

                                                          120

11:23:30  1    A    YES, MAUI -- THIS LOCATION IN KAUAI IS ALMOST

11:23:37  2    AS EXPENSIVE AS THE RESORT LOCATIONS IN MAUI, ABOUT

11:23:42  3    $3 MILLION VALUE.

11:23:43  4    Q    THAT'S $3 MILLION TOTAL FOR THE FOUR HOUSES?

11:23:46  5    A    YES.

11:23:47  6    Q    OKAY.  AND DO YOU KNOW IF THERE WERE ANY

11:23:53  7    ENCUMBRANCES, ANY MORTGAGES, OR LIENS AGAINST THAT

11:23:57  8    PROPERTY?

11:23:57  9    A    NO.

11:23:57 10    Q    NOW, WHEN DID YOU --

11:24:03 11    A    ALSO I HAD A LEASE WITH THE SANDY BEACH

11:24:08 12    10,000, 11,000 SQUARE FOOT PARCEL PORTION OF THE

11:24:13 13    FOUR ACRE PROPERTY, I HAD IT FOR SEVEN YEARS PRIOR.

11:24:16 14    Q    ALL RIGHT.

11:24:17 15    A    PRIOR TO THE PURCHASE OF THE HOME.

11:24:19 16    Q    OKAY.  ALL RIGHT.  NOW, BACK TO DR. GOOTNICK,

11:24:26 17    WHEN DID YOU PHYSICALLY FIRST MEET DR. GOOTNICK?

11:24:29 18    A    DECEMBER 17TH, 2004.

11:24:31 19    Q    AND HOW LONG WAS THAT RELATIVE TO WHEN YOU

11:24:34 20    FIRST STARTED TALKING TO DR. GOOTNICK?

11:24:38 21    A    NINE MONTHS.

11:24:39 22    Q    BECAUSE YOU HAD STARTED TALKING TO HIM ABOUT

11:24:41 23    MARCH OF 2004?

11:24:43 24    A    CORRECT.

11:24:43 25    Q    OKAY.  NOW, DID YOU EVER ENTER INTO ANY KIND

                                                          121

11:24:50  1    OF BUSINESS TRANSACTION OR CONTRACT WITH

11:24:54  2    DR. GOOTNICK?

11:24:55  3    A    WE BECAME PARTNERS ON MARCH -- ON APRIL 2ND OR

11:25:01  4    3RD, 2004.

11:25:03  5    Q    OKAY.  I'M GOING TO DISPLAY FOR YOU -- PUBLISH

11:25:12  6    GOVERNMENT'S EXHIBIT 1 WHICH HAS ALREADY BEEN

11:25:14  7    ADMITTED INTO EVIDENCE.

11:25:29  8              FIRST OF ALL, DO YOU SEE THAT DOCUMENT?

11:25:30  9    A    I DO.

11:25:30 10    Q    AND IS THAT YOUR SIGNATURE ON THE LOWER

11:25:33 11    RIGHT-HAND CORNER?

11:25:33 12    A    YES.

11:25:34 13    Q    OKAY.  AND WHERE WERE YOU WHEN YOU SIGNED THIS

11:25:36 14    DOCUMENT?

11:25:36 15    A    HAWAII.

11:25:37 16    Q    OKAY.  AND DO YOU SEE THE SIGNATURE SPACE

11:25:40 17    BELOW WITH A SIGNATURE JUST ABOVE THE TYPED NAME OF

11:25:45 18    IRWIN GOOTNICK?

11:25:46 19    A    YES.

11:25:46 20    Q    OKAY.  DO YOU KNOW WHO SIGNED THAT SIGNATURE?

11:25:48 21    A    IRWIN GOOTNICK.

11:25:53 22    Q    AND DID YOU SEE DR. GOOTNICK SIGN HIS

11:25:55 23    SIGNATURE?

11:25:55 24    A    NO.

11:25:56 25    Q    OKAY.  NOW, THIS IS A MUTUAL ASSIGNMENT OF

                                                              122

11:25:58  1     STOCK.

11:25:58  2              DO YOU SEE THAT, SIR?

11:26:00  3     A    YES.

11:26:00  4     Q    OKAY.  NOW, WHAT DID THIS DOCUMENT ACCOMPLISH

11:26:03  5     IN YOUR MIND?

11:26:04  6     A    IT WAS AN EXCHANGE OF STOCK THAT WE MADE AND A

11:26:16  7     PARTNERSHIP.

11:26:16  8     Q    AND WHICH TWO COMPANIES WERE EXCHANGING STOCK?

11:26:20  9     A    GOOTNICK CHARITABLE TRUST, INC., AND HAWAIIN

11:26:26 10     COLONY HOTEL CORPORATION.

11:26:26 11     Q    OKAY.  IS THIS SIMILAR TO THE MUTUAL EXCHANGE

11:26:31 12     OF STOCK THAT YOU ENTERED INTO WITH PROFESSOR

11:26:33 13     BOURDIER?

11:26:34 14     A    YES.

11:26:34 15     Q    AND WHAT WAS THE PURPOSE BEHIND THIS MUTUAL

11:26:36 16     EXCHANGE OF STOCK?  I'M TALKING NOW ABOUT

11:26:42 17     GOVERNMENT'S EXHIBIT 1 WITH DR. GOOTNICK.

11:26:44 18     A    THIS IS MORE OF A HELLO, HOW ARE YOU

11:26:47 19     INTRODUCTION TO A HOPE FOR A BIGGER VENTURE.

11:26:55 20     Q    OKAY.  YOU TESTIFIED EARLIER THAT YOU

11:27:02 21     EVENTUALLY MADE A SECURITIES OFFERING, RIGHT?

11:27:04 22     A    CORRECT.

11:27:05 23     Q    OKAY.  APPROXIMATELY WHEN DID THAT HAPPEN?

11:27:10 24     A    NOVEMBER 1ST, THE SAME YEAR, 2004.

11:27:13 25     Q    OKAY.  NOW AT THE TIME THAT YOU ENTERED INTO

                                                          123

11:27:16 1    THIS MUTUAL ASSIGNMENT OF STOCK AGREEMENT WITH

11:27:20 2    DR. GOOTNICK, WERE YOU ALREADY PLANNING AT THIS

11:27:23 3    TIME TO EVENTUALLY MAKE THE SECURITIES OFFERING?

11:27:27 4    A    YES, AND DR. GOOTNICK, ACCORDING TO -- WELL, I

11:27:33 5    CAN'T SAY -- I'M NOT SUPPOSED TO SAY WHAT I SAID,

11:27:36 6    RIGHT?

11:27:42 7    Q    OKAY.  NOW, DID YOU -- WHAT WAS YOUR INTENT IN

11:27:47 8    TERMS OF GOING INTO BUSINESS WITH DR. GOOTNICK?

11:27:49 9    WHAT DID YOU WANT DR. GOOTNICK TO DO FOR YOU, IF

11:27:54 10   YOU WILL?

11:27:55 11   A    TO ASSIST IN THE SECURITIES SOLICITATION.

11:27:59 12   Q    AND HOW WOULD HE DO THAT?

11:28:00 13   A    TO PARTICIPATE WITH CERTAIN ASSETS FOR

11:28:20 14   FINANCIAL STRENGTH AND IN A JOINT VENTURE, BUT I

11:28:23 15   DIDN'T KNOW WHAT HIS ASSETS WERE AT THE TIME.

11:28:25 16   Q    OKAY.  IF YOU DIDN'T KNOW WHAT DR. GOOTNICK'S

11:28:28 17   ASSETS WERE AT THE TIME THAT EXHIBIT 1 WAS SIGNED

11:28:32 18   ON OR ABOUT APRIL 3RD, 2004, WHY WERE YOU WILLING

11:28:36 19   TO EXCHANGE STOCK?

11:28:37 20   A    WELL, IT WOULD HAVE EVEN BEEN BETTER THAN

11:28:41 21   HAVING ASSETS BEING ABLE TO GO TO THE BANK AND

11:28:44 22   BORROW MONEY FOR THE CONSOLIDATION AND HE HAD HIS

11:28:48 23   ONGOING MEDICAL PRACTICE, HE WOULD HAVE BEEN A

11:28:52 24   GREAT COSIGNER.

11:28:56 25   Q    OKAY.

                                                            124

11:28:57 1     A     FOR HCHC THAN A SECURITIES OFFERING OR ANY

11:29:01 2     OTHER WAY IS JUST BORROWED MONEY.

11:29:06 3     Q     ALL RIGHT.  NOW, BEFORE GOVERNMENT'S EXHIBIT 1

11:29:12 4     WAS SIGNED ON OR ABOUT APRIL 3RD, 2004, HAD YOU

11:29:16 5     MADE ANY DISCLOSURES TO DR. GOOTNICK?

11:29:21 6     A     WELL, LIKE I DID WITH BROCK AND BOURDIER, AND

11:29:24 7     I ALSO GAVE GOOTNICK ABOUT A BANKER'S BOX FULL OF

11:29:29 8     DOCUMENTS AND I MAILED THEM.

11:29:30 9     Q     AND TO DR. GOOTNICK?

11:29:31 10    A     YES.

11:29:32 11    Q     OKAY.  AND WHAT DID THE BOX OF DOCUMENTS

11:29:34 12    CONTAIN?

11:29:35 13    A     TRANSACTIONS RELATED TO THE HOTEL AND OLD

11:29:42 14    APPRAISALS AND A LEASE AND --

11:29:52 15    Q     AND DID YOU, BEFORE THE MUTUAL ASSIGNMENT OF

11:29:55 16    STOCK WAS SIGNED, DID YOU TELL DR. GOOTNICK, DID

11:30:01 17    YOU DISCLOSE TO DR. GOOTNICK WHAT YOU CONSIDERED TO

11:30:03 18    BE THE VALUE OF YOUR COMPANY?

11:30:05 19    A     THE ONLY VALUE I GAVE HIM -- I DIDN'T DESCRIBE

11:30:14 20    THE VALUE OF THE HOTEL.  I TOLD HIM ABOUT THE

11:30:18 21    OREGON RANCH.

11:30:20 22    Q     OKAY.  WHAT IS THE OREGON RANCH?

11:30:22 23    A     IT'S A 10 ACRE PROPERTY WITH OVER 6,000 SQUARE

11:30:26 24    FOOT OF IMPROVEMENTS.

11:30:27 25    Q     AND WHO OWNED THAT OREGON RANCH?

125

11:30:31 1    A    HCHC.

11:30:32 2    Q    AND WHAT WAS THE -- DID YOU KNOW THE FAIR

11:30:35 3    MARKET VALUE OF THAT RANCH?

11:30:37 4    A    I PURCHASED IT BECAUSE THE PEOPLE WERE GOING

11:30:42 5    TO LOSE IT ON THE TAX SALE, THE REAL PROPERTY TAX

11:30:47 6    SALE I WAS TOLD AND I PURCHASED IT FOR $350,000.

11:30:54 7    SO THE FREE AND CLEAR DEED WAS OWNED BY HCHC.

11:31:00 8    Q    AND WHAT ELSE DID YOU TELL DR. GOOTNICK ABOUT

11:31:03 9    THE VALUE OF ANY ASSETS THAT YOUR COMPANY OWNED?

11:31:06 10   A    I WAS A LITTLE GUN SHY TO TALK ABOUT VALUES.

11:31:14 11   I MOSTLY TALKED ABOUT WHAT THE ASSETS WERE AND WHAT

11:31:17 12   COULD BE DONE WITH THEM.

11:31:18 13   Q    OKAY.  DID YOU TELL DR. GOOTNICK OF WHAT THE

11:31:24 14   VERTICAL RIGHTS WERE ABOUT THE HAWAIIN COLONY HOTEL

11:31:27 15   CORPORATION?

11:31:27 16   A    YES.

11:31:28 17   Q    AND WHAT DID YOU TELL HIM?

11:31:30 18   A    THAT YOU PROBABLY COULD BUILD 60 STORIES

11:31:35 19   DEPENDING ON PERMITS.

11:31:37 20   Q    AND DID YOU ASSIGN A DOLLAR VALUE TO IT?

11:31:40 21   A    NO.

11:31:40 22   Q    AND WHY NOT?

11:31:41 23   A    IT'S KIND OF HARD TO ASSIGN A VALUE BECAUSE

11:31:51 24   THE VALUE IS SO HIGH.

11:31:53 25   Q    OKAY.  DID YOU TELL DR. GOOTNICK THAT THERE

126

11:31:55  1    WAS ANY DISPUTE OVER THE DEVELOPMENT RIGHTS?

11:31:57  2    A    I DID.  THERE WAS SOME SLANDER CASES, SOME

11:32:06  3    SLANDER TITLE CASE.

11:32:07  4    Q    AND DID YOU MAKE THESE DISCLOSURES BEFORE OR

11:32:10  5    AFTER THE MUTUAL ASSIGNMENT OF STOCK WAS SIGNED?

11:32:14  6    A    BOTH.

11:32:15  7    Q    BUT YOU DID MAKE IT BEFORE AS WELL?

11:32:17  8    A    YES.

11:32:17  9    Q    YOU HEARD TESTIMONY ABOUT THE OMNIBUS RETURN

11:32:27 10    THAT DR. GOOTNICK FILED WITH OR SENT TO CID.

11:32:33 11         DO YOU REMEMBER THAT?

11:32:34 12    A    YES.

11:32:34 13    Q    OKAY.  NOW, DID YOU HAVE ANY ROLE IN THE

11:32:37 14    PREPARATION OF THAT OMNIBUS RETURN?

11:32:40 15    A    I PREPARED IT.

11:32:41 16    Q    OKAY.  AND WHEN DID YOU PREPARE THAT?

11:32:43 17    A    I THINK IT WAS APRIL 7TH.

11:32:55 18    Q    WHAT YEAR?

11:32:55 19    A    2004.

11:32:56 20    Q    AND BECAUSE THE MUTUAL ASSIGNMENT OF STOCK IS

11:32:58 21    DATED APRIL 3RD, 2004, DOES THAT REFRESH YOUR

11:33:01 22    RECOLLECTION AS TO HOW CLOSE IN TIME THOSE TWO

11:33:05 23    EVENTS WERE?

11:33:11 24    A    YES, I THINK ON APRIL 7TH.

11:33:13 25    Q    AND SO IT WAS WITHIN A WEEK OR SO?

127

11:33:16  1    A    YES.

11:33:16  2    Q    NOW, YOU PREPARED THE OMNIBUS RETURN, YOU

11:33:23  3    SAID.   WHAT WAS THE PURPOSE IN YOUR PREPARING THE

11:33:26  4    OMNIBUS RETURN ON BEHALF OF DR. IRWIN GOOTNICK?

11:33:29  5    A    EXCUSE ME.   WELL, I LIKED DR. GOOTNICK, HE WAS

11:33:32  6    A PERSONAL FELLOW BUT HE WAS AN N.T.S. MEMBER, AND

11:33:39  7    I WANTED TO MAKE SURE HE WAS CLEANED UP AND THE

11:33:42  8    I.R.S. WAS SATISFIED IN GETTING LIENS AGAINST

11:33:46  9    PROPERTY THAT N.T.S. TRUST HAD OR THE LIEN ITSELF.

11:33:51 10    Q    OKAY.   AND ANYTHING ELSE IN TERMS OF WHY YOU

11:33:56 11    PREPARED THE OMNIBUS RETURN FOR DR. GOOTNICK TO

11:33:58 12    SEND TO CID?

11:33:59 13    A    WELL, ALONG WITH, I GOT HIM TO AGREE IN

11:34:03 14    WRITING, AGREE WITH THE GOVERNMENT'S POSITION AND

11:34:07 15    THEN MORE IMPORTANTLY I GOT HIM TO PUT IN WRITING

11:34:09 16    THE DISCLOSURE THAT HE OWED SOME TAX.   AND THAT

11:34:20 17    TRIGGERED THE LIEN.

11:34:21 18    Q    OKAY.   NOW, I WANT TO PUBLISH A DOCUMENT THAT

11:34:29 19    HAS ALREADY BEEN ADMITTED INTO EVIDENCE AS

11:34:31 20    GOVERNMENT'S EXHIBIT 164.

11:34:36 21              DO YOU NEED A COPY OF THAT, MR. O'REILLY?

11:34:39 22              MR. O'REILLY:   YES, PLEASE.   THANK YOU.

11:34:41 23    BY MR. FONG:

11:34:46 24    Q    I WANT TO HAND YOU A COPY, MR. LIGHTER.   AND I

11:35:02 25    WANT TO PUBLISH THIS BECAUSE IT'S ALREADY ADMITTED

                                                              128

11:35:04 1    INTO EVIDENCE.

11:35:05 2              NOW, THIS IS GOVERNMENT'S EXHIBIT 164.

11:35:07 3              FIRST OF ALL, DO YOU SEE THAT DOCUMENT,

11:35:09 4    SIR?

11:35:09 5    A    I DO.

11:35:10 6    Q    OKAY.  DO YOU RECOGNIZE THAT DOCUMENT?

11:35:12 7    A    YES.

11:35:12 8    Q    OKAY.  WHAT IS YOUR UNDERSTANDING OF WHAT THAT

11:35:15 9    DOCUMENT IS?

11:35:17 10   A    IT'S AN UNFILLED OUT FORM, A TAX FORM TO BE

11:35:24 11   ATTACHED TO THE OMNIBUS RETURN FOR THIS STANDARD --

11:35:31 12   AS A NORMAL TAX RETURN OF SORTS TO TRIGGER THE

11:35:35 13   LIEN.

11:35:35 14   Q    OKAY.  NOW, THERE'S SOME HANDWRITING ON THE

11:35:38 15   FIRST PAGE UNDER THE U.S. INDIVIDUAL INCOME TAX

11:35:43 16   RETURN WITH THE HANDWRITTEN NAMES OF IRWIN GOOTNICK

11:35:47 17   AND SUSAN GOOTNICK AND THE 329 GOODHILL ROAD,

11:35:56 18   KENTFIELD, CALIFORNIA ADDRESS.

11:35:58 19              DO YOU SEE THAT?

11:35:59 20   A    YES.

11:35:59 21   Q    AND WHOSE HANDWRITING IS THAT, IF YOU KNOW?

11:36:02 22   A    MINE.

11:36:03 23   Q    AND SO YOU FILLED THIS OUT ON BEHALF OF THE

11:36:05 24   GOOTNICKS?

11:36:05 25   A    IT WAS ON THE NAME, ADDRESS AND SOCIAL

                                                      129

11:36:14 1   SECURITY NUMBERS WERE FILLED OUT, NOT THE NUMBERS.

11:36:16 2   Q    OKAY.  NOW, DID YOU PREPARE THIS DOCUMENT?

11:36:19 3   A    YES.

11:36:19 4   Q    AND WHAT DID YOU DO WITH IT AFTER YOU PREPARED

11:36:21 5   IT?

11:36:21 6   A    ATTACHED IT TO THE OMNIBUS RETURN.

11:36:26 7   Q    AND WHAT DID YOU DO WITH THAT?

11:36:30 8   A    I SENT IT TO IRWIN GOOTNICK FOR HIM AND HIS

11:36:33 9   WIFE TO SIGN AND MAIL IT TO THE I.R.S.

11:36:35 10  Q    BUT YOU DID NOT SEND IT TO THE CID I.R.S.

11:36:38 11  YOURSELF, RIGHT?

11:36:39 12  A    NO, I'M IN HAWAII.

11:36:40 13  Q    OKAY.  IT READS HERE -- DO YOU SEE HOW THERE'S

11:36:48 14  KIND OF A PASTE ON PARAGRAPH IN ABOUT, OH, MAYBE A

11:36:55 15  THIRD OF THE WAY DOWN ON EXHIBIT 164?

11:36:57 16  A    YES.

11:36:57 17  Q    AND IT READS, "OMNIBUS FORM 1120 TAX RETURNS

11:37:03 18  FOR THE YEARS 2000 THROUGH 2003 FOR GOOTNICK

11:37:07 19  CHARITABLE TRUST, INC., AND FORM 1040 TAX RETURN

11:37:11 20  FOR THE YEARS 2000 THROUGH 2003 FOR IRWIN GOOTNICK

11:37:14 21  AND SUSAN GOOTNICK I.R.S. CID HAS SOLE AND

11:37:17 22  EXCLUSIVE JURISDICTION FOR ALL TAX MATTERS FOR

11:37:20 23  THESE YEARS FOR SAID GOOTNICK CHARITABLE TRUST."

11:37:23 24         MS. WONG:  OBJECTION, YOUR HONOR.  UNLESS

11:37:24 25  THERE'S A QUESTION PENDING, BUT OTHERWISE THE

130

11:37:27 1    DOCUMENT SPEAKS FOR ITSELF.

11:37:28 2                THE COURT:  MR. FONG, IT SEEMS LIKE IF

11:37:31 3    YOU COULD ASK THE WITNESS IF HE SEES THE WRITING

11:37:33 4    AND THEN ASK YOUR QUESTION, THAT MIGHT BE HELPFUL.

11:37:35 5                MR. FONG:  SURE.  OF COURSE, YOUR HONOR.

11:37:38 6    THANK YOU.

11:37:38 7    Q    DO YOU SEE THE PASTED ON PARAGRAPH THERE?

11:37:44 8    A    YES, YES.

11:37:44 9    Q    AND WHAT IS YOUR UNDERSTANDING -- FIRST OF

11:37:46 10   ALL, DID YOU PREPARE THAT?

11:37:47 11   A    YES.

11:37:48 12   Q    AND WHAT WAS YOUR, WHAT WAS YOUR UNDERSTANDING

11:37:52 13   OF WHAT THAT PARAGRAPH WAS MEANT TO DO?

11:37:54 14   A    REFERENCING AND COMBINE OR MERGE THESE BLANK

11:38:02 15   SIGNED TAX FORMS OR ORDINARY TAX FORMS WITH THE

11:38:09 16   OMNIBUS RETURN.

11:38:11 17   Q    AND WHAT IS THE PURPOSE OF DOING THAT?

11:38:13 18   A    I DID NOT WANT THE I.R.S. TO IGNORE THE

11:38:18 19   OMNIBUS RETURN ON THE BASIS THAT THERE'S NO

11:38:20 20   ORDINARY TAX RETURNS ATTACHED.

11:38:22 21   Q    OKAY.  SO THIS WAS MEANT, IN YOUR MIND, THIS

11:38:25 22   WAS MEANT TO PROVIDE ADDITIONAL INFORMATION TO WHAT

11:38:27 23   THE OMNIBUS RETURN HAD?

11:38:29 24   A    IT WAS JURISDICTION SO TO MAKE SURE THAT THE

11:38:39 25   TAX LIENS ATTACH.

131

11:38:39 1    Q    NOW, EXHIBIT 164, IF YOU COULD LOOK THROUGH

11:38:43 2    IT, IT'S BLANK, RIGHT, IN TERMS OF THE ENTRIES, THE

11:38:51 3    VARIOUS LINE ENTRIES?

11:38:52 4    A    CORRECT.

11:38:52 5    Q    AND DID YOU PURPOSELY DO THAT?

11:38:55 6    A    YES.

11:38:56 7    Q    AND WHY?

11:38:56 8    A    BECAUSE I DIDN'T KNOW THE NUMBERS AND BEING

11:38:59 9    ABLE TO ESTABLISH FURTHER JURISDICTION FOR THE

11:39:01 10   LIENS, THAT'S ALL I'M DOING.

11:39:02 11   Q    OKAY.  AND BY FILING GOVERNMENT'S EXHIBIT 154,

11:39:07 12   ALONG WITH THE GOOTNICK'S OMNIBUS RETURN OR BY

11:39:12 13   HAVING THE GOOTNICKS DO THAT, WHAT DID YOU THINK

11:39:14 14   WAS GOING TO HAPPEN?  WHAT WAS THE INTENT BEHIND

11:39:17 15   IT?

11:39:17 16   A    THAT THE I.R.S. LIEN ATTACHED TO THE GOOTNICKS

11:39:25 17   HAD THEIR TRUSTS AND THEIR ASSETS.

11:39:27 18   Q    OKAY.

11:39:28 19   A    AND THEREBY AND THEREFORE CLEANING UP THE

11:39:31 20   GOOTNICKS AND THEIR TRUST, N.T.S. TRUST.

11:39:34 21   Q    OKAY.  NOW, AFTER YOU HELPED PREPARE

11:39:44 22   GOVERNMENT'S EXHIBIT 164 AND THE OMNIBUS RETURN FOR

11:39:47 23   THE GOOTNICKS, DID YOU DO ANYTHING -- DID YOU HAVE

11:39:49 24   ANY OTHER BUSINESS TRANSACTIONS OR DEALINGS WITH

11:39:53 25   DR. IRWIN GOOTNICK?

132

11:39:54 1     A     THEREAFTER?

11:39:55 2     Q     YES.

11:39:56 3     A     YES.

11:39:57 4     Q     OKAY.  AND APPROXIMATELY WHEN?

11:39:58 5     A     APPROXIMATELY A MONTH LAYER.  ACTUALLY RIGHT

11:40:07 6     AWAY.  I ASKED FOR -- IF MY COMPANY COULD BORROW

11:40:13 7     MONEY SECURED BY A MORTGAGE.

11:40:15 8     Q     OKAY.  AND HOW MUCH DID YOU ASK FOR?  WELL,

11:40:19 9     I'M SORRY.  YOU ASKED WHO, DR. IRWIN GOOTNICK?

11:40:23 10    A     YES.

11:40:23 11    Q     FOR A LOAN?

11:40:26 12    A     A MORTGAGE LOAN.

11:40:27 13    Q     WELL, THAT IS TO SAY -- WELL, WHAT DO YOU MEAN

11:40:30 14    BY THAT?

11:40:30 15    A     A LOAN SECURED BY A REAL PROPERTY.

11:40:32 16    Q     OKAY.  AND HOW MUCH OF A LOAN DID YOU ASK FOR?

11:40:34 17    A     125,000.

11:40:37 18    Q     AND DID DR. GOOTNICK AGREE TO PROVIDE YOU WITH

11:40:40 19    THE LOAN?

11:40:41 20    A     YES, A REDUCED AMOUNT.  I ASKED FOR TWO

11:40:46 21    PROPERTIES AND HE APPROVED IT FOR ONE PROPERTY IN

11:40:47 22    THE AMOUNT OF 50,000.

11:40:48 23    Q     ALL RIGHT.  SO HE AGREED TO LEND YOU $50,000?

11:40:52 24    A     MY COMPANY, YES.

11:40:56 25    Q     AND YOUR COMPANY.  WHICH COMPANY WOULD THAT

                                                           133

11:40:59  1    BE?

11:40:59  2    A    VOLCANO GARDENS, INC.

11:41:03  3    Q    AND THAT'S A COMPANY THAT YOU OWN?

11:41:05  4    A    I'M AN OFFICER AND A DIRECTOR.

11:41:06  5    Q    AND DID YOU HAVE ANY OWNERSHIP INTEREST IN

11:41:10  6    VOLCANO GARDEN, INC.?

11:41:11  7    A    I DON'T THINK SO.

11:41:12  8    Q    BUT YOU WERE AFFILIATED WITH IT?

11:41:15  9    A    YES.

11:41:15 10    Q    NOW, WHAT DID YOU OFFER IN TERMS OF SECURITY

11:41:17 11    FOR THE $50,000 LOAN FROM DR. IRWIN GOOTNICK?

11:41:20 12    A    A FREE AND CLEAR 3 ACRE LOT THAT WAS PURCHASED

11:41:26 13    YEARS EARLIER FOR $75,000 CASH.

11:41:29 14    Q    AND WHERE WAS THIS LOT?

11:41:30 15    A    VOLCANO HAWAII NEXT TO THE NATIONAL PARK.

11:41:35 16    Q    OKAY.  DID YOU HAVE -- AT THE TIME YOU OFFERED

11:41:42 17    THAT PROPERTY FOR THE $50,000 SECURITY LOAN FROM

11:41:47 18    DR. IRWIN GOOTNICK, DID YOU HAVE ANY BELIEF AS TO

11:41:50 19    WHAT WAS THE VALUE OF THAT LOT?

11:41:52 20    A    IT WAS $150,000.

11:42:01 21    Q    I'M SORRY?

11:42:02 22    A    IT WAS WORTH $150,000 APPROXIMATELY.

11:42:05 23    Q    AND HOW DID YOU COME TO THAT BELIEF?

11:42:08 24         MS. WONG:  OBJECTION, RELEVANCE.

11:42:08 25         THE COURT:  YOU CAN ANSWER THE QUESTION.

                                                                134

11:42:15  1          THE WITNESS:  I UNDERSTOOD THE MARKET

11:42:16  2  BECAUSE I HAVE A REAL ESTATE BACKGROUND AND I ALSO

11:42:24  3  GOT AN APPRAISAL THAT I CONFIRMED WITH.

11:42:27  4  BY MR. FONG:

11:42:27  5  Q    OKAY.  WAS THERE ANY DOCUMENT THAT YOU

11:42:40  6  PREPARED IN CONNECTION WITH THE $50,000 LOAN, THE

11:42:46  7  $50,000 LOAN THAT YOU RECEIVED FROM DR. IRWIN

11:42:48  8  GOOTNICK?

11:42:48  9  A    YES, I SENT HIM A DRAFT MORTGAGE AND NOTE AND

11:42:56  10  LATER I SENT HIM A COVER LETTER.

11:43:06  11  Q    I'M SORRY?  ANYTHING ELSE INSOFAR AS THE

11:43:09  12  $50,000 LOAN?

11:43:10  13  A    I DON'T THINK SO.

11:43:11  14  Q    I'M GOING TO SHOW YOU A DOCUMENT THAT HAS BEEN

11:43:13  15  PREMARKED FOR IDENTIFICATION ONLY AS DEFENSE

11:43:15  16  EXHIBIT GG, GARY, GARY.

11:43:36  17          FIRST OF ALL, SIR, DO YOU SEE THAT

11:43:38  18  DOCUMENT IN FRONT OF YOU?

11:43:39  19  A    YES.

11:43:39  20  Q    AND DO YOU RECOGNIZE THAT DOCUMENT?

11:43:41  21  A    YES.

11:43:41  22  Q    AND WHAT IS THAT DOCUMENT THAT IS MARKED AS

11:43:44  23  DEFENSE EXHIBIT GG?

11:43:45  24  A    IT'S A RECORD $50,000 FIRST MORTGAGE ON THE

11:43:52  25  VOLCANO 3 ACRE LOT.

135

11:43:54 1    Q    AND WHAT WAS THE PURPOSE OF EXHIBIT GG?

11:43:59 2    A    TO SECURE THE $50,000 LOAN.

11:44:05 3            MR. FONG:  YOUR HONOR, I'M GOING TO MOVE

11:44:07 4    INTO -- OH, I'M SORRY.

11:44:12 5    Q    ON PAGE 3 OF EXHIBIT GG, DO YOU SEE PAGE 3?

11:44:17 6    A    YES.

11:44:17 7    Q    AND THERE'S A SIGNATURE THERE, A BLOCK FOR

11:44:20 8    ERIC LIGHTER.  DO YOU SEE THAT?

11:44:22 9    A    YES.

11:44:22 10   Q    AND IS THAT YOUR SIGNATURE?

11:44:23 11   A    YES.

11:44:23 12   Q    AND WHERE WERE YOU WHEN YOU SIGNED THAT?

11:44:25 13   A    HAWAII.

11:44:26 14   Q    OKAY.  AND THEN WHAT DID YOU DO WITH THIS

11:44:33 15   DOCUMENT AFTER YOU SIGNED IT?

11:44:34 16   A    I SENT IT TO DR. GOOTNICK WHO SIGNED IT IN

11:44:39 17   FRONT OF A NOTARY.

11:44:39 18   Q    BUT YOU DIDN'T SEE DR. GOOTNICK SIGN IT IN

11:44:42 19   FRONT OF A NOTARY?

11:44:43 20   A    NO.

11:44:43 21   Q    DID YOU EVER GET THIS DOCUMENT BACK FROM

11:44:47 22   DR. GOOTNICK WITH HIS SIGNATURE AND A NOTARY STAMP?

11:44:50 23   A    YES.

11:44:51 24           MR. FONG:  YOUR HONOR, I WOULD MOVE

11:44:52 25   EXHIBIT GG INTO EVIDENCE.

                                                        136

11:44:54 1             MS. WONG:  OBJECTION, HEARSAY.

11:44:56 2             THE WITNESS:  IT'S A RECORDED DOCUMENT.

11:44:57 3             THE COURT:  I BEG YOUR PARDON, SIR.  YOU

11:44:59 4    HAVE TO WAIT.  THE RESPONSE IS STRICKEN.

11:45:00 5             MR. FONG:  YOU'RE NOT --

11:45:02 6             THE COURT:  DO YOU HAVE A RESPONSE?

11:45:03 7             MR. FONG:  YES, YOUR HONOR, YEAH.  IT'S A

11:45:08 8    DOCUMENT THAT SIMPLY SHOWS THAT THIS MORTGAGE WAS

11:45:11 9    RECORDED WITH THE STATE OF HAWAII SHOWING THAT IT

11:45:15 10   WAS USE OF SECURITY FOR THE $50,000 LOAN.

11:45:18 11            THE COURT:  THANK YOU.  I'LL SUSTAIN THE

11:45:19 12   OBJECTION.

11:45:29 13   BY MS. WONG:

11:45:30 14   Q    BUT YOU DID RECEIVE THIS DOCUMENT BACK FROM

11:45:31 15   DR. GOOTNICK?

11:45:32 16   A    YES.

11:45:32 17   Q    AND WHAT DID YOU DO WITH THE DOCUMENT THEN?

11:45:34 18   A    I HAD RECORDED IT.

11:45:35 19   Q    RECORDED IT WHERE?

11:45:38 20   A    THE HAWAII BUREAU OF CONVEYANCES, THE

11:45:41 21   STATEWIDE VERSION OF THE COUNTY RECORDER.

11:45:43 22   Q    OKAY.  NOW, BESIDES THE MORTGAGE, WAS THERE

11:45:48 23   ANY OTHER DOCUMENT THAT WAS PREPARED IN CONNECTION

11:45:50 24   WITH THE $50,000 LOAN?

11:45:54 25   A    ONE OF TWO PROMISSORY NOTES.

137

11:45:57 1    Q    OKAY.  I'M GOING TO SHOW YOU A DOCUMENT THAT

11:46:13 2    HAS BEEN MARKED BBB, B AS IN BOY.  AND DID YOU SEE

11:46:25 3    THE ONE-PAGE DOCUMENT THAT IS DEFENSE EXHIBIT BBB

11:46:28 4    IN FRONT OF YOU, SIR?

11:46:29 5    A    YES.

11:46:29 6    Q    AND HAVE YOU SEEN THAT DOCUMENT BEFORE?

11:46:30 7    A    YES.

11:46:31 8    Q    AND WHAT IS YOUR UNDERSTANDING OF WHAT THIS

11:46:32 9    DOCUMENT IS?

11:46:32 10   A    IT'S THE PROMISSORY NOTE, THE FIRST PROMISSORY

11:46:37 11   NOTE WITH THE $50,000 MORTGAGE.

11:46:40 12   Q    OF THE $50,000 LOAN THAT YOU RECEIVED FROM

11:46:42 13   DR. GOOTNICK?

11:46:43 14   A    YES, YES.

11:46:44 15   Q    AND YOU SAID THIS WAS THE FIRST.  WAS THERE A

11:46:46 16   SECOND?

11:46:46 17   A    THERE WAS.  THERE WAS A HANDWRITTEN INSERTION

11:46:51 18   OF THE WORD "MAY."  DR. GOOTNICK DID NOT WANT TO

11:47:00 19   HAVE ANY TYPE OF GRAPHICAL ERRORS SO HE WOULDN'T

11:47:05 20   FUND UNTIL I CORRECTED THE ERROR.

11:47:06 21   Q    AND DID YOU MAKE THAT CORRECTION?

11:47:07 22   A    YES.

11:47:08 23   Q    OKAY.  NOW, DID YOU SIGN DEFENDANT'S EXHIBIT

11:47:14 24   BBB?

11:47:15 25   A    YES.

                                                              138

11:47:15  1    Q    AND HOW MANY TIMES DID YOU SIGN?

11:47:16  2    A    TWICE.

11:47:17  3    Q    OKAY.  AND WHY WAS THAT?

11:47:20  4    A    BECAUSE THIS SEALS MY GUARANTORSIHP.

11:47:24  5    Q    I'M SORRY?

11:47:25  6    A    THE CORPORATION WAS ONE, ME AS THE DEBTOR, AND

11:47:38  7    ONE WAS THE GUARANTOR.

11:47:40  8    Q    AND I UNDERSTOOD THAT YOU SIGNED PERSONALLY AS

11:47:42  9    A GUARANTOR BUT YOU SAID THE FIRST ONE WAS WHAT?

11:47:45  10   A    THE CORPORATION AS A DEBTOR.

11:47:47  11   Q    AND YOU SIGNED ON BEHALF OF THE CORPORATION?

11:47:49  12   A    AS ITS OFFICER, YES.

11:47:51  13   Q    OKAY.  NOW, AFTER THIS PARTICULAR TRANSACTION,

11:48:02  14   THE $50,000 LOAN WITH DR. GOOTNICK, DID YOU HAVE

11:48:09  15   ANY OTHER BUSINESS DEALINGS WITH DR. GOOTNICK?

11:48:11  16   A    YES.

11:48:12  17   Q    AND WHAT ELSE?

11:48:12  18   A    IN AUGUST -- WELL, FIRST OF ALL, THE

11:48:18  19   CORPORATION MADE PAYMENTS ON THE MORTGAGE.

11:48:19  20   Q    ON THE $50,000 LOAN?

11:48:22  21   A    YES.

11:48:22  22   Q    OKAY.

11:48:23  23   A    SECONDLY NEXT WAS IN AUGUST OF -- IN AUGUST OF

11:48:32  24   2004 I WAS SUCCESSFUL IN THE COMPANY DEVELOPMENT.

11:48:36  25   Q    AND THAT'S RELATING TO THE ROYAL PATENTS?

                                                          139

11:48:38  1    A    ROYAL PATENT.

11:48:39  2    Q    AND HOW DID THAT RELATE TO DR. GOOTNICK?

11:48:43  3    A    ON AUGUST 4TH, I PROMISED HIM THAT IF I WAS

11:48:48  4    SUCCESSFUL THAT I WOULD GIVE HIM -- HE COULD HAVE

11:48:53  5    10 PERCENT OF THE COMPANY TO BE A NEGOTIATED PRICE.

11:48:56  6    IT WAS AN ORAL OPTION.

11:48:59  7    Q    SO YOU GAVE DR. GOOTNICK AN ORAL OPTION FOR

11:49:02  8    HIM TO INVEST IN THE ROYAL PATENT DEVELOPMENT

11:49:08  9    INSOFAR AS IT RELATES TO THE PROPERTY ON KAUAI; IS

11:49:12 10    THAT CORRECT?

11:49:12 11    A    CORRECT.

11:49:13 12            MS. WONG:  OBJECTION.  ASKED AND

11:49:14 13    ANSWERED.

11:49:14 14            THE COURT:  SUSTAINED.  THE ANSWER IS

11:49:16 15    STRICKEN.

11:49:17 16    BY MR. FONG:

11:49:22 17    Q    DID DR. GOOTNICK EVER TAKE YOU UP ON YOUR

11:49:25 18    OFFER OF THE ORAL OPTION?

11:49:27 19    A    YES, MARCH 17TH, 2004 HE BOUGHT 10 PERCENT OF

11:49:33 20    THE ROYAL PATENT COMPANY WHICH WAS ALSO A MAUI

11:49:38 21    INTEREST.

11:49:38 22    Q    OKAY.  BUT THAT WAS LATER.  THAT WAS WHAT,

11:49:42 23    ALMOST HALF A YEAR LATER?

11:49:43 24    A    YES.

11:49:44 25    Q    OKAY.  OKAY.  BUT AT THE TIME IN AUGUST OF

140

11:49:52 1    2004 YOU MADE THIS OPTION?

11:49:54 2    A    YES, AND IT WAS SIGNED BUT WITH THE KAUAI

11:49:59 3    SELLERS.

11:49:59 4    Q    BUT DR. GOOTNICK WAS NOT PART OF THAT

11:50:02 5    DOCUMENT, WAS HE?

11:50:02 6    A    NO.

11:50:03 7    Q    OKAY.  AND DID DR. GOOTNICK INDICATE THAT HE

11:50:09 8    WAS INTERESTED IN THIS KAUAI DEVELOPMENT?

11:50:12 9    A    YES.

11:50:12 10   Q    OKAY.  NOW, THEN AFTER THAT, THIS IS -- NOW

11:50:16 11   WE'RE IN AUGUST OF 2004, DID YOU HAVE ANY OTHER

11:50:18 12   BUSINESS DEALINGS OR TRANSACTIONS WITH

11:50:21 13   DR. GOOTNICK?

11:50:21 14   A    OCTOBER 8TH THERE WAS A TRANSACTION.

11:50:33 15   Q    OKAY.  AND WHAT WAS THAT TRANSACTION TO THE

11:50:35 16   BEST OF YOUR RECOLLECTION?

11:50:36 17   A    WELL, IN LATE SEPTEMBER HE INFORMED ME AND I

11:50:50 18   FAXED OUT HANDWRITTEN AND PRINTED FINANCIAL

11:50:53 19   STATEMENTS SO THAT I COULD DETERMINE WHAT HAD TO BE

11:50:57 20   DONE AND THE IDEA WAS THAT I WAS GOING TO BUY GCTI,

11:51:03 21   THE BALANCE OF THE STOCK OF GCTI.

11:51:09 22   Q    AND WHY DID THIS DISCUSSION EVEN TAKE PLACE IN

11:51:12 23   THE FIRST PLACE THAT YOU WOULD END UP BUYING THE

11:51:15 24   ASSETS, ALL OF THE ASSETS OF GCTI?

11:51:18 25   A    TWO REASONS.  IT WAS SUPPOSED TO GREATLY

141

11:51:26  1    ENHANCE THE SECURITIES OFFERING WHICH WAS FILED

11:51:30  2    NOVEMBER 1ST, AND, SECONDLY, GOOTNICK --

11:51:32  3    Q    NOVEMBER 1ST OF WHAT YEAR?  I'M SORRY?

11:51:34  4    A    2004.

11:51:35  5    Q    SO THAT WOULD BE ABOUT A MONTH, A MONTH AFTER?

11:51:38  6    A    CORRECT.

11:51:39  7    Q    OKAY. SO I'M SORRY.  GO AHEAD, PLEASE.

11:51:42  8    A    AND THE SECOND REASON WAS THAT GOOTNICK FOR

11:51:48  9    SOME REASON WANTED NOTHING DO WITH TALKING WITH THE

11:51:51 10    I.R.S. OR DEALING WITH THE I.R.S. SO IF I BOUGHT

11:51:54 11    THE COMPANY, THAT WOULD BE MY LIABILITY OR MY DUTY.

11:51:58 12    Q    NOW, YOU SAID THAT DR. GOOTNICK HAD SENT YOU

11:52:11 13    SOME HANDWRITTEN FORM?

11:52:13 14    A    FINANCIAL STATEMENTS.

11:52:14 15    Q    OKAY.  AND I'M GOING TO SHOW YOU A DOCUMENT

11:52:22 16    THAT HAS BEEN MARKED FOR IDENTIFICATION ONLY AS II,

11:52:26 17    THAT'S IVAN, IVAN TWICE.

11:52:41 18              MR. LIGHTER?

11:52:42 19    A    YES.

11:52:42 20    Q    AND DO YOU SEE EXHIBIT II IN FRONT OF YOU?

11:52:46 21    A    YES.

11:52:46 22    Q    AND IS IT APPROXIMATELY FIVE OR SIX PAGES?

11:52:48 23    A    YES.

11:52:48 24    Q    OKAY.  AND IS EXHIBIT II -- WELL, WHAT IS

11:52:57 25    EXHIBIT II IN GENERAL, WITHOUT TALKING ABOUT THE

142

11:52:59   1    SPECIFIC CONTENT?  WHAT DO YOU UNDERSTAND IT TO BE?

11:53:01   2    A    GCTI'S, GOOTNICK CHARITABLE TRUST INC.'S,

11:53:08   3    FINANCIAL STATEMENT.  THIS IS THE FOLLOW-UP TO HIS

11:53:10   4    E-MAIL A FEW DAYS EARLIER WHERE HE FINALLY TOLD ME

11:53:14   5    WHAT HIS GENERAL NET WORTH WAS.

11:53:17   6    Q    OKAY.  NOW -- AND THIS WAS GIVEN TO YOU

11:53:19   7    APPROXIMATELY WHEN?

11:53:20   8    A    THE FAX LOGO SAYS ON IT OCTOBER 3RD --

11:53:30   9    OCTOBER 6TH.

11:53:30  10    Q    OCTOBER 3RD OF WHAT YEAR?

11:53:33  11    A    2004.

11:53:35  12    Q    AND BEFORE YOU RECEIVED THE DOCUMENT THAT IS

11:53:37  13    DEFENSE EXHIBIT II, HAD YOU RECEIVED ANY FINANCIAL

11:53:40  14    STATEMENTS OR FINANCIAL DISCLOSURES IN WRITING FROM

11:53:43  15    DR. IRWIN GOOTNICK?

11:53:44  16    A    ABOUT SEPTEMBER 27TH AN E-MAIL.

11:53:48  17    Q    OKAY.  AND WHAT DID THAT -- AND IT WAS AN

11:53:53  18    E-MAIL CONCERNING DR. GOOTNICK'S FINANCIAL

11:53:56  19    INFORMATION?

11:54:00  20    A    YES.

11:54:00  21    Q    OKAY.  BEFORE THAT HAD YOU EVER RECEIVED ANY

11:54:02  22    DISCLOSURE FROM DR. IRWIN GOOTNICK AS TO HIS

11:54:05  23    FINANCIAL STATEMENT OR ASSETS AND LIABILITIES?

11:54:09  24    A    NO.

11:54:09  25    Q    OKAY.  I THINK BACK IN ACTUALLY IN MARCH, IN

143

11:54:18   1    LATE MARCH GCTI --

11:54:34   2                MS. WONG:  OBJECTION, YOUR HONOR,

11:54:35   3    HEARSAY.

11:54:35   4                THE COURT:  SUSTAINED.  IT'S STRICKEN.

11:54:38   5    BY MR. FONG:

11:54:39   6    Q    OKAY.  AFTER YOU RECEIVED THE FINANCIAL

11:54:42   7    STATEMENT FROM DR. GOOTNICK, MR. LIGHTER, DID YOU

11:54:45   8    THEN -- DID YOU AND DR. GOOTNICK THEN ENTER INTO

11:54:48   9    ANY BUSINESS TRANSACTIONS?

11:54:49  10    A    YES, A BILL OF SALE, TWO BILLS OF SALE AND A

11:54:54  11    PROMISSORY NOTE.

11:54:54  12    Q    FIRST OF ALL, LET'S TAKE THEM ONE AT A TIME.

11:54:57  13                THE FIRST BILL OF SALE, WHEN WAS THAT

11:55:00  14    SIGNED?

11:55:00  15    A    THEY WERE ALL THREE SIGNED ON OCTOBER 8TH,

11:55:06  16    MINE IN HAWAII AND THEIRS IN CALIFORNIA.

11:55:07  17    Q    AND WHO PREPARED THE BILL OF SALE?

11:55:11  18    A    I DID WITH DR. GOOTNICK'S INPUT.

11:55:13  19    Q    OKAY.  NOW, WHAT DID THE BILL OF SALE DO?

11:55:24  20    A    IT SOLD TO ME 90 PERCENT OF GCTI, GOOTNICK

11:55:31  21    CHARITABLE TRUST, INC.

11:55:32  22    Q    OKAY.  AND WHAT -- AND WHAT DID YOU UNDERSTAND

11:55:37  23    GCTI TO BE THE OWNER OF?  WHAT KIND OF PROPERTIES,

11:55:41  24    IF ANY?

11:55:42  25    A    THERE WAS -- WELL, ATTACHED TO THE BILL OF

                                                              144

11:55:46 1    SALE IS THE FINAL VERSION OF THE GOOTNICK'S

11:55:50 2    FINANCIAL STATEMENT AS WAS IN HIS TRUST.

11:55:54 3    Q    AND DOES GCTI THEN, IS IT YOUR UNDERSTANDING

11:55:57 4    AT THE TIME THAT GCTI WAS THE OWNER OF THE VARIOUS

11:56:03 5    GOOTNICK'S TRUST LIKE FAMILY TRUSTS AND OTHER

11:56:05 6    TRUSTS?

11:56:06 7    A    YES.

11:56:06 8    Q    AND THE OTHER ASSETS HELD BY THOSE TRUSTS?

11:56:08 9    A    YES.

11:56:08 10   Q    OKAY.  NOW, WHAT WERE THE TERMS OF THIS BILL

11:56:14 11   OF SALE BY WHICH YOU ACQUIRED THE OWNERSHIP OR THE

11:56:17 12   STOCK OF GCTI?

11:56:19 13           MS. WONG:  OBJECTION, YOUR HONOR.  TO THE

11:56:21 14   EXTENT THAT THE DEFENDANT IS TESTIFYING TO THE

11:56:23 15   CONTENTS OF THE DOCUMENT, THE DOCUMENT SPEAKS FOR

11:56:27 16   ITSELF.

11:56:27 17           MR. FONG:  THE DOCUMENT IS NOT EVEN IN

11:56:29 18   FRONT OF THE DEFENDANT.

11:56:30 19           THE COURT:  YOU'RE NOT OFFERING THE

11:56:31 20   DOCUMENT NOW?

11:56:31 21           MR. FONG:  NOT YET.

11:56:35 22           MS. WONG:  YOUR HONOR, THE DOCUMENT IS

11:56:36 23   ALREADY IN EVIDENCE.

11:56:51 24           MR. FONG:  OKAY.

11:56:53 25   Q    NOW, MR. LIGHTER, DO YOU SEE GOVERNMENT'S

145

11:56:55 1     EXHIBIT 18?

11:56:56 2     A    YES.

11:56:56 3     Q    AND IS THIS THE BILL OF SALE THAT YOU HAVE

11:56:58 4     BEEN TALKING ABOUT?

11:56:59 5     A    YES.

11:56:59 6     Q    OKAY.

11:57:00 7     A    ONE OF THEM.

11:57:01 8     Q    ONE OF THEM.  AND THIS CARRIES THE DATE OF

11:57:04 9     OCTOBER 8TH, 2004; IS THAT TRUE?

11:57:07 10    A    YES.

11:57:07 11    Q    OKAY.  AND WHAT WAS THE PURPOSE BEHIND THIS

11:57:11 12    BILL OF SALE FROM YOUR PERSPECTIVE?  WHAT WAS IT

11:57:16 13    SUPPOSED TO DO?

11:57:16 14    A    SINCE THE I.R.S. ALREADY HAD LIENS ON ALL OF

11:57:22 15    THESE ASSETS, I WASN'T TRYING TO CLEAN THEM UP.

11:57:26 16    THEY WERE ALREADY IN MY MIND CLEANED OUT, EXCEPT

11:57:28 17    FOR THE PAYMENT OF THE TAXES.  SO I BOUGHT THE

11:57:35 18    BALANCE, THE 90 PERCENT BALANCE OF THE STOCK OF

11:57:41 19    GCTI AND AGREED TO PAY WHATEVER TAXES THERE WERE

11:57:44 20    BASED ON THE ATTACHED FINANCIAL STATEMENT.

11:57:52 21    Q    AND I'M GOING TO DIRECT YOUR ATTENTION TO PAGE

11:57:54 22    2 OF EXHIBIT 18.

11:57:55 23         DO YOU SEE ABOUT THE FOURTH PARAGRAPH OF

11:57:59 24    EXHIBIT 18, PAGE 2?

11:58:00 25    A    YES.

146

11:58:01 1    Q    GRANTEE -- FIRST OF ALL, WHO IS GRANTEE?

11:58:03 2    A    I AM.

11:58:05 3    Q    YOU OR HCHC?

11:58:07 4    A    I AM.  IT'S ME INDIVIDUALLY.

11:58:11 5    Q    OKAY.  "GRANTEE EXPRESSLY COVENANTS THAT

11:58:15 6    GRANTEE ASSUMES ALL INDEBTEDNESS FOR DIRECT TAXES,

11:58:20 7    PENALTIES, AND INTEREST PAST, AND CURRENT, ARISING

11:58:24 8    FROM OR RELATED TO OPERATION OF GCTI AND/OR ITS

11:58:29 9    ABOVESAID SUBSIDIARIES."

11:58:32 10        IS THAT WHAT IT SAYS?

11:58:33 11   A    YES.

11:58:33 12   Q    AND IS THAT WHAT YOU WERE TESTIFYING TO A

11:58:36 13   LITTLE WHILE AGO WHEN YOU WERE TESTIFYING ABOUT THE

11:58:39 14   ASSUMING TAX LIABILITIES?

11:58:40 15   A    YES.

11:58:41 16   Q    AND IS THIS SOMETHING THAT DR. GOOTNICK WANTED

11:58:43 17   IN THE AGREEMENT?

11:58:44 18   A    YES.

11:58:44 19   Q    OKAY.  NOW, WAS THIS THE ONLY DOCUMENT THAT

11:58:57 20   REFLECTED THE TRANSACTION THAT YOU AND DR. GOOTNICK

11:58:59 21   WERE ENTERING INTO?

11:59:01 22   A    THERE WAS ANOTHER BILL OF SALE.

11:59:05 23   Q    OKAY.  AND I BELIEVE NUMBER 19, WHAT WAS YOUR

11:59:21 24   UNDERSTANDING AS TO WHAT THE SECOND BILL OF SALE

11:59:23 25   WAS SUPPOSED TO DO?

147

11:59:24  1          MS. WONG:  OBJECTION, YOUR HONOR.  ONCE

11:59:25  2     AGAIN THE DOCUMENT SPEAKS FOR ITSELF AND IT IS IN

11:59:28  3     EVIDENCE.

11:59:29  4          MR. FONG:  OKAY.

11:59:30  5          THE COURT:  I'LL SUSTAIN THE OBJECTION.

11:59:31  6     YOU CAN ASK ANOTHER QUESTION.

11:59:32  7     BY MR. FONG:

11:59:34  8     Q    OKAY.  MR. LIGHTER, I WANT TO SHOW YOU THE

11:59:39  9     FIRST PAGE OF EXHIBIT 19.

11:59:42 10          DO YOU SEE THAT, SIR?

11:59:44 11     A    YES.

11:59:44 12     Q    AND IS THIS A SECOND BILL OF SALE THAT YOU'RE

11:59:47 13     REFERRING TO?

11:59:47 14     A    YES, BUT THIS IS PAGE 2.

11:59:52 15     Q    OKAY.  BUT YOU DO RECOGNIZE THIS AS THE FIRST

11:59:54 16     PAGE OF THAT BILL OF SALE?

11:59:56 17     A    YES, YES.

11:59:56 18     Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT

11:59:59 19     THIS DOCUMENT DID?

12:00:00 20     A    SUSAN GOOTNICK OWED 450 SHARES OF GCTI AND SHE

12:00:11 21     WAS GOING SELL IT BACK TO THE CORPORATION AS

12:00:13 22     TREASURY STOCK SO THAT THE COMPANY WHEN I BOUGHT IT

12:00:17 23     WOULD HAVE 90 PERCENT OF THE SHARES.

12:00:19 24     Q    OKAY.  SO IT'S A WAY TO COMPLETE THE

12:00:22 25     TRANSACTION?

                                                              148

12:00:22  1    A    YES.

12:00:24  2    Q    OKAY.  NOW, WAS THERE ANY OTHER DOCUMENT THAT

12:00:26  3    WAS PREPARED IN CONNECTION WITH THIS TRANSACTION?

12:00:34  4    A    A PROMISSORY NOTE.

12:00:35  5    Q    OKAY.  AND WHAT DID THE PROMISSORY NOTE

12:00:37  6    PROVIDE, IF YOU KNOW?

12:00:39  7    A    FOR PAYMENTS AND A DOLLAR FOR DOLLAR CREDIT

12:00:49  8    REDUCTION TO REDUCE THE PROMISSORY NOTE BY EVERY

12:00:53  9    DOLLAR OF TAXES I HAPPENED TO PAY FOR RELATING TO

12:01:00 10    THAT EARLIER PARAGRAPH THAT YOU SHOWED ME.

12:01:03 11    Q    AND HOW MUCH WAS THE PROMISSORY NOTE FOR?

12:01:05 12    A    2 MILLION.

12:01:06 13    Q    $2 MILLION?

12:01:08 14    A    CORRECT.

12:01:08 15    Q    AND SO THE PROMISSORY NOTE AND WHAT WAS THE

12:01:10 16    $2 MILLION SUPPOSED TO DO?

12:01:12 17    A    SIMPLY TRANSFER THE STOCK TO ME.

12:01:19 18    Q    SO THAT'S THE PURCHASE PRICE FOR THE TRANSFER

12:01:22 19    OF THE GCTI STOCK TO YOU?

12:01:26 20    A    THE PURCHASE PRICE WAS A $2 MILLION NOTE AND

12:01:29 21    ALL OF THE TAX LIABILITIES THAT I ASSUMED.

12:01:33 22    Q    OKAY.  BUT THERE'S ALSO -- WELL, YOU

12:01:35 23    MENTIONED -- WAS THERE ANY KIND OF OFFSET FOR ANY

12:01:38 24    TAX LIABILITY THAT YOU ACTUALLY ENDED UP PAYING?

12:01:40 25         MS. WONG:  OBJECTION, ASKED AND ANSWERED.

149

12:01:43   1          THE COURT:  YOU CAN ANSWER THE QUESTION,

12:01:44   2   SIR.

12:01:44   3          THE WITNESS:  YES, IT'S PART OF THE NOTE

12:01:47   4   OR THE LANGUAGE OF THE NOTE.

12:01:50   5   BY MR. FONG:

12:01:51   6   Q   OKAY.  DIRECTING YOUR ATTENTION TO -- I'M

12:02:02   7   GOING TO HAND YOU A COPY OF WHAT HAS BEEN MARKED AS

12:02:06   8   DEFENSE EXHIBIT L AS IN LARRY.

12:02:15   9          DO YOU SEE THAT DOCUMENT IN FRONT OF YOU,

12:02:17   10  SIR?

12:02:17   11  A   YES.

12:02:17   12  Q   AND ON PAGE 2 OF EXHIBIT L THERE'S A SIGNATURE

12:02:23   13  ON THE UPPER RIGHT-HAND CORNER.

12:02:25   14          DO YOU SEE THAT?

12:02:26   15  A   YES.

12:02:26   16  Q   OKAY.  AND WHOSE SIGNATURE IS THAT?

12:02:29   17  A   THAT IS MINE.

12:02:30   18  Q   OKAY.  AND WHAT IS EXHIBIT L?

12:02:32   19  A   IT'S A PROMISSORY NOTE FOR $2 MILLION SUBJECT

12:02:39   20  TO EXHIBIT A WHICH IS A FINANCIAL STATEMENT THAT

12:02:42   21  HAD BEEN PROVIDED TO ME.

12:02:44   22          MR. FONG:  YOUR HONOR, AT THIS TIME WE

12:02:46   23  WOULD MOVE TO HAVE EXHIBIT L ADMITTED INTO

12:02:48   24  EVIDENCE.

12:02:49   25          MS. WONG:  OBJECTION, HEARSAY.

150

12:02:52 1        MR. FONG:  IT'S OFFERED FOR COMPLETENESS,

12:02:54 2   YOUR HONOR.  THE BILL OF SALE, THE TWO BILLS OF

12:02:58 3   SALE, WHICH ARE ADMITTED INTO EVIDENCE, CANNOT BE

12:03:05 4   SEEN IN ISOLATION OF THIS DOCUMENT BEING SEEN AS

12:03:08 5   WELL.

12:03:09 6        THE COURT:  I'LL SUSTAIN THE OBJECTION.

12:03:10 7        MR. FONG:  OKAY.

12:03:11 8   Q    NOW, MR. LIGHTER, ON THE PROMISSORY NOTE THAT

12:03:15 9   IS EXHIBIT L, YOU TESTIFIED THAT YOU DID SIGN IT,

12:03:20 10  RIGHT?

12:03:20 11  A    YES.

12:03:20 12  Q    HOW MANY TIMES DOES YOUR SIGNATURE APPEAR?

12:03:23 13  A    ONCE.

12:03:23 14  Q    OKAY.  AND ANY OTHER -- DOES ANYBODY ELSE'S

12:03:28 15  SIGNATURE APPEAR ON THAT PROMISSORY NOTE?

12:03:30 16  A    NO.

12:03:30 17  Q    OKAY.  NOW, AFTER THIS -- THESE DOCUMENTS WERE

12:03:47 18  SIGNED ON OR ABOUT OR AROUND THE TIME OF

12:03:51 19  OCTOBER 8TH, 2004, DID, DID YOU HAVE ANY OTHER

12:03:55 20  BUSINESS TRANSACTIONS WITH DR. IRWIN GOOTNICK

12:03:58 21  SUBSEQUENTLY?

12:03:59 22  A    WELL, FIRST OF ALL, I RECORDED THE ORIGINALS

12:04:01 23  OF ALL OF THESE DOCUMENTS.

12:04:03 24  Q    OKAY.  WHERE DID YOU RECORD THEM?

12:04:05 25  A    HAWAII BUREAU OF CONVEYANCES.

                                                        151

12:04:10  1    Q    AND AFTER RECORDING THESE DOCUMENTS, WHAT ELSE

12:04:13  2    DID YOU DO IN TERMS OF YOUR BUSINESS RELATIONSHIP

12:04:21  3    WITH DR. IRWIN GOOTNICK?

12:04:23  4    A    THERE WAS A BILL OF SALE FOR THE STOCK WITH

12:04:26  5    THE CREDIT BUREAU IN MARCH BUT BEFORE THAT I

12:04:29  6    LEARNED THAT THE FINANCIAL STATEMENT OF THE

12:04:31  7    GOOTNICKS HAD GIVEN ME TESTIFIED TO UNDER OATH WAS

12:04:34  8    FALSE.

12:04:35  9    Q    OKAY.  AND IN WHAT WAYS WAS IT FALSE FROM YOUR

12:04:38 10    PERSPECTIVE?

12:04:38 11    A    TWO WAYS:  ONE, THEY SAID THAT THERE WAS AN

12:04:42 12    OFFICE BUILDING AT 4333 CALIFORNIA STREET WAS FREE

12:04:48 13    AND CLEAR AND SECOND INTERNAL AUDIT, THEY SAID THEY

12:04:51 14    ONLY OWED APPROXIMATELY $50,000 IN STATE AND

12:04:54 15    FEDERAL TAX.

12:04:55 16    Q    OKAY.  AND HOW DID -- WHY DID YOU BELIEVE THAT

12:04:59 17    THE MEDICAL BUILDING AT 4333 CALIFORNIA STREET WAS

12:05:05 18    NOT FREE AND CLEAR?

12:05:07 19    A    GOOTNICK TOLD ME THAT THEY PUT A MILLION --

12:05:10 20             MS. WONG:  OBJECTION, HEARSAY.

12:05:14 21             THE WITNESS:  I LEARNED --

12:05:15 22             THE COURT:  EXCUSE ME.  SUSTAINED.  THE

12:05:16 23    ANSWER IS STRICKEN.

12:05:17 24    BY MR. FONG:

12:05:27 25    Q    LET ME SHOW YOU -- DID YOU EVER -- DID THERE

                                                                152

12:05:29 1    COME A TIME WHEN YOU DID A SEARCH ON THE TITLE,

12:05:36 2    RECORDED TITLE OF 4333 CALIFORNIA STREET MEDICAL

12:05:40 3    BUILDING IN SAN FRANCISCO?

12:05:42 4    A    YES.

12:05:42 5    Q    AND WHAT DID YOU DO?

12:05:43 6    A    I WENT TO THE SAN FRANCISCO ASSESSOR

12:05:49 7    RECORDER'S WEB SITE.

12:05:50 8    Q    OKAY.  AND WHAT DID YOU FIND OUT?

12:05:53 9              MR. FONG:  OBJECTION.  IT CALLS FOR

12:05:55 10   HEARSAY.

12:05:58 11             MR. FONG:  YOUR HONOR, THIS IS A RECORDED

12:05:59 12   DOCUMENT.

12:06:03 13             THE COURT:  HIS TESTIMONY?  I'LL SUSTAIN

12:06:07 14   THE OBJECTION.

12:06:07 15   BY MR. FONG:

12:06:08 16   Q    I'M GOING TO SHOW YOU A DOCUMENT, MR. LIGHTER,

12:06:10 17   THAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 153.

12:06:15 18             MR. O'REILLY:  I'M SORRY, MR. FONG.  WHAT

12:06:18 19   NUMBER?

12:06:21 20             MR. FONG:  153.

12:06:22 21   Q    DO YOU SEE THAT DOCUMENT, SIR?

12:06:24 22   A    YES, YES.

12:06:25 23   Q    AND HOW DID YOU ACQUIRE THAT DOCUMENT?

12:06:31 24             MR. O'REILLY:  MR. FONG, IT'S IN

12:06:34 25   EVIDENCE.

                                                          153

12:06:34 1                    MR. FONG:  WHAT?

12:06:35 2                    MR. O'REILLY:  IT'S IN EVIDENCE.

12:06:36 3                    MR. FONG:  OKAY.

12:06:38 4                    THE WITNESS:  THIS IS NOT THE MILLION

12:06:41 5       THREE.

12:06:41 6       BY MR. FONG:

12:06:41 7       Q    WHAT IS?

12:06:43 8       A    IT IS NOT.

12:06:44 9                    THE COURT:  THE QUESTION IS HOW DID YOU

12:06:45 10      ACQUIRE THIS DOCUMENT?

12:06:50 11                   MR. FONG:  I APOLOGIZE, YOUR HONOR.  I

12:06:52 12      HAVE THE WRONG EXHIBIT.

12:07:01 13                   THE COURT:  ARE YOU WITHDRAWING THE

12:07:02 14      QUESTION?

12:07:03 15                   MR. FONG:  YES, YOUR HONOR, I'M

12:07:04 16      WITHDRAWING THE QUESTION BECAUSE THAT'S MY MISTAKE.

12:07:10 17      EXHIBIT 150, WHICH IS NOT IN EVIDENCE.

12:07:17 18                   MR. O'REILLY:  YOUR HONOR, GOVERNMENT'S

12:07:18 19      EXHIBIT 150, 1-5-0 --

12:07:21 20                   MR. FONG:  YES.

12:07:22 21                   MR. O'REILLY:  -- IT IS IN EVIDENCE.

12:07:32 22                   THE COURT:  LET ME JUST ASK THE JURORS.

12:07:33 23      IT'S NOW FIVE PAST NOON.  I'M CONTEMPLATING JUST

12:07:37 24      CONTINUING UNTIL THE BOTTOM OF THE HOUR SOME TIME.

12:07:40 25      DOES THAT PRESENT A PROBLEM?  HAS ANYONE MADE

                                                            154

12:07:43  1    APPOINTMENTS BASED ON OUR REPRESENTATION THAT WE

12:07:46  2    BREAK AT NOON TODAY?

12:07:47  3              I DON'T SEE ANY HANDS.  LET'S GO FORWARD.

12:08:04  4              MR. FONG:  THANK YOU, YOUR HONOR.

12:08:05  5    Q    MR. LIGHTER, DO YOU SEE THE FIRST PAGE OF

12:08:08  6    EXHIBIT 150?

12:08:09  7    A    YES.

12:08:09  8    Q    AND DO YOU RECOGNIZE IT?

12:08:10  9    A    YES.

12:08:11 10    Q    AND WHAT DO YOU -- WHAT IS EXHIBIT 150?

12:08:16 11    A    IT'S THE FIRST MORTGAGE ON THE CALIFORNIA

12:08:30 12    STREET PROPERTY FOR A MILLION THREE.

12:08:32 13    Q    ALL RIGHT.  NOW, ON THE UPPER RIGHT-HAND

12:08:35 14    COLUMN THERE'S A STAMP.  DO YOU SEE THAT?

12:08:38 15    A    YES.

12:08:38 16    Q    AND WHAT DOES THAT STAMP SHOW IN TERMS OF THE

12:08:48 17    ACTIVITY OF THIS PARTICULAR DOCUMENT?

12:08:50 18              MS. WONG:  OBJECTION.  THE DOCUMENT

12:08:51 19    SPEAKS FOR ITSELF.

12:08:52 20              THE COURT:  IF HE CAN DESCRIBE WHAT IS

12:08:55 21    PRINTED THERE AND AS WHAT IT SHOWS AND WHAT

12:08:58 22    HAPPENED, THE DOCUMENT IS --

12:09:00 23    BY MR. FONG:

12:09:01 24    Q    BUT AT SOME POINT YOU SAW THIS DOCUMENT,

12:09:05 25    RIGHT?

                                                        155

12:09:05  1      A    I RECORDED THE COPY.

12:09:06  2      Q    OKAY.  AND YOU BECAME AWARE THAT THIS WAS

12:09:14  3    RECORDED WITH THE SAN FRANCISCO RECORDER'S OFFICE?

12:09:19  4      A    YES.

12:09:19  5      Q    AND WHEN WAS IT RECORDED?

12:09:20  6      A    JUNE 15TH, 2004.

12:09:22  7      Q    AND THAT WOULD HAVE BEEN ABOUT FOUR MONTHS

12:09:25  8    BEFORE THE BILL OF SALE BY WHICH THE GCTI ASSETS

12:09:29  9    WERE TRANSFERRED TO YOU?

12:09:30  10     A    YES.

12:09:30  11     Q    OKAY.  NOW, THE MORTGAGES FROM THE GOOTNICK

12:09:45  12   FAMILY TRUST TO THE MORTGAGOR TO J AND J TRUST

12:09:52  13   WHICH IS THE MORTGAGEE, DO YOU SEE THAT?

12:09:54  14     A    YES.

12:09:55  15     Q    AND BEFORE OCTOBER 8TH, 2004, WHEN THE BILL OF

12:09:59  16   SALE WAS PREPARED AND SIGNED, HAD YOU KNOWN ABOUT

12:10:03  17   THIS PARTICULAR MORTGAGE THAT IS GOVERNMENT'S

12:10:06  18   EXHIBIT 150?

12:10:07  19     A    NO, NOT POSSIBLE, NO.

12:10:17  20     Q    AND WHAT IS THE EFFECT WHEN YOU FOUND OUT THIS

12:10:21  21   DOCUMENT WAS RECORDED WITH THE SAN FRANCISCO

12:10:24  22   RECORDER, IN YOUR MIND WHAT WAS THE EFFECT OF THAT?

12:10:27  23     A    WELL, I SIGNED A $2 MILLION NOTE BASED ON THE

12:10:30  24   CALIFORNIA PROPERTY BE FREE AND CLEAR AND SO I PAID

12:10:35  25   GOOTNICK BY NOTE A MILLION THREE MORE THAN THAT

156

12:10:41 1    NOTE WAS WORTH.  I OVERPAID BY A MILLION THREE.

12:10:44 2    Q    AND THAT'S BECAUSE YOU DID NOT KNOW THAT THIS

12:10:47 3    MORTGAGE HAD BEEN RECORDED BACK IN JUNE OF 2004?

12:10:51 4    A    CORRECT.

12:10:53 5            MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:10:54 6            THE COURT:  I'LL SUSTAIN THE OBJECTION.

12:10:57 7    THE ANSWER IS STRICKEN.

12:11:00 8    BY MR. FONG:

12:11:00 9    Q    NOW, DID YOU HAVE ANY ROLE IN THE PREPARATION

12:11:03 10   OF THIS MORTGAGE THAT IS GOVERNMENT'S EXHIBIT 150?

12:11:07 11   A    NO.

12:11:07 12   Q    AND DID YOU HAVE ANY KNOWLEDGE THAT IT WAS

12:11:13 13   RECORDED IN JUNE OF 2004?

12:11:14 14   A    NO.

12:11:14 15   Q    AND DID YOU HAVE ANY KNOWLEDGE THAT IT WAS

12:11:16 16   PREPARED BY ANYBODY?

12:11:22 17   A    I LEARNED LATER, BUT NO.

12:11:24 18   Q    AND -- BUT AS OF OCTOBER 8TH, 2004, WHEN YOU

12:11:27 19   SIGNED THE BILL OF SALE, DID YOU KNOW IF ANYBODY

12:11:33 20   HAD PREPARED THIS MORTGAGE?

12:11:36 21           MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:11:37 22           THE COURT:  IT HAS BEEN.  YOU CAN JUST

12:11:39 23   ANSWER QUICKLY, SIR.

12:11:41 24           THE WITNESS:  NO.

12:11:41 25           THE COURT:  YOU CAN ASK THE NEXT

                                                        157

12:11:44  1    QUESTION.

12:11:44  2    BY MR. FONG:

12:11:45  3    Q    DID YOU HAVE A DISCUSSION WITH DR. GOOTNICK

12:11:46  4    REGARDING THIS MORTGAGE AFTER YOU HAD FOUND OUT

12:11:48  5    ABOUT IT?

12:11:48  6    A    YES.

12:11:49  7    Q    OKAY.  AND WHAT DID YOU SAY TO DR. GOOTNICK?

12:11:52  8            MS. WONG:  OBJECTION, HEARSAY.

12:11:53  9            THE COURT:  SUSTAINED.

12:11:55  10   BY MR. FONG:

12:11:56  11   Q    ALL RIGHT.  DID YOU -- OKAY.  YOU HAD A

12:12:00  12   DISCUSSION WITH DR. GOOTNICK ABOUT THIS MORTGAGE,

12:12:03  13   RIGHT?

12:12:03  14   A    YES.

12:12:03  15   Q    OKAY.  WHAT DID YOU DO, IF ANYTHING, AFTER

12:12:06  16   YOUR DISCUSSION WITH DR. GOOTNICK?

12:12:07  17   A    I RECORDED ADDITIONAL MORTGAGES ON THE

12:12:17  18   PROPERTY.

12:12:17  19   Q    OKAY.  NOW, LET ME MAKE SURE I HAVE THE TIMING

12:12:19  20   OF THIS DOWN RIGHT.

12:12:20  21            WHEN DID YOU HAVE THIS CONVERSATION WITH

12:12:23  22   DR. GOOTNICK ABOUT EXHIBIT 150?

12:12:26  23   A    A FEW DAYS AFTER OCTOBER 8TH.

12:12:30  24   Q    SO IT WAS AFTER THE BILL OF SALE HAD ALREADY

12:12:33  25   BEEN SIGNED?

                                                        158

12:12:34  1    A    YES.

12:12:35  2    Q    NOW, ARE YOU --

12:12:43  3    A    ACTUALLY, HE TOLD ME ABOUT IT BUT I DON'T

12:12:47  4    BELIEVE I HAD A DISCUSSION.

12:12:47  5    Q    OKAY.  BUT YOU FOUND OUT ABOUT THIS AFTER THE

12:12:55  6    PROMISSORY NOTE AND THE BILL OF SALE HAD ALREADY

12:12:57  7    BEEN SIGNED?

12:12:57  8    A    THAT'S TRUE.

12:12:58  9    Q    OKAY.  NOW, YOU SAID YOU TOOK SOME ACTION

12:13:03 10    AFTER YOU LEARNED ABOUT THIS MORTGAGE, RIGHT?

12:13:08 11    A    YES.

12:13:08 12    Q    AND WHAT DID YOU DO?

12:13:09 13         MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:13:10 14         THE COURT:  THE PREVIOUS QUESTION YOU HAD

12:13:14 15    ASKED AND ANSWERED IT, BUT THIS ONE YOU CAN ANSWER,

12:13:16 16    SIR.  WHAT DID YOU DO?

12:13:17 17         THE WITNESS:  THANK YOU.  I RECORDED TWO

12:13:21 18    MORTGAGES OF VARIOUS AMOUNTS.

12:13:22 19    BY MR. FONG:

12:13:22 20    Q    OKAY.  NOW, WHEN YOU SAY YOU RECORDED TWO

12:13:27 21    MORTGAGES OF VARIOUS AMOUNTS, WHAT DO YOU MEAN BY

12:13:30 22    THAT?

12:13:30 23    A    TWO CORPORATIONS FILED MORTGAGES, RECORDED

12:13:34 24    MORTGAGES ON THE SAME PROPERTY.

12:13:36 25    Q    OKAY.  NOW, AT THIS TIME WHEN YOU WERE DOING

159

12:13:38  1    THIS, DID YOU CONSIDER YOURSELF THE OWNER OF ASSETS

12:13:45  2    OF GCTI?

12:13:46  3    A    YES.

12:13:46  4    Q    AND WOULD THAT INCLUDE THE 4333 CALIFORNIA

12:13:50  5    STREET MEDICAL BUILDING?

12:13:51  6    A    THROUGH THE STRUCTURE OF THE GCTI, YES.

12:13:54  7    Q    OKAY.  NOW, YOU RECORDED TWO MORTGAGES.  DID

12:14:02  8    YOU RECORD THEM AT THE SAME TIME?

12:14:03  9    A    NO.

12:14:03 10    Q    AND TELL US ABOUT THE FIRST MORTGAGE THAT YOU

12:14:05 11    RECORDED IN RESPONSE TO LEARNING ABOUT THE

12:14:07 12    EXISTENCE OF EXHIBIT 150?

12:14:09 13    A    I THINK THE FIRST TIME I RECORDED THE

12:14:13 14    MORTGAGES WAS AFTER THE SECURITIES OFFERING WAS

12:14:21 15    FILED.

12:14:22 16    Q    AND WHEN WAS THAT?

12:14:23 17    A    WITH THE S.E.C. NOVEMBER 1ST.

12:14:26 18    Q    AND WHAT YEAR?

12:14:27 19    A    2004.

12:14:28 20    Q    OKAY.  SO YOU SAID YOU RECORDED THE FIRST

12:14:35 21    MORTGAGE AFTER THAT?

12:14:35 22    A    I BELIEVE SO.

12:14:37 23    Q    AND WHAT WAS THE PURPOSE IN RECORDING THIS

12:14:39 24    MORTGAGE?

12:14:40 25    A    I HAD TO GIVE UP OR ABANDON THE SECURITIES

                                                          160

12:14:51  1    OFFERING OR CORRECT -- OR AMEND IT WITH CONSISTENT

12:14:55  2    FACTS SO.  SO ONE OF THE FEATURES OF THE FIRST

12:15:03  3    DEBENTURE OFFERING WAS THE FREE AND CLEAR OFFICE

12:15:07  4    BUILDING.

12:15:07  5    Q    OKAY.  SO WHEN YOU FILED YOUR DEBENTURE

12:15:11  6    OFFERING, WHICH IS THE SECURITY OFFERING, RIGHT?

12:15:13  7    A    YES.

12:15:13  8    Q    AND YOU PUT IN THERE THE FACT THAT THE MEDICAL

12:15:16  9    BUILDING WAS PART OF THE OFFERING?

12:15:18 10    A    YES, THAT'S A FREE AND CLEAR PROPERTY.

12:15:23 11    Q    AND DID YOU SIGN A VALUE TO THE OFFICE

12:15:26 12    BUILDING IN YOUR SECURITY OFFERING?

12:15:28 13    A    1.5 MILLION.

12:15:29 14    Q    BUT WITH NO LIEN OR ENCUMBRANCES?

12:15:35 15    A    CORRECT.

12:15:35 16    Q    OKAY.  THE FIRST LIEN OR MORTGAGE YOU FILED IN

12:15:55 17    RESPONSE TO LEARNING ABOUT EXHIBIT 150, HOW MUCH

12:15:58 18    WAS THAT FOR?

12:16:00 19    A    350,000.

12:16:03 20    Q    NOW, WAS THAT -- WAS THERE ACTUALLY A LOAN FOR

12:16:15 21    $350,000 THAT THE MORTGAGE WAS ACTUALLY SECURING?

12:16:18 22    A    IT WAS AN ADDITIONAL MORTGAGE WITHOUT CHANGING

12:16:20 23    THE NOTE, IN OTHER WORDS, YOU CAN HAVE THREE OR

12:16:26 24    FOUR MORTGAGES ON ONE PROPERTY BUT IT CONTROLS THE

12:16:30 25    TRANSACTIONS IS THE NOTE.  THE DEVELOPERS USE THIS

161

12:16:34 1    ALL OF THE TIME WITH SUBDIVISIONS AND IT'S CALLED A

12:16:37 2    BLANKET MORTGAGE.

12:16:38 3    Q    AND WHAT WAS THE NOTE THAT YOU WERE

12:16:40 4    REFERENCING WHEN YOU RECORDED THE $350,000 MORTGAGE

12:16:49 5    THAT YOU JUST TALKED ABOUT?

12:16:57 6    A    WHAT I WAS DOING IS PREVENTING DR. GOOTNICK

12:17:01 7    FROM INCREASING ANOTHER MORTGAGE BECAUSE THERE WAS

12:17:04 8    STILL EQUITY LEFT BETWEEN THE MILLION THREE AND THE

12:17:09 9    MILLION FIVE.

12:17:09 10   Q    AND YOU RECORDED THE MORTGAGE FOR $350,000 TO

12:17:14 11   PROTECT WHAT?

12:17:15 12   A    TO PROTECT THE REMAINING EQUITY.

12:17:17 13   Q    OKAY.  I WANT TO PUBLISH -- EXCUSE ME.  THIS

12:17:36 14   IS GOVERNMENT'S EXHIBIT 152 THAT HAS BEEN ADMITTED

12:17:38 15   INTO EVIDENCE.

12:17:38 16        IS THIS THE MORTGAGE THAT YOU HAVE BEEN

12:17:40 17   TESTIFYING ABOUT JUST NOW?

12:17:42 18   A    COULD YOU SCROLL IT DOWN?

12:17:45 19        YES.

12:17:55 20   Q    AND WHAT DID YOU DO AFTER YOU RECORDED THAT?

12:18:00 21   WELL, FIRST OF ALL, WHEN DID YOU RECORD THE

12:18:02 22   MORTGAGE?

12:18:02 23   A    SAN FRANCISCO COUNTY ASSESSOR RECORDER.

12:18:07 24   Q    AND YOU RECORDED THAT ON OR ABOUT FRIDAY,

12:18:11 25   NOVEMBER 5TH, 2004?

162

12:18:12  1    A    YES.

12:18:12  2    Q    OKAY.  AND WHAT DID YOU DO NEXT IN TERMS OF

12:18:18  3    YOUR RELATIONSHIP WITH DR. GOOTNICK AFTER YOU

12:18:23  4    RECORDED THIS MORTGAGE?

12:18:24  5    A    WELL, RATHER THAN GET UPSET OR SUE HIM OR

12:18:30  6    TERMINATE THE DEBENTURE RECOVERING, THE SECURITIES

12:18:35  7    OFFERING, I DECIDED TO HAVE A LITTLE ALOHA SPIRIT

12:18:40  8    AND TRY TO NEGOTIATE A SETTLEMENT WITH HIM.

12:18:43  9    Q    OKAY.  NOW, THE DEBENTURE OFFERING OR

12:18:50 10    SECURITIES OFFERING WAS STILL ONGOING; IS THAT

12:18:52 11    RIGHT?

12:18:52 12    A    ABSOLUTELY.

12:18:53 13    Q    NOW, IN LIGHT OF THE INFORMATION THAT YOU

12:18:54 14    FOUND OUT ABOUT THE EXISTENCE OF THE $1.3 MILLION

12:19:00 15    MORTGAGE THAT HAD BEEN PLACED BY DR. GOOTNICK ON

12:19:02 16    THE PROPERTY BACK IN JUNE OF 2004, DID YOU DO

12:19:09 17    ANYTHING INSOFAR AS YOUR SECURITIES OFFERING

12:19:11 18    FILING?

12:19:11 19    A    ON OCTOBER 16TH, I AMENDED THE SECURITIES

12:19:16 20    OFFERING AND LISTED THE OFFICE BUILDING AS HAVING A

12:19:21 21    VALUE OF 1.5 MILLION AND A DEBT OF 1.5 MILLION.

12:19:25 22    Q    BUT YOU SAID YOU AMENDED THIS ON WHAT DATE?

12:19:28 23    A    NOVEMBER 16TH.

12:19:29 24    Q    OKAY.  I THOUGHT I HEARD YOU SAY OCTOBER 16TH?

12:19:32 25    A    NO.

163

12:19:33  1    Q    OKAY.  WELL, OKAY.

12:19:35  2              NOW, AND THE ORIGINAL OFFERING WAS

12:19:38  3    NOVEMBER 1ST, RIGHT?

12:19:39  4    A    CORRECT.

12:19:39  5    Q    OKAY.  SO ABOUT 16 DAYS LATER YOU MADE THE

12:19:43  6    AMENDMENT?

12:19:44  7    A    YES.

12:19:44  8    Q    OKAY.  AND IN THE AMENDMENT YOU NOTED THAT

12:19:48  9    THERE IS ACTUALLY, THE 4333 CALIFORNIA MEDICAL

12:19:53 10    STREET BUILDING WAS NOT FREE AND CLEAR?

12:19:55 11    A    CORRECT.

12:19:56 12              MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:19:57 13              THE COURT:  SUSTAINED.

12:20:04 14    BY MR. FONG:

12:20:05 15    Q    NOW, AFTER YOU DID THAT, WHAT DID YOU DO NEXT

12:20:08 16    IN TERMS OF YOUR BUSINESS DEALINGS WITH

12:20:10 17    DR. GOOTNICK?

12:20:10 18    A    WELL, GOOTNICK RENEGED ON THE DEAL.  HE

12:20:18 19    BREACHED HIS CONTRACT WITH ME.

12:20:19 20    Q    HOW?

12:20:19 21    A    HE SAID I WANTED COLLATERAL, IN OTHER WORDS, I

12:20:26 22    HAD PERSONALLY OWED THE $2 MILLION BASED ON MY

12:20:35 23    ORIGINAL SIGNATURES AND WHATEVER MESSAGES I ORALLY

12:20:38 24    PROMISED HIM.  AND HE WANTED DIRECT COLLATERAL.

12:20:41 25    Q    OKAY.

                                                            164

12:20:43 1     A    OR CONFIRMATION OF THE PLEDGES.

12:20:49 2     Q    SO HE WAS ASKING FOR SECURITY FOR THE

12:20:52 3     PROMISSORY NOTE?

12:20:52 4     A    OR WRITTEN PLEDGES.

12:20:54 5     Q    AND WHAT IS A PLEDGE?

12:20:55 6     A    A PLEDGE IS A PROMISE TO -- IT'S LIKE A

12:21:01 7     GUARANTEE OF PROPERTY.

12:21:01 8     Q    OKAY.  SO DR. GOOTNICK WANTED SOME SECURITY OR

12:21:06 9     PLEDGES TO SECURE THE PROMISSORY NOTE?

12:21:11 10              MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:21:12 11              THE COURT:  SUSTAINED.

12:21:13 12    BY MR. FONG:

12:21:14 13    Q    SO WHAT DID YOU DO IN RESPONSE TO THAT?

12:21:15 14    A    I STARTED COMPILING PLEDGES AND SECURITIES FOR

12:21:29 15    DR. GOOTNICK AND WHAT HE WANTED.

12:21:32 16    Q    OKAY.

12:21:33 17    A    AND THEN I HAD HIM MEET MY WIFE AND

12:21:39 18    MOTHER-IN-LAW WHO CONTROLLED MOST OF THE ASSETS,

12:21:44 19    INCLUDING 500,000 CASH THAT WAS PLEDGED TO HIM.

12:21:49 20    Q    ALL RIGHT.  AND WHERE DID THIS MEETING TAKE

12:21:51 21    PLACE BETWEEN YOU AND YOUR WIFE AND YOUR

12:21:54 22    MOTHER-IN-LAW ON THE ONE HAND AND DR. GOOTNICK ON

12:21:58 23    THE OTHER HAND?

12:21:58 24    A    IN HAWAII AT THE KONA RESORT I BELIEVE HE HAD

12:22:02 25    A TIME SHARE IN.

165

12:22:03  1     Q     AND WHEN WAS THAT?

12:22:04  2     A     DECEMBER 24TH, 2004.

12:22:06  3     Q     OKAY.  NOW, JUST BEFORE THAT YOU HAD MET

12:22:13  4     DR. GOOTNICK IN SAN FRANCISCO, RIGHT?

12:22:14  5     A     DECEMBER 17TH.

12:22:15  6     Q     SO IT WAS ABOUT A WEEK LATER?

12:22:16  7     A     YES.

12:22:17  8     Q     OKAY.  NOW, DID YOU -- AT SOME POINT

12:22:24  9     DR. GOOTNICK TRANSFERRED A WIRE TRANSFER MONEY TO

12:22:27 10     YOU, MONEY FROM HIS ACCOUNT INTO EITHER YOUR

12:22:30 11     ACCOUNT OR HCHC'S ACCOUNT; IS THAT CORRECT?

12:22:32 12     A     OR HONOLULU INN.

12:22:37 13     Q     HONOLULU INN.  IS THAT A COMPANY THAT YOU

12:22:40 14     CONTROLLED?

12:22:41 15     A     AN OFFICER AND A DIRECTOR, YES.

12:22:43 16     Q     AND, NOW, YOU HEARD TESTIMONY WHEN

12:22:45 17     DR. GOOTNICK WAS ON THE STAND ABOUT THE TRANSFER OF

12:22:48 18     A LOT OF LIQUID ASSETS FROM HIM TO ACCOUNTS THAT

12:22:52 19     YOU ASKED HIM TO TRANSFER THE LIQUID ASSETS INTO;

12:22:56 20     IS THAT CORRECT?

12:22:56 21     A     YES.

12:22:56 22     Q     OKAY.  AND WHAT WAS YOUR UNDERSTANDING AS TO

12:23:02 23     WHY THESE LIQUID ASSETS WERE BEING TRANSFERRED?

12:23:05 24     A     BECAUSE AS PART OF THE TRANSACTION I HAD

12:23:11 25     BOUGHT THE ASSETS AND I WANTED TO PUT THEM PLACES

                                                                166

12:23:15  1    WHERE I COULD REPRESENT IN A SECURITIES OFFERING

12:23:17  2    THAT WERE AVAILABLE TO REPRESENT AS BEING PART OF

12:23:23  3    THE SECURITIES OFFERING OR MORE IMPORTANTLY IF THE

12:23:26  4    S.E.C. QUESTIONED ME, I COULD PROVE THE ASSETS

12:23:32  5    REPRESENTING THE SECURITIES OFFERING.

12:23:34  6    Q    OKAY.  SO -- SO, NOW, WHAT DID YOU UNDERSTAND

12:23:38  7    THESE LIQUID ASSETS, THE LARGE SUMS OF MONEY THAT

12:23:42  8    DR. GOOTNICK HAD TRANSFERRED TO YOU, WHAT -- WHOSE

12:23:45  9    PROPERTY WERE THEY AT THE TIME THAT HE MADE THE

12:23:47 10    TRANSFER?

12:23:47 11    A    THEY WERE MINE.

12:23:48 12    Q    WHAT?

12:23:49 13    A    THEY WERE MY PROPERTY.

12:23:50 14    Q    BUT IN TERMS OF -- BEFORE THAT, WHOSE PROPERTY

12:23:54 15    WERE THEY?

12:23:54 16    A    GCTI.

12:23:56 17    Q    SO GCTI.  SO YOUR UNDERSTANDING WAS THAT GCTI

12:24:00 18    LIQUID ASSETS WERE BEING TRANSFERRED TO YOUR

12:24:03 19    CONTROL?

12:24:05 20           MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:24:06 21           THE COURT:  SUSTAINED.

12:24:09 22    BY MR. FONG:

12:24:10 23    Q    OKAY.  AFTER YOU RECEIVED THE TRANSFER OF THE

12:24:14 24    LIQUID ASSETS FROM DR. GOOTNICK, WHAT DID YOU DO

12:24:17 25    WITH THAT, WITH THE -- WELL, FIRST OF ALL, DO YOU

167

12:24:20  1    REMEMBER APPROXIMATELY HOW MUCH IN LIQUID ASSETS

12:24:22  2    YOU RECEIVED AS A RESULT OF THE AGREEMENT BETWEEN

12:24:25  3    YOU AND DR. GOOTNICK?

12:24:26  4    A    OVER 450,000.

12:24:29  5    Q    DOLLARS?

12:24:30  6    A    DOLLARS?

12:24:31  7    Q    AND WHAT DID YOU DO WITH THAT MONEY?

12:24:37  8    A    MOSTLY IT WENT TO ATTORNEY'S FEES BECAUSE I

12:24:40  9    MERGED THE BUSINESSES AND THE HAWAII BUSINESS WITH

12:24:43 10    THE CALIFORNIA BUSINESS.

12:24:44 11         A LOT OF IT WENT TO TAXES, STATE TAXES.

12:24:57 12    Q    NOW, AT ANY POINT DID YOU, AFTER, AFTER THE

12:25:02 13    BILL OF SALE TRANSFERRING THE ASSETS TO GCTI FROM

12:25:09 14    DR. GOOTNICK TO YOU, AFTER THAT TRANSACTION, DID

12:25:11 15    YOU EVER MAKE ANY REPRESENTATIONS TO DR. GOOTNICK

12:25:14 16    AS TO ASSETS THAT YOU MIGHT CONTROL OR OWN?

12:25:17 17    A    THERE WAS A PARTIAL LIST ON ONE E-MAIL THAT

12:25:26 18    DOESN'T SHOW THE REST OF THE E-MAIL, THE REPLY

12:25:29 19    E-MAIL, BUT YES.

12:25:30 20    Q    AND WAS THAT E-MAIL PART OF THE E-MAILS THAT

12:25:38 21    WE HAD SEEN COLLECTED AS GOVERNMENT'S EXHIBIT 2?

12:25:41 22    A    YES.

12:26:41 23         MR. FONG:  EXCUSE ME, YOUR HONOR.  I

12:26:42 24    APOLOGIZE.  I THOUGHT I HAD IT, BUT I DO NOT.

12:26:46 25    Q    EXCUSE ME.  MR. LIGHTER, I'M GOING TO PUBLISH

                                                          168

12:26:49 1    WHAT HAS BEEN ADMITTED INTO EVIDENCE AS

12:26:51 2    GOVERNMENT'S EXHIBIT 2 AND SPECIFICALLY PAGE 9.

12:26:54 3              FIRST OF ALL, SIR, DO YOU SEE THAT

12:26:56 4    ONE-PAGE DOCUMENT?  YEAH, THAT ONE PAGE, EXHIBIT 2,

12:27:00 5    PAGE 9?

12:27:04 6    A    YES.

12:27:04 7    Q    NOW, THERE ARE SOME PASSAGES OF THIS E-MAIL

12:27:08 8    WITH ARROWS POINTING TO THE RIGHT.

12:27:10 9              DO YOU SEE THAT?

12:27:11 10   A    YES.

12:27:11 11   Q    OKAY.  AND IS -- ARE THOSE YOUR WRITINGS?

12:27:15 12   A    I -- YOU KNOW, THIS E-MAIL IS ENDING OR IS

12:27:24 13   INCOMPLETE AND THERE'S REPLY PARTS THAT IS A

12:27:29 14   SUPPLEMENT TO THIS, BUT IT LOOKS LIKE MY WRITING.

12:27:32 15   Q    OKAY.  NOW, DIRECTING YOUR ATTENTION TO THIS

12:27:36 16   PARAGRAPHS THAT SAYS, "AS FAR AS MY PERSONAL

12:27:39 17   SITUATION, APPARENTLY BASED ON NEW SALES FIGURES,

12:27:42 18   THE FOUR VOLCANO PROPERTIES HAVE A COMBINED VALUE

12:27:46 19   OF ABOUT $1.8 MILLION WITH MORTGAGES OF $270,000."

12:27:51 20             DO YOU SEE THAT?

12:27:52 21   A    YES.

12:27:52 22   Q    OKAY.  WHAT -- FIRST OF ALL, IS THAT A

12:27:56 23   STATEMENT THAT YOU PREPARED?

12:27:57 24   A    PROBABLY.

12:28:01 25   Q    OKAY.  NOW, WHEN YOU SAY THE WORDS OR THE

                                                    169

12:28:04 1      NAMES THE FOUR VOLCANO PROPERTIES, WHAT DOES THAT

12:28:08 2      REFER TO?

12:28:09 3      A     ACTUALLY IT'S A MISSTATEMENT.  AT THE TIME

12:28:16 4      THERE WERE FIVE VOLCANO PROPERTIES.  THERE WERE

12:28:19 5      FIVE VOLCANO PROPERTIES.

12:28:21 6      Q     REGARDLESS IF THERE WERE FOUR OR FIVE, WHAT

12:28:26 7      DOES THE FOUR VOLCANO PROPERTIES REFER TO?

12:28:28 8      A     TWO BED AND BREAKFASTS AND TWO VACANT LOTS.

12:28:31 9      Q     AND TWO BED AND BREAKFASTS WHERE?

12:28:35 10     A     VOLCANO, HAWAII, NEXT TO VOLCANO'S NATIONAL

12:28:39 11     PARK.

12:28:39 12     Q     AND THAT'S ON THE BIG ISLAND OF HAWAII?

12:28:41 13     A     THE BIG ISLAND OF HAWAII, YES.

12:28:43 14     Q     OKAY.  AND AT THE TIME OF AROUND OCTOBER 16TH,

12:28:48 15     2004, DID YOU HAVE AN UNDERSTANDING OR BELIEF AS TO

12:28:54 16     THE VALUE OF THE -- LET'S JUST BREAK IT DOWN.  THE

12:28:59 17     TWO BED AND BREAKFASTS, ARE THEY TWO SEPARATE

12:29:03 18     BUILDINGS?

12:29:04 19     A     TWO SEPARATE PROPERTIES.

12:29:05 20     Q     OKAY.  AND THEN IS ONE LARGER THAN THE OTHER?

12:29:14 21            MS. WONG:  OBJECTION, RELEVANCE.

12:29:15 22            THE COURT:  SUSTAINED.  YOU CAN ASK

12:29:16 23     ANOTHER QUESTION.

12:29:17 24     BY MR. FONG:

12:29:19 25     Q     THE TWO BED AND BREAKFASTS, DO YOU KNOW -- DID

                                                              170

12:29:23  1    YOU KNOW IN OCTOBER OF 2004 HOW MUCH EACH WAS

12:29:27  2    WORTH?

12:29:28  3    A    ABOUT A MILLION DOLLARS.

12:29:29  4    Q    EACH?

12:29:30  5    A    EACH.

12:29:30  6    Q    OKAY.  AND AT THAT TIME -- WHAT ABOUT THE

12:29:35  7    VACANT LOTS.  YOU SAID THERE WERE THREE VACANT

12:29:40  8    LOTS, TOO?

12:29:42  9    A    YES.

12:29:42  10   Q    AND HOW MUCH WERE THEY WORTH?

12:29:44  11   A    FROM 300,000 TO 400,000.

12:29:47  12             THE COURT:  IS THAT EACH OR COLLECTIVELY?

12:29:49  13             THE WITNESS:  COLLECTIVELY.  SORRY.

12:29:50  14   BY MR. FONG:

12:29:51  15   Q    SO THE TWO BED AND BREAKFAST BUILDINGS WERE

12:29:54  16   WORTH ABOUT YOU SAID A MILLION DOLLARS EACH AND THE

12:29:57  17   THREE LOTS WERE ABOUT $300,000 OR $400,000 TOTAL?

12:30:01  18             MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:30:02  19             THE COURT:  SUSTAINED.

12:30:08  20   BY MR. FONG:

12:30:08  21   Q    SO THE TOTAL VALUE WAS ABOUT $2,300,000 OR

12:30:14  22   $2,400,000?

12:30:14  23   A    PROBABLY CLOSE TO 2.5 BUT THAT SOUNDS FAIR.

12:30:16  24   Q    OKAY.  AND WHAT KIND OF LIENS OR MORTGAGES OR

12:30:23  25   ENCUMBRANCES WERE ASSOCIATED WITH ANY OF THE

                                                          171

12:30:25 1    VOLCANO PROPERTIES AT THE TIME?

12:30:27 2    A    AT THE TIME 270,000.

12:30:30 3    Q    NOW, WHY DID YOU SAY THAT THE VOLCANO

12:30:32 4    PROPERTIES HAVE A COMBINED VALUE OF ONLY

12:30:35 5    $1.8 MILLION WHEN YOU JUST TESTIFIED THAT YOUR

12:30:38 6    BELIEF ACTUALLY WAS THAT THEY HAD COMBINED VALUE OF

12:30:44 7    CLOSER TO $2.3, $2.4, $2.5 MILLION?

12:30:49 8    A    WHEN YOU SPEAK OF REAL ESTATE VALUES ANYWHERE,

12:30:56 9    IT'S WISER, IN MY OPINION, TO BE CONSERVATIVE.

12:31:00 10    Q    OKAY.  BESIDES THIS E-MAIL, DID YOU AFTER THE

12:31:11 11    SIGNING OF THE BILLS OF SALE AND THE PROMISSORY

12:31:15 12    NOTE ON OR ABOUT OCTOBER 8TH, 2004, DID YOU MAKE

12:31:22 13    ANY OTHER REPRESENTATIONS TO DR. GOOTNICK AS TO THE

12:31:27 14    VALUE OF ANY ASSETS THAT YOU OWNED OR THAT YOU HAD

12:31:30 15    CONTROL OF?

12:31:30 16    A    YES, I JUST TOLD HIM THE OREGON RANCH WAS

12:31:39 17    PURCHASED FOR $350,000 AND IT'S PROBABLY WORTH

12:31:43 18    $350,000.

12:31:44 19         AS A MATTER OF FACT SHORTLY THEREAFTER I

12:31:48 20    GOT AN APPRAISAL OF 380,000.

12:31:51 21    Q    $380,000?

12:31:54 22    A    $380,000.

12:32:01 23    Q    OKAY.  ANYTHING ELSE?

12:32:19 24    A    COULD YOU PUT THIS ON?

12:32:19 25    Q    SURE?

                                                        172

12:32:22 1    A    AND THIS INCLUDES THE MAKIKI PROPERTY.

12:32:25 2    Q    AND WHAT IS THE MAKIKI PROPERTY?

12:32:26 3    A    IT'S AN APARTMENT TYPE RENTAL BUILDING.

12:32:30 4    Q    AND IT'S NOT THE SPENCER STREET PROPERTY WHERE

12:32:35 5    YOU'RE CURRENTLY SPLITTING YOUR TIME IN TERMS OF

12:32:37 6    WHERE YOU'RE LIVING?

12:32:39 7    A    YES.

12:32:39 8    Q    AND THAT HAS AN EQUITY OF ABOUT $30,000?

12:32:45 9    A    YES.  THIS DOESN'T INCLUDE THE DEVELOPMENT

12:32:48 10   AGREEMENT THAT I OWNED AT THAT TIME.

12:32:51 11   Q    IT'S NOT THE ROYAL PATENT DEVELOPMENT

12:32:55 12   PROPERTIES?

12:32:56 13   A    YES.

12:32:56 14   Q    AND I WANT TO DIRECT YOUR ATTENTION TO THE

12:32:58 15   FOUR VOLCANO PROPERTIES, OKAY?

12:33:00 16        NOW, WHO OWNED THOSE VOLCANO PROPERTIES

12:33:03 17   BE IT FOUR OR FIVE DIFFERENT PIECES OF THEM?  WHO

12:33:07 18   ACTUALLY OWNED THEM AT THE TIME IN MID-OCTOBER OF

12:33:10 19   2004?

12:33:11 20   A    MY WIFE OR HER CORPORATIONS.

12:33:15 21   Q    OKAY.  DID YOU HAVE ANY OWNERSHIP INTEREST IN

12:33:17 22   THE VOLCANO PROPERTIES AT THE TIME?

12:33:19 23   A    I WAS THINKING ABOUT THAT.  ONE OF THE BED AND

12:33:36 24   BREAKFASTS AND I HAD A REVERSIONARY BUT OTHER THAN

12:33:40 25   THAT, NO.

173

12:33:40 1    Q    OKAY.  THEN WHY DID YOU MAKE THE

12:33:42 2    REPRESENTATION THAT THE FOUR VOLCANO PROPERTIES

12:33:45 3    HAVE A COMBINED VALUE OF $1.8 MILLION?

12:33:49 4    A    I DIDN'T SPECIFICALLY SAY THAT I OWNED THEM.

12:33:53 5    Q    WELL, LET ME ASK YOU, WHEN YOU MADE THIS

12:34:00 6    REPRESENTATION ON OR ABOUT OCTOBER 16TH, 2004, DID

12:34:04 7    YOU BELIEVE THAT YOU HAD, THAT YOU HAD ACCESS TO

12:34:08 8    USE THOSE PROPERTIES, THE VOLCANO PROPERTIES AS

12:34:11 9    PLEDGES FOR YOUR TRANSACTIONS WITH DR. GOOTNICK?

12:34:14 10   A    ABSOLUTELY.

12:34:15 11   Q    OKAY.  AND HOW DID YOU COME TO THAT BELIEF?

12:34:22 12   A    CORPORATE MINUTES AND CONTRACTS.

12:34:25 13   Q    AND DID YOU -- AT THE TIME DID YOU KNOW

12:34:34 14   WHETHER OR NOT YOUR WIFE WOULD AGREE TO PUT THOSE

12:34:38 15   PROPERTIES UP FOR PLEDGES FOR DR. GOOTNICK'S

12:34:41 16   TRANSACTIONS?

12:34:41 17   A    YES.  AND, FURTHERMORE, SHE TOLD HIM HERSELF

12:34:44 18   PERSONALLY --

12:34:47 19              MS. WONG:  OBJECTION.

12:34:48 20              THE COURT:  SUSTAINED.  STRICKEN.

12:34:51 21   BY MR. FONG:

12:34:52 22   Q    BUT YOU KNEW THAT YOUR WIFE WOULD AGREE TO PUT

12:34:54 23   THE PROPERTIES ON AS PLEDGES?

12:34:55 24   A    HAD AGREED.

12:34:56 25   Q    OKAY.  AFTER DR. GOOTNICK HAD TRANSFERRED THE

174

12:35:13  1    LIQUID ASSETS OF GCTI TO YOU OR TO AN ENTITY THAT

12:35:18  2    YOU FORMED, WHAT HAPPENED NEXT -- DID YOU HAVE ANY

12:35:25  3    MORE BUSINESS TRANSACTIONS WITH DR. GOOTNICK?

12:35:26  4    A    TWO MORE.

12:35:28  5    Q    OKAY.  TELL US ABOUT THE FIRST ONE AFTER THE

12:35:32  6    TRANSFER OF THE LIQUID ASSETS?

12:35:34  7    A    TO REFORM THE ADDITIONAL MORTGAGE TO THE

12:35:43  8    DEBENTURE OFFERING, THE SECURITIES OFFERING, I

12:35:46  9    INCREASED ITS VALUE TO A MILLION FIVE, 350 TO A

12:35:51 10    MILLION FIVE AND BECAUSE THAT'S WHAT THE DEBENTURE

12:35:54 11    OFFERING SAID.

12:35:54 12    Q    OKAY.

12:35:55 13    A    TO MAKE SURE THAT I PUT A SECOND MILLION FIVE

12:36:01 14    ON I THINK IT WAS OVERKILL.  THERE WAS ONLY ONE

12:36:04 15    NOTE.

12:36:05 16        THE PLAN WAS TO RELEASE THOSE MORTGAGES

12:36:09 17    AND GOOTNICK TO RELEASE HIS MORTGAGE AND WE WOULD

12:36:16 18    HAVE IN EXCHANGE FOR SECURITIES THOSE PROPERTIES

12:36:23 19    SECURITIES.

12:36:23 20        AND IN THE MEANTIME OR SHORTLY THEREAFTER

12:36:27 21    IT WOULD REDUCE THEM BY $350,000 AND ON MARCH 17TH,

12:36:32 22    2005 IN EXCHANGE FOR MY 10 PERCENT OF THE ROYAL

12:36:42 23    PATENT COMPANY, THE AGREEMENT ALSO GAVE ME AND MY

12:36:46 24    ASSOCIATES A GENERAL RELEASE FROM GOOTNICK.

12:36:48 25    Q    OKAY.  LET'S BREAK THOSE TWO TRANSACTIONS DOWN

175

12:36:52  1    ONE AT A TIME.

12:36:53  2              OKAY.  I BELIEVE GOVERNMENT'S EXHIBIT 153

12:36:57  3    HAS ALREADY BEEN ADMITTED INTO EVIDENCE.

12:37:06  4              FIRST OF ALL, DO YOU SEE THE FIRST PAGE

12:37:08  5    OF THAT DOCUMENT, SIR?

12:37:09  6    A    YES.

12:37:10  7    Q    OKAY.  AND DO YOU RECOGNIZE IT?

12:37:12  8    A    YES.

12:37:12  9    Q    OKAY.  AND THIS IS A REAL PROPERTY MORTGAGE,

12:37:17 10    RIGHT?

12:37:18 11    A    YES.

12:37:18 12    Q    OKAY.  AND IT WAS RECORDED AROUND JANUARY 8TH,

12:37:25 13    2005?

12:37:25 14    A    YES.

12:37:26 15    Q    OKAY.  IN SAN FRANCISCO?

12:37:27 16    A    YES.

12:37:29 17    Q    OKAY.  AND IT'S FOR -- IT'S A MORTGAGE FOR

12:37:33 18    $1.5 MILLION, RIGHT?

12:37:35 19    A    YES.

12:37:35 20    Q    OKAY.  NOW, IS THIS THE MORTGAGE THAT YOU JUST

12:37:39 21    TESTIFIED TO IN TERMS OF WHAT YOU HAD DONE AFTER

12:37:43 22    DR. GOOTNICK HAD TRANSFERRED THE LIQUID ASSETS TO

12:37:46 23    YOU?

12:37:46 24    A    YES.

12:37:50 25    Q    OKAY.  AND WHAT IS YOUR -- WHAT WAS YOUR

                                                              176

PURPOSE IN RECORDING THIS PARTICULAR MORTGAGE?

A    THE MORTGAGE WAS ONLY FOR 350,000 AND THE

PURPOSE WAS TO PROTECT THE EQUITY AND SO I DIDN'T

KNOW THE EXACT STATUS OF GOOTNICK'S MILLION THREE

MORTGAGE.

AT FIRST I THOUGHT I COULD RELEASE IT

MYSELF BECAUSE HE MADE IT PAYABLE TO A NONEXISTENT

CORPORATION, BUT MY SUBSEQUENT RESEARCH TOLD ME

THAT I BELIEVED THAT WHEN HE FILED THE MILLION

THREE MORTGAGE, BECAUSE IT WAS A NONEXISTING

CORPORATION, GOT THE MORTGAGE, THE MORTGAGEE, THE

CREDITOR, AND IT DIDN'T EXIST, THE MORTGAGE

REVERTED TO GOOTNICK OWNERSHIP.  SO IT WAS HIS

CORPORATION.

SO EVEN THOUGH I BOUGHT J AND J TRUST,

INC., IN THE OCTOBER TRANSACTION, WHAT I BOUGHT WAS

A NONEXISTENT CORPORATION.  SO I BOUGHT NOTHING.

SO I HAD CONTROL OR OWNER OF THE MORTGAGE.

Q    WELL, DID YOU BELIEVE THAT AS NOW THE -- IN

2005 AS ONE OF THE OWNERS OF J AND J TRUST, INC.,

WHO WAS THE MORTGAGEE ON THE $1.3 MILLION MORTGAGE,

THAT YOU COULD HAVE IT REMOVED?

MS. WONG:  OBJECTION, YOUR HONOR, ASKED

AND ANSWERED.

THE COURT:  OVERRULED.  YOU CAN ANSWER

177

12:39:38  1        THE QUESTION, SIR.

12:39:39  2              THE WITNESS:  I WASN'T REALLY SURE.  I

12:39:41  3   WAS HEDGING MY BET BECAUSE GOOTNICK COULD FORECLOSE

12:39:45  4   AND HE COULD INCREASE IT TO $3 MILLION BECAUSE HE

12:39:49  5   OWNED IT INDIVIDUALLY AND I COULDN'T -- IT WASN'T A

12:39:52  6   CORPORATION THAT I COULD SIGN FOR MOST LIKELY.

12:39:57  7   BY MR. FONG:

12:39:57  8   Q    NOW, THIS DOCUMENT THAT YOU RECORDED,

12:39:59  9   GOVERNMENT'S EXHIBIT 153 FOR THE $1.5 MILLION,

12:40:02 10   WOULD YOU HAVE RECORDED THAT IF YOU DID NOT -- IF

12:40:05 11   YOU HAD NOT FOUND OUT ABOUT THE $1.3 MILLION

12:40:09 12   MORTGAGE?

12:40:09 13   A    ABSOLUTELY NOT BECAUSE I FILED IT WITH THE

12:40:17 14   S.E.C., AND I HAVE BEEN FILING IT WITH THE S.E.C.

12:40:19 15   Q    OKAY.  NOW, LET'S FOCUS ON THE SECOND PART OF

12:40:22 16   YOUR EARLIER ANSWER IN TERMS OF I BELIEVE THAT YOU

12:40:27 17   TESTIFIED THAT THERE WAS -- DR. GOOTNICK HAD

12:40:31 18   ACQUIRED SOME INTEREST IN THE ROYAL PATENT

12:40:36 19   DEVELOPMENT, RIGHT?

12:40:37 20   A    CORRECT.

12:40:37 21   Q    AND WHAT DID HE ACQUIRE?

12:40:43 22   A    10 PERCENT OF THE STOCK OF DIAMOND CREDIT

12:40:46 23   BUREAU.

12:40:46 24   Q    AND WHAT IS DIAMOND CREDIT BUREAU?

12:40:48 25   A    INC.

                                                      178

12:40:49  1    Q    AND INC.  AND WHAT IS THAT?

12:40:50  2    A    IT'S THE OLDER OF THE FIVE ROYAL PATENTS.

12:40:53  3    Q    OKAY.  SO DR. GOOTNICK ACQUIRED 10 PERCENT

12:41:02  4    INTEREST IN DIAMOND CREDIT BUREAU?

12:41:04  5            MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:41:05  6            THE COURT:  SUSTAINED.

12:41:07  7    BY MR. FONG:

12:41:08  8    Q    OKAY.  NOW, WHAT DID DR. GOOTNICK PAY, IF

12:41:13  9    ANYTHING, FOR THE 10 PERCENT INTEREST IN DIAMOND

12:41:21 10    CREDIT BUREAU WHICH OWNS THE ROYAL PATENT RIGHTS?

12:41:23 11    A    TWO THINGS.  HE GAVE A $350,000 REDUCTION OF

12:41:29 12    THE $2 MILLION NOTE.

12:41:30 13    Q    AND SO THIS IS THE $2 MILLION NOTE THAT YOU

12:41:34 14    HAD SIGNED, RIGHT, EARLIER WHEN YOU ACQUIRED THE

12:41:39 15    GCTI ASSETS, RIGHT?

12:41:41 16    A    YES.  THAT'S NOT THE ONLY REASON HE DID THAT

12:41:44 17    BUT THE OTHER THING HE DID WAS A GENERAL RELEASE.

12:41:47 18    Q    OKAY.  AND WHAT IS YOUR UNDERSTANDING OF WHAT

12:41:49 19    A GENERAL RELEASE WAS?

12:41:51 20    A    YOU CAN'T SUE ME.

12:41:52 21    Q    OKAY.  AND THAT WAS YOUR UNDERSTANDING?

12:41:55 22    A    YES.

12:41:55 23    Q    OKAY.  SO THAT'S WHAT DR. GOOTNICK IN YOUR

12:42:00 24    MIND, THAT'S WHAT HE PAID OR GAVE YOU IN EXCHANGE

12:42:03 25    FOR THE 10 PERCENT INTEREST IN DIAMOND CREDIT

                                                           179

12:42:07 1    BUREAU?

12:42:07 2    A    IT HAS TO BE MODIFIED WITH THE FACT THAT I

12:42:11 3    OBTAINED AN APPRAISAL ON THE BUILDING, THE SAN

12:42:14 4    FRANCISCO BUILDING AND THE MARKET VALUE OF THE

12:42:16 5    APPRAISAL WAS ONLY A MILLION TWO.

12:42:19 6              SO A GOOD PART OF THAT REDUCTION WAS

12:42:22 7    BECAUSE HE REALIZED HE SOLD ME THE BUILDING AT TOO

12:42:25 8    HIGH A PRICE.

12:42:26 9    Q    ALL RIGHT.  OKAY.  NOW, THE -- WAS THIS

12:42:33 10   AGREEMENT PUT INTO WRITING IN ANY WAY?

12:42:38 11   A    YES.  YES.  THE BILL OF SALE WAS RECORDED BY

12:42:47 12   ME IN HAWAII.

12:42:47 13   Q    NOW, WE HAVE HEARD TESTIMONY FROM YOU ABOUT A

12:42:53 14   LOT OF BILL OF SALES.  I WANT YOU TO BE MORE

12:42:56 15   SPECIFIC.  IDENTIFY WHICH BILL OF SALE THAT YOU

12:42:58 16   WERE JUST REFERRING TO?

12:42:59 17   A    MARCH 17TH, DATED MARCH 17TH, 2005, RECORDED

12:43:03 18   MARCH 24TH, 2004.

12:43:05 19   Q    OKAY.  SO THIS TRANSACTION, IN WHICH DR. IRWIN

12:43:13 20   GOOTNICK, IN CONSIDERATION FOR REDUCING THE

12:43:16 21   PROMISSORY NOTE BY $350,000 AND GIVING YOU A

12:43:19 22   GENERAL RELEASE AND HE GOT THE 10 PERCENT OF

12:43:27 23   OWNERSHIP IN DIAMOND BUREAU, THIS HAD BEEN DONE

12:43:31 24   ABOUT, WHAT, SIX MONTHS AFTER THE OCTOBER BILL OF

12:43:34 25   SALE WHEREBY GCTI'S ASSETS WERE TRANSFERRED TO YOU?

180

12:43:39 1    A    YES, FIVE AND A HALF MONTHS.

12:43:46 2    Q    OKAY.  THIS WOULD HAVE BEEN IN MARCH OF 2005,

12:43:56 3    RIGHT?

12:43:56 4    A    YES.

12:43:57 5    Q    AND DID YOU, AFTER THAT, DID YOU AND

12:43:59 6    DR. GOOTNICK HAVE ANY MORE BUSINESS TRANSACTIONS?

12:44:01 7    A    NO.

12:44:06 8    Q    OKAY.  I CAN GO INTO THE NEXT AREA OR --

12:44:17 9         THE COURT:  CAN YOU GIVE ME A BEST TIME

12:44:19 10   ESTIMATE?

12:44:20 11        MR. FONG:  I HAVE PROBABLY ABOUT HALF AN

12:44:21 12   HOUR OF THE BANKRUPTCY STUFF.  IT COULD BE A LITTLE

12:44:40 13   LONGER.  I'M TRYING TO GIVE YOU MY BEST ESTIMATE.

12:44:43 14        THE COURT:  WHY DON'T YOU GO INTO THE

12:44:44 15   NEXT TOPIC.

12:44:46 16   BY MR. FONG:

12:44:46 17   Q    BY THE WAY, BEFORE WE MOVE INTO OUR NEXT STOP,

12:44:49 18   IN ADDITION TO DR. GOOTNICK STARTING WAY BACK IN

12:44:51 19   APRIL OF 2004 TO WHAT YOU JUST TESTIFIED TO IN

12:44:54 20   MARCH OF 2005, WAS SAM FUNG INVOLVED IN ANY OF

12:44:59 21   THESE TRANSACTIONS?

12:45:00 22   A    SAM FUNG WIRED ME ABOUT $8,000 SUPPOSEDLY FROM

12:45:12 23   GOOTNICK.

12:45:12 24   Q    AND THAT WOULD HAVE BEEN AT THE BEGINNING OF

12:45:15 25   YOUR RELATIONSHIP WITH DR. GOOTNICK, RIGHT?

                                                      181

12:45:17  1     A     YES.

12:45:19  2     Q     BESIDES THAT WIRING YOU THE MONEY, DID SAM

12:45:23  3     FUNG HAVE ANY PARTICIPATION IN ANY OF THE

12:45:25  4     AGREEMENTS THAT YOU REACHED WITH DR. GOOTNICK?

12:45:28  5     A     NO.

12:45:28  6     Q     WAS SAM FUNG SUPPOSED TO PARTICIPATE IN ANY OF

12:45:38  7     THESE TRANSACTIONS IN ANY CAPACITY?

12:45:40  8     A     HE WAS WORKING FOR GOOTNICK.

12:45:41  9     Q     OKAY.  BUT WAS HE PART OF -- REMEMBER MR. FUNG

12:45:47  10    WAS PART OF -- HE WAS SUPPOSED TO DO SOMETHING

12:45:50  11    INSOFAR AS THE BROCK TRANSACTION?

12:45:52  12    A     NO.

12:45:52  13    Q     AND SO WHAT MY QUESTION IS, IS THERE, INSOFAR

12:45:56  14    AS THE GOOTNICK TRANSACTIONS, WAS SAM FUNG IN YOUR

12:45:59  15    MIND SUPPOSED TO DO ANYTHING?

12:46:01  16    A     NO, NOT FOR ME.

12:46:05  17    Q     NOW, YOU HEARD TESTIMONY ABOUT THE PHONE CALLS

12:46:15  18    THAT SAM FUNG MADE TO DR. GOOTNICK IN EARLY MARCH

12:46:19  19    OF 2006?

12:46:20  20    A     YES.

12:46:20  21    Q     NOW, LET ME JUST ASK YOU FIRST OFF, AT ANY

12:46:28  22    TIME DID YOU TELL SAM FUNG TO THREATEN DR. IRWIN

12:46:31  23    GOOTNICK?

12:46:31  24    A     ABSOLUTELY NOT.

12:46:36  25    Q     DID YOU TELL SAM FUNG AT ANY TIME THAT TO

                                                              182

12:46:40 1   PRESSURE DR. GOOTNICK INTO DROPPING THE CIVIL

12:46:44 2   LAWSUIT, HIS CIVIL LAWSUIT AGAINST YOU?

12:46:46 3   A    NO, I DIDN'T -- I DIDN'T WANT TO SETTLE.

12:46:48 4   Q    OKAY.

12:46:49 5   A    I TOLD HIM THAT.

12:46:50 6   Q    OKAY.  NOW -- BUT YOU DID HAVE TELEPHONE CALLS

12:46:54 7   WITH SAM FUNG RIGHT AROUND THAT PERIOD OF TIME; IS

12:46:57 8   THAT TRUE?

12:46:57 9   A    YES.

12:47:05 10  Q    BUT DID YOU EVER TELL SAM FUNG IN ANY WAY TO

12:47:09 11  BLACKMAIL DR. GOOTNICK?

12:47:10 12  A    NO.

12:47:10 13  Q    OKAY.  NOW, YOU HEARD MR. FUNG ON THE RECORDED

12:47:20 14  TELEPHONE CALLS TALKING TO DR. GOOTNICK ABOUT THE

12:47:22 15  FACT THAT IF DR. GOOTNICK, IF HE DID NOT DROP THE

12:47:31 16  CIVIL LAWSUIT AGAINST YOU, YOU WOULD EXPOSE

12:47:33 17  DR. GOOTNICK'S ALLEGED TAX FRAUD IN THE BANKRUPTCY

12:47:40 18  CASE, RIGHT?

12:47:41 19  A    I HEARD THAT.

12:47:42 20  Q    NOW, AT THE TIME THAT SAM FUNG MADE THESE

12:47:46 21  PHONE CALLS, I GUESS THE EARLIER ONE WOULD HAVE

12:47:48 22  BEEN AROUND MARCH 2ND, 2006, AT THAT POINT IN TIME,

12:47:52 23  WHAT WAS YOUR UNDERSTANDING OF WHAT YOU HAD --

12:47:55 24  WELL, LET ME ASK YOU, AS OF MARCH 2ND, 2006, BEFORE

12:47:59 25  THAT, HAD YOU ALREADY MADE IN A PUBLIC DOCUMENT

183

12:48:04  1    ALLEGATIONS THAT DR. IRWIN GOOTNICK HAD COMMITTED

12:48:08  2    TAX FRAUD?

12:48:09  3    A    I NOT ONLY DID, I COMPLETED MY THOUGHT ON IT.

12:48:20  4    I, AND MY C.P.A., COMPLETED OUR THOUGHT ON IT BY

12:48:26  5    FEBRUARY 24TH, 2006 --

12:48:28  6    Q    OKAY.  BUT --

12:48:30  7    A    -- A WEEK BEFORE THE PHONE CALL.

12:48:32  8    Q    OKAY.  BUT EVEN BEFORE THAT, HAD YOU IN --

12:48:36  9    WELL, YOU HAD FILED FOR BANKRUPTCY IN HAWAII?

12:48:40 10    A    IN DECEMBER OF 2005.

12:48:44 11    Q    AND THAT WAS FILED UNDER THE COMPANY QUALITY

12:48:47 12    INCOME SYSTEMS, INC.; IS THAT CORRECT?

12:48:49 13    A    YES.

12:48:49 14    Q    OKAY.  NOW, THAT QUALITY INCOME SYSTEMS, INC.,

12:48:58 15    HOW DID THAT CONNECT WITH YOUR DEALINGS WITH

12:49:00 16    DR. GOOTNICK?

12:49:01 17    A    IT BOUGHT THE ASSETS OF GCTI.  IT BOUGHT GCTI

12:49:08 18    IF I'M NOT MISTAKEN.

12:49:09 19    Q    OKAY.  AND THE BANKRUPTCY CASE THAT YOU FILED

12:49:16 20    FOR QUALITY SYSTEMS INCOME, INC., CARRIES A

12:49:19 21    BANKRUPTCY CASE NUMBER OF 05-50023; IS THAT TRUE?

12:49:27 22    A    YES.

12:49:27 23    Q    AND YOU REMEMBERED THAT WITHOUT REFERRING TO A

12:49:29 24    DOCUMENT?

12:49:29 25    A    I WAS A PARTY TO THE BANKRUPTCY.

                                                          184

12:49:33 1    Q    OKAY.  NOW, AS PART OF THAT PARTICULAR

12:49:38 2    BANKRUPTCY, WERE THE GOOTNICKS MADE PARTIES TO THAT

12:49:44 3    BANKRUPTCY PROCEEDINGS?

12:49:45 4    A    ABSOLUTELY.

12:49:46 5    Q    AND WITHIN THAT BANKRUPTCY PROCEEDING, THE

12:49:48 6    QUALITY INCOME SYSTEMS, INC., BANKRUPTCY -- WELL,

12:49:54 7    FIRST OF ALL, WHEN WAS THAT FILED?

12:49:55 8              MS. WONG:  OBJECTION, ASKED AND ANSWERED.

12:49:57 9              THE COURT:  YOU CAN ANSWER THE QUESTION,

12:50:00 10   SIR.

12:50:00 11             THE WITNESS:  DECEMBER 9TH, 2005, I

12:50:03 12   BELIEVE.

12:50:04 13   BY MR. FONG:

12:50:05 14   Q    OKAY.  NOW, AS PART OF THAT BANKRUPTCY CASE,

12:50:07 15   WAS THERE -- WITHIN THAT, WAS THERE LITIGATION

12:50:09 16   BETWEEN YOU ON THE ONE HAND OR YOU AND THE

12:50:13 17   COMPANIED THAT YOU CONTROLLED ON THE ONE HAND AND

12:50:16 18   DR. IRWIN AND SUSAN GOOTNICK ON THE OTHER HAND?

12:50:19 19   A    YES, THEY WERE DEFENDANTS INDIVIDUALLY.

12:50:25 20   Q    OKAY.  NOW, THIS WAS WITHIN THE BANKRUPTCY

12:50:28 21   COURT SYSTEM IN HAWAII, RIGHT?

12:50:30 22   A    YES.

12:50:35 23   Q    NOW, IN 2005, DID YOU HAVE AN UNDERSTANDING,

12:50:38 24   AT THE END OF 2005, EARLY 2006, DID YOU HAVE AN

12:50:41 25   UNDERSTANDING AS TO WHAT KIND OF A FILING SYSTEM

185

12:50:46 1    WAS IN EFFECT WITH THE HAWAII BANKRUPTCY COURT?

12:50:50 2            MS. WONG:  OBJECTION, RELEVANCE.

12:50:51 3            MR. FONG:  NOTICE, YOUR HONOR.

12:50:55 4            THE COURT:  WHEN YOU SAY FILING SYSTEM,

12:50:57 5    WHAT ARE YOU SPEAKING?

12:51:00 6            MR. FONG:  LET ME ASK A DIFFERENT

12:51:01 7    QUESTION.

12:51:01 8            THE COURT:  THE QUESTION IS WITHDRAWN.

12:51:03 9    BY MR. FONG:

12:51:03 10   Q    AT THE TIME OF THIS BANKRUPTCY PROCEEDING DID

12:51:10 11   YOU KNOW HOW A DOCUMENT WOULD BE FILED WITH THE

12:51:12 12   BANKRUPTCY COURT IN HAWAII?

12:51:13 13           MS. WONG:  OBJECTION.  THIS GOES TO

12:51:16 14   RELEVANCE.

12:51:16 15           THE COURT:  I'LL ALLOW THAT QUESTION.

12:51:18 16   YOU CAN ANSWER THE QUESTION, SIR.

12:51:19 17           THE WITNESS:  THANK YOU.  YES, IT'S

12:51:21 18   ELECTRONIC FILING.  I FORGET THE INITIALS, BUT IT'S

12:51:28 19   ECF, BUT IT'S A DOCUMENT WHEN IT'S FILED IT

12:51:32 20   AUTOMATICALLY IS FORWARDED TO THE OTHER PARTIES.

12:51:35 21   BY MR. FONG:

12:51:35 22   Q    OKAY.

12:51:36 23   A    ELECTRONICALLY.

12:51:37 24   Q    OKAY.  SO IF SOMEBODY FILED A DOCUMENT, AS IF

12:51:40 25   SOMEBODY FILED A DOCUMENT IN A CASE THAT YOU WERE

                                                      186

12:51:43 1    INVOLVED IN, IN A BANKRUPTCY COURT IN LATE 2005 AND

12:51:46 2    EARLY 2006, YOU, AS A PARTY, YOU OR YOUR ATTORNEY

12:51:50 3    WOULD GET AN AUTOMATIC ELECTRONIC NOTIFICATION; IS

12:51:56 4    THAT CORRECT?

12:51:56 5    A    CORRECT.

12:51:56 6    Q    AND YOU YOURSELF HAVE USED THIS SYSTEM, RIGHT?

12:51:59 7    A    YES.

12:51:59 8    Q    OKAY.  AND ALSO, THIS ELECTRONIC FILING

12:52:02 9    SYSTEM, BESIDES THE ATTORNEYS INVOLVED IN THE CASE,

12:52:06 10   COULD OTHER PEOPLE HAVE ACCESS TO IT?

12:52:07 11   A    YES, IT'S PUBLIC.

12:52:09 12   Q    OKAY.  AND WHAT DOES A PERSON HAVE TO DO, A

12:52:13 13   GENERAL PUBLIC PERSON, LET'S JUST SAY SOMEBODY WHO

12:52:16 14   IS CURIOUS, WHAT IS YOUR UNDERSTANDING OF WHAT THAT

12:52:18 15   PERSON WOULD HAVE TO DO IN ORDER TO HAVE ACCESS TO

12:52:21 16   THE ELECTRONIC FILING SYSTEM?

12:52:24 17             MS. WONG:  OBJECTION AS TO RELEVANCE.

12:52:26 18             THE COURT:  SUSTAINED.

12:52:26 19   BY MR. FONG:

12:52:29 20   Q    OKAY.  BUT YOU YOURSELF HAD, BESIDES YOUR

12:52:33 21   ATTORNEY, YOU YOURSELF HAD ACCESS TO THE ELECTRONIC

12:52:35 22   FILING SYSTEM; IS THAT CORRECT?

12:52:37 23   A    YES, IF ANYBODY HAD ACCESS, WE WOULD GET A

12:52:41 24   PASS CODE.

12:52:41 25   Q    OKAY.  NOW, THE -- IN THE BANKRUPTCY CASE IN

187

12:52:47 1    HAWAII, THE QUALITY INCOME SYSTEMS, INC., -- WELL,

12:52:51 2    FIRST OF ALL, THERE WAS MORE THAN ONE BANKRUPTCY

12:52:54 3    CASE, RIGHT?

12:52:54 4    A    YES.

12:52:55 5    Q    AND IS THE QUALITY INCOME SYSTEMS, INC., THE

12:52:58 6    FIRST ONE?

12:52:58 7    A    IT'S THE MAIN ONE.

12:53:00 8    Q    OKAY.  WAS IT THE FIRST ONE THOUGH?

12:53:02 9    A    YES.

12:53:02 10    Q    OKAY.  NOW, IN THAT CASE DID YOU FILE ANY

12:53:07 11    PLEADINGS WITH THE COURT IN WHICH YOU MADE THE

12:53:11 12    ALLEGATIONS THAT DR. GOOTNICK -- YOU BELIEVED THAT

12:53:15 13    DR. GOOTNICK HAD COMMITTED TAX FRAUD?

12:53:17 14    A    YES.

12:53:17 15    Q    OKAY.  WHEN DID YOU FILE THAT?

12:53:19 16    A    I FILED IT INDIVIDUALLY AND THE ATTORNEY WAS A

12:53:25 17    C.P.A. ALSO FILED.

12:53:27 18    Q    BUT WHEN?

12:53:28 19    A    THERE'S ONE I REMEMBER FEBRUARY 10TH.

12:53:32 20         THE COURT:  YOU'RE ASKING WHEN HE FILED?

12:53:34 21         MR. FONG:  RIGHT.

12:53:35 22    Q    YOU OR YOUR ATTORNEY?

12:53:39 23    A    I THINK FEBRUARY 10TH.

12:53:40 24    Q    WHAT YEAR?

12:53:41 25    A    2006.

188

12:54:04  1        Q    NOW, IN THAT FILING, DID YOU GO INTO DETAILS

12:54:06  2   OF WHAT YOU BELIEVED WERE SPECIFIC INSTANCES OF TAX

12:54:09  3   FRAUD BY DR. GOOTNICK?

12:54:11  4        A    I DID AND SO DID THE C.P.A.

12:54:13  5        Q    OKAY.  AND NOW, THIS WAS DONE ABOUT A MONTH

12:54:18  6   BEFORE SAM FUNG HAD MADE THOSE TELEPHONE CALLS?

12:54:26  7        A    TWO WEEKS TO A MONTH.

12:54:28  8        Q    OKAY.  AND NOW, IN THE -- AND IN THE

12:54:39  9   BANKRUPTCY -- LET ME ASK YOU, WAS THERE -- DID YOU

12:54:44 10   GET ANY RESPONSE FROM DR. GOOTNICK'S ATTORNEY IN

12:54:46 11   RESPONSE TO THE FILINGS THAT YOU MADE IN WHICH YOU

12:54:52 12   WERE TELLING DR. GOOTNICK HAD COMMITTED TAX FRAUD?

12:54:54 13        A    WELL, EARLIER ON JANUARY 23RD --

12:55:03 14             MS. WONG:  OBJECTION, NONRESPONSIVE.

12:55:04 15             THE COURT:  SUSTAINED.

12:55:05 16   BY MR. FONG:

12:55:08 17        Q    AFTER YOU FILED THE ALLEGATIONS OF TAX FRAUD

12:55:10 18   AGAINST DR. GOOTNICK, I THINK YOU SAID IT WAS LIKE

12:55:13 19   FEBRUARY 10TH OR SO?

12:55:14 20        A    BUT THE BANKRUPTCY FILING IN 2005 CONTAINED

12:55:19 21   ALLEGATIONS.  THE INITIAL FILINGS CONTAINED

12:55:21 22   ALLEGATIONS OF TAX FRAUD BACK IN DECEMBER OF 2005.

12:55:26 23        Q    WELL, THEN LET ME ASK YOU THIS, BEFORE MARCH

12:55:30 24   5TH, 2006, HAD YOU RECEIVED ANY RESPONSE FROM

12:55:33 25   DR. GOOTNICK'S ATTORNEY DISPUTING THE FACT THAT YOU

                                                              189

12:55:36 1    HAD MADE THESE ALLEGATIONS OF TAX FRAUD AGAINST

12:55:39 2    DR. GOOTNICK?

12:55:40 3    A    YES, BACK IN JANUARY DR. GOOTNICK FILED A

12:55:43 4    DECLARATION AND I RECALL RECEIVING.

12:55:46 5            MS. WONG:  OBJECTION TO ANY TESTIMONY

12:55:47 6    REGARDING THE CONTENTS OF THAT DOCUMENT IS HEARSAY.

12:55:50 7            MR. FONG:  SUSTAINED.  THAT PORTION OF

12:55:52 8    THE ANSWER IS STRICKEN REGARDING THE CONTENTS OF

12:55:55 9    ANY FILING.

12:55:56 10           MR. FONG:  BUT THAT PART OF THE ANSWER

12:55:57 11   WHERE HE DID RECEIVE THE RESPONSE IS IN THE RECORD,

12:56:00 12   RIGHT?  THANK YOU, YOUR HONOR.  OKAY.

12:56:01 13           THE COURT:  AND THE ANSWER WAS YES TO

12:56:03 14   YOUR QUESTION.  I NODDED MY HEAD.  PARDON ME.

12:56:06 15           MR. FONG:  THANK YOU, YOUR HONOR.

12:56:07 16   Q    OKAY.  NOW, AT SOME POINT WAS THE QUALITY

12:56:14 17   INCOME SYSTEMS, INC., BANKRUPTCY DISMISSED?

12:56:17 18   A    YES.

12:56:18 19   Q    AND DO YOU KNOW APPROXIMATELY WHEN THAT WAS

12:56:22 20   DISMISSED?

12:56:22 21   A    I KNOW EXACTLY WHEN IT WAS DISMISSED.  THE

12:56:26 22   HEARING WAS FEBRUARY 21ST, 2006.

12:56:28 23   Q    OKAY.  WOULD THAT BE ABOUT TWO WEEKS BEFORE OR

12:56:31 24   A WEEK OR SO BEFORE SAM FUNG HAD MADE THOSE PHONE

12:56:36 25   CALLS?

                                                            190

12:56:36  1    A    ALMOST TWO WEEKS.

12:56:37  2    Q    OKAY.  NOW, WERE YOU ACTUALLY IN COURT ON

12:56:43  3    FEBRUARY 21ST, 2006 WHEN THE CASE WAS DISMISSED?

12:56:48  4    A    YES, AND AT THAT TIME THE SECOND BANKRUPTCY

12:56:52  5    WAS ALREADY FILED.

12:56:52  6    Q    NOW, WAS DR. GOOTNICK'S ATTORNEY IN COURT ON

12:57:00  7    FEBRUARY 21ST, 2006?

12:57:02  8    A    YES.

12:57:02  9    Q    AND DID THE COURT ORDER A DISMISSAL OF THE

12:57:10 10    CASE?

12:57:10 11    A    YES, AND COMMENTED --

12:57:12 12            MS. WONG:  OBJECTION TO THE COMMENT.

12:57:13 13            THE COURT:  EXCUSE ME.  SUSTAINED.

12:57:15 14    HEARSAY, IT'S STRICKEN.

12:57:16 15    BY MR. FONG:

12:57:18 16    Q    MR. LIGHTER, I'M GOING TO SHOW YOU A DOCUMENT

12:57:20 17    THAT HAS BEEN MARKED AS DEFENSE EXHIBIT RR AS IN

12:57:23 18    RONALD TWICE.

12:57:39 19            MR. O'REILLY:  OBJECTION.  WE WOULD LIKE

12:57:41 20    A COPY OF THE DOCUMENT, PLEASE.

12:57:43 21            MR. FONG:  I'M SORRY.

12:57:43 22            THE COURT:  DO YOU HAVE A COPY NOW?

12:57:45 23            MR. O'REILLY:  YES, WE HAVE A COPY.

12:57:46 24            MR. FONG:  I APOLOGIZE.  I ACTUALLY HAD

12:57:49 25    THOUGHT I HAD GIVEN THAT OVER TO COUNSEL.  I

                                                          191

12:57:50 1     APOLOGIZE.

12:57:51 2                 ANYWAY, I'LL LET COUNSEL HAVE A MOMENT.

12:57:56 3     IT'S ONLY A ONE-PAGE DOCUMENT.  THANK YOU.

12:58:01 4     Q     MR. LIGHTER, DO YOU SEE THE ONE-PAGE DOCUMENT

12:58:04 5     THAT IS IN FRONT OF YOU DEFENDANT'S EXHIBIT RR AS

12:58:06 6     IN RONALD?

12:58:07 7     A     I DO.

12:58:07 8     Q     AND WHAT IS THAT DOCUMENT?

12:58:09 9     A     ORDER DISMISSING CASE.

12:58:11 10    Q     OKAY.  AND IS THIS A DOCUMENT THAT IS TO THE

12:58:18 11    BEST OF YOUR KNOWLEDGE PART OF THE BANKRUPTCY COURT

12:58:21 12    FILE IN THE QUALITY INCOME SYSTEMS, INC., CASE,

12:58:25 13    CASE NUMBER 05-50023?

12:58:28 14    A     YES, BUT IT INVOLVES THE SECOND BANKRUPTCY,

12:58:34 15    TOO.

12:58:34 16    Q     OKAY.  WE'LL GET THERE.  BUT THAT'S WHAT IT

12:58:37 17    IS, RIGHT?

12:58:37 18    A     RIGHT.

12:58:38 19                 MR. FONG:  YOUR HONOR, I WOULD MOVE TO

12:58:40 20    INTRODUCE -- ADMIT INTO EVIDENCE DEFENDANT'S

12:58:43 21    EXHIBIT RR, THE FEBRUARY 22ND OR 21ST -- ACTUALLY

12:58:49 22    IT'S DATED FEBRUARY 22ND, 2006, ORDER OF THE

12:58:53 23    HAWAIIN BANKRUPTCY COURT DISMISSING THE QUALITY

12:58:56 24    INCOME SYSTEMS, INC., BANKRUPTCY.

12:58:59 25                 MS. WONG:  OBJECTION, HEARSAY.

                                                              192

12:59:00  1          MR. FONG:  IT'S JUDICIAL NOTICE, YOUR

12:59:02  2    HONOR.

12:59:02  3          THE COURT:  OKAY.  THANK YOU.  WE'LL TAKE

12:59:04  4    OUR RECESS AT THIS TIME, LADIES AND GENTLEMEN.

12:59:10  5    THANK YOU FOR YOUR PATIENCE.  THE RECORD SHOULD

12:59:11  6    REFLECT IT'S ABOUT THREE MINUTES TO 1:00 O'CLOCK.

12:59:15  7    WE MARCHED ON THROUGH THE NOON HOUR, AND I

12:59:17  8    APPRECIATE YOUR ATTENTION.

12:59:18  9          SO WE'LL RECESS NOW.

12:59:20 10          I ASKED A QUESTION OF THE GROUP EARLIER

12:59:23 11    ABOUT AN 8:00 O'CLOCK START AND IF THAT COMPORTS

12:59:27 12    WITH YOUR SCHEDULE.  I'M HAPPY TO BEGIN OUR

12:59:29 13    PROCEEDINGS TOMORROW AT 8:00 A.M.

12:59:31 14          IS THERE ANYONE WHO HAS DIFFICULTY MAKING

12:59:34 15    AN 8:00 O'CLOCK START?  IF SO, PLEASE RAISE YOUR

12:59:37 16    HAND AND DON'T BE SHY ABOUT IT.  WE CAN START AT

12:59:40 17    8:30 ALSO.

12:59:41 18          I SEE NO HANDS.  SO WE'LL SEE YOU AT 8:00

12:59:45 19    O'CLOCK TOMORROW MORNING.  AND I'M ALSO ADVISED BY

12:59:47 20    STAFF THAT THEY WILL IN ALL LIKELIHOOD HAVE A

12:59:49 21    CARDBOARD BOX WITH SOME CAFFEINATED BEVERAGE IN THE

12:59:54 22    JURY ROOM FOR YOU AND I EXPECT THAT THERE WILL BE

12:59:56 23    OTHER REFRESHMENTS FROM STAFF.

12:59:58 24          AND SO I GIVE YOU THAT FOR YOUR PLANNING

13:00:00 25    PURPOSES TOMORROW MORNING.

                                                    193

13:00:01  1              SO THANK YOU.  WE'LL BE IN RECESS.  THANK

13:00:03  2      YOU.

13:00:42  3              (WHEREUPON, THE PROCEEDINGS IN THIS

13:00:43  4      MATTER WERE HELD OUT OF THE PRESENCE OF THE JURY:)

13:00:43  5              MR. FONG:  MAY MR. LIGHTER STAND DOWN?

13:00:44  6              THE COURT:  YES.  YOU MAY STEP DOWN.  THE

13:00:47  7      RECORD SHOULD REFLECT THAT THE JURY HAS LEFT THE

13:00:50  8      COURTROOM.

13:00:51  9              ALL OTHER PARTIES ARE PRESENT.

13:00:54 10      MR. LIGHTER, CAN YOU LEAVE THOSE DOCUMENTS THERE?

13:00:56 11      THANK YOU.

13:00:56 12              NOW, THERE'S A -- YOU'RE ASKING THAT RR,

13:01:01 13      WHICH IS AN ORDER DISMISSING A CASE IN HAWAII, BE

13:01:07 14      ADMITTED.  THERE'S A HEARSAY OBJECTION I THINK AS

13:01:10 15      TO THAT.

13:01:10 16              YOUR RESPONSE TO THE HEARSAY OBJECTION?

13:01:12 17              MR. FONG:  JUDICIAL NOTICE, YOUR HONOR.

13:01:13 18      I BELIEVE IT'S RULE 201, THE ORDER OF THE COURT IS

13:01:18 19      SOMETHING THAT IS SUBJECT TO THE HEARSAY RULE.

13:01:42 20              THE COURT:  WHAT CODE SECTION DID YOU

13:01:44 21      CITE?  I SEE BOOKS OPENING HERE.

13:01:46 22              MR. FONG:  I BELIEVE IT'S 201.  LET ME

13:01:48 23      CHECK HERE, YOUR HONOR.

13:01:59 24              MR. O'REILLY:  YOUR HONOR, 201 DOES ALLOW

13:02:01 25      THE COURT TO TAKE JUDICIAL NOTICE OF ADJUDICATED

                                                        194

FACTS.

OUR OBJECTION IS THE PIECE OF PAPER.
THERE'S NO DISPUTE THAT THE BANKRUPTCY OF QUALITY
SYSTEMS, INC., WAS DISMISSED ON FEBRUARY 21ST OF
2006.  IT'S NOT AN ISSUE IN THIS CASE.

THE COURT:  SO IT'S A CUMULATIVE
OBJECTION THEN?

MR. O'REILLY:  CORRECT, YOUR HONOR.

MR. FONG:  YOUR HONOR, AS WE ALL KNOW,
THE WRITTEN RULE IS SO MUCH MORE POWERFUL AND HAS
MORE OF A LASTING EFFECT WITH THE READER OR THE
AUDIENCE THAN --

THE COURT:  MAY I SEE THIS DOCUMENT?

MR. O'REILLY:  I'LL BRING IT UP TO YOUR
HONOR.  AND ACTUALLY WE DO HAVE ONE OTHER OBJECTION
WHICH IS RELEVANCE.

THERE WAS ANOTHER ONGOING -- AS
MR. LIGHTER TESTIFIED, THE SUCCESSOR BANKRUPTCY HAD
ALREADY STARTED, SO THE RELEVANCE OF THIS DISMISSAL
ESCAPES ME.

THE COURT:  WHAT IS THE RELEVANCE OF THIS
IF THERE HAS ALREADY BEEN TESTIMONY TO THIS AND THE
FACT THAT THERE IS THE OTHER, THE SECOND BANKRUPTCY
THAT PLAYS IN THIS CASE?

MR. FONG:  YOUR HONOR, THE RELEVANCE IS

195

13:03:15 1    THAT THIS IS THE MAIN BANKRUPTCY CASE AND

13:03:18 2    MR. LIGHTER, OF COURSE, OUR CONTENTION IS THAT IT

13:03:24 3    MAKES ABSOLUTELY NO SENSE FOR MR. LIGHTER TO

13:03:26 4    CONTINUE TO THREATEN IN THE BANKRUPTCY CASE AS SAM

13:03:29 5    FUNG WOULD HAVE US BELIEVE, THREATEN TO MAKE

13:03:32 6    FURTHER DISCLOSURES AGAINST OR TO MAKE DISCLOSURES

13:03:38 7    OF TAX FRAUD AGAINST DR. IRWIN GOOTNICK WHEN, IN

13:03:41 8    FACT, IN THE MAIN CASE, THE BANKRUPTCY CASE, IT WAS

13:03:44 9    ALREADY DISMISSED TWO WEEKS BEFORE THE PHONE CALLS

13:03:46 10   WERE MADE.

13:03:47 11            THE COURT:  ISN'T THAT IN EVIDENCE

13:03:49 12   ALREADY, THAT FACT?

13:03:54 13            MR. FONG:  YOUR HONOR, YES, IT IS.

13:03:56 14   AGAIN, IT IS A ONE-PAGE DOCUMENT.  I DON'T SEE

13:03:59 15   WHY -- AND FIRST OF ALL, YOUR HONOR, THIS IS NOT

13:04:01 16   SUBJECT TO THE HEARSAY EXCEPTION.

13:04:08 17            SO THE STARTING POINT IS WHY IS THE

13:04:10 18   GOVERNMENT OBJECTING TO THIS PARTICULAR DOCUMENT ON

13:04:11 19   THE BASIS OF HEARSAY?

13:04:12 20            A COURT DOCUMENT THAT SIMPLY PROVIDES

13:04:18 21   NOTICE TO THE READERS IS NOT A HEARSAY DOCUMENT.

13:04:20 22            THE COURT:  LET ME JUST ASK THE

13:04:21 23   GOVERNMENT, IS THERE ANY ARGUMENT DOUBTING THE

13:04:24 24   AUTHENTICITY?  I RECOGNIZE THAT THIS IS A

13:04:28 25   PHOTOCOPY.

                                                          196

13:04:29 1         MR. O'REILLY:  NO, YOUR HONOR.  AS I SAID

13:04:30 2    EARLIER, IT IS NOT DISPUTED.  IT'S CUMULATIVE

13:04:34 3    EVIDENCE, AND IT'S DESIGNED FOR THE PURPOSE TO

13:04:37 4    MISLEAD THE JURY.  THEY WANT TO ARGUE THAT, OH,

13:04:39 5    LIGHTER WOULD HAVE NEVER HAVE DONE THIS BECAUSE

13:04:41 6    THIS WAS DISMISSED.

13:04:44 7         WELL, THAT COMPLETELY AVOIDS THE FACT

13:04:47 8    THAT THE GOOTNICK CHARITABLE TRUST BANKRUPTCY, AS

13:04:50 9    THE DEFENDANT ALREADY TESTIFIED TO, HAD ALREADY

13:04:52 10   STARTED.  IT WAS NOT, IN FACT, TO HELP THE JURY.

13:04:54 11   IT WAS TO, IN FACT, CONFUSE THEM.

13:04:57 12        THE COURT:  THANK YOU.  SO I DO RECOGNIZE

13:04:58 13   THAT THERE COULD BE SOME CONFUSION IF THIS WAS

13:05:02 14   ADMITTED REGARDING THE TWO BANKRUPTCIES.

13:05:03 15        I AM GOING TO ALLOW YOU -- I WILL ALLOW

13:05:05 16   IT AND THEN COUNSEL CAN -- YOU CAN ARGUE THIS AS

13:05:09 17   YOU NEED.  SO I WILL, OVER THE GOVERNMENT'S

13:05:11 18   OBJECTION, ADMIT RR.

13:05:13 19        NOW, LET ME -- I WANT TO AGAIN ASK YOUR

13:05:20 20   BEST ESTIMATE.  WHEN I LAST ASKED IT WAS ABOUT

13:05:24 21   15 MINUTES -- YOU TOLD ME YOU HAD ABOUT 30 MINUTES.

13:05:27 22   DO YOU HAVE ABOUT 15 MINUTES LEFT IN YOUR DIRECT

13:05:27 23   EXAMINATION?

13:05:27 24

13:05:27 25        (WHEREUPON, DEFENDANT'S EXHIBIT RR, HAVING

                                                    197

13:05:27 1          BEEN PREVIOUSLY MARKED FOR IDENTIFICATION,

13:05:30 2          WAS ADMITTED INTO EVIDENCE.)

13:05:30 3          MR. FONG:  I SUSPECT SO.  I WOULD SAY AT

13:05:32 4  THE VERY, VERY MOST ON THE OUTSIDE NO MORE THAN

13:05:35 5  30 MINUTES, AND, AGAIN, THIS IS MY BEST ESTIMATE

13:05:38 6  AND --

13:05:39 7          THE COURT:  I UNDERSTAND.

13:05:40 8          MR. FONG:  BUT I HIGHLY DOUBT THAT IT

13:05:42 9  WILL BE MORE THAN 30 MINUTES.

13:05:44 10         THE COURT:  SO WE'RE GOING TO START AT

13:05:45 11 8:00 A.M. TOMORROW MORNING, 8:00 A.M. TOMORROW

13:05:49 12 MORNING HERE.

13:05:55 13         I ANTICIPATE THAT WE'LL BE ABLE TO ARGUE

13:05:57 14 AND INSTRUCT TOMORROW AFTERNOON, THAT'S MY GUESS,

13:06:00 15 TOMORROW AFTERNOON, AND IT MAY BE THAT WE WILL USE

13:06:02 16 SOME TIME FOLLOWING THE CLOSE OF EVIDENCE, WE HAVE

13:06:07 17 SOME HOUSEKEEPING THINGS TO DO.

13:06:09 18         THERE'S A RULE 29 MOTION THAT IS WITH THE

13:06:11 19 COURT NOW, AND I'LL WAIT UNTIL THE CLOSE OF

13:06:13 20 EVIDENCE FOR THAT AND YOU CAN DISCUSS THAT.

13:06:15 21         DEPENDING ON HOW THAT COMES OUT, THEN WE

13:06:17 22 NEED TO DISCUSS OUR FINAL JURY INSTRUCTIONS AS TO

13:06:21 23 THOSE.

13:06:21 24         I THINK I SHARED WITH YOU THIS MORNING

13:06:23 25 OFF THE RECORD SOME OBSERVATIONS THAT I MADE ABOUT

                                                        198

13:06:27 1    THE JURY INSTRUCTIONS, AND I THINK BOTH COUNSEL

13:06:29 2    TOOK NOTE OF THOSE.

13:06:33 3             MR. O'REILLY:  ACTUALLY, YOUR HONOR, IT

13:06:35 4    WAS A FAIRLY ABBREVIATED DISCUSSION.  I MUST

13:06:37 5    CONFESS THAT I DID NOT.

13:06:39 6             THE COURT:  LET ME REPEAT WHAT I -- YOU

13:06:42 7    KNOW WHAT I'M GOING TO DO IS I'M GOING TO MAKE A

13:06:44 8    PHOTOCOPY FOR YOU AND IT'S PROBABLY EASIER TO DO

13:06:48 9    THAT AND I'LL PROVIDE THAT FOR YOU RIGHT NOW.

13:06:50 10            THESE ARE JUST NOTES OF ABOUT FOUR OR

13:06:53 11   FIVE MINUTES THAT I FOUND AND I E-MAILED THIS TO

13:06:57 12   MYSELF LAST NIGHT.  SO I'LL GIVE YOU A COPY OF

13:07:00 13   THIS, AND I THINK THAT MIGHT GIVE YOU SOME

13:07:02 14   REFERENCE.

13:07:03 15            MR. FONG:  THANK YOU.

13:07:04 16            MR. O'REILLY:  ONE OTHER THING I WOULD

13:07:05 17   LIKE SOME GUIDANCE ON IS FOR CLOSING, HOW LONG, YOU

13:07:14 18   KNOW, CLOSING --

13:07:16 19            THE COURT:  HOW MANY DAYS WOULD YOU LIKE?

13:07:18 20            MR. O'REILLY:  I WOULD LIKE NO MORE

13:07:20 21   THAN -- I'M EXPECTED TO BE 20, 25 MINUTES.

13:07:23 22            THE COURT:  I'M GOING TO ASK YOUR

13:07:24 23   ESTIMATES ABOUT THAT.

13:07:25 24            DO YOU KNOW WHAT YOUR ESTIMATE WOULD BE

13:07:27 25   FOR CLOSING?

199

13:07:27 1          MR. FONG:  YOUR HONOR, I WOULD SAY

13:07:30 2    SAFELY, BECAUSE IF I OVERESTIMATE, I DON'T THINK

13:07:33 3    ANYONE IS GOING TO FAULT ME FOR OVERESTIMATING.  I

13:07:36 4    WOULD SAY PROBABLY CLOSER TO AN HOUR.  I DO NOT SEE

13:07:41 5    A 20 MINUTE CLOSING FROM THE DEFENSE.

13:07:45 6          I'M SORRY.  I DO NOT SEE A 20-MINUTE

13:07:48 7    CLOSING FOR THE DEFENSE.  I SUSPECT, YOUR HONOR, IF

13:07:51 8    ANYTHING, IT'S GOING TO BE CLOSER TO AN HOUR.

13:07:53 9          THE COURT:  MY THOUGHT INITIALLY WAS AND

13:07:57 10   IT'S PROBABLY WOULD GENERATE A 45-MINUTE CLOSING OR

13:08:02 11   SOMETHING LIKE THAT.  THAT WAS JUST MY BEST

13:08:05 12   ESTIMATE.

13:08:09 13         MR. O'REILLY:  WHAT WE'LL TRY TO DO IS

13:08:11 14   BREAK IT UP ON TWO-THIRDS/ONE-THIRD, AND I ASSUME

13:08:15 15   45 MINUTES IS OUR CUMULATIVE OR OUR TOTAL.

13:08:17 16         THE COURT:  RIGHT, RIGHT, RIGHT.

13:08:19 17         SO THAT'S KIND OF AN ESTIMATE FROM MY

13:08:25 18   PART.  WHEN I LOOK AT THIS I THINK 45 MINUTES IS

13:08:28 19   ABOUT RIGHT.  AND NOW THAT PROBABLY GETS CLOSE TO

13:08:32 20   50 MINUTES OR 55 MINUTES BUT IF IT GROWS TO AN

13:08:39 21   HOUR, WELL, OKAY.  BUT THAT'S KIND OF MY ESTIMATE

13:08:41 22   OF WHERE YOU WOULD BE.  OF COURSE, I DON'T WANT TO

13:08:43 23   UNNECESSARILY LIMIT EITHER SIDE FROM ARGUING WHAT

13:08:48 24   THEY FEEL NEEDS TO BE PRESENTED.

13:08:51 25         AND I THINK YOU NOW HAVE MY NOTES TO

                                                          200

13:08:58  1    MYSELF AND OBSERVATIONS.

13:09:00  2          SO YOU CAN LOOK AT THOSE AND DIGEST

13:09:02  3    THOSE, AND WE CAN TALK ABOUT THOSE TOMORROW

13:09:06  4    MORNING.

13:09:06  5          THEY'RE COMING AT 8:00 O'CLOCK.

13:09:08  6          MR. O'REILLY:  YES, YOUR HONOR.

13:09:09  7          MR. FONG:  YES, YOUR HONOR.

13:09:10  8          THE COURT:  WE'LL BE HERE AND EXPECT SOME

13:09:12  9    OF THOSE REFRESHMENTS WILL BE HERE FOR YOU AS WELL.

13:09:15 10          ANYTHING ELSE?

13:09:16 11          MR. O'REILLY:  NOTHING FURTHER.

13:09:17 12          MR. FONG:  NO.

13:09:18 13          THE COURT:  WE'LL SEE YOU TOMORROW

13:09:19 14    MORNING.  THANK YOU.

13:09:19 15          (WHEREUPON, THE EVENING RECESS WAS

13:09:19 16    TAKEN.)

13:09:20 17

         18

         19

         20

         21

         22

         23

         24

         25

                                                          201

1

2

3

<u>CERTIFICATE OF REPORTER</u>

5

6

7

8         I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13         THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23                    /S/

                    _____
24                  IRENE RODRIGUEZ, CSR, CRR
                    CERTIFICATE NUMBER 8074
25
                    DATED:  DECEMBER 19, 2011

                                                    202